UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :      **SEALED INDICTMENT**

                                    :
            - v. -                  :      19 Cr. ___

                                    :

NEIL COLE,

            Defendant.              **19 CRIM    869**

                                    :

- - - - - - - - - - - - - - - - - x

### COUNT ONE
**(Conspiracy to Commit Securities Fraud, to Make False
Filings with the SEC, and to Improperly Influence
the Conduct of Audits)**

The Grand Jury charges:

### Relevant Individuals and Entities

1.    At all times relevant to this Indictment, Iconix Brand
Group, Inc. ("Iconix") was a publicly traded brand management
company headquartered in New York, New York.  Iconix's
securities traded under the symbol "ICON" on the NASDAQ.  Iconix
was in the business of acquiring various brands, including
clothing and fashion brands, and then licensing those brands to
retailers, wholesalers, and suppliers, who, in turn, produced
and sold clothing and other products bearing the brand names.

2.    At all times relevant to this Indictment, NEIL COLE,
the defendant, was the Chief Executive Officer ("CEO") of
Iconix.

3.    At all times relevant to this Indictment, Seth Horowitz, a co-conspirator not named as a defendant herein, was the Chief Operating Officer ("COO") of Iconix.

### Iconix's Joint Ventures

4.    Iconix, in certain instances, utilized joint ventures ("JVs") to profit from its brands in foreign markets. With respect to these JVs, Iconix transferred ownership of a trademark or brand to the JV while maintaining a 50 percent ownership interest in the JV itself. The other party involved in the JV purchased a 50 percent interest in the JV from Iconix. The purchase price for a 50 percent interest in the JV was generally set at the valuation of half of the future cash streams from exploitation of the trademarks at issue in the relevant territory. As part of the JV agreements, each JV partner was generally entitled to 50 percent of the JV's licensing revenue.

5.    When it entered into a JV, Iconix recognized as revenue the buy-in purchase price paid by the JV partner, less Iconix's cost basis in the trademarks. At all times relevant to this Indictment, the buy-in purchase price that Iconix received from its JV partners comprised a significant portion of Iconix's earnings.

2

## Public Company Reporting Requirements

6. At all times relevant to this Indictment, Iconix was required to comply with the federal securities laws, which are designed to ensure that a publicly traded company's financial information is accurately recorded and disclosed to the investing public. Specifically, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, Iconix was required to: (a) file with the United States Securities and Exchange Commission (the "SEC") annual financial statements (on SEC Form 10-K); (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records and accounts that accurately and fairly reflected Iconix's business transactions.

7. At all times relevant to this Indictment, NEIL COLE, the defendant, signed Iconix's quarterly and annual financial reports. Additionally, Iconix filed with each of its quarterly and annual financial reports certifications entitled "Certification of Periodic Report Under Section 302 of the Sarbanes-Oxley Act of 2002" in which COLE certified, in part:

1. I have reviewed this [quarterly or annual] report [] of Iconix Brand Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

In these certifications, COLE also certified that he had disclosed to Iconix's outside auditor (the "Audit Firm") and the Audit Committee of its Board of Directors (or persons performing the equivalent functions): "Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

8. In conjunction with each of its quarterly and annual financial reports, Iconix included a second set of certifications entitled "Certification Pursuant to 18 U.S.C. Section 1350 As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002," in which NEIL COLE, the defendant, further certified, in part, that the quarterly or annual financial report:

[F]ully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and . . . the information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

9. Federal securities law further required that Iconix's annual financial statements be audited by independent certified public accountants.

4

10. Among the most critical financial metrics disclosed in Iconix's public filings with the SEC were Iconix's quarterly and annual revenue and earnings per share ("EPS"). EPS is generally derived from calculating revenue, less expenses, and dividing that amount by the number of outstanding shares of common stock. In the press releases it issued in connection with its periodic filings, Iconix regularly touted increases in its revenue and non-GAAP diluted EPS, an EPS metric that excluded certain gains and charges not relevant here. Iconix's press releases, which were typically issued shortly before the company's quarterly filings, included Iconix's actual revenue and EPS for the quarter and year-to-date, as reflected in Iconix's SEC filings.

