UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

  - v. –

NEIL COLE,

              Defendant.

19 Cr. 869 (ER)

## THE GOVERNMENT'S MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S PRE-TRIAL MOTIONS

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Edward Imperatore
Scott Hartman
Jared Lenow
Assistant United States Attorneys
    *Of Counsel*

# Table of Contents

PRELIMINARY STATEMENT .............................................................................. 1

BACKGROUND ................................................................................................. 2

    A. The Offense Conduct ............................................................................... 2

    B. Investigation and Procedural History ...................................................... 5

    C. The Government's Discovery Productions and Disclosures to the Defense .......... 7

ARGUMENT ..................................................................................................... 8

    I. The Defendant Has Failed to Make the Required Showing to Obtain Discovery Concerning Government Communications with the SEC. .............................................. 8

    II. The Defendant Has Failed to Make the Required Showing to Obtain Discovery Concerning Government Communications with Witnesses or Their Counsel ............. 17

    III. The Government Has Complied With Its Discovery Obligations, and Does Not Possess the Materials Sought by the Defendant ........................................................ 21

    CONCLUSION .................................................................................................. 31

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Neil Cole's pre-trial motions.  Although the scope of the discovery in criminal cases is generally governed by Rule 16 of the Federal Rules of Criminal Procedure, Cole's motions seek discovery beyond the bounds of Rule 16 on three topics.  First, Cole seeks disclosure of the Government's communications with the U.S. Securities and Exchange Commission (the "SEC") regarding the scheduling of Cole's testimony before the SEC, in order to advance a claim that the SEC employed "trickery" to wrongfully mislead him regarding the existence of a criminal investigation (the "Testimony Motion").  Second, Cole seeks discovery concerning the Government's statements and instructions to witnesses and their counsel, to bolster a claim that the Government interfered with Cole's Sixth Amendment right to mount a defense (the "Witness Motion").  Third, Cole seeks an order directing the Government to obtain forensic copies of entire email accounts and devices (the "Forensic Data") from a third party, Iconix Brand Group, Inc. ("Iconix"), and provide that data to Cole (the "Forensic Data Motion").

Cole is not entitled to the discovery he seeks, and his allegations of Government misconduct are meritless.  With respect to the Testimony Motion, Cole speculates that the SEC sought to advance the date of his testimony in order to hide from him the existence of the criminal investigation.  In fact, as outlined below, the SEC's request occurred before the criminal investigation was even initiated.  As to the Witness Motion, the Government has never directed or requested that a witness not meet with Cole's counsel, and Cole does not allege otherwise or point to any other sort of improper conduct.  At bottom, Cole's request for discovery in support of the Testimony Motion and the Witness Motions are an improper fishing expedition, and Cole has not—and cannot—satisfy the legal standard for obtaining this discovery.  Finally, as to the

Forensic Data, the Government does not have that material in its possession, custody, or control. Nonetheless, when Cole initially raised this concern, the Government voluntarily reached out to Iconix in an effort to find a solution. Although Iconix objected to producing the complete Forensic Data due to understandable concerns about attorney-client privilege and a time-consuming document review, the Government requested and obtained relevant data, which has been produced to Cole and will allow him to conduct the analysis that he seeks to conduct.

## BACKGROUND

### A. The Offense Conduct

The offense conduct is described in detail in the Indictment, and is summarized briefly below.

### i. *Iconix's JVs and Relevant Financial Metrics*

Neil Cole was the chief executive officer of Iconix, whose shares traded on the NASDAQ. Iconix was in the business of acquiring various brands, including clothing and fashion brands, and then licensing those brands to retailers, wholesalers, and suppliers, who, in turn, produced and sold clothing and other products bearing the brand names.

Iconix utilized joint ventures ("JVs") to profit from its brands in foreign markets. With respect to these JVs, Iconix transferred ownership of a trademark or brand to the JV while maintaining a 50 percent ownership interest in the JV itself. The other party involved in the JV purchased a 50 percent interest in the JV from Iconix. As part of the JV agreements, each JV partner was generally entitled to 50 percent of the JV's licensing revenue. When it entered into a JV, Iconix recognized as revenue the buy-in purchase price paid by the JV partner, less Iconix's cost basis in the trademarks.

2

Among the most critical financial metrics disclosed in Iconix's public filings with the SEC were Iconix's quarterly and annual revenue and non-GAAP diluted earnings per share ("EPS"). Iconix executives, including Cole, publicly identified revenue and EPS as the principal metrics demonstrating Iconix's growth. They also touted Iconix's consistent record of revenue and earnings growth and of meeting or exceeding Wall Street analyst consensus with respect to these metrics.

ii.     *The Accounting Fraud Scheme*

From 2013 to 2015, Cole, with the assistance of Seth Horowitz, who served under Cole as chief operating officer of Iconix, engaged in a scheme to falsely inflate Iconix's reported revenue and EPS by orchestrating a series of "round trip" transactions in which Cole induced a Hong Kong-based JV partner ("Company-1") to pay artificially inflated buy-in purchase prices for JV interests, with the understanding that Iconix would then reimburse Company-1 for the overpayments. Cole and Horowitz executed the scheme for the purpose of enabling Iconix to report fraudulently inflated revenue and EPS figures based on the inflated buy-in purchase prices it obtained from Company-1.

Cole arranged for Iconix to enter into three JVs with Company-1 that included inflated buy-in purchase prices from Company-1: (1) the Southeast Asia JV, which closed on or about October 1, 2013 ("SEA-1"), (2) the Southeast Asia first amendment, which closed on or about June 30, 2014 ("SEA-2"), and (3) the Southeast Asia second amendment, which closed on or about September 17, 2014 ("SEA-3"), (collectively, the "SEA JVs"). Each of the SEA JVs involved a fraudulent "round trip" transaction, lacking in economic substance, in which Company-1 paid an artificially inflated buy-in purchase price for its interest in the JV, in exchange for Cole's

3

agreement that Iconix would give back the inflated portion of the purchase price to Company-1. Cole and Horowitz hid from Iconix's lawyers and outside auditors that Cole had reached an understanding with Company-1 to artificially increase the consideration Company-1 paid Iconix in exchange for Cole's agreement to round-trip the overpayment back to Company-1.

