# Exhibit B

9/10/2021 Neil R. Cole: Admin. Proc. Rel. No. 34-47769 / April 30, 2003

Case 1:19-cr-00869-ER Document 106-2 Filed 09/10/21 Page 2 of 5

Home | Previous Page



U.S. Securities and Exchange Commission

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**Securities Exchange Act of 1934**
**Release No. 47769 / April 30, 2003**

**Accounting and Auditing Enforcement**
**Release No. 1767 / April 30, 2003**

**Administrative Proceeding**
**File No. 3-11098**

| | |
|---|---|
| In the Matter of<br><br>Neil R. Cole,<br><br>Respondent. | ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") be, and hereby are, instituted against Neil R. Cole ("Cole" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Cole has submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or in which the Commission is a party, and without admitting or denying the findings, except as to the Commission's jurisdiction over the Respondent and the subject matter of this proceeding, which Respondent admits, Respondent consents to the entry of this Order Instituting Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Cole's Offer, the Commission finds[1] that:

**Respondent and Relevant Entity**

1. Candie's is a Delaware corporation with headquarters in Valhalla, NY. Candie's primary business is designing, marketing, and distributing moderately priced women's shoes, handbags and other accessories. During the period from 1997 to 1999, Candie's filed periodic reports with the Commission pursuant to Section 12(g) of the Exchange Act and its stock was traded on the Nasdaq National Market.

2. Cole, age 46, resides in New York, NY. Since 1993, Cole has served as Candie's Chief Executive Officer, president and chairman of the board.

**Background**

3. This matter involves accounting fraud at Candie's. From August 1997 until the Spring of 1999, former members of Candie's senior management employed fraudulent accounting practices designed to improve Candie's publicly reported financial condition. As will be discussed below, among other practices, Candie's prematurely recognized revenue through the use of improper bill and holds. Candie's also artificially inflated revenue by entering into illusory sales transactions with a barter company. During the course of the fraud, Candie's had inadequate internal accounting controls, and the company failed to maintain accurate books and records. Moreover, to cover-up its fraudulent accounting practices, Candie's former Chief Operating Officer ("COO"), its former Chief Financial Officer ("CFO"), and others, provided false information to Candie's auditors.

**Candie's Engaged in an Improper Bill and Hold Practice**

4. Candie's former COO directed employees to engage in a practice known as bill and hold. At the end of certain quarters, Candie's prematurely recorded revenue from various purchase orders calling for future delivery of shoes, by recording these orders as final sales prior to shipping the shoes to customers. Generally Accepted Accounting Principles ("GAAP") do not permit revenue recognition for sales unless risk and title has passed to the customer, which was typically when Candie's shipped shoes to the customer. Candie's revenue recognition policy, as disclosed in its Commission filings, calls for recognition of revenue upon shipment of goods with risk and title passing.

5. Despite the prohibitions of GAAP and its own policy, from at least January 1998 through July 1998, Candie's prematurely recognized over $4.4 million in revenue through the improper use of bill and hold and other irregular shipping procedures. Specifically, Candie's Form 10-K for fiscal year 1998 dated May 1, 1998, contained financial statements that reflected $1.8 million in improper revenue, and $775,000 in improper income, from the bill and hold practice and other irregular shipping procedures that violated GAAP. The improper income from bill and hold and these other irregular shipping procedures that violated GAAP allowed Candie's to convert a fourth quarter loss to a gain. Candie's Form 10-Q for the first

quarter of fiscal year 1999 dated June 11, 1998, contained financial statements reflecting $991,000 in improper revenue solely from the bill and hold practice. Candie's Form 10-Q for the second quarter of fiscal year 1999 dated September 14, 1998, contained financial statements reflecting $1.7 million in improper revenue solely from the bill and hold practice. These overstatements of revenue and income were material.

6. Cole received indications that Candie's was improperly recognizing revenue from the use of improper bill and holds. For instance, Candie's former CFO expressed concerns about the bill and hold practice to Cole before Candie's finalized and released its first quarter of fiscal year 1999 results. In August 1998, a schedule titled "Special Bill and Hold" reflecting Candie's use of bill and holds for the second quarter of fiscal year 1999 was distributed to Cole. The schedule indicates that shoes were invoiced prior to the end of the quarter and shipped after the end of the quarter. Finally, in late summer or early fall, Candie's former CFO again raised his concerns with Cole about Candie's shipping practices. Cole signed Candie's Forms 10-Q for the first and second quarters of fiscal year 1999 without investigating, or otherwise determining, whether Candie's was improperly recognizing revenue from the bill and hold practice.

