UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>             v.<br><br>NEIL COLE,<br><br>                     Defendant. | 19 Cr. 869 (ER) |

MOTION AND MEMORANDUM OF LAW ON BEHALF OF NEIL COLE
TO COMPEL THE GOVERNMENT TO IMMUNIZE CERTAIN WITNESSES

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Lorin L. Reisner
Richard C. Tarlowe
Andrew D. Reich
1285 Avenue of the Americas
New York, New York 10019-6064
T:  212-373-3000

*Attorneys for Neil Cole*

Dated:  September 22, 2021

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................1
FACTUAL BACKGROUND............................................................................................2
ARGUMENT....................................................................................................................6
I.   THE COURT SHOULD ORDER THE GOVERNMENT TO
     IMMUNIZE MR. FAMULAK AND MR. VENTRICELLI .................................6
     A.   The Government is Using its Immunity Authority in a
          Discriminatory Manner for Tactical Reasons.............................................8
     B.   The Testimony of Mr. Famulak and Mr. Ventricelli Would Be
          Material, Exculpatory, and Non-cumulative and is Not
          Obtainable From Any Other Source ........................................................10
CONCLUSION...............................................................................................................12

# **TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*United States* v. *Dolah*,
  245 F.3d 98 (2d Cir. 2001) ........................................................................................6, 9

*United States* v. *Ebbers*,
  458 F.3d 110 (2d Cir. 2006) ........................................................................7, 8, 10, 11

*United States* v. *Morrison*,
  535 F.2d 223 (3d Cir. 1976) ...........................................................................................7

*United States* v. *Quinn*,
  728 F.3d 243 (3d Cir. 2013) ...........................................................................................9

*United States* v. *Stewart*,
  907 F.3d 677 (2d Cir. 2018) ...........................................................................................9

*United States* v. *Todaro*,
  744 F.2d 5 (2d Cir. 1984) ...............................................................................................9

*United States* v. *Turkish*,
  623 F.2d 769 (2d Cir. 1980) ......................................................................................7, 9

*United States* v. *Viloski*,
  557 F. App'x 28 (2d Cir. 2014) ......................................................................................7

*United States* v. *Westerdahl*,
  945 F.2d 1083 (9th Cir. 1991) ................................................................................8, 10

This memorandum of law is submitted on behalf of Neil Cole in support of his motion for an order directing that the government provide use immunity to defense witnesses Dow Famulak and Ron Ventricelli. As demonstrated below, the government has selectively immunized witnesses that it expects to provide testimony favorable to the government but failed to immunize witnesses expected to provide testimony favorable to the defense on the same issues. This selective grant of immunity is a violation of Mr. Cole's fundamental due process rights.

## PRELIMINARY STATEMENT

The government has immunized at least two witnesses whose anticipated testimony aligns with the government's theory of the case, but declined to immunize similarly situated witnesses whose anticipated testimony contradicts the government's allegations and is exculpatory. The government's selective and discriminatory use of its immunity power for tactical reasons threatens to deprive Mr. Cole of a fair trial and should not be permitted.

The government alleges that Mr. Cole participated in a scheme to inflate Iconix's reported revenue and earnings through the use of so-called "round trip" transactions. In particular, the government alleges that, in connection with certain international joint venture transactions, Iconix's counterparty[1] agreed to pay an inflated buy-in purchase price for its interest in the joint venture, in exchange for an agreement by Iconix to repay the alleged "overpayments" in the future.

---

[1] Iconix's counterparty in the relevant joint venture transactions is referred to in the indictment as "Company-1." The counterparty was Li & Fung, a Hong Kong-based conglomerate, or its spun-off subsidiary Global Brands Group ("GBG"). For simplicity, this memorandum refers to both of these entities as "GBG," unless otherwise noted.

Two former GBG executives with firsthand knowledge of the underlying transactions, Dow Famulak and Ron Ventricelli, refute the government's core allegations. Both have told the government, in substance and in part, that there were no round trip transactions, no inflated purchase prices and no commitment or obligation undertaken by Iconix to pay back to GBG any portion of the purchase prices. Without the Court's intervention, the jury most likely will never hear this highly exculpatory testimony, because Mr. Famulak and Mr. Ventricelli have indicated that they intend to invoke their Fifth Amendment privileges if called to testify at trial, and the government is unwilling to grant them immunity.

