UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                    :

UNITED STATES OF AMERICA       :

                                    :

           - *v.* -           :       19 Cr. 869 (ER)

                                    :

NEIL COLE,                       :

                                    :

               Defendant.      :

                                    :

------------------------------------------------------x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTIONS *IN LIMINE*

AUDREY STRAUSS
United States Attorney
Southern District of New York

Scott Hartman
Noah Solowiejczyk
Andrew Thomas
Assistant United States Attorneys

- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

I.      THE COURT SHOULD ADMIT EVIDENCE OF COLE'S STOCK SALE AND
        COMPENSATION PLAN ............................................................................................... 1

        A.   Factual Background................................................................................................. 2

             1.   Cole Was Motivated to Maintain and Increase Iconix's Stock Price .................... 2

             2.   Cole Understood the Connection Between Investor Expectations and the Stock's

        Performance ................................................................................................................ 3

             3.   Cole's Stock Sale ............................................................................................. 4

             4.   Cole Himself Recognized that His Stock Sale Was Evidence of Scienter ............. 5

        B.   Applicable Law ...................................................................................................... 6

        C.   Discussion ............................................................................................................. 7

             1.   Compensation ................................................................................................... 7

             2.   Cole's Stock Sale and Iconix's Stock Price........................................................ 9

II.     THE COURT SHOULD ADMIT EVIDENCE OF WEALTH INSOFAR AS IT
        DEMONSTRATES COLE'S 2014 STOCK SALE AND ICONIX HOLDINGS............. 15

III.    THE COURT SHOULD ADMIT THE CANDIES EVIDENCE ...................................... 16

CONCLUSION.................................................................................................................... 18

## **TABLE OF AUTHORITIES**

### **CASES**

*Accord Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ........................................................................... 11

*La Plante v. American Honda Motor Co., Inc.,*
    27 F.3d 731 (1st Cir. 1994) ............................................................................. 14

*Old Chief v. United States,*
    519 U.S. 172, 186–87 (1997) .......................................................................... 14

*SEC v. Jensen,*
    2013 WL 12129377 (C.D. Cal. Mar. 13, 2013) ................................................ 9

*United States v. Bailey,*
    696 F.3d 794 (9th Cir. 2012) .......................................................................... 17

*United States v. Bilzerian,*
    926 F.2d 1285 (2d Cir. 1991) .......................................................................... 10

*United States v. Block,*
    16 Cr. 595 (JPO) .............................................................................. 8, 13, 15

*United States v. Bradley,*
    644 F.3d 1213 (11th Cir. 2011) ...................................................................... 14

*United States v. Cassese,*
    290 F. Supp. 2d 443 (S.D.N.Y. 2003) ............................................................ 14

*United States v. Clay,*
    832 F.3d 1259 (11th Cir. 2016) ...................................................................... 13

*United States v. Ferguson,*
    2007 WL 4240782 (D. Conn. Nov. 30, 2007) ................................................... 7

*United States v. Ferguson,*
    676 F.3d 260 (2d Cir. 2011) ............................................................................. 9

*United States v. Forbes,*
    29 F. App'x 233 (2d Cir. 2007) ........................................................................ 9

United States *v. Gelzer,*
    50 F.3d 1133 (2d Cir. 1995) ............................................................................. 7

*United States v. Kaiser*,
   609 F.3d 556 (2d Cir. 2010)..................................................................... 16

United States v. LaFlam,
   369 F.3d 153 (2d Cir. 2004)..................................................................... 6

*United States v. Peters*,
   543 F. App'x 5 (2d Cir. 2013) .................................................................. 7

*United States v. Petit*,
   19 Cr. 850 (JSR) ............................................................................. 8, 13, 15

*United States v. Quattrone*,
   441 F.3d at 187 ........................................................................................ 7

*United States v. Reyes*,
   660 F.3d 454 (9th Cir. 2011) .................................................................. 13

*United States v. Schiff*,
   538 F. Supp. 2d 818, (D.N.J. 2008) ........................................................ 9

*United States v. Shapiro*,
   No. 15 Cr. 155 (RNC D. Conn. Apr. 24, 2017) ...................................... 8

*United States v. Singer*,
   2010 WL 146165 (D.S.C. 2010)............................................................. 11

*United States v. Socony-Vacuum Oil. Co.*,
   310 U.S. 150 (1940)................................................................................ 13

*United States v. Stahl*,
   616 F.2d 30 (2d Cir. 1980)..................................................................... 14

## OTHER AUTHORITIES

Sand, et al., Modern Federal Jury Instructions, Instr. 57-20....................... 14

## RULES

Fed. R. Evid. 401 ........................................................................................ 6

