UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                              :

UNITED STATES OF AMERICA       :
                              :

           - *v.* -             :         19 Cr. 869 (ER)
                              :

NEIL COLE,                   :
                              :

             Defendant.       :
                              :

------------------------------------------------------ x


**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE
DEFENDANT'S MOTION TO COMPEL THE GOVERNMENT TO IMMUNIZE
CERTAIN WITNESSES**


                                      AUDREY STRAUSS
                                        United States Attorney
                                        Southern District of New York


Scott Hartman
Noah Solowiejczyk
Andrew Thomas
Assistant United States Attorneys

- Of Counsel -

# TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 1

I.   The Iconix-GBG Round Trip Transactions.................................................................. 1

II.  The Proffers OF Famulak and Ventricelli ................................................................. 3

   A.   Famulak's Proffer ................................................................................................ 3

   B.   Ventricelli's Proffer ............................................................................................ 5

ARGUMENT ................................................................................................................... 11

I.   The Court Should Not Compel Immunity ................................................................ 11

   A.   Applicable Law .................................................................................................. 11

   B.   Discussion .......................................................................................................... 12

     i.   The Testimony is Not Material or Exculpatory and It
       Is Obtainable from Another Source ................................................................ 13

    ii.   The Government Has Not Through Overreaching, Forced
       Witnesses to Invoke the Fifth Amendment, or Used Immunity
       in a Discriminatory Way to Gain Tactical Advantage .................................... 17

CONCLUSION.................................................................................................................. 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
                                                    :
    UNITED STATES OF AMERICA              :
                                                    :
              - v. -                                :          19 Cr. 869 (ER)
                                                    :
    NEIL COLE,                                 :
                                                    :
                         Defendant.          :
                                                    :
------------------------------------------------------- x

The Government respectfully submits this memorandum of law in opposition to the defendant's motion for an order directing the Government to provide use immunity to Dow Famulak and Ron Ventricelli ("Def. Mot.") (ECF Doc. No. 116).

## BACKGROUND

### I.      THE ICONIX-GBG ROUND TRIP TRANSACTIONS

Neil Cole served as the chief executive officer of Iconix Brand Group ("Iconix"). Iconix managed various clothing and fashion brands, typically by acquiring the rights to the brand name and then licensing those brands to retailers, wholesalers, and suppliers, who, in turn, produced and sold clothing and other products to retail customers. Iconix operated as a public company with shares traded on the NASDAQ.

The Government alleges that Cole, from 2013 to 2015, engaged in a scheme to falsely inflate Iconix's reported revenue and earnings per share ("EPS") by orchestrating a series of "round trip" transactions in which Cole induced a Hong Kong-based JV partner, Global Brands Group Asia Limited ("GBG")[1], to purchase JV interests at artificially inflated prices with the understanding that Iconix would then reimburse GBG for the overpayments. At times, Cole

---

[1] During the early portions of the scheme, the entity that was later known as GBG operated under the name LF Asia. For simplicity's sake, both entities are referred to herein as GBG.

conducted the scheme with the assistance of Seth Horowitz, who served under Cole as chief operating officer of Iconix. Cole and Horowitz executed the scheme so Iconix could report fraudulently inflated revenue and EPS figures based on the inflated buy-in purchase prices it obtained from GBG. Through the scheme, Cole and Horowitz caused Iconix to report fraudulently inflated revenue and, in some cases, EPS figures to the investing public to ensure that the reported figures met analyst consensus and to fraudulently convey the impression to the investing public that Iconix was growing quarter after quarter, as Cole had touted

Cole arranged for Iconix to enter into JVs with GBG that included inflated buy-in purchase prices on three occasions: (1) the Southeast Asia JV, which closed on or about October 1, 2013 ("SEA-1"), (2) the Southeast Asia first amendment, which closed on or about June 30, 2014 ("SEA-2"), and (3) the Southeast Asia second amendment, which closed on or about September 17, 2014 ("SEA-3"), (collectively, the "SEA JVs"). Each of the SEA JVs involved a fraudulent "round trip" transaction, lacking in economic substance, in which GBG paid an artificially inflated buy-in purchase price for its interest in the JV, in exchange for Cole's agreement that Iconix would give back the inflated portion of the purchase price to GBG. Cole— who had received a presentation from Iconix auditors in 2012 about "round tripping"—knew that these arrangements were improper. So Cole and Horowitz hid the inflated purchase prices and offsetting round-trip payments from Iconix's lawyers and outside auditors. With respect to SEA 1, GBG paid a purchase price of $12 million, which was inflated by $2 million, in return for a commitment from Iconix that it would reimburse GBG for the $2 million overpayment by paying GBG through a consulting agreement that lacked economic substance. With respect to SEA 2, GBG paid a purchase price of $15.9 million, which was inflated by $5 million, in return for a commitment from Iconix that it would reimburse GBG for the $5 million overpayment at a later

time, and through various potential means. With respect to SEA-3, GBG paid a purchase price of $21.5 million, which was inflated by $6 million, in return for a commitment from Iconix that it would reimburse GBG for the $6 million overpayment by releasing it from certain royalty obligations.

