UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                                  :

UNITED STATES OF AMERICA       :

                                    :

             - *v.* -              :        19 Cr. 869 (ER)

                                    :

NEIL COLE,                          :

                                    :

                  Defendant.       :

                                    :

------------------------------------------------------ x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE GOVERNMENT'S MOTIONS *IN LIMINE*

AUDREY STRAUSS
United States Attorney
Southern District of New York

Scott Hartman
Noah Solowiejczyk
Andrew Thomas
Assistant United States Attorneys

- Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ................................................................................................................... 2

   I. THE COURT SHOULD NOT ADMIT EVIDENCE OF POST-SCHEME

     TRANSACTIONS AND ACCOUNTING CHANGES. ............................................ 2

     A.   Post-Conspiracy Business Transactions ............................................................ 2

     B.   Change in Accounting Approach ....................................................................... 5

   II. THE COURT SHOULD NOT PERMIT COLE TO ADMIT

     EVIDENCE OF OTHER BUSINESS TRANSACTIONS. ....................................... 8

   III.   THE COURT SHOULD ADMIT THE CANDIE'S EVIDENCE ........................ 11

   IV.   THE COURT SHOULD PRECLUDE THE DEFENSE EXPERTS

     OR, AT A MINIMUM, REQUIRE FURTHER DISCLOSURE

     AND HOLD A DAUBERT HEARING ................................................................. 12

     A.   Wertheim's Testimony Should Be Precluded .................................................... 12

       1. Wertheim's Testimony Regarding the Application of GAAP

       and Revenue Recognition Should Be Precluded .................................................. 12

       2. Wertheim's Testimony Regarding Materiality Should be Precluded ............. 16

       3. Wertheim's Opinions Lack Sufficient Reasons and Bases and

       the Disclosure is Inadequate ................................................................................ 20

     B.   Jassin's Testimony Should Be Precluded .......................................................... 21

CONCLUSION ............................................................................................................. 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                              :

UNITED STATES OF AMERICA       :
                              :

 - *v.* -                        :      19 Cr. 869 (ER)
                              :

NEIL COLE,                   :
                              :

               Defendant.    :
                              :

------------------------------------------------------- x

## PRELIMINARY STATEMENT

The Government respectfully submits this reply memorandum of law in further support of its motions *in limine* (ECF Doc. 115 ("Gov't Br.")), and in response to defendant Neil Cole's brief in opposition to the Government's motions (ECF Doc. 121 ("Def. Opp.")).

Cole's brief in opposition to each of the Government's motions indicates that he wishes to introduce volumes of extraneous and largely irrelevant information at trial, at the expense of juror comprehension and the Court's time, but simultaneously to prevent the jury from learning certain relevant, non-prejudicial evidence, such as the fact that Cole was put on notice about the accounting implication of round-trip transactions. For the reasons set forth in the Government's opening brief, the Court should grant the Government's motions.

The Government specifically replies below to Cole's arguments regarding (a) post-scheme transactions and accounting changes; (b) evidence of other, non-criminal transactions; (c) the Candie's evidence; and (d) the defense's proposed experts.

## ARGUMENT

### I.   THE COURT SHOULD NOT ADMIT EVIDENCE OF IRRELEVANT POST-SCHEME TRANSACTIONS AND ACCOUNTING CHANGES

The Government has moved *in limine* to preclude Cole from introducing evidence of transactions and accounting treatments made at Iconix after Cole resigned from the company, *see* Gov't Br. 11-13 (post-scheme transactions); 24-29 (post-scheme accounting changes). Cole now confirms he intends to introduce such after-the-fact evidence at trial. As to the subsequent business transactions, Cole argues the evidence will show "the purchase price paid by GBG reflected fair value and was not 'artificially inflated.'" (Def. Opp. 11). As to the change in accounting, Cole argues the evidence will show Cole's conduct "could not have caused Iconix to report inflated revenue." (Def. Opp. 31). Cole's efforts to obscure his conduct by reference to developments after he left Iconix—and that reflect the work and choices of others—is both illogical and prejudicial as the admission of this irrelevant evidence that has zero relevance to Cole's state of mind at the time of the charged conduct risks significant juror confusion  The Court should not allow this evidence before the jury.

#### A.  Post-Conspiracy Business Transactions

Cole concedes that transactions after he left Iconix are not relevant to assess his knowledge, intent, or good faith when he was there, which is the central issue in this case. *Compare* Gov't Br. 12-15 (arguing post-conspiracy sales cannot be proof of materiality or the defendant's knowledge, intent, or good faith) *with* Def. Opp. 11 ("Mr. Cole does not intend to offer this evidence for any of the three purposes identified by the government."). Nor does Cole articulate any basis by which business transactions consummated after he resigned could fairly bear on whether Cole did (or did not) mislead the conduct of audits, obstruct the SEC's investigation, and cause false documents to be filed with the SEC when he was CEO. Rather, Cole describes this post-conspiracy evidence as valuation evidence that will tend to establish the true worth of the SEA-3 interest and its associated brands.

2

Were the jury being asked to value the intrinsic worth of SEA-3 and its associated brands a year or years after the charged accounting fraud scheme ended, Cole's reasoning might merit consideration. The subsequent valuation of SEA-3 is not, however, an element of any offense the jury is being asked to consider. *See, e.g.*, ECF Doc. 113 (gov't proposed jury charge); ECF Doc. 110 (defense proposed jury charge). Nor does a later valuation become an element of the charged offense because witnesses have used the word "worth" in discussing negotiations, or because the Government and the Indictment have described Cole's scheme to involve "overpayments." *Cf.* Def. Opp. 13. The Indictment alleges that Cole schemed to defraud investors by falsely inflating Iconix's revenue and earnings per share and by misdescribing the terms of its joint ventures; the Indictment makes no allegations concerning the subsequent intrinsic worth of SEA-3 a year or more after the charged conduct, nor does the Government allege that no willing buyer could have paid Iconix the prices it recorded in its books. *See* Indictment ¶¶ 13-39.

