# EXHIBIT A

# MEMORANDUM

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**

TO: Neil Cole
Larry O'Shaughnessy

FROM: Deborah K. Sorell

DATE: May 27, 1999

RE: Redwood Accounting Issues

## I. INTRODUCTION

On May 12, 1999, Candie's, Inc. (the "Company") issued a statement that it was unable to complete its audit for the fiscal year ended January 31, 1999 ("Fiscal 1999") before its extension to file its Annual Report on Form 10-K expired on May 18, 1999. The Company further reported that as a result of certain accounting issues that had been identified by the Company's auditors, Ernst & Young, LLP ("E & Y"), in conducting its Fiscal 1999 audit, it was possible that the Company might have to restate the first three quarters of Fiscal 1999 and the results of the prior year ended January 31, 1998 ("Fiscal 1998"). The Company reported that pending the completion of the audit, the financial statements of the Company previously issued could not be relied upon. On May 13, 1999, NASDAQ announced that it was halting the trading of the Company's stock.

The Company's inability to complete its audit stems from the identification by E & Y of certain accounting transactions with respect to which E & Y has been unable to locate complete supporting documentation or has questioned explanations given by the Company. As a result of the issues raised, E & Y asked the Audit Committee of the Board of Directors of the Company to conduct an independent investigation of certain accounting transactions that had been effected by the Company and their effect on the reported financial results of the Company. The Audit Committee is composed of Barry Emanuel ("BE") and Mark Tucker ("MT"). MT, however, is affiliated with Redwood Shoes Corp ("Redwood"), one of the parties involved with certain of the transactions at issue, as described further below. Accordingly, the Audit Committee formed a Special Committee composed of BE to conduct the investigation (the "Special Committee"). The Special Committee retained Squadron, Ellenoff, Plesent & Scheinfeld as special counsel and PricewaterhouseCoopers LLP as accountants to assist the Special Committee in conducting its investigation.

One of the issues identified by E & Y to the Special Committee involved certain credits granted to the Company by Redwood during Fiscal 1999. Concerns about these credits are based upon the dates that the Company recorded and gave effect to the credits and the fact that they were given to the Company by Redwood, which is a shareholder of the Company and which designated MT as its representative to the Company's board of directors.

2CA 01505
CONFIDENTIAL

GOVERNMENT
EXHIBIT
600
19 Cr. 869 (ER)

This Memorandum is based upon a preliminary review of the documentation relevant to the transactions and preliminary discussions with Neil Cole, the Company's CEO ("NC"), Larry O'Shaughnessy, the Company's COO ("LO") and David Golden, the Company's CFO ("DG"). It has been prepared as a "roadmap" to assist the Special Committee in its investigation, and is therefore subject to further review and analysis of the facts in all respects.

2CA 01506
CONFIDENTIAL

2.  **Fiscal 1999 Credits**

    (a)  **$650,000 Volume Incentive Credit**

    In or about May, 1998, NC met with MT in Taiwan. NC advised MT that the Company was growing quickly and wanted support from Redwood. NC and MT discussed Redwood granting the Company a volume incentive credit. NC and MT agreed in principle that Redwood would grant the Company such a credit. They did not formalize the agreement in writing at that time.

    In or about February 1999, prior to the commencement of the Fiscal 1999 audit, MT met with DG in New York to discuss various business issues and certain year-end matters. They discussed the $650,000 volume incentive credit and finalized the agreement reached by NC and MT. Thereafter, sometime in April 1999, the parties formalized the arrangement in a Memorandum of Understanding, dated May 20, 1998, based upon the date upon which the agreement was originally reached (see Agreement at **Tab 2**). At or about the same time in April 1999, Redwood issued a credit notice, dated November 1, 1998, to the Company reflecting the $650,000 volume incentive credit and the $1 million business interruption credit (described below)(see Credit Notice at **Tab 3**).

    The Company recorded and gave effect to the $650,000 credit, as part of a total credit of $1,650,000 (as explained below) in the fourth quarter of Fiscal 1999 (see Journal Entry at **Tab 4**).

