

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 17, 2021

By ECF

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Neil Cole*, 19 Cr. 869 (ER)

Dear Judge Ramos:

      The Government respectfully submits this letter regarding Government Exhibits 1068 and 1139 (the "Government Exhibits").[1]  For the reasons that follow, the Court should admit the Government Exhibits because the statements (i) fall within the coconspirator exception to the hearsay rule under Fed. R. Evid. 801(d)(2)(E); (ii) are against the declarant's pecuniary and penal interests under Fed. R. Evid. 804(b)(3)(A), (B)); and (iii) evince the declarant's then-existing state of mind under Fed. R. Evid. 803(3).

## Background

1. The Government Exhibits

      GX 1068 consists of an email dated August 28, 2014 sent from Ethan Cole, an employee of LF Asia/Global Brands Group ("LF/GBG"), using his personal Gmail account, to Jared Margolis at his personal Gmail account. The subject line of the email is "Iconix Notes." The attachment to the email has the heading "Summary of Various Amounts with Iconix." Cole sent this message after LF/GBG had already overpaid for SEA 2 by $5 million, but before LF/GBG had submitted invoices to Iconix to obtain the giveback on that $5 million overpayment.

      The attachment itself reflects the overpay/offset arrangement: With respect to SEA 2, the attachment to the email describes a "$5 Million Overpay from Iconix Korea" and goes on to state that "[t]he $5M overpay from Iconix Korea will be offset by . . . $2.5M Rocawear, $1.0 M Zoo York SEA Marketing, [and] $1.5M Peanuts China Marketing." With respect to SEA 3, the attachment to the email describes a "$4.5 Million Proposed Overpay for Umbro / Lee Cooper China" and goes on to state that this proposed overpayment "will be offset by Iconix paying the $4.5M in markdown money to Rainbow." (*Id.*). The attachment goes on to describe "Additional Amounts – TBD [To Be Determined]," which consist of, among other things, "$3.5M in Rocawear

---

[1] GX 1068 is annexed hereto as Exhibit A, and GX 1139 is annexed hereto as Exhibit B.

royalty for YR [year] 2" that "remains outstanding" and "$3.5M in fixtures" that "remains outstanding."

GX 1139 is an email sent by Ethan Cole to Jared Margolis on December 1, 2014 at 10:42 p.m., with the subject "Notes for Iconix Meeting." As Margolis testified, Ethan Cole prepared the contents of the message at Margolis's direction in anticipation for a December 2, 2014 meeting between Neil Cole, Jason Rabin, and Margolis. (Tr. 1168:1-14) (Q. "Did Ethan Cole prepare this on his own or at your direction?" A. "At my direction." Q. "And it was for a meeting?" A. "It was." Q. "A meeting with who?" A. "With Jason Rabin and Neil Cole.")); (*see also* Tr. 1167:21-23) (Q. "Mr. Margolis, what were you generally asking Ethan Cole to prepare for you?" A. "The monies that were owed to us from the overpay.").

As with GX 1068, the message reflects the overpay/giveback arrangement: The chart at the top of the email lists a purchase price, "value based on rev [revenue] multiple," and "plug" that reflects the amount of the overpayments on SEA 2 and SEA 3, as well as a contemplated overpayment on the Middle East Joint Venture ("MENA"). With respect to SEA 2, the email reflects that LF/GBG had invoiced Iconix for $5 million and that $1.9 million had been paid, while the remaining two invoices remained outstanding. With respect to SEA 3, the email states that "[t]he $6M for China Umbro / LC will offset the following" and goes on to list $4.5 million in Rocawear royalties and $1.5 million in fixture expenses. Finally, with respect to MENA, which had yet to close, GX 1139 contemplates a purchase price $5 million above the "value based on rev [revenue] multiple" and notes that "[h]ow to allocate the $5M plug for the Middle East JV" is a point for discussion.

2.   The Record Evidence

The record is replete with evidence that Ethan Cole and the defendant jointly participated in the same conspiracy to cause LF/GBG to overpay on joint ventures in exchange for givebacks of those overpayments by Iconix.

Jared Margolis – who was Ethan Cole's direct supervisor during the relevant time period – testified, among other things, that:

- Margolis made Ethan Cole aware of the fact that LF/GBG had overpaid by $5 million with a firm commitment from Iconix that it would return that $5 million to LF/GBG. (Tr. 1123:17-1124:6).