11. At all times relevant to this Indictment, at the end of each reporting period, in connection with the preparation of Iconix's quarterly and annual financial statements, NEIL COLE, the defendant, signed and caused to be submitted to the Audit Firm a management representation letter, in which COLE represented, among other things:

a. "[t]here are no material transactions that have not been properly recorded in the accounting records underlying the consolidated financial statements," and that "[j]oint ventures or other participations" "have been properly recorded or disclosed in the consolidated financial statements;"

5

b. COLE was "not aware of any linked or barter transactions, including transactions entered into under separate agreements where one of the arrangements is contingent upon execution of another arrangements, except for agreements where such linkage, barter, or contingent nature is explicitly stated in the contract terms;" and

c. COLE was "not aware of any concessions for additional free or discounted services or products under any license arrangements," nor of "any plans to provide more favorable terms than were originally negotiated, especially related to arrangements known internally as fixed term arrangements, that have not been properly accounted for."

### Iconix Touted Its Revenue and EPS Growth and the Fact That It Had Met Revenue and EPS Analyst Consensus

12. Iconix executives, including NEIL COLE, the defendant, publicly identified revenue and EPS as the principal metrics demonstrating Iconix's growth. They also touted Iconix's consistent record of revenue and earnings growth and of meeting or exceeding Wall Street analyst consensus with respect to these metrics. The following are excerpts of Iconix's press releases accompanying its quarterly filings in late 2013 and 2014:

6

| February 20, 2014 Press Release | |
|---|---|
| Headline | *Iconix Brand Group Reports Record Revenue And Earnings For The Fourth Quarter And Full Year 2013* |
| Q4 2013 Results | • Record Q4 revenue of $105.3 million, a 24% increase over prior year quarter<br>• Record 2013 revenue of $432.6 million, a 22% increase over prior year<br>• Record Q4 non-GAAP diluted EPS of $0.54, a 32% increase over prior year quarter<br>• Record 2013 non-GAAP diluted EPS of $2.39, a 41% increase over prior year |

| July 29, 2014 Press Release | |
|---|---|
| Headline | *Iconix Brand Group Reports Record Revenue And Earnings For The Second Quarter 2014* |
| Q2 2014 Results | • Record Q2 revenue of $118.9 million and non-GAAP diluted EPS of $0.75<br>• Non-GAAP diluted EPS for the second quarter of 2014 increased 4% to $0.75 compared to $0.72 in the prior year quarter |

| October 28, 2014 Press Release | |
|---|---|
| Headline | *Iconix Brand Group Reports Record Revenue And Earnings For The Third Quarter 2014* |
| Q3 2014 Results | • Record Q3 revenue of $113.8 million, a 6% increase over prior year quarter<br>• Record Q3 diluted non-GAAP EPS of $0.73, a 23% increase over prior year quarter |

| February 26, 2015 Press Release | |
|---|---|
| Headline | *Iconix Brand Group Reports Financial Results For The Fourth Quarter And Full Year 2014* |
| Full Year 2014 Results | • 2014 revenue of $461.2 million, a 7% increase over prior year<br>• Q4 total revenue of $112.4 million, a 7% increase over prior year quarter<br>• 2014 diluted non GAAP EPS of $2.78, a 16% increase over prior year<br>• Q4 diluted non GAAP EPS of $0.56, a 4% increase over prior year |

These press releases were filed with the SEC as exhibits to a Form 8-K, a report companies must file with the SEC to inform the investing public about major corporate events or announcements.

### Overview of the Accounting Fraud Scheme

13.  NEIL COLE, the defendant, Seth Horowitz, and others engaged in a scheme to falsely inflate Iconix's reported revenue and EPS by orchestrating a series of "round trip" transactions in which COLE and Horowitz induced a JV partner, a Hong Kong-based international apparel licensing company ("Company-1"), to pay inflated buy-in purchase prices for JV interests, with the understanding that Iconix would then reimburse Company-1 for the overpayments.  COLE and Horowitz executed the scheme for the purpose of enabling Iconix to report fraudulently inflated revenue and EPS figures based on the inflated buy-in purchase prices it obtained from Company-1.

14.  Specifically, NEIL COLE, the defendant, arranged for Iconix to enter into three JVs with Company-1 that included

8

inflated buy-in purchase prices from Company-1: (1) the Southeast Asia JV, which closed on or about October 1, 2013 ("SEA-1"), (2) the Southeast Asia first amendment, which closed on or about June 30, 2014 ("SEA-2"), and (3) the Southeast Asia second amendment, which closed on or about September 17, 2014 ("SEA-3") (collectively, the "SEA JVs"). Each of the SEA JVs involved a fraudulent "round trip" transaction, lacking in economic substance, in which Company-1 paid an artificially inflated buy-in purchase price for its interest in the JV, in exchange for COLE's agreement that Iconix would give back the inflated portion of the purchase price to Company-1, through sham payments for "consulting" or "marketing" work or, in the case of SEA-3, through relief from an existing financial obligation.