Through the scheme, Cole and Horowitz caused Iconix to report fraudulently inflated revenue and EPS figures to the investing public. Cole and Horowitz did so, in part, to ensure that the reported figures met analyst consensus and to fraudulently convey the impression to the investing public that Iconix was growing quarter after quarter, as Cole had touted to the investing public. Absent the false inflation of revenue from SEA-2 and SEA-3, Iconix would have missed its quarterly revenue consensus in the second and third quarters of 2014 and its annual revenue consensus for the full year 2014. Absent the false inflation of EPS from SEA-2 and SEA-3, Iconix would have missed its annual non-GAAP diluted EPS consensus for the full year 2014.

     *iii.*     *Obstruction of Justice*

In late 2014 and early 2015, the SEC Division of Corporate Finance ("Corp Fin") conducted an inquiry into Iconix's accounting treatment for the formation of certain Iconix international JVs, including the SEA JVs. Although the SEC directed Iconix to disclose to the SEC the "business purpose" and material terms of the SEA JVs, Cole intentionally and falsely omitted from an Iconix response letter to the SEC that Company-1 had agreed to inflate the purchase prices for SEA-2 and SEA-3 by $5 million and $6 million, respectively, in exchange for Cole's secret agreement that Iconix would reimburse Company-1 for these overpayments. Cole also took steps during the Corp Fin inquiry to destroy and conceal relevant evidence, including by

deleting emails related to the SEA JVs and directing Horowitz to do the same, in order to prevent the scheme from being detected.

## B.  Investigation and Procedural History

The Government (also referred to herein as the "U.S. Attorney's Office" or "USAO") and the SEC conducted parallel investigations into Cole's participation in accounting fraud at Iconix. The SEC's civil investigation predated the USAO's criminal investigation by several years.

The SEC issued Cole a subpoena for documents on or about March 4, 2016 (the "Cole SEC Document Subpoena"), which called for the production of documents by March 21, 2016.  On or about September 7, 2018, the SEC also issued Cole a subpoena for testimony (the "Cole SEC Testimony Subpoena"), which called for Cole to give testimony on November 29 and 30, 2018. Both subpoenas were accompanied by the SEC's Form 1662 titled "Supplemental Information for Persons . . . directed to Supply Information Pursuant to a Commission Subpoena" ("Form 1662," attached hereto as Exhibit A).  Form 1662 expressly advised Cole, among other things, that "[t]he Commission often makes its files available to other governmental agencies, particularly the United States Attorneys and state prosecutors.  There is a likelihood that information supplied by you will be made available to such agencies where appropriate."  (Ex. A at 3).  Form 1662 further advised Cole that "[i]nformation you give may be used against you in any federal . . . civil or criminal proceeding brought by the Commission or any other agency.  You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you."  (Ex. A at 2).

Cole gave testimony to the SEC on November 8, 2018, approximately three weeks earlier than the original November 29 and 30 dates set forth in the Cole SEC Testimony Subpoena.

During his SEC testimony, Cole was accompanied by his lawyers, former Assistant United States Attorneys deeply experienced in civil and criminal enforcement matters who continue to represent Cole in both the criminal case and the parallel SEC action.  During Cole's SEC testimony, an SEC staff attorney informed him on the record that "[t]his is an investigation by the United States Securities and Exchange Commission . . .  to determine whether there have been violations of certain provisions of the federal securities laws.  However, the facts developed in this investigation might constitute violations of other federal or state, civil or criminal laws."  (Cole SEC Testimony Tr. at 6, relevant except attached hereto as Exhibit B).

During the testimony, the SEC did not question Cole about the round-tripping allegations at issue in the Indictment.  Instead, the SEC questioned Cole principally about conduct and issues that did not result in criminal charges.  The conduct on which the SEC focused in its questioning of Cole, such as Iconix's valuation of certain intellectual property assets, ultimately became part of a civil action that the SEC brought against Iconix.

More than one year later, on December 5, 2019, the Indictment was unsealed against Cole, charging him with engaging in a scheme to fraudulently inflate Iconix's revenue and earnings per share and obstruct justice relating the SEA JVs.   The Indictment charges Cole with one count of conspiracy to commit securities fraud, make false filings with the SEC, and improperly influence the conduct of audits; one count of securities fraud; six counts of making false filings with the SEC; one count of improperly influencing the conduct of audits; and one count of conspiracy to destroy, alter, and falsify records in federal investigations.   The USAO also unsealed an information against Seth Horowitz relating to the same conduct.  Horowitz previously pled guilty

pursuant to a cooperation agreement with the USAO.  Cole was arrested the same day that the charges against him and Horowitz were unsealed.

Also on December 5, 2019, the SEC brought civil charges against Cole, Horowitz, and Iconix stemming from its parallel civil investigation.  Those charges include allegations relating to the same series of transactions at issue in this criminal matter, and the civil charges against Iconix (but not Cole or Horowitz) also include allegations relating to Iconix's valuation of its intellectual property that are not at issue in the criminal case.

### C.  The Government's Discovery Productions and Disclosures to the Defense

Since Cole's arrest, the USAO has produced extensive discovery to him.  The USAO's Rule 16 productions in this case include documents from Iconix and its outside auditor; Company-1; and current and former employees of those entities, among other materials.  Relevant to the allegations in the Indictment concerning document destruction, the USAO's productions included spreadsheets provided by Iconix listing (1) all email traffic involving either Cole or Horowitz that were collected by an Iconix backup system that captures all emails sent through Iconix's email system even if a user deletes those emails from their mailbox, and (2) spreadsheets listing the contents of email mailboxes (stored in "PST" email file format) used by Cole and Horowitz at fixed points in time  (including the contents of their local email boxes that existed at the time they left Iconix), the latter of which show the absence of emails (due to deletion) that were located in another backup email database.