### Candie's Entered Into Fraudulent Barter Transactions

7. Candie's improperly recognized revenue from two transactions with a barter company. Specifically, in August 1997, Candie's former vice president of finance negotiated and signed an agreement with the barter company that provided Candie's would sell 160,000 pairs of shoes to the barter company for $10 per pair to be paid in a combination of cash and advertising credits. Candie's then purportedly shipped 133,000 pairs of the shoes to the barter company and recorded $1.3 million in revenue from the sale of these shoes on its books and records on October 31, 1997, the last day of the fiscal quarter. Candie's, however, should not have recognized this revenue because, among other reasons, it did not ship the shoes to the barter company until July 1999, and it was only then that Candie's was permitted under GAAP to recognize any revenue generated by the transaction. Candie's Form 10-Q for the third quarter of fiscal year 1998, dated November 24, 1997, contained financial statements that materially overstated revenue by $1.3 million (a six percent overstatement) and income by $335,000 (a forty-one percent overstatement) from this transaction.

8. Similarly, in October 1998, Candie's former COO negotiated and signed an agreement with the barter company that increased the value of shoes that Candie's had purportedly already sold to the barter company as part of the August 1997 agreement by $600,000. The October 1998 agreement also described the purported sale of an additional 62,000 pairs of shoes to the barter company. Candie's then recorded $1.8 million in revenue from this transaction on its books and records on October 31, 1998, the last day of the fiscal quarter. Once again, Candie's should not have recognized this revenue because, among other reasons, the 62,000 pairs of shoes described in the agreement were not shipped to the barter company. Candie's Form 10-Q for the third quarter of fiscal year 1999 dated December 15, 1998, contained financial statements that materially overstated revenue by $1.8 million from this transaction (a six percent overstatement) and income by $1.2 million. The improper revenue allowed Candie's to convert a loss for the third quarter to a gain. The overstatements of revenue and income from the August 1997 and October 1998 agreements with the barter company were material.

9. Cole failed to investigate, or otherwise determine, if Candie's improperly recognized revenue from the October 1998 barter agreement after learning about the suspicious agreement. Specifically, Cole reviewed the October 1998 barter agreement by at least January 1999 and realized that the agreement should immediately be cancelled because it purported to revalue, at a higher price, shoes that Candie's had purportedly already sold to the barter company. At that time, Cole also learned that Candie's had never, in fact, shipped the shoes to the barter company. Cole ordered that the October 1998 agreement be reversed. Despite Cole's questions and concerns about the agreement, he took no further steps to investigate why Candie's was party to such an agreement. Nor did Cole raise any question about the August 1997 barter transaction, the validity of which was called into question by the terms of the October 1998 agreement. As a result of the foregoing conduct, Candie's was able to continue to recognize improper revenue and income from the barter transactions on its books and records and in its public filings with the Commission.

### Documents Inaccurately Reflected Credits with Candie's Buying Agent

10. Candie's purchased a large quantity of shoes from a buying agent located in Taiwan. On occasion, Candie's would negotiate credits with its buying agent that Candie's would then use to offset the amounts it owed the buying agent. These credits took various forms, such as chargebacks when Candie's received defective shoes, as well as volume incentive and business interruption credits. (These credits would offset Candie's amounts owed to the buying agent and have the effect of reducing Candie's expenses and increasing Candie's net income.) In April 1999, at Candie's former CFO's request, Cole signed two memoranda reflecting a $650,000 volume incentive credit and a $1 million business interruption credit, and backdated the memoranda as of May 1998 and October 1998 respectively. Candie's former CFO then used these memoranda to convince Candie's auditors that the two credits totaling $1.65 million from Candie's buying agent were valid, and that Candie's properly recorded these credits in its financial statements for the fourth quarter of fiscal year 1999.

### Candie's Improperly Recorded Revenue and Income Generated By These Schemes

11. As a result of these fraudulent accounting practices, and as discussed above, Candie's materially inflated its reported financial results for the quarter ended October 31, 1997, the fiscal year ended January 31, 1998, and for the quarters ended April 30, 1998, July 31, 1998, and October 31, 1998. Candie's reported these false results in a Form 10-Q filed in

connection with the third quarter of fiscal year 1998, which Cole signed, and Forms 10-Q for the first three quarters of fiscal year 1999, and in its Form 10-K for fiscal year 1998, which Cole signed. Candie's also reported these false results in press releases issued in connection with each of these reporting periods. These press releases were dated November 24, 1997, April 21, 1998, May 28, 1998, August 25, 1998 and December 2, 1998.