By contrast, the government granted immunity to two other GBG witnesses, Jason Rabin and Jared Margolis, after they provided information that more closely aligns with the government's narrative, and we expect that Mr. Rabin and Mr. Margolis will testify at trial pursuant to a grant of immunity. The government has no proper basis to withhold immunity from Mr. Famulak or Mr. Ventricelli, neither of whom is a credible target of prosecution. To ensure that Mr. Cole receives a fair trial untainted by the government's tactical use of its immunity power, the Court should direct the government to grant immunity to Mr. Famulak and Mr. Ventricelli.

## **FACTUAL BACKGROUND**

In October 2013, Iconix and GBG formed a joint venture (referred to in the indictment as SEA-1) to license certain brands in a number of countries throughout Southeast Asia. In June 2014 and September 2014, Iconix and GBG entered into two amendments to that joint venture, which are referred to in the indictment as SEA-2 and SEA-3, respectively.

With respect to SEA-2, the government alleges that, in June 2014, Iconix "reached a secret, undocumented agreement with representatives of [GBG] that [GBG] would inflate the buy-in purchase price to be paid to Iconix for [GBG]'s interest in the JV by $5 million, from approximately $10.9 million to approximately $15.9 million, in exchange for Iconix round-tripping approximately $5 million back to [GBG] in the form of payments purportedly for marketing." Indictment ¶ 22.

With respect to SEA-3, the government alleges that, in September 2014, Iconix "reached a secret agreement with representatives of [GBG] that [GBG] would artificially inflate the buy-in purchase price it paid to Iconix by $6 million, from approximately $15.5 million to approximately $21.5 million, in exchange for Iconix's commitment to reimburse [GBG] the $6 million overpayment" by "releasing" a GBG affiliate, Kids Headquarters ("KHQ"), "of its royalty obligations" under a separate license agreement with Iconix for Rocawear Kids brands. Indictment ¶ 29–31.

During the relevant period, Mr. Rabin served as President of Li & Fung subsidiary LF Asia and then as Chief Merchandising Officer of Li & Fung and GBG. Mr. Margolis was Executive Vice President of Business Development & Licensing, first at LF Asia's Fashion and Home division, and then at GBG.

In March 2019, the FBI approached each of Mr. Rabin and Mr. Margolis and questioned them about the joint venture transactions with Iconix. Mr. Rabin stated that GBG did not overpay for any joint ventures, and neither witness recalled any purported round trip transactions. During subsequent proffers with the government, however, Mr. Rabin and Mr. Margolis made statements supportive of the government's theory of the

3

case.[2] In October 2019, the government obtained immunity orders and compelled Mr. Rabin and Mr. Margolis to testify before the grand jury pursuant to a grant of immunity.

In October and November 2019, the government also interviewed Mr. Famulak and Mr. Ventricelli and received attorney proffers from their counsel. Both of these witnesses informed the government that there were no overpayments by GBG and no agreements by Iconix to repay any portion of the joint venture purchase prices to GBG. With respect to SEA-2, they stated that the payment of marketing expenses by Iconix was not the result of a prior commitment by Iconix to reimburse GBG for an alleged overpayment, and they identified the actual reasons – explained to them by Mr. Rabin, a government witness – why GBG agreed to increase the purchase price from approximately $10.9 million to approximately $15.9 million.

Among other things, Mr. Famulak's attorney told the government, with respect to SEA-2, that:

- "[GBG] determined it could not go forward with the Lee Cooper aspect of deal […] Dow's recollection was that this caused problem for Iconix. Iconix not happy to do the deal for less than they originally thought they would do the deal for, without the Lee Cooper piece. Dow recalls discussing with Rabin whether deal would still make sense at price higher than 10.9. Dow understood that in light of the put option and additional guarantees, they could do deal even at 15.9M price." Notes of October 22, 2019 Attorney Proffer at 2, Production No. 3528-001 (attached as Exhibit A).

- "During their conversations about the deal and the purchase price, Rabin said something about GBG being able to charge Iconix for marketing expenses. Dow thought Rabin could get Iconix to pay some amount for marketing. But whether they could do so, from Dow's perspective, was based on how well the brands did going forward. So he did not understand this to be a specific feature of deal

---

[2] Based on the government's 3500 materials, it appears that in addition to their initial FBI interviews and grand jury appearances, Mr. Rabin and Mr. Margolis have each met with or spoken to the government on at least four occasions.

4

    that was approved. […] From his perspective, marketing was not a specific term of deal. It was something they talked about and hoped to achieve." Exhibit A at 2–3.