Fed. R. Evid. 402 ........................................................................................ 6

Fed. R. Evid. 403 ........................................................................................ 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                                       :
UNITED STATES OF AMERICA                               :
                                                       :
   - v. -                                              :         19 Cr. 869 (ER)
                                                       :
NEIL COLE,                                             :
                                                       :
                       Defendant.                      :
                                                       :
------------------------------------------------------x

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Neil Cole's motions to exclude (a) evidence of Cole's stock sale proceeds, ECF Doc. No. 108 (the "Stock Profits Br."); (b) evidence of Cole's wealth, ECF Doc. No. 104 (the "Wealth Br."); and (c) evidence of Cole's participation in a prior accounting fraud investigation, ECF Doc. No. 106 (the "Candies Br.").

## ARGUMENT

## I.   THE COURT SHOULD ADMIT EVIDENCE OF COLE'S STOCK SALE AND COMPENSATION PLAN

Neil Cole seeks to prevent the jury from learning that he sold millions of dollars of Iconix stock mere days after he caused the company to misstate its key financial metrics to the market. Cole argues the evidence of his sale will be irrelevant without expert testimony in the form of an event study and, in any event, would be unduly prejudicial. In making his argument, Cole misstates the law and misunderstands the nature of the evidence.

The Court should admit the stock sale evidence and permit the Government to argue that the sale, as well as Cole's compensation and Iconix stock holdings, demonstrate Cole's motive, intent, and personal views on the materiality of his misstatements.

### A.  Factual Background

The evidence will show that Cole was motivated to engage in the charged scheme in part to maintain and increase the share price of Iconix's stock, which had the effect of benefitting him personally.

### 1.  *Cole Had Strong Incentive to Maintain and Increase Iconix's Stock Price.*

Evidence of Cole's personal and professional interest in maintaining Iconix's stock price will come in multiple forms. First, testimony and compensation records will establish that Cole had a personal, financial stake in maximizing Iconix's share price. As the defense motion concedes, Cole was a large shareholder in Iconix, which holdings accounted for a substantial portion of his personal wealth. Indeed, as of early November 2014, Cole's Iconix holdings were valued at just over $131 million and constituted approximately 87% of his net worth based on the Government's rough calculations. (*See* GX-1504, attached hereto as Exhibit A). Additionally, as part of his compensation package, Cole received performance stock awards if Iconix met certain financial metrics as established by the Board of Directors, including targets for EPS, one of the metrics that the Government alleges Cole manipulated. (*See* GX-121, attached hereto as Exhibit B).

Cole featured the fact that he owned such a large percentage of Iconix stock in conversations with investors as a reason they should invest in Iconix. By way of example, in a December 2013 conversation with one investor whose hedge fund owned a substantial position in Iconix stock, Cole noted that he owned five percent of Iconix's stock. Cole further predicted that Iconix would have a $5 billion market capitalization within 3 years and that by that point Cole would own 10 percent of the company's stock. (GX-1701, attached hereto as Exhibit C).

In addition to his personal, financial stake in Iconix, Cole derived bragging rights from the performance of Iconix's stock. For example, in an email exchange with a fellow Iconix employee and close associate on January 25, 2013, Cole asserted that the "best revenge for

2

those" against whom he held "animosity" would be "a 50 dollar stock" – referring to Iconix – "that they won't participate in." (GX-1233, attached hereto as Exhibit D).

Cole also recognized that Iconix's stock represented valuable currency that could be used in connection with mergers and acquisitions and that the trading price of the stock would affect the value of that currency. For example, in a September 29, 2013 email discussing a potential business combination, Cole asserted that Iconix's "valuable public stock" would be an incentive to the counterparty to engage in the transaction. (GX-1236, attached hereto as Exhibit E). In a separate exchange with Seth Horowitz, another Iconix executive and Cole's co-conspirator, Cole asserted that Iconix's stock was "same as cash for value." (GX-1234, attached hereto as Exhibit F).

2. *Cole Understood the Connection Between Investor Expectations and the Stock's Performance.*

Cole appreciated the commonsense connection between pleasing Wall Street and Iconix's stock price. Iconix employees will testify to conversations they had with Cole on this topic, and they will be corroborated by documents and other communications. For example, during the timeframe of the scheme, Cole's co-conspirator Horowitz referenced their shared desire for "an $80 stock" in urging a particular business action that Horowitz believed would be especially profitable for the company. (GX-242, attached hereto as Exhibit G). In a similar vein, Cole appeared on CNBC's Mad Money in May 2014. After the appearance, Horowitz wrote to Cole, "Just watched [Mad Money]. Thought you were great. [Jim] Cramer is so supportive of the company [Iconix] – and the stock. Really nice." Cole responded, "Yes, he is very supportive. I didn't have to say much since he was a better pitchman then [sic] me." (GX-1237, attached hereto as Exhibit H). In another email exchange with Iconix board members from mid-2013, Cole commented that it was "funny" that the stock was down 10 percent despite "all the good news," and attributed the downward trend to the fact that it had been a "tough week in the market" generally. (GX-1235, attached hereto as Exhibit I).