## II.       THE PROFFERS OF FAMULAK AND VENTRICELLI

Both Dow Famulak and Ron Ventricelli decided to speak with the Government pursuant to proffer agreements. While the defendant has included a complete copy of the memorialized notes of those interviews, the Government summarizes below the relevant aspects of each witnesses' statements.[2]

### A.   Famulak's Proffer

On or about November 22, 2019, Dow Famulak, met with the Government pursuant to a proffer agreement.[3] Famulak was the President of GBG during the relevant period of 2013 to 2015. He was on the investment committee for GBG, which approved the relevant joint venture transactions with Iconix based on a written preliminary investment proposal ("PIP"), which should have contained all the material terms of the deal. (Def. Ex. B, at 2-3). With respect to SEA 1, Famulak stated that he was not involved in negotiating the transaction. He gained knowledge of the transaction as a member of the GBG's Investment Committee. (Defense Ex. B, at 4). Famulak gave Jason Rabin – who was the president of LF Asia at the time – general guidance procedurally about how to do the deal. Famulak did not review the underlying deal documents for SEA 1. Famulak was not aware of an understanding between GBG and Iconix where the $2 million increase in purchase price would go back to GBG and he stated that such an understanding "should

---

[2] The Government is simply summarizing what the witnesses stated at the proffers. The Government does not take a position on whether the proffer statements should or should not be credited.

[3] Famulak's attorney previously provided the Government with an attorney proffer, the notes of which are annexed to the defendant's motion as Exhibit A.

have been communicated to the [Investment Committee]." (Def. Ex. B, at 4). Famulak lacked knowledge of many of the details of the transaction. He did not know how GBG accounted for the purchase price. He was not aware of a consultancy agreement for SEA I. He said that if Iconix and GBG entered into an agreement where Iconix would pay GBG for consultancy as part of the ultimate deal, "then it should have been disclosed to the [Investment Committee]." (*Id.* at 4). In a statement that was actually inculpatory of Cole and only further shows that the $2 million consultancy agreement entered into did, in fact, lack economic substance – one of the Government's core allegations with respect to SEA 1– Famulak stated that he had heard of LF Centennial Limited (the entity that signed the $2 million consulting agreement with Iconix), and that he "did not believe that LF Centennial performed consulting services." (*Id.* at 4).

With respect to SEA 2, Famulak told the Government that he "did not negotiate the SEA II deal." (*Id.* at 4-5). Instead, Famulak learned the details of the SEA 2 deal "mostly from Rabin but also [Jared] Margolis." (*Id.* at 5). Famulak "had no discussions with Cole or Iconix about SEA II," except for a discussion relating to a $500,000 debt that Rocawear owed GBG that is not relevant to the allegations in this case. Famulak did know "that the SEA II purchase price increased by $5 million at the end of the deal," and Rabin told Famulak that "Cole would not do the deal for less than $15.9 million." (*Id.* at 5). Famulak "recalled that he and Rabin talked on the phone about SEA II still being a good deal. The justifications were that GBG: would get an additional $1 million in guaranteed money; would pay the deal off relatively quickly; and could get some marketing money back." (*Id.* at 5). Famulak said that he was "comfortable with the increased consideration because GBG had just purchased a brand business called Cocoban that was only in Korea. He said it was a great platform." As the defense notes in its motion, Famulak stated that he "was not aware of an understanding where the purchase price increased by $5 million and was given back to GBG

4

through transactions papered as marketing expenses." (*Id.* at 5). With respect to the submission of the marketing invoices to Iconix, Famulak did not know "that marketing invoices were prepared and submitted to Iconix," and was "not aware of GBG sending invoices reflecting $5 million in marketing costs." (*Id.* at 6). Famulak reviewed the PIP for SEA 2 and noted that while the first two pages of the document had been updated, the rest of the pages reflected the old PIP. Famulak said there was "no valuation in the PIP to support the $15.9 million purchase price" and that "the old valuation, supporting the $10.9 million purchase price[,] was listed." (*Id.* at 6).

With respect to SEA 3, Famulak "did not recall discussing SEA III with anyone." Famulak viewed Margolis as "the deal champion." (*Id.* at 7). Famulak "did not negotiate the deal," and "did not recall what justified the purchase price." (*Id.* at 7). Famulak "was not aware that the purchase price increased by $6 million." (*Id.* at 7). Famulak "did not recall a connection between SEA III and [GBG's Rocawear Kids Royalty obligations]," and was "not aware of a purchase price increase for a commitment to relax money owed to Iconix." (*Id.* at 7).

B.  Ventricelli's Proffer

On or about November 5, 2019, Ronald Ventricelli met with the Government pursuant to a proffer agreement. Ventricelli was the chief operating officer of LF USA (a GBG-related company) during the relevant time period. Ventricelli "was not in the details of the transactions" during the relevant time period "because Ventricelli didn't have time." (*Id.* at 5). Ventricelli was, however, kept in the loop "as far as what was going on" but there were mergers and acquisitions teams in Hong Kong and other teams that "were more involved in those details." (*Id.*). Ventricelli spoke generally about the investment committee process and noted that the final PIP presented to the investment committee for any deal "should include all of the deal terms." (*Id.* at 6).