The fact Cole's scheme involved accounting fraud does not render the intrinsic worth of SEA 3 relevant. As the Second Circuit has observed, "even where improper accounting is alleged, the statute requires proof only of intentionally misleading statements that are material, *i.e.*, designed to affect the price of a security." *United States v. Ebbers*, 458 F.3d 110, 125 (2d Cir. 2006). Perhaps for this reason, Cole resorts to the eminent domain doctrine of "just compensation" to justify the admission of the post-conspiracy transaction evidence. But the proposition that "the admission of comparable sales in condemnation action[s] should not be determined by a per se rule excluding all post-taking sales," advanced by the cases Cole cites, is neither applicable nor helpful to the issues on trial here. *See United States v. 4.85 Acres of Land, More or Less, Situation in Lincoln County, Mont.*, 546 F.3d 613, 618 (9th Cir. 2008); *United States v. 63.04 Acres of Land*, 245 F.2d 140 (2d Cir. 1957). The issue is not the inherent value of SEA-3—or any of Iconix's intellectual property—but whether Cole lied about the deals he struck at the time he was making statements about their then current value.

3

Cole therefore reprises his error when he asserts that post-conspiracy valuation evidence is also relevant "because it supports an alternative, lawful explanation for GBG's willingness to pay $21.5 million for an interest the government contends was worth just $15.5 million." (Def. Opp. 13). The Government does not contend that SEA-3 was "worth just $15.5 million," however, as the intrinsic worth of SEA-3 is beside the point. Rather, the Government will prove that GBG and Cole agreed GBG would pay $15.5 million for the interest in SEA-3, further agreed to pay an additional $6 million as part of an undisclosed side deal, and reached those agreements in order to create the appearance of gain for Iconix that would not have been booked if Cole had disclosed all of the terms of the deals to Iconix's auditors. Later valuations of the SEA-3 interest do not at all tend to prove those allegations true or false, so they should be excluded. *See* Fed R. Evid. 401, 402. After all, GBG did not, and could not, know that Iconix would seek to reacquire the SEA-3 interest at the end of 2015 so that later development cannot explain in any way GBG's assessment of the deal in 2014.

Moreover, the relevant issue is what the Iconix and GBG executives who negotiated these transactions believed the appropriate purchase price was *at the time* the transaction occurred. There will be ample evidence in the record that the defendant and others at Iconix, as well as the executives at GBG negotiating the deal, all thought these deals were worth far less than the purchase price GBG ultimately paid and that GBG agreed to an overpayment so Iconix could book more revenue in the relevant quarter, with Iconix later returning that overpayment through a giveback. Even assuming for the sake of argument that the parties were somehow mistaken in their belief about what the actual fair value purchase price should be (which there is no evidence they were), such a mistaken belief ultimately has no bearing on this case.

In addition, even if the Court somehow believed that testimony about the intrinsic value of the interest GBG was acquiring through the joint ventures was relevant, looking to a subsequent transaction price to determine intrinsic value would be inappropriate. What would matter is what the intrinsic value was at the time transaction closed, not what it was later valued

4

to be worth in a subsequent transaction.  There could be any number of factors – including changes in the business environment and other macroeconomic factors – that would lead to the intrinsic value going up or down in the months and years that followed the transaction closing. But that has nothing to do with whether at the time the transaction closed GBG paid a fair value.[1]

In any event, Cole's response also makes plain that the purpose of this evidence is to confuse the jury about their task, the Government's burden, and the significance of the purchase price terms in the joint venture deal documents. Accordingly, the evidence should also be excluded under Rule 403.

## B.  Change in Accounting Approach

Cole treads similar ground when he asks to tell the jury that Iconix changed its approach to accounting for joint ventures after Cole resigned. As Cole explains it, proof of Iconix's subsequent use of a variable interest entity approach (the "VIE Evidence") is relevant for two reasons: First, the VIE Evidence will disprove that Cole schemed to inflate revenue because under the VIE method the joint ventures did not contribute to revenue at all. Second, the VIE

---

[1] This testimony about "intrinsic value" is plainly irrelevant.  But even assuming *arguendo* it were not, to conduct a valuation of the transactions at the time they closed – not on a later date – the defendant would ultimately have to call an expert witness who could conduct a detailed and reliable economic analysis that complies with all of the requirements of *Daubert* and its progeny. The defense has not given expert notice for such an expert and any notice at this late juncture would be untimely.  *See Glenwood Cap., LLC v. W. Plains Co.*, No. 13-2109-RDR, 2014 WL 3359310, at *4 (D. Kan. July 9, 2014) ("The law is also clear that generally the valuation of a business requires expert testimony."); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 324 (S.D.N.Y. 2015) ("there comes a point at which expert testimony is rightly seen as based on speculation, conjecture, or an assumption so unrealistic as to warrant exclusion through the court's role as gatekeeper.") (citations omitted); *Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186–87 (7th Cir.1993) (reversing district court's admission of business valuation testimony because the judge did not undertake a preliminary assessment, mandated by Daubert, of whether the methodology underlying the testimony was scientifically valid and whether it could be applied to the facts in issue); *Ullman-Briggs, Inc. v. Salton/Maxim Housewares, Inc.*, No. 92 C 2394, 1996 WL 535083, at *3 (N.D. Ill. Sept. 17, 1996) (collecting cases regarding necessary expert methodology to conduct a valuation of a business).

Evidence will demonstrate that Cole did not intend to obstruct the SEC investigation. Cole's logic is unsound on both fronts.