3

2CA 01507
CONFIDENTIAL

(c) **$1,000,000 Business Interruption Credit**

As mentioned above, during 1998 and 1999, the Company was experiencing explosive growth and began to make substantial investments to support the growth and prepare for the future. It was the Company's feeling that Redwood was not contributing sufficiently to support the Company's growth. Not only had Redwood failed to increase its own infrastructure and facilities to support the increase in business generated by the Company, but it had diversified its business outside the Company and taken on other brands thereby diverting existing resources away from the Company's business.

From early June 1998 through mid-August 1998, the Company and Redwood attempted to negotiate a new arrangement in the form of a joint venture. Those discussions continued for several weeks, but broke down amidst considerable animosity in the Fall of 1998, when both parties decided to sever the relationship entirely.

During the negotiations and the weeks subsequent to the termination thereof, the Company had a significant amount of open purchase orders placed with factories by Redwood as its buying agent. In the latter part of August, the Company noted an unusual trend of pre-scheduled deliveries from factories being delayed and failing to meet production schedules. From late August through the beginning of October 1998, the Company's shipments were arriving two to three weeks late, and upon arrival, were comprised of products that suffered from an unusual amount of quality problems not experienced in the past.

As a result of the above circumstances, the Company was forced to negotiate a significant amount of allowances, accommodations and price concessions to customers to compensate for the late delivery of shoes and to compensate for quality defects.

In mid-October, recognizing that it would be difficult to forge a new relationship with an agent in the tight Taichung community, and wanting to re-focus management on the business at hand rather than diverting resources toward developing a new sourcing relationship, NC negotiated a reconciliation

4

2CA 01508
CONFIDENTIAL

with Redwood and entered into a new agreement (see 10/15/98 Agreement at **Tab 7**). Pursuant to the agreement, the Company appointed Redwood as its exclusive agent for a five year period and Redwood agreed not to work with other companies in the Company's "sales grid" at department and specialty stores. Moreover, the Company agreed to invest $2 million in a development center in Taichung, which the Company believed was necessary to achieve the construction of, and thereafter maintain, the center. Redwood further agreed to contribute to the Company $2 million each year for five years (or an aggregate of $10,000,000 over the life of the contract) to defray the costs of dilution (i.e., chargebacks), so long as the Company guaranteed a minimum of $65 million in business annually. In the event that the Company did less than $65 million in any year, the $2 million would be prorated down to reflect the shortfall.

In or about February 1999, as previously mentioned, MT met with DG in New York to discuss, among other things, year-end matters. At this meeting, MT and DG discussed the business interruption that had occurred during 1998 and finalized an agreement granting a credit to the Company in the amount of $1,000,000. Thereafter, sometime in April 1999, the parties formalized the arrangement in a Memorandum of Understanding, dated October 22, 1998, based upon the date upon which the agreement was originally reached (see Agreement at **Tab 8**). At or about the same time in April 1999, Redwood issued the credit notice referred to above, dated November 1, 1998, to the Company reflecting the $1,000,000 business interruption credit and the $650,000 volume incentive credit (see Credit Notice at Tab 3).

The Company recorded and gave effect to the $1,000,000 business interruption credit, as part of a total credit of $1,650,000, during the fourth quarter (see Journal Entry at Tab 4).

2CA 01509
CONFIDENTIAL

IV. **PURCHASE OF DEVELOPMENT CENTER EQUIPMENT**

Pursuant to the October 15, 1998 Agreement, the Company commenced making payments to Redwood in connection with the establishment of the development center. On January 15, January 22 and January 29, 1999, the Company made three payments totaling $1,650,000 ($400,000, $500,000 and $750,000, respectively) to Redwood by wire transfer (see 1/31/99 Redwood Invoice at **Tab 11**). The last payment of $450,000, which brought the total investment to $2.1 million, was made on or about May 10, 1999 (see **Tab 12**).

E & Y has raised the issue of whether there is a correlation between the $1,650,000 credit that the Company took in connection with the volume incentive credit ($650,000) and the business disruption claim ($1,000,000) and the $1,650,000 constituting the first three payments toward the equipment. DG has stated that fact that the numbers are the same is completely coincidental.

2CA 01510
CONFIDENTIAL