- Margolis informed Ethan Cole that the purpose of submitting the marketing invoices to Iconix was to obtain the return of the $5 million overpayment on SEA 2 (Tr. 1128:19-1129:2) (Q. "What did you tell Ethan Cole?" A. "That we were going to invoice the – were were going to invoice them for – to get the money, the overpay back.").

- Margolis stated that both he and Ethan Cole were part of the process of preparing and submitting the marketing invoices to Iconix to effectuate the return of the $5 million overpayment (Tr. 1130:3-9; 1148:12-16). To prepare these invoices GBG did not conduct any analysis of the number of hours that were worked on marketing these brands.

(Tr. 1148:17-20). Absent the commitment from Iconix to return the $5 million overpayment, LF/GBG would not have invoiced Iconix for these marketing expenses because these marketing expenses should have been paid for by the joint venture itself. (Tr. 1148:25-1149:6). Ethan Cole, in fact, did prepare the original round dollar figure invoices (GX 1097) and the revised invoices that provided more detail and, while still totaling $5 million, were in non-round dollar figures. (GX 1111). With respect to the revised invoices in non-round dollar figures, Margolis testified that, other than making sure they still added up to $5 million, no other analysis was conducted. (Tr. 1154:1-4).

- To support the revised invoices requested by Iconix, Ethan Cole and Margolis worked together to obtain backup documentation as Iconix had requested. (Tr. 1154:14-16). In conduct that is demonstrative of Ethan Cole's understanding of the wrongfulness of the overpayment and giveback arrangement, Ethan Cole had multiple interactions in which he made misleading and incomplete statements to other LF/GBG employees in connection with obtaining this backup documentation for the revised invoices. (GX 1106; Tr. 1156:19-1157:15; GX 1257; Tr. 1159:1-1160:2 (Q. "He told her it had just come up in conversation with you, isn't that right?"; A. "That's correct." Q. "That wasn't true, was it?" A: "No."); GX 1258; Tr. 1160:3-1161:15). [2] Margolis only ever spoke to the small circle of Jason Rabin and Ethan Cole about the overpayments and givebacks with Iconix (Tr. 1157:2-12), and to the best of his recollection never told the LF/GBG employees that they received the backup documentation from what the materials were really for. (Tr. 1162:21-1163:1; 1164:15-17).

- As is noted above, Ethan Cole prepared the December 1, 2014 email, GX 1139, at Margolis's direction in preparation for a December 2, 2014 meeting with Neil Cole and Jason Rabin. (Tr. 1168:1-14; 1167:21-23).

Seth Horowitz also testified extensively as to Ethan Cole's involvement in the conspiracy:

- Horowitz testified regarding a September 5 meeting that Ethan Cole also attended where the overpayments and givebacks were discussed.[3] Per Horowitz, at the meeting the group "discussed the payments and how Iconix would like to be invoiced for the $5 million that we owed to GBG" and also discussed "the increased purchase price for the joint venture in June, as well as the Rocawear Kids termination." (Tr. 233:25-234:5). Horowitz further testified he prepared a sheet summarizing the givebacks and overpayments that he handed out at the meeting (GX 1084),[4] and his account is corroborated by the cover email to this document which shows that he had his assistant print three copies of the document to bring

---

[2] The Government intends to introduce similar evidence during the remainder of Margolis's testimony in which Ethan Cole continued to provide incomplete and misleading reasons to other LF/GBG employees as to why he was requesting certain documentation that was, in reality, to be used as backup documentation for invoices used to effectuate the $5 million giveback on SEA 2.

[3] A calendar invite sent from Seth Horowitz's assistant to Margolis, Ethan Cole and Horowitz (and certain of their assistants) reflects that a September 5, 2014 meeting occurred at 2:00 p.m. at Iconix's offices in Conference Room 3B. (GX 1082).

[4] GX 1084 is annexed hereto as Exhibit C to provide the Court with additional context.

into the conference room where the calendar entry indicates Horowitz was meeting with Margolis and Ethan Cole. The attachment to that email sets out information about the $5 million in marketing invoices that were used to effectuate the SEA 2 giveback, and also reflects discussion of the inflated $21.5 million purchase price on SEA 3 and royalty relief on Rocawear Kids. (GX 1084, at 2). On September 5, 2014 at approximately 5:06 p.m. – mere hours after the 2:00 P.M. meeting at Iconix – Ethan Cole emailed Horowitz, copying Margolis, requesting a "soft copy" of the Rocawear termination letter. (GX 1085).