15.    Through the scheme, NEIL COLE, the defendant, and Seth Horowitz caused Iconix to report, among other things, fraudulently inflated revenue and EPS figures to the investing public.  COLE and Horowitz did so, in part, to ensure that the reported figures met analyst consensus and to fraudulently convey the impression to the investing public that Iconix was

growing quarter after quarter, as COLE had touted to the investing public.

## SEA-1

16. In or about mid-2013, NEIL COLE, the defendant, and representatives of Company-1 negotiated SEA-1, a JV between Iconix and Company-1, in which Iconix sold to Company-1 the right to manufacture and sell any of approximately 25 Iconix-owned trademarks in approximately ten countries in Southeast Asia.

17. During negotiations, in or about the summer of 2013, NEIL COLE, the defendant, and representatives of Company-1 reached a side agreement that Company-1 would increase the consideration it paid to Iconix by approximately $2 million, from approximately $10 million to $12 million, in exchange for Iconix's agreement to round trip $2 million back to Company-1. As COLE well understood, Iconix would recognize revenue in an amount equal to the inflated consideration paid by Company-1 to Iconix, $12 million, less Iconix's cost basis in the underlying assets.

18. To conceal the fact that the approximately $2 million payment that Iconix agreed to make to Company-1 was a give-back to compensate Company-1 for overpaying for its interest in SEA-1, NEIL COLE, the defendant, and a representative of Company-1 agreed to a written "Consultancy Agreement," which characterized

Iconix's $2 million payment to Company-1 purportedly as compensation for "consulting" work that Company-1 had performed. In truth and in fact, and as COLE and a representative of Company-1 had agreed, Iconix transferred $2 million to Company-1 to reimburse Company-1 for its overpayment for its interest in SEA-1, not to compensate Company-1 for consulting work it had performed.

19.  NEIL COLE, the defendant, hid from Iconix's lawyers and the Audit Firm that COLE had arranged with Company-1 for Company-1 to increase its buy-in purchase price for SEA-1 in order for COLE to inflate Iconix's revenue and that the Consultancy Agreement was a pretextual means to reimburse Company-1 for the overpayment.

20.  Iconix's 10-K for year-end 2013, which NEIL COLE, the defendant, signed, and which Iconix filed with the SEC on or about February 27, 2014, disclosed that Iconix and Company-1 had entered into SEA-1 and that Company-1 "had purchased a 50% interest in [SEA-1] for $12 million." Iconix did not disclose that the $12 million purchase price was inflated by $2 million and that Iconix agreed to pay a $2 million "consultancy" as a give-back to Company-1.

### SEA-2

21.  In or about 2014, NEIL COLE, the defendant, again sought out Company-1 as a partner in a JV that could help Iconix

11

increase its revenue and EPS, including through the fraudulently inflated buy-in purchase price for Company-1's interest in the JV.  COLE and Seth Horowitz negotiated with representatives of Company-1 an amendment to SEA-1, referred to herein as SEA-2, which involved the sale to Company-1 of an interest in certain Iconix trademarks in Korea and various countries in Europe.

22.  During the SEA-2 negotiations, NEIL COLE, the defendant, reached a secret, undocumented agreement with representatives of Company-1 that Company-1 would inflate the buy-in purchase price to be paid to Iconix for Company-1's interest in the JV by $5 million, from approximately $10.9 million to approximately $15.9 million, in exchange for Iconix round-tripping approximately $5 million back to Company-1 in the form of payments purportedly for marketing.  COLE, with the assistance of Seth Horowitz, structured the transaction in this fashion in order to falsely inflate the revenue that Iconix would recognize from SEA-2 by approximately $5 million.