On December 18, 2019, Cole sent the Government a letter making 18 separate discovery demands.  As relevant here, the letter sought "all communications between the U.S. Attorney's Office for the Southern District of New York and the Staff of the Enforcement Division of the

SEC prior to November 8, 2018, concerning the scheduling, timing, content or substance of actual or potential SEC testimony by Mr. Cole or Horowitz." (Docket Entry No. 30 (Tarlowe Aff.) Ex. G at 7.).  In response, the Government observed that Cole was not entitled to the broad swath of information that he sought.  Nonetheless, the Government voluntarily informed Cole's counsel that "the Government did not provide any direction or instruction or make any requests to the SEC as to the timing or conduct of SEC testimony taken from Mr. Cole." (Docket Entry No. 30 Ex. H).  The Government likewise acknowledged that it did not intend to introduce Cole's testimony, which did not address any of the transactions at issue in the Indictment, in the Government's case-in-chief.  (Docket Entry No. 30 Ex. J).  In response to an inquiry by Cole about the Government's contact with witnesses and their counsel, the Government responded that "our interactions with witnesses and their counsel were entirely consistent with the law and our ethical obligations." (Docket Entry No. 30 Ex. H).  In pre-indictment discussions with the Government, Cole's counsel broadly (and vaguely) questioned the propriety of the Government's witness interactions.   In response, the Government asked Cole's counsel to identify the witness interactions that gave rise to their concern so that the Government would have an opportunity to address them.  Cole's counsel declined to do so.

## ARGUMENT

### I. The Defendant Has Failed to Make the Required Showing to Obtain Discovery Concerning Government Communications with the SEC.

#### A.  Applicable Law

"It is well established that the Government may conduct simultaneous criminal and civil investigations of the same targets and subject matters." *United States v. Rhodes*, No. 18-CR-887 (JMF), 2019 WL 3162221, at *3 (S.D.N.Y. July 16, 2019).  "Nothing in the Constitution forbids

contemporaneous civil and criminal proceedings concerning the same subject matter." *Nosik v. Singe*, 40 F.3d 592, 596 (2d Cir. 1994) (citing *United States v. Kordel*, 397 U.S. 1, 11 (1970)); *see also United States v. Gel Spice Co.*, 773 F.2d 427, 434 (2d Cir. 1985) ("Civil and criminal enforcement may proceed simultaneously.").  "Moreover, 'there is no general rule" prohibiting a civil enforcement agency such as the SEC from "sharing . . .  evidence acquired through civil discovery with criminal prosecutors.'" *Rhodes*, 2019 WL 3162221, at *3 (quoting *United States v. Fiore*, 381 F.3d 89, 94 (2d Cir. 2004)).  "Indeed, because '[s]ecurities fraud is a proper subject of both administrative and criminal investigations . . . SEC enforcement officials and prosecutors all expect coordination at some investigative level and perceive the various proceedings as integral to each other." *Rhodes*, 2019 WL 3162221, at *3 (quoting *Fiore*, 381 F.3d at 94).

While "sharing between the lawyers and agents on the criminal prosecution team, on the one hand, and the SEC, on the other, is, in itself, unexceptional and unproblematic," *Rhodes*, 2019 WL 3162221, at *3, the Government may not conduct parallel criminal and civil investigations "in bad faith," *United States v. Stringer*, 535 F.3d 929, 936 (9th Cir. 2008) (citing *Kordel*, 397 U.S. at 11); *accord Rhodes*, 2019 WL 3162221, at *5.  In particular, as relevant here, "[a] government official must not 'affirmatively mislead' the subject of parallel civil and criminal investigations 'into believing that the investigation is exclusively civil in nature and will not lead to criminal charges.'" *Stringer*, 535 F.3d at 940; *see also United States v. Sclafani*, 265 F.2d 408, 414-15 (2d Cir. 1959) (in the context of a challenge to a consent search, refusing to find improper coordination between civil and criminal authorities absent evidence that civil authorities affirmatively deceived the defendant regarding the potential for criminal charges).

In order to obtain "even limited discovery" regarding a claim of improper coordination between civil and criminal authorities, a defendant must "make a substantial preliminary showing of bad faith."  *Rhodes*, 2019 WL 3162221, at *4 (quoting *Gel Spice*, 773 F.2d at 434).  As applied to the facts here, to succeed on his discovery motion, Cole must make a substantial showing that the SEC affirmatively misled him regarding the existence of the criminal investigation.  *Stringer*, 535 F.3d at 940; *Sclafani*, 265 F.2d at 414.

## B.  Discussion

Cole seeks an order directing the USAO to submit an affidavit and provide copies of correspondence between the USAO and the SEC regarding Cole's testimony in the SEC investigation.  Cole asserts that he needs these materials in order to support a claim that an SEC staff attorney engaged in "trickery" when she informed his counsel on September 19, 2018, that the SEC would "need to move Mr. Cole's testimony to an earlier day."  (Docket Entry No. 29 at 3, 7).  Cole suggests that the discovery he seeks would show that the reason that the SEC sought to advance his testimony was that it feared that the existence of the criminal investigation would become public before the original testimony date and that the revelation of this fact would cause him to assert his Fifth Amendment rights rather than testify as expected.  (Docket Entry No. 29 at 7).  As discussed below, there is no merit to Cole's speculation that the SEC acted in "bad faith" in seeking to reschedule his testimony.

Cole fails to satisfy his burden of demonstrating that he is entitled to the discovery he seeks.  As an initial matter, Cole's discovery demand is not tailored to the claim he hopes to advance.  Cole seeks all communications between the Government and the SEC regarding the testimony of both Cole and Horowitz.  As was true of his letter requests to the Government, this demand is

10

much broader than would be necessary to allow Cole to investigate his claim of bad faith, even if Cole could meet the standard for obtaining such discovery, which, as discussed below, he cannot.[1] Given that the only bad faith that Cole has alleged relates to the SEC's representations to him in connection with its request to advance his testimony, any discovery request should be tailored to that issue.  The fact that Cole seeks much more, including communications related to the testimony of Horowitz, makes plain that he is engaged in an improper fishing expedition.

Even as to the narrow subject of the timing of his testimony, Cole's motion falls woefully short of making a "substantial preliminary showing" that the SEC acted in bad faith.  This is so for a number of independent reasons.