**Candie's Issued a Materially Misleading Press Release on April 30, 1999**

12. On April 30, 1999 Cole authorized, and Candie's issued, a press release that preannounced Candie's revenue and earnings for fiscal year 1999, and further announced Candie's intention to file for a 15-day extension for its Form 10-K filing. Among other things, the release reported Candie's anticipated pre-tax income to be $750,000 and indicated that revenue for fiscal year 1999 would be up 24% over fiscal year 1998. The press release was misleading because it omitted certain material information. The press release omitted information about the need to reverse the recognition of revenue from the October 1998 barter transaction, and to adjust the quarters in which Candie's recognized revenue from the bill and hold practice. By April 30, 1999, Cole had reversed the October 1998 agreement with the barter company, and he had reason to investigate the bill and hold practice. Additionally, by April 30, 1999, Candie's auditors had raised questions with Cole about the barter company agreement and the credits with Candie's buying agent. Moreover, the auditors had indicated that because of these concerns and Candie's inability to resolve questions they had raised, they would be unable to complete their audit of the financial statements by the time Candie's Form 10-K had to be filed. In the press release, however, Candie's simply disclosed that it intended to file for a 15-day extension for its Form 10-K filing, and omitted to disclose that Candie's auditors were unable to complete their audit because of pending issues. On May 12, 1999, Candie's announced that it may have to restate results for fiscal years 1998 and the first three quarters of 1999.

13. As noted above, in April 1999, Candie's auditors began to question certain transactions while auditing Candie's January 31, 1999 financial statements. Before the audit was completed, the auditors advised Candie's that prior results might need to be restated, and recommended that Candie's conduct an internal investigation. Candie's formed a Special Committee of the Board of Directors, which then conducted an investigation. On September 22, 1999, Candie's filed an amended Form 10-K with the Commission containing its January 31, 1999 financial statements, and reporting material restatements of results for fiscal year 1998 and the first three quarters of fiscal year 1999.

**Cole Recklessly Caused Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

14. Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of securities. To establish a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the evidence must show: (1) misrepresentations or omissions of material fact or other fraudulent conduct; (2) "in connection with" the purchase or sale of securities; and (3) that the defendant acted with scienter. See SEC v. Chester Holdings, Ltd., 41 F. Supp.2d 505, 519 (D.N.J. 1999). The scienter element may be satisfied by knowing or reckless conduct. See e.g. SEC v. U.S. Environmental, Inc., 155 F.3d 107, 111 (2d Cir. 1998).

15. Candie's committed violations of Section 10(b) of Exchange Act and Rule 10b-5 thereunder because, among other things, the company knew, or was reckless in not knowing, that the press release dated April 30, 1999 described above was materially misleading.

16. Cole caused Candie's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder when he recklessly authorized Candie's to issue the April 30, 1999 press release described above which was materially misleading.

**Cole Caused Violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 Thereunder**

17. Issuers of securities registered under Section 12 of the Exchange Act must file accurate quarterly reports with the Commission pursuant to Section 13(a) of the Exchange Act and Rule 13a-13 thereunder. Rule 12b-20 requires that statements and reports contain all information necessary to ensure that statements made in them are not materially misleading. Implicit in these provisions is the requirement that the information reported be true, correct, and complete. No showing of scienter is necessary to establish an issuer's violation of the corporate reporting provisions. See SEC v. Wills, 472 F. Supp. 1250, 1268 (D.D.C. 1978).

18. Candie's committed violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder by, among other things, filing the materially false Forms 10-Q dated September 14, 1998 and December 15, 1998 described above.

19. Cole caused Candie's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder by signing and authorizing the filing of the materially false Forms 10-Q dated September 14, 1998 and December 15, 1998 described above.

**Cole Caused Violations of Section 13(b) of the Exchange Act and Rule 13b2-1 Thereunder**

20. Section 13(b)(2)(A) of the Exchange Act requires companies whose securities are registered pursuant to Section 12 of the Exchange Act to make and keep books, records, and accounts that accurately reflect the transactions and dispositions of their assets. Rule 13b2-1 prohibits any person from falsifying or causing the falsification of any book, record, or account subject to Section 13(b)(2)(A) of the Exchange Act.

21. Candie's committed violations of Section 13(b)(2)(A) of the Exchange Act as a result of the actions described above. Candie's failed to maintain books and records that accurately reflected its transactions. For instance,

Candie's books and records failed to describe accurately the $1.65 million volume incentive and business interruption credits with Candie's buying agent.

22. Cole caused Candie's violations of Section 13(b)(2)(A) of the Exchange Act, and committed violations of Rule 13b2-1 thereunder, by backdating the memoranda reflecting the $1.65 million volume incentive and business interruption credits with Candie's buying agent described above.

### IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions specified in Cole's Offer.

Accordingly, IT IS HEREBY ORDERED, that Cole, pursuant to Section 21C of the Exchange Act, cease and desist from committing or causing any violations and any future violations of Section 10(b) of the Exchange Act and Rules 10b-5 and 13b2-1, and from causing any violations or any future violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20 and 13a-13.

By the Commission.

                       Jonathan G. Katz
                            Secretary

---

[1] The findings herein are made pursuant to Cole's Offer and are not binding on any other person or entity in this or any other proceeding.

*http://www.sec.gov/litigation/admin/34-47769.htm*

Home | Previous Page                          Modified: 04/30/2003