- "The put options and guarantees got the [Investment Committee] comfortable with the deal, and not marketing expenses." Exhibit A at 3.

Mr. Famulak subsequently told the government that:

- "Famulak was not aware of an understanding where the [SEA-2] purchase price increased by $5 million and was given back to GBG through transactions papered as marketing expenses." Notes of November 22, 2019 Interview at 5, Production No. 3528-003 (attached as Exhibit B).

- "Famulak was comfortable with the increased consideration [for SEA-2] because GBG had just purchased a brand business called Cocoban that was only in Korea. He said it was a great platform." Exhibit B at 7.

- "He did not recall a connection between [SEA-3] and KHQ. He was not aware of a purchase price increase for a commitment to relax money owed to Iconix." Exhibit B at 7.

Similarly, Mr. Ventricelli told the government that:

- "The consideration that Rabin got for the [SEA-2] deal value change was consideration for guarantees going forward for the Lee Cooper deal. There were several types of guarantees: the royalty stream, the commitment to increase the Put/Call floor of the transaction, and the guarantee to do the Lee Cooper deal. The marketing piece was settled, that was done, but the increase in value in this transaction was the lock up of Lee Cooper, and the guarantees in royalty streams." Notes of November 5, 2019 Interview (FBI 302) at 13, Production No. 3593-001 (attached as Exhibit C).

- "The marketing was not related to the purchase of this JV. The marketing was a separate thing that Rabin was working on, where he tried and get money back for prior marketing." Exhibit C at 13.

- "Ventricelli did not recall any conversations about an increase of $5 million on the purchase price in exchange for marketing invoices being sent from GBG to Iconix. The basis of the transaction was not built that way." Exhibit C at 14.

5

- "GBG recorded a capital investment of $15.9 million for this [SEA-2] deal. GBG were paying for the value of the right to get Lee Cooper. Ventricelli did not recall if the Lee Cooper deal ever happened. If they were doing GAAP accounting, and not IFRS accounting, they could still record it for the $15.9 increased price, because there was value that GBG was getting from it. Ventricelli didn't view it as an inducement, but rather as the value for what the next deal was going to give them." Exhibit C at 15.

Mr. Famulak was the President of Li & Fung subsidiary LF USA and, later, GBG and was a member of the Investment Committee that approved each of the joint venture transactions. Mr. Rabin, Mr. Margolis, and Mr. Ventricelli all reported to him. Mr. Ventricelli was the Executive Vice President of Finance and Operations at LF USA and, later, the Chief Operating Officer of GBG. Mr. Ventricelli also served on the GBG Investment Committee.

Counsel for Mr. Famulak and Mr. Ventricelli have informed us that, if called to testify at trial, both witnesses will invoke their Fifth Amendment privilege and refuse to testify. We therefore asked the government whether it would be willing to immunize Mr. Famulak and Mr. Ventricelli in order to facilitate their testimony at trial, and the government declined to do so. We anticipate that the government will grant use immunity to both Mr. Rabin and Mr. Margolis for their testimony at trial.

## ARGUMENT

**I.      THE COURT SHOULD ORDER THE GOVERNMENT TO IMMUNIZE MR. FAMULAK AND MR. VENTRICELLI**

The Second Circuit has "recognize[d] the essential unfairness of permitting the Government to manipulate its immunity power to elicit testimony from prosecution witnesses who invoke their right not to testify, while declining to use that power to elicit from recalcitrant defense witnesses testimony." *United States* v. *Dolah*, 245 F.3d 98, 106 (2d Cir. 2001), *abrogated on other grounds by Crawford* v. *Washington*, 541 U.S. 36

6

(2004).  District courts therefore have the authority to direct the government to grant use immunity to a defense witness and, if the government does not comply, dismiss the indictment.  *See United States* v. *Ebbers*, 458 F.3d 110, 119 (2d Cir. 2006).  This "carrot-and-stick approach . . . leav[es] the immunity decision to the executive branch but interpos[es] the judicial power to subject the government to certain choices of action." *Dolah*, 245 F.3d at 105 n.5 (quotation omitted).  There are circumstances (albeit rare) when "denial of defense witness immunity" will "unfairly thwart" a trial's search for the truth. *United States* v. *Turkish*, 623 F.2d 769, 774 (2d Cir. 1980)

To demonstrate that defense witness immunity is appropriate, a defendant must make a two-pronged showing.

> ***First***, the defendant must show that the government has used immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment through 'overreaching,' or has deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation . . . . ***Second***, the defendant must show that the evidence to be given by an immunized witness will be material, exculpatory and not cumulative and is not obtainable from any other source.