3

Cole also actively monitored shareholder commentary and sell-side analyst coverage of the company's earnings and stock price targets. Testimony and documents will establish that Cole held regular meetings at Iconix in which he focused on the company's intra-quarter financial performance and, in particular, whether the company's quarterly numbers would make or miss the expectations of Wall Street analysts and improve over the financial results that Iconix reported for the same quarter the prior year. In preparation for those meetings, Cole directed the preparation of spreadsheets, an example of which is marked as GX-234 (attached hereto as Exhibit J), which show the revenue and earnings per share that the company was "forecast" to report as of that date, and the additional revenue and EPS effect of certain "opportunities and risks," including, as relevant here, the potential creation of joint ventures. The spreadsheets also included for reference the prior year's quarterly numbers, and the Wall Street consensus for revenue and EPS as of that date.

Additional evidence of Cole's expectation that meeting investors' expectations for earnings and consensus was important to support Iconix's stock price will come from Iconix's quarterly press releases and investor calls, in which Cole and Iconix emphasized growth in revenue and EPS, among other metrics, including on a year-over-year basis.

### 3.   *Cole's Stock Sale*

On October 28, 2014, Iconix released its third quarter earnings in a press release touting "Record Q3 diluted non-GAAP EPS" representing a "23% increase over prior year quarter," and "[r]ecord Q3 revenue" that constituted a "6% increase over prior year quarter." In a quote included in the press release, Cole highlighted the company's "double digit growth around the world driven by our global brands and joint ventures." (GX-104, at 4, attached hereto as Exhibit K).

The evidence at trial will show that that these statements by Cole came after he had been engaged in a scheme since the fall of 2013 to fraudulently inflate the Company's revenue and earnings. Cole's statements and the public pronouncements in the Company's SEC filings and

4

news releases masked the fact that Iconix had not grown by double digits in the third quarter of 2014 and in fact had shrunk in the second quarter.

Slightly more than a week later, on November 7, Iconix filed its quarterly report for the period ending September 30, 2014 with the SEC. In connection with the filing, Cole certified that the report was accurate and "fairly present[ed], in all material respects, the financial condition and operations of [Iconix]." (GX-105, at 34, attached hereto as Exhibit L).

On October 31, 2014, in the window between the filing of Iconix's third quarter press release and the filing of quarterly report with the SEC, Cole sold his stock. The timing of Cole's stock sale was not a foregone conclusion. The options that Cole exercised had been granted to him in 2005, and could have been exercised at any point between the date they were granted and March 29, 2015, when the oldest set of options was due to expire. Cole could have exercised the options without immediately selling the stock he obtained. Indeed, Horowitz will testify that in early 2014, Cole told him that he intended to wait to sell Iconix stock until early 2015, and that, if Horowitz wished to sell stock, he should do so then as well. Moreover, prior to deciding to sell 1 million shares in a single block immediately after the earnings announcement, Cole considered putting in place, and even had drafted, a 10b5-1 plan that would have spread the exercise of options and sales of the resulting stock over the six months from October 2014 to March 2015. (GX-1107, attached hereto as Exhibit M).

Ultimately, as noted, in the midst of the fraudulent scheme charged in this case, Cole exercised options to purchase one million shares in Iconix common stock and immediately liquidated those shares for gross proceeds of $39.5 million. After subtracting the $5.7 million strike price on the options and $5.4 million in income tax withholding, Cole received net proceeds of over $28 million.

### 4.   Cole Himself Recognized that His Stock Sale Was Evidence of Scienter.

On December 15, 2014, the SEC sent Iconix a comment letter raising questions about the accounting of certain the company's joint ventures. The same day, a short seller released a report

raising different issues that likewise concerned the joint ventures. Although neither the SEC
comment letters nor the short report identified the fraudulent practices charged in this case, the
evidence will show that Cole recognized that the additional scrutiny that they would generate
increased the risk that the scheme would be discovered. In conversations with Horowitz, Cole
acknowledged that the risk for him would be particularly great due to the timing of Cole's stock
sales. Indeed, at various points in conversations with Horowitz, Cole suggested that he had
criminal exposure. In order to distance himself from the transactions at issue in this case, Cole
pressured Horowitz to falsely describe Cole's role in negotiating the transactions in
correspondence with the SEC, which conduct forms part of the basis for the obstruction
conspiracy charged in Count Ten of the Indictment in this case.