With respect to SEA 1, Ventricelli stated that he was not involved in the transaction. (*Id.* at 7). Those involved in the deal "would keep Ventricelli on the outskirts to inform him what was going on, but primarily Ventricelli was dealing with spinoff issues." (*Id.* at 7-8). While Ventricelli believed he may have received the PIP for SEA 1 and reviewed it (*Id.* at 8), he had "no memory of discussing the terms of this deal with anyone." (*Id.*). He did "not recall anything about an extra $2 million outlined through a side letter for additional consideration for LF doing the deal" and he "did not have all the details on this." According to Ventricelli, "it was Rabin and his team running with the deal." (*Id.* at 9). Furthermore, Ventricelli "did not recall anything about a consultancy agreement" as part of the SEA 1 deal under which Iconix would provide $2 million to GBG for consulting work. (*Id.*).

With respect to SEA 2, Ventricelli said he "was not involved on this transaction." (*Id.* at 10). While Ventricelli was not involved in the negotiation, he "was involved in some capacity because in the process of spinning the company off, in order to get anything done they needed to get approval." (*Id.*). Ventricelli had some discussions with Iconix on the deal, including telling Neil Cole that while GBG would proceed with amending the joint venture to include Korea and Europe, they were going to hold off on proceeding with expanding to cover the Lee Cooper brand in China. (*Id.* at 10).[4] Significantly, Ventricelli stated that he "never got involved in what the purchase price was for the [joint venture]" and Ventricelli said that he "was not involved in how that price was established" as that "was not Ventricelli's function." (*Id.* at 10).

Ventricelli knew that the SEA 2 deal value later increased and they had to go back to the investment committee to explain the change and get approval. Specifically, Ventricelli said there "needed to be about $5 million additional for something, not $5 million just because." (*Id.* at 11).

---

[4] This transaction was later consummated in SEA 3.

Ventricelli said that in his view "the deal changed." (*Id.* at 11). According to Ventricelli, "[i]t was Rabin that told [him] about the change in the deal price." (*Id.*) Ventricelli understood that the purchase price was increasing by $5 million and Rabin told Ventricelli "that he wanted a rebate on his marketing dollars, and Rabin needed money to spend on marketing for lots of brands that [GBG] had, not specific to this." (*Id.* at 11). Ventricelli said that Rabin "was always saying that Iconix didn't spend enough money to market these brands, and they needed to get that money back, because LF was spending the money." (*Id.* at 11). Rabin told Ventricelli "about the settlement of the $5 million for marketing, and the guarantee that Iconix would do [SEA 3], as well as a "guarantee in royalty over a period of time." (*Id.* at 12). Ventricelli believed that Rabin "got additional value on the transaction, getting a guaranteed royalty income over a number of years" and he recalled seeing an email indicating that "they were getting additional value over time." Ventricelli needed to understand it "in order to justify the increase in the purchase price." (*Id.* at 12).

Crucially, Ventricelli said that "[n]one of this information was coming from a discussion that Ventricelli had with Iconix." (*Id.* at 12). Instead, "[t]his was all stemming from information that Rabin expressed to Ventricelli." Ventricelli further said that "Rabin was the only one that told Ventricelli a reason as to why the purchase price was going up" and Ventricelli said that Rabin told him that Rabin "was getting his marketing money, and he was putting that to bed, but Rabin also communicated the guarantees." (*Id.* at 14). Ventricelli did not recall "having those discussions with anyone else" and believed that the increase in purchase price on SEA 2 "was not discussed with anyone except Rabin." (*Id.* at 14). Ventricelli "knew what he knew about this deal because of what Rabin told him" and Ventricelli "did not have conversations with anyone else besides Rabin

as far as why there was an increase in the purchase price." (*Id.* at 14).[5] Ventricelli "did not recall any conversations about an increase of $5 million on the purchase price in exchange for marketing invoices being sent from GBG to Iconix" and said that "[t]he basis of the transaction was not built that way." (*Id.* at 14). Ventricelli acknowledged that such a transaction "would be problematic" because "you were basically just taking the $5 million for a marketing expenditure, only to give it right back." (*Id.*). Ventricelli said he did not know "what the obligations from Iconix would be as part of the [joint venture], as that was more the business people's responsibility" and that he "did not know that GBG would be doing marketing work as part of the [joint venture] regardless of any other arrangements." (*Id.* at 14).

Ventricelli reviewed the PIP for the SEA 2 deal and acknowledged that "[t]he marketing details was not in the revision, as well as other relevant changes in the deal terms, and that, thus, "no person reading the amended PIP would know the basis for the increase in price." (*Id.* at 13). When the purchase price changed by $5 million, the amended PIP for SEA 2 reflected the valuation for the Korean rights increasing from $3.3 million to $8.3 million. Ventricelli acknowledged that he "was not aware of any work done to support the increase" and acknowledged that he "was aware of no valuation support" for the $5 million increase in the figure. (*Id.* at 15). Ventricelli did not know how Iconix accounted for the SEA 2 transaction. (*Id.* at 15).