As to revenue: Given that Cole himself did not know or believe the VIE accounting principles to apply when he developed and executed his plan, their later application says nothing about Cole's contemporaneous intent to defraud or the nature of his scheme. To the extent that Cole's point is that the VIE Evidence will show that, in the end, Iconix's reported revenue was not inflated—or, put differently, his scheme failed to achieve its purpose in the long run—that is itself no defense to the charges. *See United States v. Clemente*, 22 F.3d 477, 480-81 (2d Cir. 1994) (""Factual impossibility" is no defense to the inchoate offense of conspiracy under the Hobbs Act. The government needs to prove only that an agreement to commit extortion existed, not that extortion was actually committed."). Nor does the VIE Evidence prove that Cole did not cause Iconix to report inflated revenue, as Cole implies; to the contrary, the later-applied accounting principles demonstrate that Iconix had been significantly overstating its revenue for years because it had been incorrectly taking gain from JV sales, and that Cole's scheme further worsened the problem. *See, e.g.*, Iconix Form 10K (March 30, 2016), at 27, available at: https://www.sec.gov/Archives/edgar/data/0000857737/000156459016015686/icon-10k_20151231.htm (reporting restatement of prior financials).

What matters, at bottom, is that Cole sought to overstate Iconix's revenue based on the accounting treatment that Iconix was using at the time for JV sales.  The fact that the company later changed its approach tells the jury nothing about the charged crimes.  By way of example, if a defendant lied to a bank under its currently existing mortgage criteria to get a loan, and obtained a loan as a result of his lies, the fact that the bank months or years later changed its lending criteria such that the defendant would have qualified for the loan anyway would be plainly irrelevant.  Similarly here, the fact that Iconix later changed its accounting treatment for JV sales such that it would not have let Cole's scheme result in inflated revenue is an irrelevant after-the-fact justification.

In any event, Cole reveals that his intent is to ask the Auditor Witnesses "hypothetical 'what-if'" questions "based on the application of the VIE accounting standard BDO has deemed applicable to the SEA transactions." Def. Opp. 31. This is a proposal to bend time: when the audits occurred here, the JV transactions were not accounted for using VIE methodology. Though he argues this approach is a permissible application of *United States v. Cuti*, Cole's proposal is not at all akin to permitting either party to inquire how a set of facts—independently proven in the record—would have altered the witness's behavior at the time he could have, but did not, know those facts. *Cf.* 720 F.3d 453, 460 (2d Cir. 2013) ("The only issue was whether the withheld facts would have altered the rules' application."). After all, no witness in 2013 could have known that the company would alter its accounting treatment in 2016. Cole's proposal is to ask witnesses to opine on the implications of a different set of accounting rules that did not apply at the time the events occurred in a purely hypothetical manner. Such testimony is not "whether a witness would have acted differently if had been aware of additional information," as envisioned by *Cuti* but pure expert testimony that would have to satisfy Rule 702. *See Cuti*, 720 F.3d at 460.

As to Cole's claim that the VIE Evidence demonstrates his lack of intent to obstruct the SEC's investigation, Cole offers a circuitous explanation: "The subsequent adoption of VIE accounting . . . establishes that the Corp. Fin. inquiry easily could have been rendered moot simply by switching to VIE accounting," thus, Cole could have ended the SEC inquiry by switching to VIE, and, therefore, Cole had no need or incentive to obstruct the investigation. (Def. Opp. 33).

This argument suffers from a number of flaws, any one of which would justify its exclusion.  First, Cole does not identify what competent evidence he could offer to prove his assumption that "the Corp. Fin. inquiry easily could have been rendered moot simply by switching to VIE accounting," nor is it obvious that any exists. For one thing, the Corp. Fin inquiry did not end with Iconix's restatement of its earnings but with a referral to the SEC Enforcement Division. *See SEC v. Cole*, 19 Civ. 11148 (JPC). For another, the mere fact that

Iconix's subsequent management satisfied Corp. Fin. by restating its earnings after an extensive back-and-forth is not itself proof that Cole could have ended the inquiry whenever he desired. It is rank speculation.

Second, to the extent Cole's point is that he personally believed he could end the Corp. Fin. inquiry by changing Iconix's accounting methodology, the relevant, non-hearsay proof on the point would be Cole's own testimony, or other admissible evidence or testimony, not the VIE Evidence itself. Whether and how Iconix satisfied the SEC after Cole's resignation does not evidence Cole's theoretical earlier belief about how he could have ended the inquiry.

Third, permitting Cole to adduce evidence of Iconix's restatement (and accounting rationale) would also mean admitting evidence that the restatement followed an internal investigation by the Audit Committee that concluded Iconix had falsely inflated revenue from SEA-1 and SEA-2, as well as numerous other transactions that are not at issue in this case. *See, e.g.*, Iconix Form 10K (March 30, 2016), at 27. Accordingly, the magnitude, length, and complexity of the trial would increase for little to no gain in probative evidence.

In short, the predictable consequence of allowing Cole to explore after-the-fact sales and subsequent changes in accounting methodology will be juror confusion and a significant waste of time. There is little probative value telling the jury about events that Cole did not and could not foresee when he undertook his scheme and there is substantial prejudice. If such evidence were admitted, Cole would plainly seek to impermissibly point to after-the-fact events that he did not control in order to try to argue to the jury that he lacked fraudulent intent at the time he did what he did. This evidence should be excluded under Rule 403. *See* Gov't Br. 11-16, 24-33.

## II. THE COURT SHOULD NOT PERMIT COLE TO ADMIT EVIDENCE OF OTHER BUSINESS TRANSACTIONS

The Government moved *in limine* to preclude Cole from introducing "good acts" evidence in the form of specific occasions when he did not commit fraud. *See* Gov't Br. 19-23. Cole now disclaims any intention to offer such evidence.