- Horowitz further described the events leading up to the December 2, 2014 meeting between Neil Cole, Jason Rabin, Jared Margolis, and himself. As is described above, Margolis has testified Ethan Cole prepared GX 1139 at Margolis's direction in anticipation of this meeting. (Tr. 1168:1-14). In a December 1, 2014 email chain between Horowitz, Margolis, and Ethan Cole (GX 1134), Horowitz testified that Margolis referenced "the allocations of how GBG was going to be repaid any monies that were owed," which included "an outstanding balance owed to GBG from the June [SEA 2] joint venture, as well as the $6 million overpayment from the September [SEA 3] joint venture." (Tr. 318:10-319:12). Horowitz further stated that his understanding of what was going to be discussed at that upcoming meeting was "the two parties [i.e. Iconix and LF/GBG] were going to come to terms on how the repayments would be made to settle everything up." (Tr. 319:15-21; *see also* Tr. 319:24-320:8).

- Horowitz further testified that, on December 12, 2014, Ethan Cole "dropped off two large folders full of invoices and proposed backup to those invoices and told me that we should pay whatever – whichever of these invoices we wanted to pay that added up to how much money we owed them." (Tr. 332:6-20). These invoices related to the giveback on the SEA 2 transaction (Tr. 333:25-1) The invoices and backup that Ethan Cole dropped off with Horowitz were "six to eight inches high of paperwork" and totaled more than the remainder of the $5 million that was owed by Iconix to GBG on the overpayment. (Tr. 333:10-22).[5]

### The Court Should Admit Government Exhibits 1068 and 1139

1. The Court Should Admit the Exhibits Under the Coconspirator Exception

*Applicable Law*

To admit a statement under Rule 801(d)(2)(E), the district court must find by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012).

---

[5] The Government expects that the evidence will show that, as was the case with the backup documentation that Ethan Cole obtained from others at LF/GBG to support the invoices submitted to Iconix on or about October 2, 2014, Ethan Cole once again provided pretextual reasons to others at LF/GBG in order to obtain documentation that was then used as backup for these additional invoices.

To admit a statement under the co-conspirator exclusion from the hearsay rule, "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment" or that is the subject of the relevant trial. *See United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999); *Coppola*, 671 F.3d at 246 (the objective of the joint venture need not be any particular "crime charged in the indictment"); Christopher Mueller & Laird Kirkpatrick, Evidence § 8.33, at 870 (6th Ed.) ("the exception operates even if no conspiracy charges are brought . . . or if the charged conspiracy differs from (or is not as broad as) the one suggested as the basis for admitting coconspirator statements.").

When determining whether the predicate conspiracy has been established, "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181). If it does so, however, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy.'" *United States v. Padilla*, 203 F.3d at 161 (quoting *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996)). In assessing whether a statement qualifies as a co-conspirator statement, the Court may consider inadmissible evidence (such as hearsay) and need only find the relevant facts by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 177-78 (1987) (citing Fed. R. Evid. 104(a)); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy. Thus, statements are in furtherance of the conspiracy if they (1) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," *United States v. Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id*.; (5) "serve to foster trust and cohesiveness," *id*.; (6) "facilitate and protect" the conspiratorial activities, *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his co-conspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989).

*Discussion*

In deciding the admissibility under the coconspirator exception, the Court may consider the content of the exhibits themselves, in conjunction with other independent evidence in the record. *See United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) ("In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself.") (citing *Bourjaily v. United States*, 483 U.S. 171, 176–81 (1987)). Both the contents of the emails themselves – which are highly probative of Ethan Cole's participation in the conspiracy and knowledge of its aims – as well as the other record evidence demonstrate beyond a preponderance of the evidence that the statements are admissible. In particular, the Government Exhibits and the additional record evidence detailed above demonstrate that Ethan Cole was a member of the securities fraud conspiracy with the defendant through which Iconix reported inflated revenue by

LF/GBG paying inflated purchase prices with the commitment from Iconix to return those overpayments to LF/GBG.[6] Ethan Cole was, among other things, directly involved in the invoicing and reinvoicing of Iconix for the $5 million giveback, knew that the purpose of these invoices was to obtain a $5 million giveback on the $5 million SEA 2 overpayment, attended a meeting with Seth Horowitz and Jared Margolis where the overpayments and givebacks on both SEA 2 and SEA 3 were discussed, and prepared, at Margolis's direction, GX 1139 in anticipation for a December 2, 2014 meeting between the defendant, Margolis and Jason Rabin where it was anticipated the group would agree upon how the overpayments would be settled up. (Tr. 319:15-21; *see also* Tr. 319:24-320:8). Both Horowitz and Margolis have testified that Ethan Cole participated in key events in the conspiracy, and significant documentary evidence in addition to GX 1068 and GX 1139 corroborates those accounts. When taken in combination with the Government Exhibits that the Government seeks to admit, this Court can and should find by a preponderance of the evidence that both GX 1068 and GX1139 are admissible under the coconspirator exception.