23.  NEIL COLE, the defendant, sought to close SEA-2 in the second quarter of 2014 so that Iconix could recognize revenue during that quarter and meet analyst consensus for revenue and EPS.  On or about June 30, 2014, the last day of the second quarter of 2014, Iconix and Company-1 entered into a purchase agreement, which was styled as an amendment to SEA-1 and was signed by COLE (the "SEA-2 Purchase Agreement").  The SEA-2

12

Purchase Agreement provided that Company-1 would pay a purchase price to Iconix of approximately $15,917,500 for Company-1's interest in the JV.  The secret agreement between COLE and Company-1 that Iconix would send back to Company-1 approximately $5 million, purportedly for marketing expenses, was undocumented.

24.   In or about June 2014, Iconix recognized revenue from SEA-2 in the amount of approximately $13.6 million, reflecting the purchase price of $15,917,500, less Iconix's cost basis in the trademarks contributed to the JV.  The undisclosed and undocumented commitment that NEIL COLE, the defendant, made for Iconix to reimburse Company-1 for its $5 million overpayment, purportedly as compensation for marketing expenses incurred by Company-1, was not accounted for in Iconix's books at the time SEA-2 was entered.

25.   Nonetheless, consistent with his undisclosed side agreement with representatives of Company-1, in or about November and December 2014, NEIL COLE, the defendant, authorized wire transfers from Iconix to Company-1 totaling approximately $5 million.  As COLE knew, these transfers from Iconix to Company-1 were not consideration for marketing work Company-1

had performed, but instead constituted a reimbursement to Company-1 for its $5 million overpayment.

26. NEIL COLE, the defendant, hid from Iconix's lawyers and the Audit Firm that COLE had reached an understanding with Company-1 to increase the consideration Company-1 paid Iconix by $5 million in exchange for COLE's agreement for Iconix to round-trip the $5 million back to Company-1.

27. Iconix's Form 10-Q for the second quarter of 2014, which NEIL COLE, the defendant, signed, and which Iconix filed with the SEC on or about August 6, 2014, disclosed, with respect to SEA-2, that Company-1 "agreed to pay [Iconix] $15.9 million" and "[a]s a result of this transaction [Iconix] recorded a gain of $13.6 million in the Current Quarter, which is included in licensing and other revenue in the unaudited condensed consolidated income statement." The Form 10-Q failed to disclose that Iconix's revenue was inflated by approximately $5 million based upon Company-1's overpayment and that Iconix had secretly agreed to reimburse Company-1 for this overpayment. Nor was Iconix's commitment to transfer $5 million to Company-1 as purported consideration for marketing services disclosed or accounted for at the time SEA-2 was entered.

## SEA-3

28. In or about the late summer of 2014, NEIL COLE, the defendant, and Seth Horowitz negotiated with representatives of

14

Company-1 a second amendment to SEA-1, referred to herein as
SEA-3, which involved the sale to Company-1 of an interest in
certain Iconix brands in China, Hong Kong, Macau, and Taiwan.
As with SEA-2, COLE orchestrated SEA-3 as a fraudulent means of
inflating Iconix's revenue and EPS.

29.  During the SEA-3 negotiations, NEIL COLE, the
defendant, and Seth Horowitz reached a secret agreement with
representatives of Company-1 that Company-1 would artificially
inflate the buy-in purchase price it paid to Iconix by $6
million, from approximately $15.5 million to approximately $21.5
million, in exchange for Iconix's commitment to reimburse
Company-1 the $6 million overpayment at a later time.  COLE and
Horowitz reached this understanding in order to falsely inflate
the revenue that Iconix would recognize from SEA-3 by
approximately $6 million.

30.  In or about the summer and fall of 2014, while Iconix
and Company-1 were negotiating SEA-3, NEIL COLE, the defendant,
Seth Horowitz, and representatives of Company-1 explored
potential ways in which Iconix could round-trip back to Company-
1 its $6 million purchase price overpayment.  They discussed,
among other things, that an affiliate of Company-1 ("Affiliate-
1") owed Iconix money in connection with an unrelated licensing
agreement for the children's line of a well-known clothing brand
("Brand-1") that Iconix owned and licensed to Affiliate-1 in

15

exchange for guaranteed royalty payments. By in or about the summer of 2014, Affiliate-1 was struggling to pay the guaranteed minimum royalties it owed to Iconix to license Brand-1, and Affiliate-1 wanted to be released from its payment obligations to Iconix.