First, and most obviously, Cole's motion fails because the Government's investigation *did not exist* at the time the SEC requested to advance Cole's testimony date.  Thus, there are no communications between the Government and the SEC related to making that request.  According to the timeline proffered by Cole's counsel:  "On September 13, 2018, approximately one week after Mr. Cole received the SEC subpoena for testimony, and unprompted by Mr. Cole or his counsel, the SEC Staff Attorney responsible for the investigation contacted counsel for Mr. Cole and represented that the SEC needed to accelerate the date of Mr. Cole's testimony from November 29 and 30 to a date in early November."  (Docket Entry No. 29 at 3; *see also* Docket Entry No. 30 (Tarlowe Decl.) ¶ 4.)  Cole's counsel further proffers:  "On September 19, 2018, the SEC Staff Attorney sent a follow-up email, stating: 'As discussed, we will need to move Mr. Cole's testimony

---

[1] As discussed below, Cole does not clearly articulate what substantive motion he would be entitled to make with the benefit of discovery regarding Horowitz's testimony, nor does he even attempt to make the "substantial preliminary showing" required to obtain such discovery.

to an earlier day. During our call, I proposed a single day between 11/2/18 and 11/9/18, with the hope that additional time will not be needed. Our preference is for one of the earlier days in the 11/2 – 11/9 range.'"   (Docket Entry No. 30 ¶ 5.)

As noted above, the Government's investigation did not exist at the time the SEC sought to reschedule Cole's testimony.  After Cole filed his motion, the Government consulted with the SEC regarding Cole's allegations.  From that consultation, the Government learned that the SEC sought to advance Cole's testimony to early November 2018 in light of internal SEC timing considerations.  Accordingly, Cole's claim that his testimony was procured through "trickery" is meritless.  The Government did not provide any direction or instruction or make any requests to the SEC as to the timing or conduct of Cole's SEC testimony, as the Government previously, and voluntarily, disclosed to Cole's counsel.  (Docket Entry No. 30 (Tarlowe Decl.) Ex. H at 2).  His demand for discovery is a baseless fishing expedition.  Cole's motion thus should be denied for this reason alone.[2]

Second, Cole's motion fails because there is no plausible relief that he has not already received.  Although Cole does not disclose it in his motion, on or about January 30, 2020, the Government informed Cole in writing that it did not intend to introduce the transcript of Cole's testimony, which does not relate to the conduct charged in the Indictment, in the Government's

---

[2] It also bears noting that because the original dates for Cole's SEC testimony were November 29 and 30, 2018, more than a week before the December 10 SEC disclosure Cole says alerted him to the USAO's criminal investigation, his testimony would have proceeded before public disclosure of the criminal investigation regardless of whether it was advanced by three weeks.

case-in-chief.[3]  Moreover, any notion that Cole's SEC testimony was improperly used to further the Government's criminal investigation is undermined by the fact that the SEC never even questioned Cole about the round-tripping allegations at issue in the Indictment.  Plainly, there can be no "substantial preliminary showing of bad faith" by the Government, *Rhodes*, 2019 WL 3162221, at *5, particularly where, as here, (1) the SEC did not focus any of its questioning of Cole on the transactions at issue in the criminal case, and (2) the Government voluntarily acknowledged that it did not intend to introduce Cole's SEC testimony at trial.

Third, even if Cole were correct that the SEC sought to reschedule his testimony in order to hide the existence of a criminal investigation (and, as discussed, he is not), his motion would still fail as a matter of law, because he has made no showing that the SEC affirmatively misled him regarding the existence of the criminal investigation.  *Stringer*, 535 F.3d at 940; *Sclafani*, 265 F.2d at 414.  To the contrary, Cole was specifically notified by the SEC Form 1662 that "[t]he Commission often makes its files available to other governmental agencies, particularly the United States Attorneys and state prosecutors" and that "[t]here is a likelihood that information supplied by you will be made available to such agencies where appropriate."  (Ex. A at 3).  The Form 1662 also advised Cole that "[i]nformation you give may be used against you in any federal . . . civil or criminal proceeding brought by the Commission or any other agency" and that Cole could "refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you."  (Ex. A at 2).  Further,

---

[3] The Government reserved the right to use the transcript to rebut arguments, testimony or exhibits offered by the defense or to cross-examine Cole if he testifies.  Of course, that right would exist even if the testimony were to be suppressed.  *See Walder v. United States*, 347 U.S. 62, 65 (1954).

at the beginning of Cole's SEC testimony, an SEC staff attorney informed him on the record that "the facts developed in this investigation might constitute violations of other federal or state, civil or criminal laws." (Exhibit B at 6).

Thus, far from affirmatively misleading Cole about the existence of any parallel criminal investigation, the SEC affirmatively put him on notice of the likelihood that the information he provided would be made available to criminal authorities where appropriate. Cole does not allege that the SEC ever denied the existence of a criminal investigation, or otherwise contradicted the warnings in the Form 1662. Rather, the only purported misrepresentation that Cole attributes to the SEC is that Cole's testimony needed to be advanced due to a "scheduling" need. But as discussed above, that representation was entirely accurate and made in good faith by the SEC. The criminal investigation—which had yet to begin—played no part in the SEC's request to advance Cole's testimony.

Far from aiding Cole's argument, *United States v. Stringer*, 535 F.3d 929 (9th Cir. 2008), the primary case upon which Cole relies, entirely undermines his claim. In *Stringer* the Ninth Circuit court concluded, as a matter of law, that conduct similar to that alleged by Cole does not establish a due process violation. The defendant in *Stringer* asserted that the SEC had violated his due process right in connection with his testimony, because (1) in response to his lawyer's question about whether the SEC was working with criminal authorities, the SEC attorney directed him to Form 1662 but would identify no particular U.S. attorney's office; and (2) the SEC attorney made a request to a court reporter not to mention a criminal prosecutor in the presence of the defendants' attorneys. The Ninth Circuit held that there could be no due process violation absent a showing that civil authorities "affirmatively mislead the subject of parallel civil and criminal investigations

14

into believing that the investigation is exclusively civil in nature and will not lead to criminal charges." *Stringer*, 535 F.3d at 940 (internal quotations omitted); *see also id.* ("Almost every other circuit has denied suppression, even when government agents did not disclose the possibility or existence of a criminal investigation, so long as they made no affirmative misrepresentations.") (citing *inter alia*, the Second Circuit's decision in *Sclafani*, 265 F.2d at 414). Analyzing the conduct cited by Stringer, the Ninth Circuit noted "[t]here was no deceit; rather, at most, there was a government decision not to conduct the criminal investigation openly, a decision we hold the government was free to make." *Stringer*, 535 F.3d at 933.