*Ebbers*, 458 F.3d at 119 (emphases added; quotations and citations omitted).

Although the Second Circuit has observed that it has yet to find that a district court abused its discretion by denying a defense motion to compel immunity, *see United States* v. *Viloski*, 557 F. App'x 28, 34–35 (2d Cir. 2014) (quoting *United States* v. *Ferguson*, 676 F.3d 260, 291 (2d Cir. 2011)), we are not aware of any instance in which the Court held that a district court abused its discretion by ***granting*** such relief.  Indeed, the Second Circuit repeatedly has affirmed the authority of district courts to compel defense witness immunity, and courts in other circuits have vacated convictions based on the government's failure to immunize potential defense witnesses.  *See, e.g.*, *United States* v.

7

*Morrison*, 535 F.2d 223, 229 (3d Cir. 1976) (holding that "[t]here are circumstances under which it appears due process may demand that the Government request use immunity for a defendant's witness" and ordering a new trial at which a key defense witness must be immunized or a judgment of acquittal entered); *United States* v. *Westerdahl*, 945 F.2d 1083, 1086–87 (9th Cir. 1991) (vacating conviction and remanding to district court for an evidentiary hearing on "whether the government intentionally distorted the fact-finding process" by immunizing witnesses whose testimony inculpated the defendant but refusing to immunize an exculpatory witness who contradicted the others). This case presents circumstances in which the fact-finding process will be unfairly and impermissibly distorted if the government is permitted to selectively immunize witnesses.

      A.      **The Government Is Using Its Immunity Authority in a Discriminatory Manner for Tactical Reasons.**

With regard to the first prong of the *Ebbers* standard, "a discriminatory grant of immunity arguably may be no more than 'a decision to confer immunity on some witnesses and not on others.'" *Ebbers*, 458 F.3d at 119 (quoting *Dolah*, 245 F.3d at 105-06). "The 'manipulation' standard overlaps to a degree with the discrimination test but involves an express finding of a tactical purpose on the government's part." *Id.* (citing *Blissett* v. *Lefevre*, 924 F.2d 434, 442 (2d Cir.1991)).

In this case, the government improperly is attempting to use its immunity authority to gain a tactical advantage – namely, to facilitate trial testimony it deems helpful to its case while preventing the presentation of exculpatory evidence to the jury by reserving the theoretical threat of potential prosecution for purely tactical purposes. There is no other plausible explanation for the government's differing approach to Mr. Rabin and Mr. Margolis, on the one hand, and Mr. Famulak and Mr. Ventricelli, on the other. The

8

only meaningful distinction between these two sets of witnesses is whether their testimony inculpates or exculpates Mr. Cole, and that is not a proper basis on which to confer or withhold immunity. *See Dolah*, 245 F.3d at 106 (cautioning that "using the immunity device in a one-sided manner can result in a basic unfairness that rises to the level of a violation of due process"); *see also United States* v. *Quinn*, 728 F.3d 243, 259 (3d Cir. 2013) ("If there were a governmental reason, unrelated to the defendant's trial, for refusing immunity, we would not interfere with that decision. If, however, the Government had no strong reason to keep exculpatory testimony from trial, we could overturn a resulting conviction.") (citing *Turkish*, 623 F.2d at 777).

Courts have permitted the government to withhold immunity when the witness is "an actual or potential target of prosecution." *Turkish*, 623 F.2d at 778; *United States* v. *Stewart*, 907 F.3d 677, 685 (2d Cir. 2018); *United States* v. *Todaro*, 744 F.2d 5, 7 (2d Cir. 1984). In *Stewart*, for example, the Second Circuit found no due process violation where the district court denied a defense motion to compel immunity for a co-conspirator who had been arrested for participating in the alleged scheme with the defendant, *see* 907 F.3d at 685; and it similarly found no due process violation in *Todaro* where the government had submitted "an affidavit of the prosecutor indicating the extent of the then existing evidence of possible criminal activity by each of the prospective defense witnesses and representing that any grant of immunity to either witness might impede future prosecutions," 744 F.2d at 7.