### B.  Applicable Law

Under Federal Rule of Evidence 402, relevant evidence is admissible, unless otherwise
barred by the Constitution, federal law, or federal rule. Fed. R. Evid. 402. Federal Rule of
Evidence 401 defines what it means for evidence to be considered relevant—namely, "it has any
tendency to make a fact more or less probable than it would be without the evidence; and [] the
fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence may still
be excluded at trial if "its probative value is substantially outweighed by a danger of . . . unfair
prejudice[.]" Fed. R. Evid. 403.

In conducting the necessary balancing of the probative value of evidence against any
possible prejudice, required under Federal Rule of Evidence 403, the District Court considers
whether the probative value is "substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of
time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The discretion
conferred on a district court to balance probative value against possible prejudice is
"broad." *United States v. LaFlam*, 369 F.3d 153, 155 (2d Cir. 2004). Since any evidence that is
probative of guilt is, by definition, prejudicial, Rule 403 is designed to reach only unfair or

undue prejudice--that which "involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (internal quotation marks omitted).

### C.  Discussion

Though styled as a motion to preclude evidence of a Cole's October 2014 stock sale, Cole's Stock Profit Brief argues that the Government should not discuss Cole's compensation (Stock Profit Br. 4); inform the jury that Cole sold millions of dollars in Iconix stock in the midst of his fraud (Stock Profits Br. 7-8); or argue that Iconix's stock price was inflated (Stock Profits Br. 7 n.2). The Court should reject each of these arguments.

#### 1.  Compensation

Cole's compensation structure highlights Cole's incentive to manipulate Iconix's financial results because Cole stood to profit from a fraud that inflated the company's published financial metrics. In similar circumstances, courts have admitted such motive and intent evidence, and this Court should do the same. *See, e.g.*, *United States v. Quattrone*, 441 F.3d at 187 ("The district court concluded that evidence of Quattrone's compensation for 1999 and 2000 was relevant to Quattrone's motive to protect his reputation and that of CSFB's Tech group."); *United States v. Peters*, 543 F. App'x 5, 10 (2d Cir. 2013) (Summary Order) ("The record shows . . . that the district court appropriately limited the prosecution's references to the defendant's lifestyle, and that some evidence of the defendant's wealth was relevant to the question of motive."); *United States v. Ferguson*, No. 06 Cr. 137 (CFD), 2007 WL 4240782, at *1 (D. Conn. Nov. 30, 2007) ("The evidence concerning Milton's deferred compensation plan . . . is relevant to proving motive, because AIG's performance affected Milton's benefits under the plan. Evidence that links a defendant's financial compensation to his possible motives for participating in an alleged fraud is relevant to proving the fraud . . . . In light of Milton's financial interest in AIG's performance, evidence of the deferred compensation plan is relevant to Milton's motive to

manipulate AIG's financial statements to maintain AIG's stock price."). Indeed, the mere fact that Cole held stock in Iconix is probative of motive when the fraud concerns the company's financial statements. The Hon. Jed S. Rakoff made that point in *United States v. Petit*, where he admitted evidence about the defendants' stock holdings during the period of the alleged accounting fraud because it "goes directly to motive." 19 Cr. 850 (JSR), Trial Tr. at 2031, ECF Doc. 185. Cole's stock holdings and compensation plan are similarly admissible.

*United States v. Shapiro*, a case relied upon in the defendant's motion (Stock Profits Br., at 4), does not counsel otherwise. In *Shapiro*, the U.S. District Court for the District of Connecticut excluded under Rule 403 a spreadsheet detailing a trader's total compensation over multiple years unless the Government could show more than an "indirect . . . and limited" link to certain fraudulent trades. *United States v. Shapiro*, No. 15 Cr. 155 (D. Conn. Apr. 24, 2017), ECF Doc. 372 at 20-22. In contrast to *Shapiro*, the proof here will include specific evidence that the defendant stood to (and, in fact, did) receive Iconix shares through his compensation package and that his compensation depended, in part, on metrics, such as earning per share, that the defendant caused to be inflated through the accounting fraud. This approach tracks that in *United States v. Block*, where the Hon. J. Paul Oetken excluded general evidence of the defendant's wealth but admitted as evidence of motive, intent, and materiality "evidence about the amount and structure of [the defendant's] compensation and bonus and his [company] stockholding insofar as they are tied to earnings numbers or in another way connected to the alleged fraud." Case No. 16 Cr. 595 (JPO), 6/5/2017 Hr'g Tr. at 9:05-10:01, ECF Doc. 107, *aff'd* 797 F. App'x 668 (2d Cir. 2020). The Court should strike the same balance here: permit the jury to learn that Cole's compensation structure and personal holdings in Iconix incentivized him to commit the fraud, but shield the jury from evidence of Cole's general wealth or extravagant spending. Such an approach would also ensure that the jury would not mistake the relevance of the evidence to be the mere fact of the defendant's wealth.