---

[5] Ventricelli provided what he understood was the basis of the SEA 2 purchase price increasing from $10.9 million to $15.9 million based on those conversations with Rabin. He said that "[t]he marketing was not related to the purchase of this [joint venture]" and that "[t]he marketing was a separate thing that Rabin was working on, where he tried and get money back for prior marketing." (*Id.* at 13). Ventricelli also said that "[t]he consideration that Rabin got from the deal value change was consideration for guarantees going forward for [SEA 3]. There were several types of guarantees; the royalty stream, the commitment to increase the Put/Call Floor on the transaction, and the guarantee to do the [SEA 3] deal. The marketing piece was settled, that was done, but the increase in value in this transaction was the lock up of [SEA 3], and the guarantees in royalty streams." (*Id.* at 13). But, per Ventricelli's telling, this was all derived from his conversations with Rabin. Ventricelli also stated that "GBG were paying for the value of the right to get [SEA 3]" and Ventricelli "didn't view it as an inducement, but rather as value for what the next deal was going to give them." (*Id.* at 15).

With respect to getting paid back for the marketing work, Ventricelli stated that he was "not involved in the creation of invoices" and that he was "not a part of the process for the invoices." Ventricelli did observe Jared Margolis and another GBG employee named Ethan Cole working on the invoices one day at the office, and Margolis and Ethan Cole told Ventricelli they were "bill back for the marketing fees." (*Id.* at 16). Margolis was "running the process of creating the invoices" to the best of Ventricelli's recollection. Ventricelli acknowledged that if the invoices were simply used as a pretext to get an increase in purchase price, this would be problematic. (*Id.* at 17). Ventricelli was not aware that certain of the invoices involved the Peanuts brand, which was not part of the SEA joint venture. The fact an invoice was submitted for a brand that had nothing to do with the SEA joint venture did not matter to Ventricelli. Ventricelli understood from his conversations with Rabin that Rabin "was getting money back on all of his Iconix marketing expenses" and the $5 million "as money back was reimbursement, as GBG already spent the money." (*Id.* at 17). Ventricelli understood that it was a reimbursement for the cost of marketing that GBG "was actually spending." (*Id.* at 17). Regarding the PIP for SEA 2, Ventricelli said that in retrospect "the other commitments in the SEA 2 [deal], inclusive of the $5 million for marketing" should have been included in the PIP for the deal. (*Id.* at 22).

With respect to SEA 3, Ventricelli only "vaguely recalled this transaction." (*Id.* at 17). Ventricelli, as part of the GBG investment committee, would have to approve the transaction but he "did not recall the details behind it." (*Id*. at 17). Ventricelli was shown the PIP for the SEA 3 transaction, which showed a $21.5 million purchase price. He did not know how that figure was arrived at. He also did not know that there was initially a lower number as a purchase price, nor was he aware that the increase in purchase price was linked to an obligation involving money owed on a prior deal with Iconix. (*Id.* at 18). "Rabin told Ventricelli that Rabin was doing the transaction"

and that "Rabin was going to pay extra to get out of the Rocawear license." Ventricelli knew that Rabin intended to pay "an additional amount towards the purchase price to get out of Rocawear Kids." (*Id.* at 18).[6] Ventricelli acknowledged that "[w]ith respect to the purchase price, the [GBG] auditors would have wanted to know about the RWK forgiveness, and anyone in the pipeline of the accounting department would have had an obligation to tell the auditor that as it was a component of the purchase price." (*Id.* at 19). This idea was presented to Ventricelli by Rabin and Ventricelli understood that the Rocawear Kids forgiveness "would be linked" to the SEA 3 purchase price. (*Id.* at 19).

Since Iconix never ended up letting GBG out of the Rocawear Kids deal, Ventricelli acknowledged that GBG "overpaid on the transaction because GBG paid a purchase price for something that they were not relieved of" and GBG "never adjusted the value of the asset, and never wrote down the value of the asset on the GBG side," which was something that GBG "probably should have" done. (*Id.* at 19). Ventricelli also acknowledged that he was "not aware of any valuation work to support the $21.5 million valuation." (*Id.* at 20). Ventricelli further stated that he was "100 percent sure that the additional $6 million value was for the [Rocawear Kids] forgiveness, based on Ventricelli's conversations with Rabin. There was no good reason why it wasn't papered. The Rocawear Kids piece should have been papered around the same time as the JV." (*Id.* at 20).

---

[6] Ventricelli's statements relate to GBG paying an inflated purchase price in return for Iconix excusing certain liabilities that GBG owed in connection with the licensing agreement for the Iconix brand Rocawear Kids. This statement by Ventricelli tends to show the existence of an illicit giveback arrangement under which GBG paid an inflated purchase price in return for being excused from a liability on a separate licensing arrangement.

<u>**ARGUMENT**</u>

**I.      THE COURT SHOULD NOT COMPEL IMMUNITY**

Neil Cole seeks an order compelling the Government to immunize Dow Famulak and Ron Ventricelli. Cole does not meet his heavy burden to obtain such extraordinary relief as to either person, let alone as to both of them.