Cole argues that he seeks to present a good faith defense by showing that Iconix's auditors never raised concerns to him when "Iconix entered into business arrangements—with the involvement of its lawyers and approval from its outside auditors—in which Iconix received payments from counterparties and simultaneously agreed to make marketing and similar payments to those same counterparties pursuant to written agreements." Def. Opp. 18.

To the extent Cole seeks to establish what he was (or was not) told about the propriety of transactions similar to SEA-1, SEA-2, and SEA-3 before he negotiated those arrangements, the Government agrees that evidence is relevant to the extent it shows Cole's knowledge.[2] Indeed, the evidence is relevant for the same reasons why the Candie's Evidence is relevant: it demonstrates Cole learned of the accounting principles involved and was aware of the auditors' expectations. *See* Gov't Br. 8-10.

But Cole is wrong to imply that he may introduce evidence of any Iconix transactions whatsoever simply by asserting that the evidence goes to his good faith. Cole's reliance on the Second Circuit's decision in *United States v. Litvak* for this point is misplaced. In *Litvak*, the trial court precluded defense evidence that supervisors at the bank where the defendant worked, including the defendant's own supervisors, "regularly approved of conduct identical to that with which [the defendant] was charged." 808 F.3d 160, 189 (2d Cir. 2015). The Second Circuit held that the evidence was admissible because it supported an inference that the defendant "held an honest belief that his conduct was not improper or unlawful, a belief the jury may have found more plausible in light of his supervisors' approval of his colleagues' substantially similar behavior." *Id*. at 190. In *Litvak*, therefore, there was a link between the precluded evidence (which supported an inference that supervisors at a particular bank approved certain practices) and the defendant's subjective belief (because the evidence showed that he worked for those same supervisors).

---

[2] Cole would, of course, still have to offer the evidence in an otherwise admissible form.

The Court should constrain Cole's proof of other transactions to those with such a link. For example, Iconix transactions that occurred after he left the company, and for which he had no role, do not support any good faith defense. Nor do references to transactions occurring at other companies without evidence in the record to support an inference that Cole was aware of those other transactions.

Second—and notwithstanding his assurances to the contrary—Cole argues that the jury may infer he did not enter into unwritten side deals with GBG because, on other occasions, he memorialized such agreements in writing. (Def. Opp. 23). The argument that Cole's behavior during the SEA-2 and SEA-3 negotiations can be explained by his conduct on other specific occasions is classic propensity reasoning, whether Cole acknowledges it or not, and precisely what the law forbids. *See, e.g., United States v. Chambers*, 800 Fed. Appx. 43, 46 (2d Cir. 2020) (summary order) ("Chambers's argument that his running of a legitimate law practice makes it less likely that he had corrupt intent to bribe Villanueva is precisely the type of propensity inference that Rule 404(b)(1) is intended to prohibit."); *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978) (affirming district court's exclusion of testimony that witnesses did not pay defendant any bribes "because such testimony would in effect be an attempt to demonstrate appellant's good character by proof of specific good acts"); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming the district court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); *see also United States v. Boykoff*, 67 Fed. App'x 15, 20-21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.") (quoting *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978)).

Cole offers no support for his position that the jury may draw such an inference in his favor simply because he styles it as a "good faith" defense. In *Crawford v. Tribeca Lending*

*Corp.*, on which he relies, the Second Circuit affirmed the admission of testimony about a lawyer's "typical practice" with respect to the handling of more than one thousand loan documents as proper habit evidence because it was a "regular response to a repeated specific situation." 815 F.3d 121, 125 (2d Cir. 2016). Even on his own description Cole's proposed evidence—that on a handful of specific occasions he memorialized a marketing arrangement—does not resemble a "regular response to a repeated specific situation." Cole also points to *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 624 (S.D.N.Y. 2018) and *Zola v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* No. 84 CIV. 8522-CSH, 1985 WL 94, at *1 (S.D.N.Y. May 28, 1985). Neither is helpful. In *John Wiley & Sons*, the court ruled that certain testimony offered at a copyright infringement trial was sufficient to establish the plaintiffs' ownership of the books at issue without documentary evidence. 327 F. Supp. 3d at 624. And in *Zola* the court denied a motion to compel arbitration without signed arbitration agreement.

## III.    THE COURT SHOULD ADMIT THE CANDIE'S EVIDENCE

The Government's affirmative arguments in support of admission of this evidence are set forth in its motion *in limine* of September 10, 2021. *See* ECF Doc. 115. In addition to the arguments made there, the Government notes the following in response to the arguments made in the defendant's brief.

First, while Cole seeks to offer (1) a mountain of evidence regarding unrelated transactions as to which, as explained above, he appears to have received no accounting guidance whatsoever, and (2) expert testimony that, as explained below, cannot possibly bear on his state of mind, he is resisting the admission of evidence regarding a clear instance in which he was indisputably put on notice that transactions involving payments flowing in both directions could be problematic from a legal and accounting perspective.

Cole's suggestion that the Candie's investigation had nothing to do with round tripping (Def. Opp., at 6) is puzzling.  The Government has marked as an exhibit a memorandum that Cole participated in drafting that clearly explains one of the issues identified by the auditors of

11

Candie's (and the only one about which the Government seeks to present evidence) was a concern that "there [was] a correlation between the $1,650,000 credit that [Candie's] took" from Redwood, "and the $1,650,000 constituting the first three payments" toward a Redwood showroom.  (GX-600, at 6) (annexed hereto as Exhibit A).  Moreover, the Government expects to offer testimony from a member of the audit team that, during a meeting on May 14, 1999, at which Cole was present, the auditors raised a concern about the offsetting payments and specifically the possibility that their purpose may have been "an acceleration of income."  The team also raised the concern that the booking of the credits could be the result of "illegal acts." (GX-601, at 3, 5) (annexed hereto as Exhibit B).  In other words, the issue that the auditors raised with regard to Redwood was precisely the one at issue here.  In any event, "evidence of other acts need not be identical to the charged conduct to show knowledge or intent pursuant to Rule 404(b), so long as the evidence is relevant in that it provides a reasonable basis for inferring knowledge or intent."  *United States v. Cadet*, 664 F.3d 27, 32–33 (2d Cir. 2011).