There is now substantial evidence before the Court that demonstrates beyond a preponderance of the evidence that Ethan Cole was a knowing member of the conspiracy. In particular, the record evidence amply addresses the Court's concern that it did not "know enough about . . . Ethan Cole" and that "[t]here could be people at lower levels of the organization that are told the facts and not know that there is a corrupt agreement." (Tr. 1127:5-9; *see also* Tr. 1127:10-13 (The Court questioning whether it could "determine that [Ethan Cole] is a knowing member of the conspiracy.").) For example, the Government details above an instance when Ethan Cole was present for a meeting at Iconix's offices at which Horowitz testified that the group "discussed the payments and how Iconix would like to be invoiced for the $5 million that we owed to GBG. And we discussed the increased purchase price for the joint venture in June, as well as the Rocawear Kids termination" — conversations that were plainly at the heart of the unlawful conspiracy. (Tr. 233:25-234:5). Margolis likewise testified that Ethan Cole knew about the $5 million overpayment and Iconix's firm commitment to return that $5 million to LF/GBG and that Margolis told Ethan Cole that LF/GBG was "going to invoice them [Iconix] . . . to get the money, the overpay back." (Tr. 1123:17-1124:6; Tr. 1128:19-1129:2). When considered against this backdrop, it is clear that Ethan Cole was not merely a lower-level functionary who was told facts but did not know about the scope of the corrupt agreement. Indeed, it was Ethan Cole that was communicating with these lower level employees to further the conspiracy while keeping them in the dark as to the true purpose of his requests, whereas, by contrast, he was explicitly referring to the "overpayments" when emailing directly with his boss, Margolis.[7] Moreover, in an episode that illustrates that the

---

[6] Indeed, two of the acts alleged in furtherance of the conspiracy were the defendant authorizing transfers to LF/GBG in November and December 2014 (Indictment ¶ 44(i), (i)), that included payment of invoices that Ethan Cole participated in submitting to Iconix as part of the $5 million giveback.

[7] As Margolis will testify, he frequently entrusted Ethan Cole to draft emails for Margolis that Margolis then briefly reviewed before sending. In addition, the Government anticipates that Margolis will testify on Monday that Ethan Cole was a trained attorney (who had received his law degree in Canada and briefly practiced there) and had a sophisticated understanding of legal and accounting principles. Thus, it is not surprising that an individual with Ethan Cole's training and sophistication took steps to conceal from other LF/GBG employees why he was seeking the backup documentation that was used in connection with invoicing Iconix to effectuate the illicit

defendant and Ethan Cole were members of the same conspiracy, Ethan Cole prepared GX 1139 – which sets out in significant detail the overpayments and givebacks on both SEA 2 and SEA 3 – in anticipation of a meeting between the defendant, Jason Rabin, and Margolis. And Horowitz likewise testified that an email chain between Horowitz, Margolis and Ethan Cole pertained directly to preparations for the same meeting and related directly to the overpayments and givebacks, which was going to be discussed in detail at that meeting. (Tr. 318:10-319:12; Tr. 319:15-21). That is, Ethan Cole was working to achieve the overpayment/giveback arrangement with and for the defendant.

Certain of the evidence received during Margolis's testimony on Friday following the sidebar regarding GX 1068 is of particular significance in further demonstrating that Ethan Cole was a knowing member of the conspiracy and understood the wrongful nature of his conduct. As is detailed above, in seeking backup documentation to support the revised invoices requested by Iconix in connection with the SEA 2 giveback, Ethan Cole requested guidance from Margolis as to how to "position" the requests for such backup documentation from other LF/GBG employees that did not know about the overpayments and givebacks (GX 1106), and Ethan Cole then proceeded to provide pretextual and misleading reasons to other LF/GBG employees in order to obtain said backup documentation. (*See* GX 1106; Tr. 1156:19-1157:15; GX 1257; Tr. 1159:1-1160:2; GX 1258; Tr. 1160:3-1161:15). As Mr. Margolis testified, what Ethan Cole told one LF/GBG employee as to why he wanted a particular marketing plan was simply not true. (Tr. 1159:1-1160:2). Ethan Cole's efforts to mislead other LF/GBG employees about the true reasons why he was requesting certain documentation is highly probative of his knowledge and intent, and only further demonstrates that he was a knowing member of the conspiracy who understood the wrongful nature of his conduct.