31. On or about August 13 and 14, 2014, NEIL COLE, the defendant, and Seth Horowitz exchanged emails about the possibility of terminating the Brand-1 license and releasing Affiliate-1 of its royalty obligations--which had nothing to do with the SEA JVs--as a fraudulent means of giving back money to Company-1 for its JV overpayments. In the email exchange, Horowitz told COLE, in relevant part: "Spent a lot of time . . . on [the Brand-1] model today. Believe we should not go forward with taking this back." COLE responded, in relevant part: "lets discuss tomorrow. Will be tough to do China [SEA-3] without [Brand-1] . . . ." For discussions with Iconix, representatives of Company-1 prepared an internal Company-1 document reflecting the SEA-2 and SEA-3 "Overpay[ments]" and "offset[s]," including Iconix's forgiving the Brand-1 royalty payments owed by Affiliate-1.

32. NEIL COLE, the defendant, and Seth Horowitz sought to close SEA-3 during the third quarter of 2014 so that Iconix could recognize revenue from the transaction during that quarter and meet analyst consensus for revenue and EPS. On or about

16

September 17, 2014, Iconix and Company-1 entered into a purchase agreement, which was styled as the second amendment to SEA-1 and signed by COLE (the "SEA-3 Purchase Agreement"). The SEA-3 Purchase Agreement provided, in relevant part, that Company-1 would pay a purchase price of approximately $21.5 million for its interest in the JV. The secret agreement between COLE and Company-1 that Iconix would give back approximately $6 million to Company-1 was undocumented.

33. In or about September 2014, Iconix recognized revenue from SEA-3 in the amount of approximately $18.7 million, reflecting the purchase price of approximately $21.5 million, less Iconix's cost basis in the brands contributed to the JV. In truth and in fact, as NEIL COLE, the defendant, well knew, SEA-3 resulted in the false inflation of Iconix's revenue by approximately $6 million. The undisclosed and undocumented commitment that NEIL COLE, the defendant, made for Iconix to reimburse Company-1 for its $6 million overpayment was not accounted for in Iconix's books at the time SEA-3 was entered.

34. NEIL COLE, the defendant, hid from Iconix's lawyers and the Audit Firm that COLE had reached an understanding with Company-1 to increase the consideration Company-1 paid to Iconix by approximately $6 million in exchange for COLE's agreement for

17

Iconix to round-trip the $6 million back to Company-1 at a later time.

35.  Iconix's Form 10-Q for the third quarter of 2014, which NEIL COLE, the defendant, signed, and which Iconix filed with the SEC on or about November 7, 2014, disclosed, with respect to SEA-3, that Company-1 "agreed to pay [Iconix] $21.5 million" and "[a]s a result of this transaction [Iconix] recorded an $18.7 million gain, which is included in licensing and other revenue in the unaudited condensed consolidated income statement for the Current Quarter."  The Form 10-Q did not disclose that the purchase prices for SEA-2 and SEA-3 had been inflated by $5 million and $6 million, respectively, and that COLE had agreed that Iconix would reimburse Company-1 for those overpayments.

## The Fraudulent SEA-2 Give-Back

36.  With respect to SEA-2, NEIL COLE, the defendant, reached a secret understanding with Company-1 that Iconix would pay invoices submitted by Company-1, which purported to be for marketing services, as a pretextual means of giving back $5 million to Company-1 to reimburse Company-1 for inflating its SEA-2 purchase price.

37.  On or about September 26, 2014, a representative of Company-1 submitted to Seth Horowitz, among others, three sham invoices for purported "marketing costs," with large, round-

18

dollar figures totaling approximately $5 million, including for brands that did not relate to SEA-2. Shortly thereafter, NEIL COLE, the defendant, rejected the sham invoices, advising representatives from Company-1, in substance, that Company-1 needed to send more realistic-looking invoices. In response, Company-1 revised the sham invoices in various ways, including, for example, by eliminating the large, round-dollar figures, to make them look more credible and less obviously fraudulent, and then re-submitted them to Iconix for payment. Thereafter, in or about November and December 2014, COLE authorized payments to Company-1 totaling approximately $5 million, purportedly as payment for the "revised" marketing invoices that Company-1 had submitted to Iconix. In truth and in fact, as COLE well knew, the invoices were a sham, and the payments he authorized were not in consideration for marketing services, but, in fact, constituted the promised reimbursement to Company-1 for its inflated purchase price payment for SEA-2.