Here, as in *Stringer*, Cole was expressly advised of the possible involvement of "United States Attorneys," and the "deception" he purports to identify – related to the SEC's reasons for rescheduling his deposition – does not come close to constituting an affirmative misrepresentation regarding the existence of a criminal investigation.

*United State v. Rhodes*, the other case upon which Cole primarily relies, is similarly unhelpful to him. As an initial matter, Cole fails to mention that in *Rhodes*, Judge Furman *denied* the defendant's discovery request after concluding that the defendant had failed to make a substantial preliminary showing of bad faith. *See Rhodes*, 2019 WL 3162221, at *5. More importantly, *Rhodes* did not concern a claim that the SEC had affirmatively misled the defendant, the claim that Cole makes here. Rather, the issue in *Rhodes* was whether the defendant could obtain discovery to support his allegation that the SEC had conducted a civil investigation, which did not result in a lawsuit, "solely for the purpose of advancing a criminal case." *Id.* at *1. That issue is plainly not implicated here. The SEC conducted an extensive investigation and brought civil charges against Cole on the same day the Indictment was unsealed. Moreover, as noted,

15

although the subjects upon which the SEC focused its questioning of Cole had nothing to do with the transactions at issue in the Indictment, those subjects did form the basis for a lawsuit that the SEC brought against Iconix, which has now been settled.  In light of these facts, there can be no serious argument that the SEC's investigation, and its taking of Cole's testimony in particular, was undertaken "solely for the purpose of advancing" the criminal case, *id*., and Cole makes none.[4]

Finally, Cole lacks standing to challenge what he characterizes as the cancellation of Horowitz's testimony.  He fails to articulate how the cancellation of formal SEC testimony of another witness in the SEC's investigation would have any bearing on Cole's own due process rights, or why a decision of the SEC to cancel testimony is in any way improper.  Cole's suggestion of impropriety with respect to Horowitz's testimony—which plainly had no bearing on Cole's Fifth Amendment rights—is unsupported by any legal authority, and indeed, Cole cites none.

To summarize, Cole has failed to articulate even a facially plausible theory of bad faith under the relevant legal standards.  That is unsurprising given that any coordination between the SEC and the Government in this case was, at all times, "unexceptional and unproblematic." *Rhodes*, 2019 WL 3162221, at *3.   Accordingly, and for the reasons set forth above, his motion for discovery concerning the USAO's communications with the SEC should be denied.

---

[4] Cole's reliance upon *United States v. Scrushy*, 366 F. Supp. 2d 1134, 1137 (N.D. Ala. 2005), is likewise unavailing.  In that case, the Government, among other things, provided improper direction to the SEC (1) to change the location of the defendant's SEC testimony to give venue over criminal perjury charges and (2) to keep the defendant "in the dark" about the existence of the criminal investigation.  *Id.* at 1137-38, 1140.   In *Scrushy*, the defendant was not advised that there was a likelihood that information provided to the SEC would be made available to criminal authorities.  Nothing of that sort happened here, and Cole makes no allegation to the contrary.

16

## II. The Defendant Has Failed to Make the Required Showing to Obtain Discovery Concerning Government Communications with Witnesses or Their Counsel

### A. Applicable Law

#### 1. Contact With Witnesses

"A witness is not the exclusive property of either the government or a defendant; a defendant is entitled to have access to any prospective witness, although in the end the witness may refuse to be interviewed." *United States v. Walton*, 602 F.2d 1176, 1179–80 (4th Cir. 1979); *see also Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966) ("Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense."). "Although the defense [has] no right to interview [a] witness under Rule 16, it [has] a right to be free from prosecution interference with a witness' freedom of choice about whether to talk to the defense." *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir.1999); *see also Kines v. Butterworth*, 669 F.2d 6, 9 (1st Cir. 1981)) ("[W]hen the free choice of a potential witness to talk to defense counsel is constrained by the prosecution without justification, this constitutes improper interference with a defendant's right of access to the witness."). Courts have held that advising or requesting that a witness only speak to defense counsel in the presence of a representative of the prosecution constitutes an improper interference with the defense's access to witnesses, *see Gregory*, 369 F.2d at 188; *United States v. Ebrahimi*, 137 F. Supp. 3d 886, 889 (E.D. Va. 2015), and also held that defense counsel should not be required to notify the prosecution in advance of any witness interview requests, although a prosecutor may advise a witness of their right to decline interviews, *see United States v. Rodriguez–Berrios*, 376 F.Supp.2d 118, 120 (D.P.R. 2005).

17

### 2. Discovery for Claims of Government Misconduct

Rule 16 does not authorize discovery into claims of government misconduct as a matter of course. Such discovery does not fall within any of the Rule's specific provisions, and the Supreme Court has held that the catch-all provision for items "material to preparing the defense," Fed. R. Crim. P. 16(a)(1)(E)(i), authorizes production only of items that tend to "refute the Government's arguments that the defendant committed the crime charged." *United States v. Armstrong*, 517 U.S. 456, 462 (1996).

To be sure, courts faced with allegations of Government misconduct sometimes authorize discovery on those issues, but before doing so they require that the defendant make a substantial threshold showing that misconduct in fact occurred. *See Wade v. United States*, 504 U.S. 181, 186 (1992) (defendant claiming that Government's refusal to file a 5K motion was based on an unconstitutional motive must make a "substantial threshold showing" before he can obtain discovery); *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (defendant seeking discovery on a claim of selective prosecution must provide "some evidence tending to show the existence of the essential elements of the defense" before discovery authorized); *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) (same in the context of a claim of vindictive prosecution, and noting that the standard is a "rigorous" one); *Rhodes*, 2019 WL 3162221, at *4 (in order to obtain "even limited discovery" regarding parallel criminal and civil investigations, a defendant must "make a substantial preliminary showing of bad faith." (quoting *Gel Spice*, 773 F.2d at 434)).