Here, by contrast, there can be no credible claim that Mr. Famulak or Mr. Ventricelli is a target of prosecution. The government did not even identify Mr. Famulak or Mr. Ventricelli among a list of alleged co-conspirators. *See* January 10, 2020 Letter

9

from Government at 3 (attached as Exhibit D).  In addition, the government has entered into tolling agreements with a number of other witnesses in this case, presumably to preserve its ability to file charges after the expiration of the statute of limitations, but to our knowledge did not enter into tolling agreements with Mr. Famulak or Mr. Ventricelli, confirming that the government does not have any genuine intention of prosecuting either witness.  Given that the underlying transactions at issue in this case took place in 2013 and 2014, it is unlikely that the government even could charge either witness at this point.

> B. **The Testimony of Mr. Famulak and Mr. Ventricelli Would Be Material, Exculpatory, and Non-cumulative and Is Not Obtainable from Any Other Source.**

With regard to the second prong of the *Ebbers* standard, "exculpatory evidence is material when it tends to show that the accused is not guilty." *Ebbers*, 458 F.3d at 119 (quotation omitted).  "The bottom line at all times is whether the non-immunized witness's testimony would materially alter the total mix of evidence before the jury." *Id.*; *see also Westerdahl*, 945 F.2d at 1086 ("[A] defendant need not show that the testimony sought was either 'clearly exculpatory' or 'essential to the defense'; the testimony need be only relevant.").

The testimony of Mr. Famulak and Mr. Ventricelli would be material and exculpatory, and would directly refute the central premise of the government's theory.  The government's case relies on the existence of an alleged agreement by GBG to pay an inflated buy-in purchase price, in exchange for a commitment or obligation undertaken by Iconix to repay the allegedly inflated amount.  Based on their statements to the government, Mr. Famulak and Mr. Ventricelli would testify that there was no such agreement, that GBG did not pay inflated purchase prices, and that there was no commitment or obligation undertaken by Iconix to make future payments to GBG.  They also would explain the

10

actual, legitimate reasons why GBG agreed to pay an increased purchase price for its interest in SEA-2.  Further, their testimony would contradict that of the GBG witnesses expected to be called by the government, including Mr. Rabin and Mr. Margolis.  It cannot reasonably be disputed that the testimony of Mr. Famulak and Mr. Ventricelli would be exculpatory and "affect[] the total mix of evidence before the jury."  *Compare Ebbers*, 458 F.3d at 120-122 (holding that there was "no abuse of discretion in denying Ebbers' requests" when Ebbers "ha[d] not shown that the absence of testimony by [defense witnesses] affected the total mix of evidence before the jury").

Their testimony also would be non-cumulative and is unobtainable from any other source.  Mr. Famulak and Mr. Ventricelli were senior executives of the entities that entered into the joint ventures at issue, and they served on the Investment Committee that evaluated and ultimately approved the transactions (including the purchase price).  They are uniquely positioned to testify about the terms of the agreements and the basis for GBG agreeing to pay the purchase prices at issue.  Mr. Ventricelli is also uniquely positioned to testify about GBG's accounting for the transactions.  He told the government, for example, that GBG (a publicly traded company) determined its accounting treatment for the SEA-2 transaction based on the full $15.9 million purchase price (just as Iconix did).

In addition, Mr. Famulak and Mr. Ventricelli spoke directly with Mr. Cole concerning at least one of the transactions, and they spoke with Mr. Rabin regarding both the SEA-2 and SEA-3 transactions.  Their anticipated testimony would contradict Mr. Rabin's account in significant ways.  Mr. Rabin is expected to testify, for example, that he told Mr. Famulak and Mr. Ventricelli about the alleged agreements to pay increased purchase prices in exchange for supposed "give backs."  Mr. Famulak and Mr. Ventricelli

told the government that Mr. Rabin provided other, lawful explanations for the price increase. There are no other witnesses who can testify to the communications between Mr. Rabin, on the one hand, and Mr. Famulak and Mr. Ventricelli, on the other.

In sum, this case presents the rare circumstances in which defense immunity is necessary to ensure a fair trial. The government has no proper basis to withhold immunity from Mr. Ventricelli or Mr. Famulak, and unless the Court intervenes, the defense most likely will be unable to present this material and highly exculpatory evidence to the jury.

## **CONCLUSION**

For all of these reasons, we respectfully request that the Court direct the government to grant use immunity to Dow Famulak and Ron Ventricelli.

Dated: September 22, 2021

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: /s/ Lorin L. Reisner
Lorin L. Reisner
Richard C. Tarlowe
Andrew D. Reich
1285 Avenue of the Americas
New York, New York 10019-6064
T: 212-373-3000
E: lreisner@paulweiss.com

*Attorneys for Neil Cole*

12