### 2.   Cole's Stock Sale and Iconix's Stock Price

Cole asserts that where "the government seeks to introduce evidence of a defendant's stock sale proceeds, it must . . . establish a causal connection between the alleged misstatements and the stock price at the time of the sale; otherwise no relationship exists between the alleged fraud and the stock sale." Def. Br. 4-5. This purported evidentiary principle has no basis in law.

The authorities Cole relies upon largely address a circumstance where the government seeks to prove the materiality of a misstatement (or omission) based on stock price movements after a defendant's false statements are corrected to the market. *See, e.g.*, *United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011) (district court abused its discretion in admitting as evidence of materiality three stock-price charts showing single-day stock price drops in the aftermath of articles about the fraud); *United States v. Schiff*, 538 F. Supp. 2d 818, 835 (D.N.J. 2008) ("[I]f the Government wishes to use a stock price drop as evidence of materiality, it must demonstrate that public disclosure of the misstatements charged in the indictment had an 'appreciable negative effect' on the stock price."). Those cases did not consider evidence of a defendant's sale of stock at all, let alone impose a special rule of relevancy that such evidence must be accompanied by expert causation testimony. Indeed, contrary to Cole's argument, those authorities do not even establish a categorical rule that expert testimony must always be used to establish stock-drop materiality. In fact, the Second Circuit has affirmed the admission of stock-drop materiality evidence presented by lay witnesses. *See, e.g.*, *United States v. Forbes*, 29 F. App'x 233, at *2 (2d Cir. 2007) (Summary Order) ("The District Court correctly ruled that references to the decline in Cendant's stock price or investor losses were probative on the issue of materiality and permissible under [Rule 403]"). And in *SEC v. Jensen*, cited by Cole, the U.S. District Court for the Central District of California held that expert testimony was not required to assess the materiality of a stock drop when the circumstances of the stock-drop plainly related to the disclosure of the fraud. No. 11 Civ. 5316, 2013 WL 12129377, at *4 (C.D. Cal. Mar. 13, 2013) (distinguishing *Schiff* and noting that "[e]xpert analysis is not required to draw an

inference that after-the-fact admission of accounting errors have a greater, negative impact on stock price than the impact of accurate financial statements.").

The Government here has no intention of introducing general stock-drop evidence unless Cole elicits testimony about what happened at Iconix after the discovery of his fraud. Nor does the Government intend to argue that the jury should infer from Iconix's stock price movements over the duration of the scheme that Cole's misstatements were "material" within the meaning of the federal securities laws, though, as a general matter, price evidence may be used to make the point. *See, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991). Rather, the Government intends to prove the materiality of Cole's misstatements through, among other evidence, the testimony of company employees, outside auditors, investors, Cole's own statements, and the terms of his compensation plan. Accordingly, Cole's abstract fears that the jury will draw unfounded inferences from Iconix's stock price trend will not be realized.

Cole's stock sale, however, bears directly on why and how Cole would commit the securities fraud, false filing, and misleading the conduct of audits offenses, and the jury should learn of it. The trial evidence will demonstrate that Cole repeatedly opined that Iconix's success in meeting financial guidance, beating analyst consensus, and showing revenue growth were important to avoid a decline in the company's stock price. Witnesses will also recall that Cole explicitly pushed joint venture negotiations to conclude by quarter-end so Cole could present that news to the market and report the resulting revenue and earnings. And, as noted above, Cole's compensation included stock grants and awards based on meeting certain financial metrics. Against that background, the fact that Cole sold millions of dollars in Iconix stock days after misleading the markets is both highly probative and easily understood. The jury need not speculate about how Iconix's stock price may have influenced Cole's criminal conduct: the jury will have direct evidence that it motivated his choices.

This evidence will not run afoul of a rule that expert causation testimony must accompany any evidence of a defendant's stock sale in a securities fraud case, as Cole argues,

because no such rule exists. Cole reasons otherwise based on *United States v. Singer*, 2010 WL 146165 (D.S.C. 2010). In *Singer,* the U.S. District Court for the District of South Carolina precluded the government from arguing that "over the course of several years the stock price rose as a result of the thirty-five allegedly fraudulent acquisitions," reasoning that to conclude the stock price rose because of the fraud "rather than as a result of other factors . . . is simply not a permissible inference absent expert evidence to support the government's argument." *Singer*, 2010 WL 146165 at *4.