A.  <u>Applicable Law</u>

"Absent extraordinary circumstances, the Due Process Clause imposes no requirement that defense witness immunity be ordered whenever it seems fair to grant it." *United States v. Diaz*, 176 F.3d 52, 115 (2d Cir. 1999) (quoting *Blissett v. Lefevre*, 924 F.2d 434, 441 (2d Cir.1991)) (quotation marks omitted); *United States v. Ebbers*, 458 F.3d 110, 118 (2d Cir. 2006) ("The government is under no general obligation to grant use immunity to witnesses the defense designates as potentially helpful to its case but who will invoke the Fifth Amendment if not immunized."). Indeed, because immunity is "pre-eminently a function of the Executive Branch," *United States v. Turkish*, 623 F.2d 769, 776 (2d Cir. 1980), "as a general rule the Government may not be required to confer immunity for the benefit of the defense," *United States v. Dolah*, 245 F.3d 98, 105 (2d Cir. 2001), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 63 (2004).

A defendant requesting such relief must make a two-pronged showing:

> First, the defendant must show that the government has used immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment through overreaching, or has deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining tactical advantage through such manipulation. . . . Second, the defendant must show that the evidence to be given by an immunized witness will be material, exculpatory and not cumulative and is not obtainable from any other source.

*Stewart*, 907 F.3d at 685 (quoting *Ebbers*, 458 F.3d at 119) (ellipsis in *Stewart*).

The Second Circuit has recognized that this is a burden that will rarely, if ever, be met:

> "The situations in which the United States is required to grant statutory immunity to a defense witness are few and exceptional." So few and exceptional are they that, in the nearly thirty years since establishing a test for when immunity must be granted, we have yet to reverse a failure to immunize.

*United States v. Ferguson*, 676 F.3d 260, 291 (2d Cir. 2011) (quoting *United States v. Praetorius*, 622 F.2d 1054, 1064 (2d Cir. 1979)); *see also Stewart*, 907 F.3d at 685 (noting that the Second Circuit still had not reversed a failure to immunize and that that "case [wa]s no exception").

B.  Discussion

Cole's Immunity Motion falls far short of carrying his burden. It is only "under 'extraordinary circumstances'" where due process "may require that the government confer use immunity on a witness for the defendant." *United States v. Praetorius*, 622 F.2d 1054, 1064 (2d Cir. 1979). "The situations in which the United States is required to grant statutory immunity to a defense witness are few and exceptional." *Praetorious*, 622 F.2d at 1064. This case is not one of them.

As is stated above, the defendant must show both that "the government has used immunity in a discriminatory way, has forced a potential witness to invoke the Fifth Amendment through overreaching, or has deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining tactical advantage through such manipulation" and that "the evidence to be given by an immunized witness will be material, exculpatory and not cumulative and is not obtainable from any other source." *Ebbers*, 458 F.3d at 119.  The defendant falls far short of meeting his burden as to either prong of the analysis.  As the court did in *Ebbers*, however, this Court need not even reach the first prong of the analysis because it is abundantly clear that the defendant cannot show the testimony is material, exculpatory, and obtainable from another source. *See United States v. Ebbers*, 458 F.3d 110, 120 (2d Cir. 2006) (not resolving whether the first

prong of the analysis had been met because the defendant could not show that the requested testimony "affected the total mix of evidence before the jury").

      i.    <u>The Testimony is Not Material or Exculpatory and It Is Obtainable from Another Source</u>

Cole must show that "the evidence to be given by an immunized witness will be material, exculpatory and not cumulative and is not obtainable from any other source." *Ebbers*, 458 F.3d at 119. He has not done so.

The Government has provided a fulsome and detailed description of what Famulak and Ventricelli said in their proffer sessions. When taken in its totality, the anticipated testimony of both Famulak and Ventricelli – assuming they testified consistently with their proffers – boils down to this: Rabin and Margolis, not Famulak or Ventricelli, were the individuals at GBG who primarily negotiated these transactions at Iconix, including with respect to the purchase price and material terms of the deal. Unlike Rabin and Margolis, Famulak and Ventricelli had limited direct dealings with the defendant, the Chief Executive Officer at Iconix, and his co-conspirator Seth Horowitz, the Chief Operating Officer at Iconix, in connection with the relevant transactions.

Because Famulak and Ventricelli, by their own account, did not know about all of the details of the transactions and relied on the information provided to them by others, their testimony is only marginally relevant, and is not exculpatory to the defendant. These witnesses cannot speak to the defendant's actions, his statements, or what commitments he may or may not have made. Given that they are expected to testify that they were far removed from the negotiation of the transaction, their own state of mind and understanding as to the nature of the deals has no probative value as to the defendant's knowledge and intent with respect to these transactions.