Cole's argument that the evidence is inadmissible because it involves unproven allegations likewise misses the point.  As the Government has explained previously, the purpose of this evidence is not to prove that Cole or Candie's engaged in any misconduct at all.  Rather, its purpose is to show that, contrary to Cole's suggestion that he believed that transactions involving money flowing in both directions were unproblematic, he had been specifically alerted to their potentially problematic nature.  Moreover, unlike in *United States v. Bailey*, 696 F.3d 794 (9th Cir. 2012), the proof of Cole's knowledge of the accounting rules will not rest on an unproven complaint (and, indeed, the Government does not seek to admit the SEC's complaint at all). Rather, as discussed, the Government will call a percipient witness who will testify that the potentially problematic nature of these transactions was specifically explained to Cole, and it will offer a memorandum that, by his own admission, Cole participated in drafting.

IV.   **THE COURT SHOULD PRECLUDE THE DEFENSE EXPERTS OR, AT A MINIMUM, REQUIRE FURTHER DISCLOSURE AND HOLD A *DAUBERT* HEARING**

    A.  **Wertheim's Testimony Should Be Precluded**

        *1.  Wertheim's Testimony Regarding the Application of GAAP and Revenue Recognition Should Be Precluded*

The defendant's arguments regarding why Wertheim should be permitted to opine regarding revenue recognition and the application of GAAP are flawed for a number of reasons.

First, the defendant proposes that Wertheim will give specific opinion testimony directly tied to the facts of this case, not merely that he will opine on generalized principles of accounting treatment. In particular, the defense seeks for Wertheim to opine that it would have been "reasonable and appropriate" for Iconix to record revenue exactly as it did for SEA-1, SEA-2, and SEA-3. (Gov't Br., Ex. C ("Def. Expert Notice") at 3-4). But the defendant studiously avoids referencing those very specific opinions it intends for Wertheim to offer in its brief, instead opting to focus on the more generalized topic areas Wertheim's testimony will cover, such as that "GAAP and other accounting guidance, including with respect to revenue recognition," "considerations relevant to determining the appropriate accounting treatment for transactions involving payments between counterparties," and "the application of GAAP and other accounting guidance to each of the joint venture transactions at issue in this case." (Def. Opp. at 42). While even testimony about those generalized principles is not probative of any issue in this case, Wertheim's specific opinions about what was "reasonable and appropriate" for Iconix to do would usurp the jury's fact-finding role and is therefore inadmissible. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to

13

substitute the expert's judgment for the jury's. When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination. In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony which states a legal conclusion.") (emphasis in original)); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (expert testimony in securities cases "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it.").[3]

Second, the defendant's argument in favor of admitting Wertheim's "reasonable and appropriate" opinion depends on the notion that this testimony "is relevant to the issue of whether Mr. Cole had a reasonable belief that the Company properly reported revenue and [Earnings Per Share]." (Def. Opp., at 44). In other words, the defendant seeks to have Wertheim opine on the application of GAAP to help establish that the defendant acted with good faith. (*Id.*). The Government and the defendant both agree that under the Second Circuit's precedents in *Ebbers*, *Rigas*, and *Simon*, "GAAP may have relevance in that a defendant's good faith

---

[3] The defendant claims that "Wertheim's testimony will educate the jury about a complex regime of accounting rules and how those rules apply to the transactions at issue" but that it will "then be left for the jury to decide whether, based on the facts found by the jury, the relevant financial statements were misleading to investors . . . ." (Def. Opp. at 45-46). The defendant further claims that Wertheim "simply will explain what the relevant considerations are under the applicable accounting standards and how those considerations impact the accounting determination," which testimony, the defendant claims, "will provide the jury with the tools it needs to assess the facts in evidence and make a determination as to the charges in this case." (Def. Opp., at 46). This description of Wertheim's supposed generalized testimony about accounting principles that will "provide the jury with the tools it needs to assess the facts" is a far cry from the defendant's expert notice, which proposes that Wertheim will provide the bottom line conclusion that the manner in which Iconix recorded revenue and treated expenses in connection with SEA 1, SEA 2, and SEA 3 was "reasonable and appropriate." (Def. Expert Notice, at 3).

14

attempt to comply with GAAP or reliance upon an accountant's advice regarding GAAP may negate the government's claim of an intent to deceive." *Ebbers*, 458 F. 3d. at 125 (citing *Simon*, 425 F.2d at 805); *see also Rigas*, 490 F.3d at 220. But such a defense would only become relevant if, in fact, there was any basis in the record to conclude that the defendant actually received any such advice that he relied upon in good faith. The fact that in the abstract a different accounting treatment for the transactions may have been hypothetically possible is not probative whatsoever of the defendant's purported good faith unless there is any basis in the record to say that the defendant *actually* relied on such an alternate interpretation.