In addition, the Court need only conclude that the statements were in furtherance of a conspiracy between the declarant and the defendant and this conspiracy need not be the one charged in the Indictment. *See Gigante*, 166 F.3d 75, 82 (2d Cir. 1999); *Coppola*, 671 F.3d at 246. Here, at a minimum, even assuming *arguendo* that the Court is not persuaded that the Government has carried its burden of showing by a preponderance that Ethan Cole was a knowing member of the securities fraud conspiracy with the defendant, this Court can and should find beyond a preponderance of the evidence that Ethan Cole and the defendant were both knowing members of a wire fraud conspiracy through which the conspirators defrauded Iconix. In particular, both Horowitz and Margolis have testified that the giveback of $5 million on SEA 2 contemplated Iconix paying for marketing expenses that it should not and would not have paid for absent the commitment from Iconix to return the $5 million overpayment on SEA 2. (Tr. 277:6-279:2; Tr.

---

givebacks. In this regard, it bears noting that the Second Circuit has held that a "factfinder may . . . rely on conscious avoidance to satisfy at least the knowledge component of intent to participate in a conspiracy" and that "a defendant's conscious avoidance of knowledge of its illegal purpose may substitute for knowledge of the illegal purpose." *United States v. Svoboda*, 347 F.3d 471, 479 (2d Cir. 2003). Given Ethan Cole's legal training and sophistication in legal and accounting matters, this Court should conclude that the knowledge component is satisfied.

1148:25-1149:6.) Ethan Cole, for the reasons described above, was plainly, at a minimum, a central and knowing member of that wire fraud conspiracy, as was the defendant.[8]

Finally, with respect to the in furtherance requirement, both GX 1068 and GX 1139 clearly contain statements in furtherance of the conspiracy, and lay out the current status of the overpayments and the givebacks, as well as steps that may be taken with respect to future overpayments and different options for how givebacks of those overpayments can be effectuated. *See, e.g., Desena*, 260 F.3d at 158 (statements are in furtherance that inform or provide an update as to the status or progress of the conspiracy).

2.   The Court Should Admit the Exhibits as Statements Against Penal and Pecuniary Interest

The Court should also admit the statements under the exception relating to statements against pecuniary and penal interest. Ethan Cole's statements in GX 1068 and GX 1139 go directly against both his penal and pecuniary interest and no reasonable person would have uttered them unless they were in fact the truth, are corroborated by other evidence, were made to someone that Ethan Cole "believe[d] [wa]s an ally," and were otherwise made under circumstances that give no reason to doubt the statements' reliability. *See United States v. Gupta*, 747 F.3d 111, 127 (2d Cir. 2014).

---

[8] While the Government does not believe the Court need reach this issue because the Court should find that Ethan Cole and the defendant were both members of an unlawful conspiracy, it bears noting that, because the coconspirator exception to the hearsay rule is rooted in principles of agency law, "the objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all." *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002). Rather, "[t]he central idea of the term 'conspiracy' does not depend on the substantive definition of a crime or civil wrong, for the exception can apply if people act together by mutual understanding in pursuit of a common purpose ('joint venture' would fit as well as the usual term)" and thus "[t]he exception can apply even if the proponent does not show the venture is unlawful." Mueller, Kirkpatrick & Richter, Evidence (6th Ed.) § 8.33; *see also Russo*, 3002 F.3d at 45 (citing *Fischl v. Armitage*, 128 F.3d 50 (2d Cir.1997) (admitting statements by a corrections officer in prisoner's civil rights action under Section 1983 alleging officers participated in or encouraged assault by other inmates); *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1073–74 (2d Cir.1988) (upholding admission of testimony pursuant to Rule 801(d)(2)(E) in civil antitrust suit)); *United States v. Holy Land Foundation For Relief and Development*, 624 F.3d 685, 694 (5th Cir. 2010) ("One can qualify as a 'joint venturer' for the purposes of Rule 801(d)(2)(E) merely by engaging in a joint plan—distinct from the criminal conspiracy charged—that was non-criminal in nature."); *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006) ("Although Rule 801(d)(2)(E) refers to 'conspiracy' and 'coconspirators' … our precedents hold that the doctrine is not limited to unlawful combinations. . . Rather, the rule, based on concepts of agency and partnership law and applicable in both civil and criminal trials. . . .")(citations omitted). While at least one district court in this District has expressed hesitance at adopting this approach with respect to the coconspirator exception and declined to rule on the issue, *see United States v. Stein*, No. S1 05 Cr. 0888 (LAK), 2007 WL 3009650, at *5 (S.D.N.Y. Oct. 15, 2007), the Second Circuit's decision in *Russo* is good law and is consistent with the approach taken in certain other circuits.