## Impact of the Fraudulent Round Trips

38. By virtue of the fraudulent scheme orchestrated by NEIL COLE, the defendant, along with Seth Horowitz, Iconix reported fraudulently inflated revenue and non-GAAP diluted EPS, as follows:

19

| Reporting Period | Reported Revenue | Actual Revenue | Fraudulent Revenue | % Alteration to Reported Revenue vs. Actual Revenue |
|---|---|---|---|---|
| Q4 2013 | $105.3 million | $103.3 million | $2 million | 1.9% |
| Q2 2014 | $118.9 million | $113.9 million | $5 million | 4.4% |
| Q3 2014 | $113.8 million | $107.8 million | $6 million | 5.6% |
| Full Year 2014 | 461.2 million | $450.2 million | $11 million | 2.4% |

| Reporting Period | Reported Non-GAAP Diluted EPS | Actual Non-GAAP Diluted EPS | Fraudulent Non-GAAP Diluted EPS | % Alteration to Reported vs. Actual Non-GAAP Diluted EPS |
|---|---|---|---|---|
| Q2 2014 | $0.75 | $0.69 | $0.06 | 8.7% |
| Q3 2014 | $0.73 | $0.65 | $0.08 | 12.3% |
| Full Year 2014 | $2.78 | $2.70 | $0.08 | 3.0% |

39. By virtue of the fraudulent scheme, Iconix reported revenue and EPS within analyst consensus. Absent the false inflation of revenue from SEA-2 and SEA-3, Iconix would have missed its quarterly revenue consensus in the second and third quarters of 2014 and its annual revenue consensus for the full year 2014. Absent the false inflation of EPS from SEA-2 and SEA-3, Iconix would have missed its annual non-GAAP diluted EPS consensus for the full year 2014.

## Statutory Allegations

40. From at least in or about 2013 through at least in or about 2015, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, and others known and unknown,

20

including Seth Horowitz, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; making false and misleading statements of material fact in applications, reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-1, 240.13a-11, 240.13a-13, and 244.100(b); and improperly influencing the conduct of audits, in violation of Title 15, United States Code, Sections 7202, 7242, and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

## Objects of the Conspiracy

41. It was a part and an object of the conspiracy that NEIL COLE, the defendant, and others known and unknown, including Seth Horowitz, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities,

manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons; and (c) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

42.   It was a further part and an object of the conspiracy that NEIL COLE, the defendant, and others known and unknown, including Seth Horowitz, willfully and knowingly would and did make and cause to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and  244.100(b).

43.   It was a further part and an object of the conspiracy that NEIL COLE, the defendant, others known and unknown, including Seth Horowitz, willfully and knowingly would and did

22

take actions to fraudulently influence, coerce, manipulate, and mislead independent public and certified accountants engaged in the performance of audits of the financial statements of an issuer for the purpose of rendering such financial statements materially misleading, and did so by, as officers of a company issuing publicly traded securities, (a) making, and causing to be made, materially false or misleading statements to an accountant, and (b) omitting to state, and causing another person to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant; with these false statements and omissions being in connection with audits, reviews and examinations of required financial statements of the company and the preparation and filing of documents and reports required to be filed with the SEC, in violation of Title 15, United States Code, Sections 7202, 7242, and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

## Overt Acts

44. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

23

a. On or about October 1, 2013, NEIL COLE, the defendant, signed the Consultancy Agreement.

b. On or about February 27, 2014, COLE signed Iconix's Form 10-K for 2013.

c. On or about June 30, 2014, COLE signed the SEA-2 Purchase Agreement.

d. On or about August 6, 2014, COLE signed Iconix's Form 10-Q for the second quarter of 2014.

e. On or about August 14, 2014, COLE sent an email to Seth Horowitz stating, in part, that it "[w]ill be tough to do China without [Brand-1] . . . ."

f. On or about September 5, 2014, Horowitz sent an email to his assistant requesting that she print for a meeting a summary of the SEA-3 deal terms, SEA-2 marketing expenses, and termination of the Brand-1 license.

g. On or about September 17, 2014, COLE signed the SEA-3 Purchase Agreement.

h. On or about November 7, 2014, COLE signed Iconix's Form 10-Q for the third quarter of 2014.

i. On or about November 25, 2014, COLE approved by email an approximately $1.94 million wire transfer to Company-1 for purported marketing expenses.