## B. Discussion

Cole seeks an order requiring the Government to disclose its statements to witnesses and, to the extent applicable, require that the Government notify witnesses that they are free to speak

with Cole's counsel.  Because Cole has failed to establish any valid basis for this request, and the Government has not asked any witness not to speak with Cole's counsel, his motion is meritless and should be denied.

The Government has never directed or requested that a witness not meet with Cole's counsel, or meet with Cole's counsel only in the presence of a Government representative.  Nor has the Government sought to have the defense provide advance notice of any defense request to meet with a witness, or threatened a witness with prosecution, or any other sanction, if the witness sought to speak with Cole's counsel.  Cole does not allege otherwise.  Rather, the only allegation that Cole has proffered in support of his motion is the assertion by his counsel that "[i]n November 2019, an attorney for a witness advised me that his client had met with the government but that he could not share additional information with us because the government had asked him not to." (Docket Entry No. 30 (Tarlowe Decl.) ¶ 12).  Cole's counsel does not identify the lawyer or witness, the purported request made by the Government, when the request was purportedly made, the information that the lawyer could and did share with Cole's counsel, or what "additional information" the lawyer purportedly would not share with Cole's counsel at the Government's request.

This vague and unsourced assertion falls far short of providing "evidence tending to show the existence of the essential elements" of Cole's claim that the Government interfered with his right to present a defense.  *Berrios*, 501 F.2d at 1211.  As an initial matter, the assertion by Cole's counsel is too vague to support his claim for discovery.  Cole has refused to identify the source of this statement, the nature of the Government's purported request to the unidentified lawyer, or the unspecified "additional information" that the lawyer purportedly would not share.  Indeed, far from

"tending to show" misconduct on the part of the Government, Cole's allegation is so broad as to encompass conduct that is entirely proper. *See, e.g.*, *United States v. Bryant*, 655 F.3d 232, 238-39 (3d Cir. 2011) (finding no impropriety in the Government's request that witnesses voluntarily refrain from disclosing matters that occurred before the grand jury and the existence of grand jury subpoenas); *accord United States v. Agostino*, 132 F.3d 1183, 1191–92 (7th Cir.1997) (same, where the Government requested that witness refrain, as a courtesy, from discussing with others the substance of his grand jury testimony).

During pre-indictment discussions with defense counsel, the Government requested that the defense provide detail about its allegations so that the Government would have the opportunity to address them, but the defense refused to do so. In the face of such a vague and conclusory allegation, the Government cannot possibly respond, nor can the Court make a meaningful assessment of whether Cole can carry his burden of providing "evidence tending to show the existence of the essential elements" of his misconduct claim. *Berrios*, 501 F.2d at 1211; *see also Zimmerman v. Conway*, 10 Civ. 1393 (ER) (PED), 2018 WL 6413144, at *8 (S.D.N.Y. Dec. 6, 2018) (holding that court properly assigned no weight to hearsay and double hearsay allegations that prosecutor interfered with defense access to witnesses). That the defense has withheld the relevant facts underscores that their request for discovery is a fishing expedition.

Moreover, as set forth above, and as the Government informed Cole when he made the same discovery demand informally, the Government's interactions with witnesses and their counsel have been entirely consistent with the law and the Government's ethical obligations. (Docket Entry No. 30 (Tarlowe Decl.) Ex. H). Certainly the Government has not directed or requested that a witness not speak with Cole's counsel, or meet with Cole's counsel only in the

20

presence of a Government representative.  Nor has Government directed or asked any witness (or his or her counsel) not to share the witness's account of the underlying facts at issue in this case with Cole's counsel, or sought to have Cole's counsel provide advance notice of any defense request to meet with a witness.  And at no point has the Government threatened a witness with prosecution, or any other sanction, if the witness sought to speak with Cole's counsel.

In sum, the Government's interactions with witnesses were entirely proper, and Cole has not made a colorable allegation to the contrary, let alone made the substantial threshold showing required to obtain the discovery that he seeks.   Accordingly, his motion should be denied.

## III.   The Government Has Complied With Its Discovery Obligations, and Does Not Possess the Materials Sought by the Defendant

### A.  Applicable Law

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides that "the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant."

In determining whether materials are in the "custody, or control" of the Government for Rule 16 purposes, courts apply the familiar "prosecution team" analysis developed in the *Brady* line of cases.  *See United States v. Chalmers*, 410 F. Supp. 2d 278, 289-90 (S.D.N.Y. 2006) (Chin, J.) ("The Court is not persuaded that the 'government' for purposes of Rule 16 should be any broader than the 'prosecution team' standard that has been adopted in the *Brady* line of cases."); *accord United States v. Blondet*, No. 16 Cr. 387 (JMF), 2019 WL 5690711, at *5 n.4 (S.D.N.Y.

Nov. 4, 2019); *United States v. Lobo*, 15 Cr. 174 (LGS), 2017 WL 1102660, at *2 (S.D.N.Y. Mar. 22, 2017); *cf. United States v. Volpe*, 42 F.Supp.2d 204, 221 (E.D.N.Y.1999) ("Courts have construed the term 'government' in [Rule 16] narrowly to mean the prosecutors in the particular case or the governmental agencies jointly involved in the prosecution of the defendant, and not the 'government' in general") (citing cases).

"[T]he relevant inquiry [for determining whether a person is a member of the prosecution team] is what the person did, not who the person is." *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006). "Individuals who perform investigative duties or make strategic decisions about the prosecution of the case are considered members of the prosecution team, as are police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 Fed. App'x 36, 38 (2d Cir. 2015) (summary order). "At bottom," the determination of who constitutes the prosecution team, "involves a question of agency law: should a prosecutor be held responsible for someone else's actions?" *United States v. Meregildo*, 920 F. Supp. 2d 434, 443–44 (S.D.N.Y. 2013). "Generally, a principal is responsible for the knowledge of an agent when that agent has a 'duty to give the principal information' or when the agent acts on his knowledge regarding a matter that is 'within his power to bind the principal.' An agent's duty to disclose is thus linked to his power to bind the principal." *Id.* (quoting Restatement (Second) of Agency § 272). In the context of a criminal investigation and prosecution, the individuals empowered to bind the prosecutor consist generally of those who "actively investigate[] the case, act[] under the direction of the prosecutor, or aid[] the prosecution in crafting trial strategy." *Meregildo*, 920 F. Supp. 2d at 442; *see also United States v. Barcelo*, No. 13 Cr. 38 (RJS), 2014 WL 4058066, at *9 (S.D.N.Y. Aug. 15, 2014) ("To determine whether

22

someone is a member of the prosecution team—in other words, whether the prosecution can be deemed to have constructive knowledge of information held by that individual—the Court considers the totality of the circumstances, including 'whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy.'" (quoting *Meregildo*, 920 F.Supp.2d at 441–42)), *aff'd*, 628 F. App'x 36 (2d Cir. 2015).