The comparison to *Singer* does not flatter Cole's argument. For one thing, the trial evidence will demonstrate that Cole sold approximately $38 million in stock days after causing the company to issue false statements about the company's performance in an October 28, 2014 press release and shortly after his stockbroker wrote him to observe that "the market liked the quarter and the guidance." GX-1121, attached hereto as Exhibit N. The timing and size of Cole's sale, especially considered in light of Cole's preoccupation with the company's financial metrics, is plain evidence of Cole's personal financial motives for committing fraud. *Accord Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (civil pleading requirement "generally met when corporate insiders were alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit."). To sanitize the record such that the jury never hears that Cole lied to manipulate Iconix's revenue and EPS for the third quarter of 2014 and then promptly dumped a huge block of Iconix stock after the release of the fraudulent good news would deprive the jury from hearing about powerful evidence that goes directly to Cole's motive to commit the accounting fraud.

In addition, unlike in *Singer*, the Government does not intend to argue that Iconix's stock price rose over a period of years because of the fraud. Nor will the Government ask the jury to evaluate multiple stock transactions by Cole. Rather, the Government will argue that Cole misled the investing public about Iconix's financial condition, Cole chose to manipulate certain metrics

based on his belief that those metrics would affect the stock price, and, having misled the public, Cole sold millions of shares of stock. The Government will substantiate Cole's belief in the nexus between his fraud and the stock price through testimony by investor-victims who will describe the significance of the metrics Cole manipulated to their investment decisions. From this evidence, the Government may fairly argue that Cole's scheme was a scheme to inflate the stock price and that he, in fact, profited by selling shares after misleading the market.

Further, with respect to the obstruction of justice count, Cole's stock sale is both probative of his motive to frustrate the SEC's inquiry and is also inextricably intertwined with the actions he took to accomplish that plan. The trial evidence will demonstrate that Cole worried that his stock sale had invited SEC scrutiny of the company because it occurred after the company's Q3 2014 press release but before the company's Q3 2014 periodic report. When the SEC subsequently inquired who at Iconix had taken the lead in negotiating SEA-2 and SEA-3, Cole implored a co-conspirator to minimize Cole's role in the negotiations so it would not appear to the SEC that Cole had negotiated, timed, and publicized the joint ventures to benefit his stock sale. The Court should not preclude evidence that is so directly related to the charged offense and which provides significant context to the incriminating conversations that Cole had with his co-conspirators in response to the SEC's inquiry.

The admissibility of the stock sale evidence is not diminished by the fact that Cole sold only part of his Iconix stock holdings, or that Cole exercised options due to expire the following year, or that Cole's Iconix position increase in 2015.[1] *Cf.* Stock Profits Br. 3. For one thing, the fact that Cole continued to hold Iconix stock after the 2014 sale underscores the Government's

---

[1] Cole's further assertion that "Mr. Cole ultimately incurred substantial losses that exceeded the amount of his gain on the October 2014 stock sale" is, at best, unsubstantiated. *Cf.* Stock Profits Br. 3. Based on Iconix's description of its officer compensation practices in various filings, it appears that Cole obtained all, or nearly all, of his Iconix holdings through stock grants or stock options conferred to him by the company at little out-of-pocket cost. Cole's point may be that he was unable to realize the gain on those securities before his fraud was discovered and the stock price dropped dramatically.

point that Cole had personal incentives to manipulate Iconix's financial reporting and those incentives continued, as did his scheme, into 2015. For another, the fact that Cole exercised options obtained in 2005 that were due to expire in 2015 makes the timing of Cole's stock sale more suspicious, not less. Cole could have exercised his options without selling the stock immediately afterwards. Cole also could have exercised the options between 2005 and 2014 and sold the stock in the eight years or so that preceded his fraud. Instead, Cole waited to sell his stock until he had first misled the market about Iconix's performance through an inaccurate press release and 8-K. For still another, the claim that Cole "increased his overall position in March 2015" omits that his increased holdings result from the compensation package awarding him performance stock units. *See* Ex. F to Stock Profits Br., ECF Doc. 108-6. Based on the Form 4, Cole did not buy more Iconix stock in 2015 as he implies.