Relatedly, the defense points to certain cherry-picked statements from the memorialized interview of Famulak and Ventricelli that suggest they believed that the transaction purchase prices

were appropriate. Whether Famulak or Ventricelli believed the purchase price being paid was a fair price is not particularly exculpatory given that they were largely relying on Rabin and his explanations of the transactions in forming this belief. (Ex. B, at 4-5; Ex. C, at 14, 18). Moreover, the ultimate issue for the jury will not be whether or not the purchase price was defensible in the abstract, but instead whether or not the defendant sought to mislead investors and Iconix's auditors by concealing terms of the transactions.  *Cf. Ebbers*, 458 F.3d at 125 ("[E]ven where improper accounting is alleged, the statute requires proof only of intentionally misleading statements that are material, *i.e.*, designed to affect the price of a security.").  In this respect, as noted, the fact that Vintricelli linked the increase in purchase price of SEA 3 to the forgiveness of Rocawear Kids royalties is inculpatory, not exculpatory.  And the fact that Famulak and Ventricelli were not aware of the other terms that the Government allege is not, in actuality, exculpatory for the defendant given that Famulak and Ventricelli were not directly involved in the negotiation of the transaction with the defendant and that they would testify that their information regarding the terms of the deal came from Rabin. This is particularly true when considered against the totality of the evidence, which shows that the executives at GBG actually charged with negotiating these deals – including Rabin and Margolis – conducted due diligence and analysis and concluded that the deals were worth well below the purchase price that GBG ultimately paid. The totality of the evidence will also clearly show that Margolis and another GBG employee expressly in writing called these payments "overpayments" and committed to writing exactly how those overpayments would be "offset" by Iconix reimbursing marketing expenses and other forms of givebacks. (GX 1068).

In order to constitute exculpatory evidence, the testimony to be offered must "tend[] to show that the accused is not guilty." *United States v. Gil*, 297 F.3d 93, 101 (2d Cir.2002) (citing *In re United States (Coppa)*, 267 F.3d 132, 139 (2d Cir.2001)). "The bottom line at all times is

whether the non-immunized witness's testimony would materially alter the total mix of evidence before the jury." *United States v. Ebbers*, 458 F.3d 110, 119 (2d Cir. 2006). Famulak and Ventricelli's expected testimony – when judged against this high bar – plainly falls short, particularly when considered against the context that they were a step removed from the transaction and did not have direct dealings with the defendant. Such testimony would not tend to show that the defendant was not guilty. It would tend to show that Ventricelli and Famulak relied on what Rabin told them, and Rabin will testify that the givebacks alleged by the Government existed.

The defense further points to the fact that Famulak and Ventricelli would contradict Rabin as a basis for compelling the Government to immunize these witnesses. The defendant highlights in particular that Rabin is expected to testify that he told Famulak and Ventricelli about the giveback arrangement and Famulak and Ventricelli claim that Rabin, instead, provided them with other, lawful explanations for the increase in the purchase price of the joint ventures. (Def. Br. at 11-12). The mere fact that Famulak and Ventricelli are inconsistent with Rabin on this point, however, is not sufficiently exculpatory *to the defendant* to warrant the extraordinary relief of ordering the government to immunize these witnesses subject to dismissal of the indictment. Whether Rabin actually told Ventricelli and Famulak about the givebacks, even if relevant to Rabin's credibility, is not a central issue at this trial, which centers on an accounting fraud at Iconix, not at GBG. Whether Rabin told Famulak and Ventricelli about the givebacks is particularly not exculpatory when considered against the totality of evidence from the GBG side of the transaction, which, as described above, shows that the GBG employees who actually were directly involved in negotiating the terms of the deals and interacting with the defendant plainly knew about and believed that a giveback arrangement existed.

Moreover, the defense offers no explanation as to why Famulak and Ventricelli's expected testimony that they did not know about the illegal round trip transactions – which is self-serving and which they have every incentive to claim they did not know about – would be inherently more credible than Rabin's testimony in which he inculpates himself in the roundtrip arrangement. *See, e.g., United States v. Chartier,* No. 17-CR-0372(JS), 2021 WL 3795352, at \*21 (E.D.N.Y. Aug. 26, 2021) ("At best, the proposed testimony would have contradicted Lee's and Matz's testimony and Chartier offers 'no reason why [Ms. Cataneo's] testimony would have been more credible[.]'" (quoting *United States v. Figueroa*, No. 92-CR-0019, 1995 WL 354893, at \*4 (S.D.N.Y. June 13, 1995))).

Finally, the testimony of Famulak and Ventricelli is also obtainable from other sources. The defense argues that "Mr. Famulak and Mr. Ventricelli were senior executives of the entities that entered into the joint ventures at issue, and they served on the Investment Committee that evaluated and ultimately approved the transactions (including the purchase price)" and that, accordingly, "[t]hey are uniquely positioned to testify about the terms of the agreements and the basis for GBG agreeing to pay the purchase prices at issue." (Def. Br. at 14). But, of course, there is documentary evidence that the defense could seek to offer from GBG showing how the investment committee documented the value for the transaction, including the PIPs. In addition, there were other members of the investment committee that were involved in approving the transactions from the GBG side. The defendant provides no explanation why these other GBG executives could not be called by the defense to serve this purpose.[7] *See, e.g., Chartier,* 2021 WL 3795352, at \*22 ("The Court also concludes that Ms. Cataneo was not the sole source of this