Stated another way, Wertheim's testimony about "why the accounting determinations at issue are highly complex and require significant accounting judgment" (Def. Opp. at 44) would only matter if the defendant actually knew about and relied upon a differing accounting judgment. The defendant's argument that Wertheim's "testimony will provide essential support for the argument that Mr. Cole had a reasonable belief that the accounting for these transactions was proper and thus did not act with fraudulent intent" is a massive logical leap: how could the defendant have acted in good faith on the type of accounting treatment Wertheim will opine was appropriate if he did not even know about this accounting treatment? Thus, at a minimum, the Court should reserve on this issue and consider the totality of the trial record before deciding whether to admit such testimony that purportedly goes to the defendant's good faith. If the record is devoid of any evidence that Cole actually was relying in good faith on the sort of alternative accounting treatment Wertheim would opine about, then the testimony is, at bottom, irrelevant.[4]

---

[4] The defendant cites a 1952 case, *United States v. Brandt*, 196 F.2d 653 (2d Cir. 1952), for the proposition that "[s]ince [good faith] may be only inferentially proven, no events or

If this were not the case, then a defendant in an accounting fraud case could always offer expert testimony about potential alternative accounting methods in order to show good faith, regardless of whether there was any basis to say the defendant actually relied upon that interpretation. The defendant cites no authority that stands for this illogical proposition.[5]

### 2.  Wertheim's Testimony Regarding Materiality Should be Precluded

As the Government argued in its moving brief, Wertheim's proposed opinions regarding materiality should be precluded because they are irrelevant and usurp the jury's factfinding role and this court's role in instructing the jury on the law. (Gov't. Br. at 50). The defense seeks for Wertheim to opine as to SEA 1, SEA 2, and SEA 3 that "under GAAP, the inflation of revenue alleged in the Indictment . . . was not material." (Def. Expert Notice, at 3) As

---

actions which bear even remotely on its probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweighs any relevancy it might have." *Id.* at 657. *Brandt* by its terms pertains to "events or actions" – not hypothetical interpretations that a defendant may or may not have known about or relied upon. Moreover, even under the defendant's strained reading of *Brandt*, allowing an expert to testify regarding an alternative accounting treatment that there is no basis in the record to say the defendant ever thought about or relied upon would be just the sort of "tangential and confusing" interjection that outweighs any relevancy such testimony might have. *Cf. United States v. Napout*, 963 F.3d 163, 185-87 (2d Cir. 2020) ("evidence that commercial bribery was permitted under the laws of Brazil or Paraguay would be relevant to the question of the appellants' intent only if the jury could infer that: (1) the laws of the appellants' home countries permitted commercial bribery and the appellants 'knew or believed' that to be so; and (2) the appellants 'believed that their duties to FIFA and [CONMEBOL] were identical to their obligations under th[ose] foreign law[s].'") (citing *Brandt*, 196 F.2d at 657).

[5] It bears emphasis that the defendant wants to keep out the evidence that goes to what the defendant actually did know about the accounting rules and their application to transactions just like the ones the defendant used to fraudulently inflate Iconix's revenue. As is described above and in the Government's moving brief, rather than there being evidence that Cole believed in good faith that the manner in which Iconix recorded revenue in connection with the SEA joint venture transactions was reasonable and appropriate, to the contrary Cole was on notice, at least as early as the Candie's investigation, that transactions that involved payments flowing in multiple directions could be problematic and he therefore knew and understood the accounting implications of his actions. *See* Govt MIL at 10; *supra* at 11-13

an initial matter, whether or not a particular misrepresentation by the defendant was or was not material is a factual issue for the jury to resolve. (Gov't. Br. at 51-52) (citing cases). And in resolving the materiality element, the jury should be guided by this Court's instructions on the law with respect to what information it may consider in making that materiality determination. This is plainly the Court's role and not the role of a defense expert. Providing the jury with supplemental legal instructions regarding materiality improperly usurps the role of this Court as the sole source of the jury's legal instruction. *See United States v. Tomasetta*, 2011 WL 6382562, at \*2 (excluding defense expert testimony that alleged misstatements "would not have significantly altered the total mix of information" for investors and "that truthful disclosures would not have been important to a reasonable investor," and holding that such testimony "is improper because it invades the province of the Court in defining materiality and the province of the jury in determining whether the misstatements were material").

The defendant also argues that Wertheim's proposed testimony regarding materiality is admissible to rebut the expected testimony of institutional investors and research analysts that the misstatements at issue would be important to a reasonable investor. (Def. Opp. 47-48). The defense claims Wertheim has relevant expert testimony to offer on that issue. But his expertise is in accounting and finance. There is nothing in Wertheim's background that would qualify him to opine on what would or would not matter to a reasonable investor, nor has the defendant provided notice of such an opinion. (Def. Expert Notice at 2-4).[6]

---

[6] To be sure, as explained in the Government's opening motion *in limine*, the Government will offer testimony from Iconix's auditors and accountants regarding how the undisclosed facts, if known to them, would have affected their conduct and, ultimately, the information conveyed to investors. But the Second Circuit has made clear that such testimony is

The defendant principally relies on two cases – *United States v. Litvak* and *United States v. Block* – to argue that Wertheim's proposed testimony that the revenue inflation here is not material under GAAP is admissible. Both cases are inapposite. In *United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015), the defendant proposed to have an expert with "extensive experience in portfolio management in the fixed income asset class" testify:

> [T]hat where a manager follows rigorous valuation procedures, as was the case here, consideration of, or reliance on, statements by sell-side salesmen or traders concerning the value of a RMBS or the price at which the broker-dealer acquired it or could acquire it, are not relevant to that fund's determination with respect to how much to pay for a bond. In Mr. Willner's opinion, such statements from sell-side sales representatives or traders are generally biased, often misleading, and *unworthy of consideration in trading decisions. Accordingly, such statements from sell-side sales representatives or traders are not material to a professional investment manager's decision-making.*

*Id.* at 182 (emphasis original). The Second Circuit ruled the unitalicized portion of the proposed expert testimony should have been admitted but that the italicized portion was for the jury to decide because it embraced the ultimate issue of the materiality of Litvak's lies. *See id.* at 182 (citing *Bilzerian*, 926 F.2d at 1295 ("[T]estimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice.")).