*Applicable Law*

Under Federal Rule of Evidence 804(b)(3)(A), a party may introduce an out-of-court statement made by a declarant who is not available to testify that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability." Such a statement must also be "supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." Fed. R. Evid. 804(b)(3)(B). "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

With respect to statements against penal interest, to satisfy Rule 804(b)(3)(A) and (B), the proponent must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (quoting *United States v. Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983)). "It is settled in this Circuit that a witness who invokes the privilege against self-incrimination is 'unavailable' within the meaning of Rule 804(b) even though the Government has the power to displace the witness's privilege with a grant of use immunity." *United States v. Dolah*, 245 F.3d 98, 102 (2d Cir. 2001), abrogated on other grounds by *Crawford v. Washington*, 541 U.S. 36 (2004).

"In assessing whether a statement is against penal interest within the meaning of Rule 804(b)(3), the district court must first ask whether a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest, . . . a question that can be answered only in light of all the surrounding circumstances." *Gupta*, 747 F.3d at 127 (internal quotations and citations omitted). "The statement [need] not have been sufficient, standing alone, to convict [the declarant] of any crime, so long as it would have been probative in a criminal case against him." *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017) (internal quotations and citations omitted) (alterations in *Dupree*).

If the court finds that the statement is against the declarant's penal interest, the Court must then determine whether there are corroborating circumstances indicating "both the declarant's trustworthiness and the truth of the statement," and "the inference of trustworthiness from the proffered corroborating circumstances must be strong, not merely allowable." *United States v. Ojudun*, 915 F.3d 875, 887 (2d Cir. 2019) (internal quotations and citations omitted). This inquiry focuses on, among other things, the relationship between the declarant and his intended audience, whether the statement appears calculated to shift blame from the declarant, and whether independent evidence corroborates the facts in the proffered statement. *Dupree*, 870 F.3d at 81.

*Discussion*

The statements in the Government Exhibits were clearly contrary to Ethan Cole's penal and pecuniary interests and, as such, are admissible. First, with respect to the declarant's unavailability, Ethan Cole's counsel stated his intention to invoke as recently as late September of this year. (3517-010). *Dolah*, 245 F.3d at 102.

Second, the statements were plainly against Ethan Cole's penal interest, as well as his pecuniary interests. Making statements in which you acknowledge your own knowledge and participation in a roundtrip accounting fraud – which is a common form of accounting fraud that is criminally charged with some frequency – is precisely the type of statement that would expose a declarant to legal jeopardy. Moreover, the statements were against Ethan Cole's pecuniary interests because, had they been uncovered, they could have led to the loss of his employment. *See* Mueller, Kirkpatrick, Evidence § 8.73 ("In general, statements that tend to subject the speaker to loss of job or employment opportunity, fit the exception."); *Gichner v. Antonio Troiano Tile & Marble Co.*, 410 F.2d 238, 242 (D.C. Cir. 1969) ("A statement is against pecuniary and proprietary interest when it threatens the loss of employment. . . ."). Even if the statements in the two emails from Ethan Cole would not be sufficient, standing alone, to convict him of securities fraud conspiracy or wire fraud conspiracy, there can be little doubt that they would be "probative in a criminal case against him." *Dupree*, 870 F.3d at 80. In other words, viewed in the context of the surrounding circumstances – as they should be – the statements are the types of statements that would expose him to criminal liability, and Ethan Cole would never have made these types of otherwise damning statements unless they were true. Indeed, when it comes to engaging in round trip accounting fraud, these two emails essentially provide a roadmap or overview of the precise overpayments and givebacks that constitute the crime.[9]

Third, and finally, the statements are also supported by independent corroboration as required by Rule 804(b)(3)(B).[10] The information contained in these two emails are corroborated by substantial independent evidence, including the testimony of Horowitz, Rabin and Margolis that such overpayments and givebacks occurred. Moreover, with respect to GX 1139 in particular, the timing of the email corroborates the trustworthiness of the statements. The email is titled Notes for Iconix Meeting, and there is independent record evidence, including calendar invites and Horowitz's and Margolis's testimony, that a meeting was to occur the next day with the defendant at which the overpayments and givebacks were to be discussed. Furthermore, the nature of the

---

[9] Moreover, there is no requirement that, in order to meet the requirements of 804(b)(3), a statement must make out all of the elements of a criminal offense. Indeed, in order for a statement to be self-inculpatory, it need not even implicate the declarant in a particular criminal act. *See, e.g., United States v. Barone*, 114 F.3d 1284, 1297 (1st Cir. 1997) (Statements demonstrating "an insider's knowledge of a criminal enterprise and its criminal activities" are sufficiently against a declarant's penal interest to come within the exception, even when they implicate others.).