24

j.    On or about December 10 and 17, 2014, COLE signed
bank forms authorizing the transfer of a total of approximately
$3.4 million to Company-1.

k.    On or about March 2, 2015, COLE signed Iconix's
Form 10-K for 2015.

l.    On or about March 31, 2015, COLE signed a
management representation letter to the Audit Firm.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

45.    The allegations contained in paragraphs 1 through 39
and paragraph 44 of this Indictment are repeated and realleged
as if fully set forth herein.

46.    From at least in or about 2013 through at least in or
about 2015, in the Southern District of New York and elsewhere,
NEIL COLE, the defendant, willfully and knowingly, directly and
indirectly, by use of the means and instrumentalities of
interstate commerce, and of the mails and of the facilities of
national securities exchanges, used and employed, in connection
with the purchase and sale of securities, manipulative and
deceptive devices and contrivances, in violation of Title 17,
Code of Federal Regulations, Section 240.10b-5, by: (a)
employing devices, schemes, and artifices to defraud; (b)

25

engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons; and (c) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, to wit, COLE engaged in a scheme to fraudulently inflate Iconix's publicly reported revenue and EPS.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNT THREE
### (False SEC Filings - Second Quarter 2014 Press Release)

The Grand Jury further charges:

47.     The allegations contained in paragraphs 1 through 39 and paragraph 44 are repeated and realleged as if fully set forth herein.

48.     On or about July 30, 2014, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC a Form 8-K attaching a press release reporting Iconix's

financial results for the three- and six-month periods ending June 30, 2014, which omitted material facts and contained materially misleading statements.

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-11, and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (False SEC Filings - Second Quarter 2014 10-Q)

The Grand Jury further charges:

49. The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

50. On or about August 6, 2014, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC Iconix's quarterly filing on Form 10-Q for the second quarter of 2014, which omitted material facts and contained materially misleading statements.

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-13, and 244.100(b); and Title 18, United States Code, Section 2.)

27

## COUNT FIVE
### (False SEC Filings - Third Quarter 2014 Press Release)

The Grand Jury further charges:

51. The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

52. On or about October 29, 2014, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC a Form 8-K attaching a press release reporting Iconix's financial results for the three- and nine-month periods ending September 30, 2014, which omitted material facts and contained materially misleading statements.

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-11, and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNT SIX
### (False SEC Filings - Third Quarter 2014 10-Q)

The Grand Jury further charges:

53. The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

54. On or about November 7, 2014, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC Iconix's quarterly filing on Form 10-Q for the third quarter of 2014, which omitted material facts and contained materially misleading statements.

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-13, and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNT SEVEN
### (False SEC Filings - 2014 Year-End Press Release)

The Grand Jury further charges:

55. The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

56. On or about February 27, 2015, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in

reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC a Form 8-K attaching a press release reporting Iconix's financial results for the full year 2014, which omitted material facts and contained materially misleading statements.

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-11, and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNT EIGHT
### (False SEC Filings - 2014 10-K)

The Grand Jury further charges:

57. The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

58. On or about March 2, 2015, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, COLE caused to be filed with the SEC Iconix's annual filing on Form 10-K for 2014, which

30

omitted material facts and contained materially misleading
statements.

(Title 15, United States Code, Sections 78m(a) and 78ff; Title
17, Code of Federal. Regulations, Sections 240.12b-20, 240.13a-1,
and 244.100(b); and Title 18, United States Code, Section 2.)

## COUNT NINE
### (Improperly Influencing the Conduct of Audits)

The Grand Jury further charges:

59.  The allegations contained in paragraphs 1 through 39
and paragraph 44 of this Indictment are repeated and realleged
as if fully set forth herein.

60.  From at least in or about 2013 through at least in or
about 2015, in the Southern District of New York and elsewhere,
NEIL COLE, the defendant, willfully and knowingly took actions
to fraudulently influence, coerce, manipulate, and mislead
independent public and certified accountants engaged in the
performance of audits of the financial statements of an issuer
for the purpose of rendering such financial statements
materially misleading, and did so, as officers of a company
issuing publicly traded securities, by (a) making, and causing
to be made, materially false or misleading statements to an
accountant, and (b) omitting to state, and causing another
person to omit to state, material facts necessary in order to
make the statements made, in light of the circumstances under
which such statements were made, not misleading, to an

accountant; with these false statements and omissions being in connection with audits, reviews and examinations of required financial statements of the company and the preparation and filing of documents ·and reports required to be filed with the SEC, to wit, COLE made affirmative misrepresentations to, and intentionally withheld information from, the Audit Firm relating to the SEA JVs.