Applying these principles, the Second Circuit and courts in this District have consistently rejected efforts to impose discovery obligations on the Government related to information held by entities that do not act as agents of the prosecution, including cooperating witnesses, expert witnesses for the Government, other government agencies, and even separate components of the Justice Department. *See, e.g.*, *Barcelo*, 628 Fed. App'x at 38 (holding that a cooperating witness was not a part of the prosecution team where he "played no role in the investigation or in determining investigation or trial strategy," and "did no more than provide information to the government and testify at trial"); *Stewart*, 433 F.3d at 299 (holding that a civilian employee of the Secret Service who testified as an expert witness for the Government was not a member of the "prosecution team" for *Giglio* purposes); *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (holding that for *Giglio* and Jencks Act purposes, the Government had no discovery obligation related to information filed in an unrelated bankruptcy proceeding); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (holding that the reports made by FBI agents in the course of investigations unrelated to the defendants' prosecutions were not possessed by the prosecution team); *Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir.1985) (holding that a prosecutor's constructive knowledge did not extend to a parole officer who "did not work in conjunction with either the police or the prosecutor"); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting

"completely untenable position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor'"); *United States v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) ("[T]he prosecution team does not include federal agents, prosecutors, or parole officers who are not involved in the investigation."); *Meregildo*, 920 F. Supp. 2d at 444 ("[I]n most cases, cooperating witnesses should not be considered part of the prosecution team.").[5]

## B. Discussion

Cole seeks an order directing the Government to seek to obtain the Forensic Data, including forensic copies of email backups and electronic devices, from Iconix and provide it to Cole. Cole's motion should be denied because the Government does not have possession, custody, or control over the Forensic Data pursuant to Rule 16. In any event, as discussed further below, the Government has voluntarily sought from Iconix and produced material to Cole that will allow Cole to conduct the analysis he seeks.

The Indictment alleges that Cole deleted emails, and directed Horowitz to do so as well. As probative of that allegation, the Government disclosed in discovery an analysis conducted by Iconix that compared header data (*i.e.*, data regarding the sender, recipient, date, time, and subject of each email) for certain emails that once existed in Cole or Horowitz's email mailboxes, but that no longer existed in their mailboxes when they left Iconix (the "Deletion Analysis"). Specifically, the Government understands that the Deletion Analysis was accomplished by comparing (1) a

---

[5] *See also United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2006) (Government cooperator not a member of prosecution team, and thus fifteen boxes of records held by the cooperator were not in the Government's possession); *United States v. Merlino*, 349 F.3d 144, 154-55 (3d Cir. 2003) (holding that Government not required to obtain prison calls of cooperating witness to satisfy disclosure obligations).

database of all emails collected, including from the company's backup system that captures all emails sent through Iconix's email system even if a user deletes those emails from their mailbox with (2) PST file backups of Cole and Horowitz's individual email mailboxes, in which emails were deleted.  .

On or about January 30, 2020, Cole contacted the Government to request the full content of Cole and Horowitz's PST mailbox backups from May 2015 and July 2016, as well as the content of any devices used by either Cole or Horowitz, so Cole could reconstruct this analysis himself. In response to Cole's request, the Government reached out to counsel for Iconix.  Iconix raised objections to producing the complete contents of mailbox backups for both Cole and Horowitz to the Government because those mailbox backups contained both privileged and irrelevant information.  In the face of Iconix's objection, the Government inquired of Iconix whether it would be willing to provide to the Government complete and unredacted header information for the Cole and Horowitz mailbox backups as well as header information for all Cole and Horowitz emails recovered by Iconix.  This approach would allow Cole to attempt to replicate the Deletion Analysis while allowing Iconix to preserve its privilege and avoid a lengthy review.  Iconix agreed, and on February 28 and March 1, 2020, it provided the header information to the Government, which produced it to Cole on March 1, 2020.  The Government also obtained and produced additional information relevant to the Deletion Analysis in the following weeks, including a document detailing additional information about the collection of each of the mailbox backup files.

Notwithstanding the Government's efforts to provide Cole the information he needs to conduct his analysis, Cole now moves for an order directing the Government to "produce the underlying data used to generate the spreadsheets, including any 'PST files' and images of the

hard drives of Mr. Cole and Mr. Horowitz." (Docket Entry No. 34 at 6). Cole argues that he is entitled to this Forensic Data, and that it is "under the Government's control." (*Id.* at 7) Cole is wrong.

Cole's contention that the Government is obligated to obtain and produce the Forensic Data from a third party—Iconix—is baseless. Iconix has not produced the requested Forensic Data to the Government, and the Government never seized or obtained any electronic devices or forensic copies of electronic devices in its investigation of this case. Thus, the Government does not have possession, custody, or control over the Forensic Data. *See Hutcher*, 622 F.2d at 1088 ("Clearly the government cannot be required to produce that which it does not control and it never possessed or inspected" (quoting *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir. 1975)); *Meregildo*, 920 F. Supp. 2d at 445.

Nor is Cole correct that, despite not physically possessing the Forensic Data, the Government has "control" over it within the within the meaning of Rule 16. As noted, the Government's discovery obligations extend only to materials in the "possession, custody, and control" of the "prosecution team." *Chalmers*, 410 F. Supp. 2d at 289-90. And Iconix is plainly not part of the prosecution team. "Interacting with the prosecution team, without more, does not make someone a team member." *Meregildo*, 920 F. Supp. 2d at 441–42. Rather, as discussed, the relevant question is whether the individual or entity in question acted with authority to bind the prosecution. *Id.* at 443–44. Cole does not seriously contend that Iconix has the authority to bind the Government as its agent, nor does he advance any argument that Iconix or its agents "actively investigate[ed] the case, act[ed] under the direction of the prosecutor, or aid[ed] the prosecution in crafting trial strategy." *Id.* at 442; *see also Barcelo*, 2014 WL 4058066, at *9.