The fact that Cole sold more than $30 million worth of stock (and realized more than $28 million in profit) will not unfairly prejudice Cole by engendering class animus. As explained above, the stock sale evidence offers substantial and specific evidence of Cole's motive and intent. *See supra* at 7-11. *See also Petit*, No. 19 Cr. 850 (JSR), Trial Tr. at 2031, ECF Doc. 185; *Block*, No. 16 Cr. 595 (JPO), 6/5/2017 Hr'g Tr. at 9:05-10:01, ECF Doc. 107; *United States v. Reyes*, 660 F.3d 454, 464 (9th Cir. 2011) ("[T]he Government was allowed to introduce evidence about [the defendant's] motivation for his involvement in the backdating scheme, his scienter, even if such evidence is generally not sufficient, standing alone, to prove intent to defraud."); *United States v. Clay*, 832 F.3d 1259, 1314 (11th Cir. 2016) (finding the district court did not abuse discretion in admitting compensation evidence to extent "necessary to show that the defendants had an incentive to maximize" their company's profits).

None of the cases cited by Cole suggest otherwise. *United States v. Socony-Vacuum Oil. Co.*, 310 U.S. 150, 238-39 (1940) (finding statements such as "We are going to stop it, as our forefathers stopped it before us and left this country with us as it is now, or we are going down into ruin as did the Roman Empire" to be "undignified and intemperate"); *United States v.*

*Cassese*, 290 F. Supp. 2d 443, 457 (S.D.N.Y. 2003) (granting Rule 29, in part, because the government failed to prove up the "anger theory" of motive it had used to justify the introduction of the defendant "wealth, salary, and stock holdings."); *United States v. Stahl*, 616 F.2d 30, 32-33 (2d Cir. 1980) (vacating conviction because the prosecutor engaged in "calculated and persistent efforts to arouse [prejudice against the defendant because of his wealth] throughout the trial."); *La Plante v. American Honda Motor Co., Inc.*, 27 F.3d 731, 740 (1st Cir. 1994) (excluding "enormous profitability" of product in a products liability case as "marginally relevant"); *United States v. Bradley*, 644 F.3d 1213, 1272 (11th Cir. 2011) (finding no abuse of discretion in trial court's admission of wealth evidence in the form of showing how the defendants spent their profits).

Finally, Cole's sale of stock is also direct proof of one of the charged offenses and allows the Government to establish one of the necessary elements of that offense, only further underscoring the probative value of this evidence. Cole is charged in Count Two of the Indictment with securities fraud. To prove that offense, the Government must prove, among other elements, that *in connection with the purchase or sale of Iconix's stock*, the defendant either (i) employed a device, scheme or artifice to defraud, (ii) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or (iii) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller. *See generally* Sand, et al., Modern Federal Jury Instructions, Instr. 57-20. Cole's stock sale would clearly satisfy this element and it is the Government's choice as to how to prove the elements of the offense. *Old Chief v. United States*, 519 U.S. 172, 186–87, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ("[T]he prosecution is entitled to prove its case by evidence of its own choice."). This only further weighs in favor of permitting the Government to present this evidence, particularly given that its probative value far outweighs any minimal prejudice.

14

## II.     THE COURT SHOULD ADMIT EVIDENCE OF WEALTH INSOFAR AS IT DEMONSTRATES COLE'S 2014 STOCK SALE AND ICONIX HOLDINGS.

Cole moves to preclude evidence of "Mr. Cole's financial resources and how he chose to spend his money," such as on the purchase of multiple homes, luxury items, and the use of private jets. *See* Wealth Br. 2, 6. Much of this motion can be denied as moot: The Government voluntarily agrees to forego evidence of how Mr. Cole spent his money—even the fraud proceeds—in its case-in-chief. The Government also agrees not to introduce generalized information about the wealth of the defendant or any witness.[2] The Government, however, reserves the right to seek the introduction of any such spending and wealth evidence if the evidence responds to a specific argument raised by the defense or if the evidence relates to a matter about which Mr. Cole testifies.

All that said, the Government will seek to offer the motive, intent, and materiality evidence described above, including (a) the nature of Cole's Iconix compensation plan; (b) the fact, size, and concentration of Iconix stock holdings as a percentage of his overall wealth; and (c) the fact, size, and timing of Cole's sale of Iconix stock. As detailed in the discussion about the Stock Profits motion, such evidence is not generalized evidence of the defendant's wealth but rather specific evidence of motive, intent, and materiality. *See Petit*, No. 19 Cr. 850 (JSR), Trial Tr. at 2031, ECF Doc. 185; *Block*, Case No. 16 Cr. 595 (JPO), 6/5/2017 Hr'g Tr. at 9:05-10:01, ECF Doc. 107. To the extent that particular documentary proof of Cole's Iconix stock holdings—such as GX-1504, attached hereto as Exhibit A—also reflect how the defendant spent his wealth, the Government would be amenable to appropriate redactions or stipulations.