---

[7] The Government reserves its rights to challenge the admissibility of any such testimony, including relevance grounds.

evidence. Chartier was free to question and/or recall (as he did with Lee and Matz) other individuals.").

   ii.    <u>The Government Has Not Through Overreaching, Forced Witnesses to Invoke the Fifth Amendment, or Used Immunity in a Discriminatory Way to Gain Tactical Advantage</u>

Cole comes nowhere close to describing the sort of prosecutorial overreach that the Second Circuit has imagined may justify the immunization of a defense witness. *Cf. United States v. Diaz*, 176 F.3d 52, 115 (2d Cir. 1999) ("The district court must find that the government, through its own overreaching, has forced the witness to invoke the Fifth Amendment or, that the government has engaged in discriminatory use of grants of immunity to gain a tactical advantage"); *Stewart*, 907 F.3d at 685.

Cole's core argument is that Famulak and Ventricelli have no sincere belief they could be a target of prosecution and thus their invocation of their Fifth Amendment rights is frivolous. In particular, the defendant argues that "there can be no credible claim that Mr. Famulak or Mr. Ventricelli is a target of prosecution" because, among other thing, neither was identified in a list of alleged co-conspirators provided by the Government. (Def. Br. At 10). In emphasizing that the Government has not identified Famulak and Ventricelli as co-conspirator—and by further conceding the Government has not described either as target of the investigation—Cole misses the point entirely: The Government did not force the witness to invoke the Fifth Amendment in response to a Government statement, let alone do so through "overreaching."[8] *Cf. Diaz*, 176 F.3d at 115. Famulak and Ventricelli, respectively, made that decision with counsel and without any pressure or threat from the Government.

---

[8] Out of an abundance of caution, the Government will be disclosing to the defendant notes of conversations that it had with counsel to Famulak and Ventricelli.

Cole attempts to convert his burden to show exceptional circumstances into a burden on the witnesses to show why they have a credible basis to invoke the Fifth Amendment. That is not the standard for a defendant seeking to obtain an immunity order. Nor should it be. As Judge Gardephe recently stated in *United States v. Avenatti*, "the Second Circuit has made clear that it is a fool's errand for a district judge weighing a witness's assertion of his Fifth Amendment privilege to attempt to predict the likelihood of prosecution." *United States v. Avenatti*, No. 19 Cr. 373 (PGG), 2020 WL 418453, at *11 (S.D.N.Y. Jan. 26, 2020) (citing *Miranti*, 253 F.2d at 139) ("We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute. Such a rule would require the trial court, in each case, to assess the practical possibility that prosecution would result from incriminatory answers. Such assessment is impossible to make because it depends on the discretion exercised by a United States Attorney or his successor.").

In any event, Famulak and Ventricelli, after consultation with their counsel, have decided to invoke their Fifth Amendment rights. The Government has not threatened to prosecute either man. But neither has the Government assured either that he will not be prosecuted. The Government does not know why either Famulak and Ventricelli plan to invoke the Fifth Amendment, but it is worth noting that both men proffered with the Government about the transactions at the heart of this case and untruthful responses during those meetings could form the basis for a prosecution for false statements that would not be time-barred.[9] Those facts are

---

[9] The Government by no means is seeking to suggest that it knows the basis for the invocation, or even that the Government has a view as to whether a prosecution for making false statements is likely. Rather, the Government simply notes that a prosecution for making false statements during the proffer statements would not be time-barred and that Famulak and Ventricelli *may* have decided to invoke their Fifth Amendment rights based on such concerns. The Government has never indicated to counsel for Famulak or Ventricelli whether it viewed their proffers as entirely truthful or untruthful.

more than sufficient for this Court to determine that their invocation of their Fifth Amendment rights has a basis. *See United States v. Avenatti*, No. 19 Cr. 373 (PGG), 2020 WL 418453, at *11 (S.D.N.Y. Jan. 26, 2020) ("[T]he Government has not exonerated Geragos, and it has not given him any assurances that he will not be prosecuted. . . . And although Geragos gave detailed proffers to the Government about these matters, were he to testify at trial, he would face different questions, which could lead to different or inconsistent answers that could heighten the risk of prosecution he still faces. Finally, Geragos's claim of innocence does not undermine his assertion of his Fifth Amendment privilege.").

As to the possibility of showing that the Government has "deliberately denied immunity for the purpose of withholding exculpatory evidence and gaining tactical advantage through such manipulation," *Stewart*, 907 F.3d at 685, the defendant argues that the Government is improperly seeking "to facilitate trial testimony it deems helpful to its case while preventing the presentation of exculpatory evidence to the jury by reserving the theoretical threat of potential prosecution for purely tactical reasons." (Def. Br. at 8). But this kind of generalized unfairness argument has been rejected by the Second Circuit as "entirely unpersuasive" because a criminal trial is "in no sense a symmetrical proceeding." *Turkish*, 623 F.2d at 774. Cole is no more persuasive when he contends that "the only meaningful distinction between [Famulak and Ventricelli and Rabin and Margolis] is whether their testimony or exculpates Mr. Cole. . . ." (Def. Br. at 8). After all, "[I]t is not sufficient simply to show that the prosecution granted immunity to its own witnesses and not to the defendants'; the defendant must prove discriminatory use of immunity for the purpose of gaining a tactical advantage." *United States v. Triumph Cap. Grp., Inc.*, 237 F. App'x 625, 630 (2d Cir. 2007) (Summary Order) (citing *Blissett*, 924 F.2d at 442; *United States v. Todaro*, 744 F.2d 5, 10 (2d Cir.1984)). The defendant has failed to do so here.