The Second Circuit found error in precluding expert testimony about the process by which "investment managers value RMBS and the likely impact on the final purchase price of a broker's statements made to a counterparty during the course of negotiating a RMBS

---

not generalized expert testimony of the type that the defendant seeks to offer but is instead relevant to the issue of impact, that is "whether [the] witness would have acted differently if he had been aware of additional information." *United States v. Cuti*, 720 F.3d 435, 460 (2d. Cir. 2013).

transaction." *Id.* at 182. But the Second Circuit found no error in the district court's preclusion of the testimony that certain statements were "not material to a professional investment manager's decision-making." The testimony that the defendant proposes Wertheim provide here is a far cry from the testimony the Second Circuit ruled was improperly precluded in *Litvak*, and is far closer to the portion of the proposed expert testimony that the Second Circuit found the district court had not erred in precluding.

In addition, and of great significance here, *Litvak* is clearly a case that is limited to its unique set of facts, which pertained to highly complex residential mortgage-backed securities. *Litvak* itself distinguished these unique circumstances from expert testimony about what a reasonable investor would consider material in investing in ordinary equities. *See id.* at 182 ("These portions of Willner's testimony would have been highly probative of materiality, the central issue in the case. This is particularly true because of the meaningful distinction between the complex securities at issue in this case and the common equities and bonds traded in 'traditional,' efficient markets (*e.g.,* shares of corporate entities traded on the New York Stock Exchange)."); *see also United States v. Newkirk,* No. 14-CR-534-02 (JSR), 2016 WL 1659149, at *2 (S.D.N.Y. Apr. 19, 2016), aff'd, 684 F. App'x 95 (2d Cir. 2017) (distinguishing *Litvak* in denying Rule 33 motion based on court's preclusion of expert testimony.). *Litvak* is thus plainly distinguishable given that the defendant proposes to have Wertheim opine on materiality with respect to investment decisions involving ordinary equities.

The defendant also relies heavily on Judge Oetken's ruling in *United States v. Block*, 16 Cr. 595 (JPO). *Block* involved another specialized investment situation – real estate investment trusts (REIT) – and the expert's testimony pertained to "what participants in the REIT industry consider in assessing the materiality of misstatements of non-GAAP financial metrics." (16 Cr.

19

595, Dkt. No. 107 (June 5, 2017 Hearing Transcript), at 14. Judge Oetken expressly cited to *Litvak* in deciding that the expert's opinions would "help the jury assess the legality of the alleged misstatements here and Block's state of mind." *Id.* at 14. But, as is explained above, here the defense wants Wertheim to testify about what a reasonable run-of-the-mill equities investor would consider material, and *Litvak* itself distinguishes such a circumstance from more complex, specialized markets.

Block* is further distinguishable because Judge Oetken's ruling as to the relevance of the proposed expert's testimony turned in part on the fact that "the government made the acceptability of [the defendant's company's] accounting practices relevant in the indictment by describing 'permissible methods' of calculating [Adjusted Funds From Operations (AFFO)] and describing Block's alleged understanding that [the defendant's company's] AFFO calculation was 'erroneous.'" (*id.* at 13). Here, by contrast, the Indictment contains no such allegation.

### 3. Wertheim's Opinions Lack Sufficient Reasons and Bases and the Disclosure is Inadequate

Finally, even if the Court were to determine that any of Wertheim's proposed testimony is potentially admissible, the Government respectfully submits that before the Court rules it should hold a *Daubert* hearing and require a far more fulsome disclosure from the defendant that sets forth in much more detail Wertheim's methodology and assumptions in reaching his bottom line expert opinions. *See United States v. Petit and Taylor*, No. 19 Cr. 850 (JSR) 10/23/2020 Tr. at 11 (ECF No. 115) (reserving on motion to admit account expert testimony by noting that "it's likely that we will have a hearing outside the presence of the jury . . . regarding the proffered expert opinions"). As it stands, the Government only knows what opinions Wertheim will provide, and does not even know those with specificity, but has no basis to judge whether those opinions are rooted in sound methodology and reasonable assumptions. In order for this Court to

20

have a proper basis to determine if such testimony is admissible, far more information is required. By way of example, when it comes to his materiality opinions the Government has many questions, including: what thresholds did Wertheim apply in deciding the inflation of revenue was not material and what sources did he rely on to apply those thresholds? Are the sources Wertheim relied upon in reaching that conclusion widely accepted in the field and reliable? With respect to Wertheim's conclusion that the manner in which revenue was recognized in connection with SEA 1, SEA 2, and SEA 3 (Def. Expert Notice at 3) was "reasonable and appropriate," the Government has essentially no information as to how Wertheim reaches these conclusions.

The mere fact that Wertheim is a qualified individual in the area of accounting with extensive experience is not enough to establish reliability. An expert's experience alone – without more – is insufficient to establish that proffered opinions are reliable or for this Court to exercise its gatekeeping functions. *See Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 443 (S.D.N.Y. 2015) ("Of course, courts do not simply take the word of people with experience; the court's gatekeeping function applies even to experts whose opinion testimony derives from their experience."); *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242(SAS), 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) ("[A] court cannot permit experts to offer credentials rather than analysis." (internal citation omitted)); *id.* ("If experts are permitted to testify on an issue of fact, they must provide some explanation for their conclusions, rather than referring generally to their experience. Without good explanations, courts cannot assess the reliability of any conclusion drawn by an expert, even if he possesses relevant experience."); Advisory Comm. Notes to Fed. R. Evid. 702 ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that

experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.*'") (emphasis added).