[10] If the Court finds that the statement is a statement against pecuniary interest it does not need to address this prong of the analysis, as 804(b)(3)(B)'s requirement that the statement be "supported by corroborating circumstances that clearly indicate its trustworthiness" only applies in situations where the statement "is offered in a criminal case as one that tends to expose the declarant to criminal liability."

relationship between Ethan Cole and the intended audience of the statements provides additional corroborating circumstances. GX 1068 and GX 1139 are from Ethan Cole solely to his boss Margolis and include no other participants. As Margolis testified, he only spoke to Jason Rabin and Ethan Cole about the overpayments and givebacks. Ethan Cole would have no discernible interest to lie to Margolis given that the emails were just between them. The statements were, thus, to an ally with a unity of interests with Ethan Cole that gives the statements particular reliability. *United States v. Nikas*, No. 19 CR 716 (DLC), 2019 WL 7288870, at *2 (S.D.N.Y. Dec. 30, 2019) ("A declarant's statements may be deemed trustworthy when they are uttered to 'a person whom the declarant believe[s] [is] any ally' and when the declarant does not 'appear to have been attempting to shift criminal culpability from himself.'" (quoting *Dupree*, 870 F.3d at 80))).

3.   The Court Should Admit the Exhibits Under Rule 803(3)

The Government Exhibits should also be admitted under the "state of mind" hearsay exception pursuant to Rule 803(3).

*Applicable Law*

Rule 803 provides an exception for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or *plan*) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed …." Fed. R. Evid. 803(3)(emphasis supplied). By referring to the declarant's "then-existing" state of mind, Rule 803(3) incorporates a "contemporaneity requirement." *United States v. Farhane*, 634 F.3d 127, 171-75 (2d Cir. 2011) (Raggi, J., concurring). The contemporaneity requirement reduces the declarant's chance for reflection and, therefore, misrepresentation. *See United States v. Cardascia*, 951 F.2d 474, 488 (2d Cir. 1991) ("the reasons for the state of mind exception focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation"); *Farhane*, 634 F.3d at 171 (Raggi, J., concurring) ("the statement must evidence the declarant's 'then existing state of mind,' a circumstance presumed to reduce a declarant's chance for reflection and, therefore, misrepresentation").

To satisfy Rule 803(3), "the statement must face forward, rather than backward." *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993). This restriction is necessary to prevent this exception from "swallowing the hearsay rule." *Cardascia*, 951 F.2d at 487. In *United States v. Delvecchio*, the Second Circuit court specifically observed that such forward-looking statements exist when a declarant's statements reflect an intent to meet with the defendant:

> A declarant's out-of-court statement of intent may be introduced to prove that the declarant acted in accordance with that intent…. A declarant's statement of intent may also be admitted against a non-declarant when there is independent evidence which connects the declarant's statement with the non-declarant's activities…. For example, an informant's out-of-court statement of intent to meet a defendant may be introduced against the defendant when there is independent evidence that the meeting took place.

816 F.2d 859, 863 (2d Cir. 1987) (citations omitted); *see also Hydrolevel Corp. v. American Soc. of Mechanical Engineers, Inc.*, 635 F.2d 118, 128 (2d Cir. 1980), *judgment aff'd*, 456 U.S. 556 (1982) (in private antitrust action responses of customer, apparently occasioned by defendant's acts, admissible to show effects of defendant's acts).

*Discussion*

Here, the statements contained in the Government Exhibits "face forward" and relate directly to future plans with respect to both LF/GBG's payment of additional "overpayments" as well as the mechanisms by which LF/GBG plans to obtain the return of those overpayments from Iconix. In addition, the statements contained in the Government Exhibits evidence the declarant's "then-existing" state of mind that such overpayments existed and that LF/GBG expected the amounts of those overpayments to be returned by Iconix.