(Title 15, United States Code, Sections 7202, 7242, and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18 United States Code, Section 2.)

## COUNT TEN
### (Conspiracy to Destroy, Alter, and Falsify Records in Federal Investigations)

The Grand Jury further charges:

61. The allegations contained in paragraphs 1 through 39 and paragraph 44 of this Indictment are repeated and realleged as if fully set forth herein.

62. In or about late 2014 and early 2015, the SEC Division of Corporate Finance ("Corp Fin") conducted an inquiry into Iconix's accounting treatment for the formation of certain Iconix international JVs, including the SEA JVs. Corp Fin submitted several comment letters to Iconix management that focused on whether the JVs should have been consolidated into Iconix's historical results, and requested written responses from Iconix management.

32

63. On or about February 24, 2015, Iconix submitted to the SEC a letter response, approved by NEIL COLE, the defendant, describing SEA-2 and SEA-3. Although the SEC letter directed Iconix to disclose the "business purpose" and material terms of the SEA JVs, COLE intentionally and falsely omitted from the response letter that Company-1 had agreed to inflate the purchase prices for SEA-2 and SEA-3 by $5 million and $6 million, respectively, in exchange for COLE's secret agreement that Iconix would reimburse Company-1 for these overpayments.

64. NEIL COLE, the defendant, who had previously been the subject of an SEC enforcement action for improper revenue recognition practices while he was chief executive officer of Iconix's predecessor-in-interest, an entity named Candie's, became concerned that the SEC would discover the fraudulent revenue inflation scheme involving the SEA JVs. Accordingly, COLE knowingly took steps during the Corp Fin inquiry to destroy and conceal relevant evidence. COLE, among other things, deleted emails related to the SEA JVs and directed Seth Horowitz to do the same in order to prevent the SEC from detecting the scheme.

## Statutory Allegations

65. From at least in or about 2014 through at least in or about 2015, in the Southern District of New York and elsewhere, NEIL COLE, the defendant, and others known and unknown,

33

including Seth Horowitz, willfully and knowingly did combine,

conspire, confederate and agree together and with each other to

commit an offense against the United States, to wit, to destroy,

alter, and falsify records in federal investigations, in

violation of Title 18, United States Code, Section 1519.

66. It was a part and an object of the conspiracy that

NEIL COLE, the defendant, and others known and unknown,

including Seth Horowitz, knowingly would and did alter, destroy,

mutilate, conceal, cover up, falsify, and make false entries in

records, documents, and tangible objects with the intent to

impede, obstruct, and influence the investigation and proper

administration of a matter within the jurisdiction of a

department or agency of the United States, to wit, the SEC, and

in relation to and contemplation of any such matter and case.

### Overt Acts

67. In furtherance of the conspiracy and to effect the

illegal object thereof, the following overt acts, among others,

were committed in the Southern District of New York and

elsewhere:

a. On or about February 24, 2015, NEIL COLE, the

defendant, caused Iconix to submit a response letter to the SEC

discussing SEA-2 and SEA-3.

b. In or about February 2015, COLE directed Seth

Horowitz to delete emails related to the SEA JVs.

34

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATIONS

64.   As a result of committing one or more of the offenses charged in Counts One through Nine of this Indictment, NEIL COLE, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendant personally obtained.

### Substitute Assets Provision

65.   If any of the above-described forfeitable property, as a result of any act or omission by the defendant:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

35

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

> (Title 18, United States Code, Section 981(a)(1)(C);
> Title 21, United States Code, Section 853(p);
> Title 28, United States Code, Section 2461.)

GRAND JURY FOREPERSON

GEOFFREY S. BERMAN DW
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

- v. -

NEIL COLE,

Defendant.

**SEALED INDICTMENT**

19 Cr. _____

(Title 15, United States Code, Sections
78j(b),78m(a), 78ff, 7202, and 7242; Title
17, Code of Federal Regulations, Sections
240.10b-5, 240.12b-20, 240.13a-1, 240.13a-
11, 240.13a-13, 240.13a-14, 240.13b2-2, and
244.100(b); Title 18, United States Code,
Sections 2 and 371.)

_____
Foreperson

GEOFFREY S. BERMAN
United States
Attorney