26

Iconix, a publicly-traded company responsible to its own shareholders, has no "duty," contractual or otherwise, to provide information to the Government and no ability to bind the Government on any question, let alone matters related to the collection and preservation of the Forensic Data at issue, which occurred before the criminal investigation even began. *See Meregildo*, 920 F. Supp. 2d at 443–44 ("Generally, a principal is responsible for the knowledge of an agent when that agent has a 'duty to give the principal information' or when the agent acts on his knowledge regarding a matter that is 'within his power to bind the principal.'" (quoting Restatement (Second) of Agency § 272)).

Indeed, as discussed, after receiving discovery requests from defense counsel, the Government conferred in good faith with counsel for Iconix about obtaining the Forensic Data. Counsel for Iconix raised objections to this request, but agreed to provide the Government with data that would allow for the replication of the Deletion Analysis (as well as an analysis of other emails that were also deleted, or of other emails that were not deleted). This fact alone demonstrates that Iconix is not an agent of the prosecution for these purposes; the Government has no ability to compel the production of data over which Iconix or its employees maintains a claim of privilege (including communications between the defendant and his current counsel at Paul Weiss, which appear to be included in the Forensic Data).

Nor does the fact that Iconix seeks to cooperate with the Government in order to avoid prosecution transform it into an agent of the prosecution. *Meregildo* is instructive on this point. In *Meregildo*, Judge Pauley rejected a defense motion to compel the Government to produce content from a cooperator's social media account on the ground that, among other reasons, the

27

cooperator was not a member of the prosecution team.  Judge Pauley observed that cooperating

witnesses are rarely members of the prosecution team:

> When the Government uses an informant as a government agent and
> directs him to gather information, a court may hold the Government
> responsible for his actions.  But in most cases witnesses and agents
> perform separate functions. Agents investigate. Witnesses relate
> information they observe. Prosecutors do not direct witnesses to
> investigate, and witnesses do not advise prosecutors on trial
> strategy. As such, cooperating witnesses are rarely members of the
> prosecution team."

920 F. Supp. 2d at 444 (internal citation omitted)).  Judge Pauley determined that the cooperator

"was not a member of the prosecution team or an arm of the prosecutor" because the cooperator

"never participated in formulating trial strategy nor was he directed to investigate," but rather only

testified pursuant to a plea agreement that required him to "truthfully and completely disclose all

information with respect to the activities of himself and others concerning all matters about which

this Office inquires of him."  *Id.* at 445; *see also Barcelo*, 2014 WL 4058066, at *9 (holding that

cooperating witness was not a member of the prosecution team because witness "merely pleaded

guilty pursuant to a standard cooperation agreement.").

In light of this precedent, Cole's argument that an independent company becomes a

member of the prosecution team merely by voluntarily producing documents is meritless.  If this

Court adopted Cole's argument, the Government would be required to obtain and search the files

of virtually any company that voluntarily produced materials to the Government.   No court has

adopted such an extreme position, which would lead to absurd results and impose insurmountable

burdens on the Government.  *See United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)

("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working

with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis." (internal citation omitted)); *Quinn*, 445 F.2d at 944 (rejecting "completely untenable position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor' . . . on a 'reduction ad absurdum' basis.").

The cases upon which Cole relies are easily distinguishable and unavailing.  Cole cites cases that involve the sharing of documents between government agencies, *see, e.g.*, *United States v. Giffen*, 379 F. Supp. 2d 337, 342 (S.D.N.Y. 2004), and the contractual obligation of a company with a deferred prosecution agreement to produce documents "upon request" to the Government, *see, e.g.*, *United States v. Stein*, 488 F. Supp. 2d 350, 364 (S.D.N.Y. 2007).   Iconix is obviously not a government agency.   And unlike in *Stein*, 488 F. Supp. at 353-54, 362-64, the Government has no deferred prosecution or non-prosecution agreement with Iconix, let alone an agreement that obligates Iconix to produce documents to the Government.[6]  Notably, Cole does not cite any cases in which a court has held that the Government is required to obtain material from a third-party with which the Government has no agreement.  In any event, as discussed above, an agreement with the Government by itself does not make an individual or entity part of the prosecution team. *See, e.g.*, *Barcelo*, 2014 WL 4058066, at *9; *Meregildo*, 920 F. Supp. 2d at 445.

Although the information that Cole seeks is beyond the Government's possession, custody, and control, the Government has made efforts to ensure that Cole has sufficient information to assess the email evidence.  In particular, as discussed, Cole has received in discovery the complete

---

[6] In *Meregildo*, Judge Pauley also criticized the *Stein* decision for "import[ing] civil discovery principles into a criminal case."  920 F. Supp. 2d at 443.

email header data that was used to generate the Deletion Analysis.  The header data was not curated or filtered by the Government, but was instead drawn directly from Iconix's backup server and the PST mailbox files.  Accordingly, Cole already has at his disposal the information that will allow him to assess the emails for himself, as well as the evidence the Government intends to rely on at trial.  Because the Government has already produced header data for Cole and Horowitz's emails, including the date, time, sender, recipient, and subject of each email, it is not necessary also to obtain the underlying PST files or hard drives in order for Cole to understand and assess the evidence of email deletions.

　　　　To summarize, because the Government does not have possession, custody, or control over the Forensic Data and Cole has obtained the information necessary to accomplish the analysis he seeks to conduct, Cole's motion for an order directing the Government to obtain and produce the Forensic Data should be denied.

**CONCLUSION**

For the foregoing reasons, Cole's pre-trial motions should be denied.

Dated: New York, New York

March 31, 2020

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York


By:      _____/s/_____
Edward Imperatore
Scott Hartman
Jared Lenow
Assistant United States Attorneys
(212) 637-2327 / -2527 / -1068

31