---

[2] The Government presumes that the defense likewise will agree not to cross examine witnesses regarding their wealth or to put arguments before the jury based on the defendant's or a witness's general wealth. For example, the Government presumes that the defense will not argue that the defendant lacked a motive to commit this crime because he was already flourishing financially and thus had no need to engage in fraud and put everything he had earned at risk.

III.    **THE COURT SHOULD ADMIT THE CANDIE'S EVIDENCE**

The Government's affirmative arguments in support of admission of this evidence are set forth in its motion *in limine* of September 10, 2021. *See* ECF Doc. 115. In addition to the arguments made there, the Government notes the following in response to the arguments made in the defendant's motion.

First, the defendant is wrong to assert that the Candie's Evidence cannot be admitted as direct proof of the charged offenses because those events "did not arise 'out of the same transaction or series of transactions as the charged offense.'" (Candies Br. 7). As the Government's opening memorandum explained, evidence offered "to show the background of a conspiracy" is not "other crimes" evidence subject to Rule 404(b), but rather "direct proof of the charged conspiracy." *United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010). That is precisely the use to which the Government intends to put this evidence.

In particular, the Candie's Evidence is relevant to show Cole's knowledge and understanding that linked financial transactions, particularly transactions in which funds between counterparties are flowing in both directions, could have accounting implications and lead to the misstatement of revenue or earnings. The defendant cannot seriously dispute that he intends to argue that he lacked understanding of the sensitivity around roundtrip transactions. Indeed, in a letter to the Government dated November 12, 2019, counsel for Cole argued that charges should not be brought because "Neil is not an accountant and . . . believed (and had no reason to doubt) that the accounting related to the transactions was appropriate."

Cole's suggestion that that the accounting concerns identified at Candie's were entirely dissimilar to those at issue here is wrong as well. Government Exhibit 604 (attached) is a memorandum that Cole, according to his own SEC testimony, helped to prepare. The memorandum has been redacted to remove references to accounting issues at the company unrelated to the issues in this case.[3] The unredacted portion memorializes the fact that Candie's

---

[3] A prior version of the exhibit redacted slightly different portions of the memo.

auditors at Ernst & Young ("E&Y) raised roundtripping concerns because the company had recorded certain capital expenditures on behalf of a counterparty that equaled expense credits from that counterparty that had the effect of increasing Candie's earnings. In other words, E&Y was seeking to verify that Candie's had not engaged in precisely the sort of improper roundtripping that the Government alleges occurred in this case.

In addition to showing Cole's knowledge of the relevant accounting issues, the Candie's evidence is also relevant to show Cole's motivation in directing Horowitz to destroy documents and conceal material terms. As the Government has previously explained, the Candie's episode put Cole on notice of the types of evidence that auditors and the SEC use to investigate roundtrip transactions, and therefore the jury should be able to conclude that the Candie's Evidence, in part, explains Cole's particular concealment and evidence-destruction efforts in 2015. And, contrary to the defendant's claim, the evidence will make clear that the experience of the Candie's investigation was not some remote memory for Cole. Indeed, Horowitz will testify that Cole specifically made reference to the Candie's investigation and the fact that it had made him "better" in discussing with Horowitz their own response in 2015 to SEC scrutiny.

*United States v. Bailey*, 696 F.3d 794 (9th Cir. 2012), upon which Cole relies to urge the exclusion of this evidence, in addition to not controlling this Court, is distinguishable. There the Government sought to introduce a complaint, and the court correctly concluded that a complaint "does not establish the truth of either the facts asserted in the complaint, or of the law asserted in the complaint." *Bailey*, 696 F.3d at 801-02. Here, in contrast, the Government intends to offer admissible evidence of the facts – in the form of the actual credits and expenses recorded by Candie's, the testimony of one of the E&Y auditors, and the memorandum regarding E&Y's concerns that Cole assisted in drafting.

Nor is Cole helped by the many cases that he cites for the uncontroversial proposition that the Government cannot introduce unproven allegations that the defendant previously engaged in a bad act to prove that he committed that act. As the Government has stated explicitly

on a number of occasions, the Government does not plan to offer proof or to argue to the jury that Cole committed any wrongdoing whatsoever in connection with the Candie's conduct and would welcome a limiting instruction to that effect. For that reason, there will be no need, as Cole suggests, to engage in a mini-trial regarding the details of the Candie's investigation or the niceties of the vendor relationships in that case.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the defendant's motions should be denied.

Dated:  New York, New York
        September 27, 2021

                              Respectfully submitted,
                              AUDREY STRAUSS
                              United States Attorney

                    By:  _____/s/_____
                              Scott Hartman
                              Noah Solowiejczyk
                              Andrew Thomas
                              Assistant United States Attorneys
                              (212) 637-2357/2473/2106

18