The Government's decision to immunize Rabin and Margolis and its refusal to immunize Famulak and Ventricelli is a proper—and routine—application of the Government's executive prerogative under existing Department of Justice guidance. The United States attorney may seek immunity when "the testimony or other information from such individual may be necessary to the public interest." 18 U.S.C. § 6003(b)(1). In deciding whether to seek immunity, the Government attorneys are required to consult the Justice Manual, which directs the Government to make a judgment as to whether "the testimony or other information that is expected to be obtained from the witness 'may be necessary to the public interest.'" Justice Manual § 9-23.210; 18 U.S.C. § 6003(b)(1). The Justice Manual goes on to list a series of non-exhaustive factors that "should be weighed in making this judgment," which includes, among other things, "the value of the person's testimony or information to the investigation or prosecution."[10] Justice Manual, § 9-23.210. Here, that factor was particularly determinative in the Government's decision to seek immunity for Rabin and Margolis, while not seeking immunity for Famulak and Ventricelli. In other words, the Government does not offer immunity to every witness with testimony of passing relevance --- the Government reserves such extraordinary measures for those witnesses who actually possess valuable and probative information.

As is described above, Rabin and Margolis were the principal negotiators for GBG of the relevant joint venture transactions with Iconix, and had direct interactions with the defendant

---

[10] The other factors that the Government is directed to consider are: (i) "The importance of the investigation or prosecution to effective enforcement of the criminal laws"; (ii) "The likelihood of prompt and full compliance with a compulsion order, and the effectiveness of available sanctions if there is no such compliance"; (iii) "The person's relative culpability in connection with the offense or offenses being investigated or prosecuted, and his or her criminal history"; (iv) "The possibility of successfully prosecuting the person prior to compelling his or her testimony"; and (v) "The likelihood of adverse collateral consequences to the person if he or she testifies under a compulsion order." Justice Manual, § 9-23.210. The Justice Manual notes that "[t]hese factors are not intended to be all-inclusive or to require a particular decision in a particular case" and are simply "representative of the kinds of factors that should be considered when deciding whether to seek immunity." *Id.*

regarding the unsubstantiated increase in the purchase price in return for givebacks from Iconix. Ventricelli and Famulak, by contrast, were not directly involved in the negotiations of these transactions and, by their own account, did not have direct dealings with Cole on the relevant deal points of these transactions. Accordingly, in deciding to immunize Rabin and Margolis and refusing to immunize Famulak and Ventricelli, the Government has made a reasoned judgment within its discretion that there is significant "value of [Rabin and Margolis's] testimony . . . to the investigation or prosecution" of Neil Cole, and that the testimony of Ventricelli and Famulak would be lacking in such value given their very limited role in the relevant transactions that are at-issue. This difference in how Rabin and Margolis are situated more than amply supports the Government's decision to immunize Rabin and Margolis while not immunizing Famulak and Ventricelli. Whether or not the defense agrees with that decision, it was within the Government's discretion to make these determinations, and as the case law makes clear, it is not the role of the Court to second guess that reasoned executive branch decision.[11] *Bahadar,* 954 F.2d at 825 (decision whether to grant long considered "preeminently a function of the Executive Branch."); *United States v. Payment Processing Ctr.*, LLC, 443 F. Supp. 2d 728, 731, 733 (E.D. Pa. 2006) ("A court may encroach on the Executive function of immunizing witnesses only in extraordinary circumstances and to avoid a constitutional violation involving prosecutorial misconduct in the immunity process itself. . . . Assessing the risks and strategy involved in the decision to immunize a witness falls within the special province of the Executive branch, which is charged with enforcing the law." (citing *Pillsbury Co. v. Conboy*, 459 U.S. 248, 260–61 (1983); *Ebbers*, 458 F.3d at 114)).

---

[11] The United States Attorney's Manual further provides with respect to granting immunity to compel testimony on behalf of a defendant that: "As a matter of policy, 18 U.S.C. § 6002 will not be used to compel the production of testimony or other information on behalf of a defendant except in extraordinary circumstances where the defendant plainly would be deprived of a fair trial without such testimony or other information. This policy is not intended to preclude compelling a defense witness to testify if the prosecutor believes that to do so is necessary to a successful prosecution." Justice Manual, § 9-23.212.

## CONCLUSION

For the foregoing reasons, the defendant's motion should be denied.

Dated:  New York, New York
        September 29, 2021

                            Respectfully submitted,

                            AUDREY STRAUSS
                            United States Attorney

                    By:   ___s/_____
                            Scott Hartman
                            Noah Solowiejczyk
                            Andrew Thomas
                            Assistant United States Attorneys