**B.  Jassin's Testimony Should Be Precluded**

The defense also seeks to offer expert testimony from Andrew Jassin, who is purportedly an expert "in the fields of fashion, apparel and brand licensing." (Def. Expert Notice, at 1). Jassin's opinions principally concern "customary practices in the negotiation of licensing and other business arrangements in the fashion, apparel and brand licensing industry; the types of marketing and advertising commonly supported by brand owners in these fields, and the reasons for doing so; customary practices and expectations with respect to retail sales support, including marketing, advertising, chargebacks and markdowns; and methods for valuing an apparel brand." (*Id.* at 5).  The defendant seeks for Jassin to specifically opine that certain business conduct – which bears a striking resemblance to the conduct at-issue in this case – is "customary" in the fashion, apparel and brand licensing industry.  (*Id.*, at 5-6).  For the reasons stated in the Government's moving brief, Jassin's testimony should be precluded because (1) many of the subjects Jassin's testimony would cover can readily be understood by the jury in lay terms by fact witnesses, (2) the testimony regarding what is customary industry practice is irrelevant and unhelpful in this particular case, (3) many of Jassin's opinions that relate specifically to the facts of this case improperly invade the jury's role, and (4) Jassin's opinions lack sufficient reasons and bases and the expert disclosure is inadequate. (Gov't Br., at 57-67).

With that said, with respect to the relevancy of the testimony in particular, while industry custom and usage testimony can in certain circumstances be relevant at trial, the Government expects at this trial it will not be. As the Government noted in its moving brief, the Government

anticipates that Jassin's testimony about his perception of industry custom is going to be at odds with what the evidence at trial will show when it comes to Iconix's and GBG's respective business practices given the particular unique circumstances of Iconix and GBG's business relationship.

The Government respectfully submits that a *Daubert* hearing would only underscore why Jassin's testimony should be precluded. The Government respectfully suggests that the Court should reserve on this issue and consider the relevancy of Jassin's proposed testimony – if any – against the backdrop of the totality of the Government's case-in-chief and after conducting a *Daubert* hearing. Assessing Jassin's proposed expert opinions with the benefit of having heard the Government's case and with a *Daubert* hearing will allow the Court to better assess whether Jassin has any testimony to offer that would actually be helpful to the jury at *this trial*. *See Nimely*, 414 F.3d at 397 ("Even after determining that a witness is 'qualified as an expert' to testify as to a particular matter, and that the opinion is based upon reliable data and methodology, Rule 702[ (a) ] requires the district court to make a third inquiry: whether the expert's testimony ... will 'assist the trier of fact'" in understanding the evidence or determining a fact in issue.") (quoting Fed. R. Evid 702). *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful") (citations omitted).

The Government has serious doubts that Jassin can assist the jury as the trier of fact. Many of Jassin's proposed opinions about what he would expect that Iconix and GBG would do is based on what he perceives would occur "in the fashion, apparel and licensing industry" generally. Such proposed testimony does not appear to consider that the relevant events in this case happened in the context of joint venture partnerships between Iconix and GBG and

23

contractual agreements by which "Iconix transferred ownership of a trademark or brand to the JV while maintaining a 50 percent ownership interest in the JV itself" and GBG "purchased a 50 percent interest in the JV from Iconix" with Iconix and GBG then being generally entitled to "50 percent of the JV's licensing revenue." (Indictment ¶ 4). This case is thus not about a typical brand owner business arrangement with a licensee.

For example, Jassin proposes to opine "given the nature of the business relationship between Iconix and GBG in 2014" that it was reasonable for GBG to bill Iconix for marketing work and for Iconix to pay those expenses. But if that opinion is not rooted in the contractual joint venture framework that Iconix and GBG constructed, the Court will very likely conclude, the Government submits, that such opinion testimony is of minimal value to the jury. This is just one of many issues that could be explored at a *Daubert* hearing. Such a hearing close to the end of the Government's case would be of particular utility as by that point the Court will have a far fuller understanding of the factual context of these joint venture transactions and will be better able to assess whether Jassin's proposed opinions about general industry custom and usage have any actual bearing to the business circumstances that existed between Iconix and GBG.

In addition, in advance of any *Daubert* hearing, the Court should further require a far more fulsome disclosure from the defendant that sets forth in much more detail Jassin's methodology and assumptions in reaching his bottom line expert opinions. By way of example, the Government has no idea whatsoever what Jassin is relying on to conclude that the "[t]he prices paid by GBG for the brands/territories in each of SEA 1, SEA 2 and SEA 3 were reasonable and within a range of fair value" and what methodology he used to reach that conclusion. The only bases and reasons provided are Jassin's "extensively professional experience and his review and consideration of documents included in the government's Rule 16

materials concerning the SEA 1, SEA 2 and SEA 3 transactions." (Def. Expert Notice, at 6).
Particularly on a question like "fair value," the defendant should be required to say much more
and provide details as to how Jassin reached that conclusion. As noted above, an expert's say-so
is entirely insufficient to constitute a reliable basis for expert testimony. Advisory Comm. Notes
to Fed. R. Evid. 702 ("If the witness is relying solely or primarily on experience, then the witness
must explain how that experience leads to the conclusion reached, why that experience is a
sufficient basis for the opinion, and how that experience is reliably applied to the facts. *The trial
court's gatekeeping function requires more than simply 'taking the expert's word for it.'*")
(emphasis added). If Jassin did not even bother to conduct a detailed study comparing other
similar transactions in concluding that the price paid was a "fair value," the Court should
preclude the testimony as inherently unreliable.[7]

## **CONCLUSION**

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated:  New York, New York
       September 29, 2021

<div style="margin-left:40%">

Respectfully submitted,
AUDREY STRAUSS
United States Attorney

By:    s/
       _____
       Scott Hartman
       Noah Solowiejczyk
       Andrew Thomas
       Assistant United States Attorneys

</div>

---

[7] As is noted above, *see supra* at 5, n.1, expert testimony regarding business valuation
requires sound methodology that complies with *Daubert*. Jassin does not appear to have the
requisite qualifications to opine on this subject, nor does it appear his opinion will be based on
reliable reasons and bases.