The timing and content of both of the Government Exhibits evidence Ethan Cole's "then existing state of mind" with respect to both the SEA 2 and SEA 3 overpayments and the way in which LF/GBG expected those overpayments to be returned by Iconix. Indeed, GX 1068 in essence lays out a plan for the overpayments and givebacks that are to come in the future and thus falls within the heartland of the state of mind exception under Rule 803(3). *See* Fed. R. Evid. 803(3) ("A statement of the declarant's then-existing state of mind (such as motive, intent, or *plan*). . . .") (emphasis added). GX 1068, which is dated August 28, 2014, was sent after the SEA 2 $5 million overpayment had occurred, before Iconix had returned any of that $5 million overpayment, before LF/GBG had sent Iconix the $5 million of marketing invoices to obtain the giveback, and before the SEA 3 overpayment had occurred. The document reflects Ethan Cole's "then-existing" state of mind with respect to the fact there had been a $5 million overpayment with respect to SEA 2, that there was an agreement for Iconix to return that $5 million overpayment through specific proposed means, and that an overpayment on SEA 3 was in the offing. (GX 1068, at 2) ("[t]he $5M [million] overpay from Iconix Korea will be offset by: $2.5M Rocawear, $1.0M Zoo York SEA Marketing, $1.5M Peanuts China Marketing."; SEA 3 overpay "will be offset by Iconix paying the $4.5M in markdown to Rainbow."). GX 1068 contains statements that plainly face forward, not backward, and thus are admissible under Rule 803(3). *See Harwood*, 998 F.2d at 98.

Similarly, GX 1139 – which was sent by Ethan Cole to Margolis the evening of December 1, 2014 in anticipation for a meeting with the defendant the next day – reflects Ethan Cole's "then existing state of mind" with respect to both the SEA 2 and SEA 3 overpayments and provides the current status as to the return of those overpayments and proposed methods by which the giveback will be effectuated. (*See, e.g.,* GX 1139) ("[t]he $6M for China Umbro / LC will offset the following . . . ."). GX 1139 also references MENA, which had yet to close, and contemplates a $5 million overpayment. This email thus contains forward looking statements relating to Ethan Cole's then existing state of mind as to an ongoing plan—including an anticipated meeting with the defendant—and those statements are admissible under Rule 803(3). *See Harwood*, 998 F.2d at 98; *Delvecchio*, 816 F.2d at 863.[11]

---

[11] Consistent with *Delvecchio* and its progeny, if the Court admits the statements under solely Rule 803(3) the Government will only seek to use Ethan Cole's statements to show Ethan Cole acted

### Conclusion

Ethan Cole knew of, and aided, the defendant's overpayment/giveback scheme, including by preparing and attending meeting with the defendant and his conspirators on the topic. Ethan Cole' statements advanced the conspiracy's work, tended to subject him to penal and pecuniary jeopardy by reflecting his role in the illicit conduct, and described his then-existing intention to help complete the scheme's giveback objective. Accordingly, and as detailed above, GX 1068 and GX 1139 are not subject to the rule against hearsay and should be admitted at trial.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
    Scott Hartman
    Noah Solowiejczyk
    Andrew Thomas
    Assistant United States Attorneys
    (212) 637-2357 / 2473 /2106

cc:    Defense counsel (by ECF)

---

"in accordance with his stated intention." *See United States v. Persico*, 645 F.3d 85, 100-01 (2d Cir. 2011) ("The point we made in *Delvecchio* was that, while a declarant's statement of intention to do something with another person is admissible as evidence that the *declarant* acted in accordance with his stated intention, it is not admissible under Rule 803(3) to show that the third person also acted in accordance with an intention attributed to him by the declarant."). Ethan Cole's state of mind is relevant to show, among other things, that there, in fact, did exist a firm commitment for Iconix to return the overpayments through a giveback and that the GBG employees viewed it as a firm commitment, not merely as an aspiration or hope. Plainly the internal understanding at GBG is a relevant issue, and the defense has admitted, among other things, internal GBG investment committee documents relating to GBG's understanding of the transactions and the purchase prices for those transactions in order to suggest that GBG actually valued these transactions at these prices and that the prices were not, in fact, inflated. While the Government cannot use Ethan Cole's state of mind as a substitute for the defendant's, it can use this evidence to show that it is more likely that a firm commitment did, in fact, exist, irrespective of whether the defendant knew of that firm commitment, which is a separate question. The evidence is further relevant to show that at least one of the GBG employees viewed the purchase prices paid as overpayments and not fair market value.