

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 24, 2021

By ECF

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:  *United States v. Neil Cole*, 19 Cr. 869 (ER)

Dear Judge Ramos:

  The Government respectfully submits this letter regarding its motion to preclude the testimony of proposed defense experts Paul Wertheim and Andrew Jassin. While the defense provided additional disclosure with respect to both proposed experts (annexed hereto as Exhibit A (the "Supplemental Disclosure")), the deficiencies identified in the Government's motions *in limine* persist. For the reasons set forth in the Government's motions *in limine*[1] and the additional reasons that follow, certain proposed testimony of Wertheim should be precluded, and the proposed testimony of Jassin should be precluded in its entirety.

  I. Much of Wertheim's Proffered Testimony Should Be Precluded

    A. Wertheim's Fact-Specific Proposed Opinions Should Be Precluded But Testimony Regarding General Principles May Be Permissible

  The defendant continues to propose that Wertheim provide opinions regarding revenue recognition and treatment of expenses directly linked to the underlying facts of the case. (*See* Supplemental Disclosure, at 2-3) (proposing to provide accounting opinions as to SEA 1, SEA 2, and SEA 3 on facts essentially identical to those that the defense argues occurred in this case). As the Government stated previously, such testimony should be precluded because it would, among other things, usurp the jury's factfinding role and seek to substitute the expert's judgment for the jury's. (*See* Govt MIL Brf. at 44-45); MIL Reply Brief at 13-14; *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.") (emphasis in original)); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (expert testimony in securities cases "must be carefully circumscribed to assure that

---

[1] The arguments set forth in the Government's motions *in limine* (Dkt. No. 115)(hereinafter "Govt. MIL Brf.") and reply in support of the motions *in limine* (Dkt. No. 125)(hereinafter "Govt. MIL Reply Brf.") are incorporated herein by reference.

Case 1:19-cr-00869-ER   Document 136   Filed 10/24/21   Page 2 of 10

Page 2

the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it.").[2]

Because the defense has been permitted to ask *Cuti* hypotheticals of a fact witness – namely, Larry Shapiro, the lead BDO auditor – this testimony from Wertheim is largely unnecessary and cumulative. To the extent the defense will seek to argue that since the Government was able to call the auditor that it should be permitted to call its own witness with accounting expertise to contradict Shapiro's testimony, this argument misses the mark because fact witnesses and expert witnesses are not similarly situated. The defense has been given wide latitude to ask hypotheticals with its own built-in assumptions to the appropriate fact witness to answer those questions. Through those counterfactual hypotheticals, the defense essentially through a fact witness already obtained testimony on cross examination of Shapiro that largely mirrors the expert testimony it now wants to offer through Wertheim. *See, e.g.,* Tr. 1850-51 (examples of SEA 1 hypotheticals); Tr. 1874--79; 1886-89 (examples of SEA 2 hypotheticals); 1890-91 (examples of SEA 3 hypotheticals). Accordingly the testimony is cumulative. *See* Fed. R. Evid. 403 ("evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"); *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 596 (2d Cir.1996) ("A district judge has discretion to exclude evidence if it is cumulative of evidence already in the record."). Indeed, it is far from clear that there is much of anything the parties disagree on when it comes to the applicable accounting principles, as was made clear by the fact that Shapiro largely agreed that there would be no accounting issue under the defense's counterfactual hypotheticals. What the parties strenuously dispute is the underlying facts. This speaks to the fact that the testimony of an accounting expert is of particularly limited utility in this case.

With all of that said, the Government does agree there is *some* permissible testimony that Wertheim can provide when it comes to revenue recognition and appropriate treatment of expenses. Testimony from Wertheim regarding the general underlying principles underlying revenue recognition rules and treatment of expenses could – depending on the specific opinions to be offered – be admissible. Such testimony would be consistent with what the defense stated in opposing the motions *in limine* was the purpose of offering the testimony – namely explaining the general principles and "[b]y doing so. . . provid[ing] the jury with the tools it needs to assess the facts in evidence and make a determination as to the charges in this case." (Dkt. No. 121 ("Def.

---

[2] The defense claimed in its opposition to the motions *in limine* that it wants to admit Wertheim's opinions in this regard because it is "relevant to the issue of whether Mr. Cole had a reasonable belief that the Company properly reported revenue and [Earnings Per Share]." (Def. MIL Opp. Brf. at 47). While such testimony about the application of GAAP can in theory be relevant to showing a defendant's good faith under *Ebbers*, *Rigas*, and *Simon*, there must be some evidence in the record that the defendant *actually* knew of the accounting approach that Wertheim plans to opine on and *relied* upon it in good faith. The Government is not aware of any such evidence in the record as of yet. That some hypothetical accounting approach is possible in the abstract has nothing to do with the defendant's own good faith unless there is a factual predicate to demonstrate that the defendant was so aware and so relied. *See generally United States v. Tomasetta*, No. 10 Cr. 1205(PAC), 2011 WL 6382562 (S.D.N.Y. Dec. 12, 2011).

MIL Opp. Brf.") at 46). Providing the tools for the jury to assess the facts can be accomplished by Wertheim providing expert testimony about the general considerations that accountants must take into consideration when assessing revenue recognition and treatment of expenses. It is for the jury to apply those general principles to the facts of the case.

        B.        Wertheim's Testimony Regarding Materiality Should Be Precluded

Wertheim's proposed testimony that the alleged revenue inflation resulting from SEA 1, SEA 2 and SEA 3 "was not material from an accounting standpoint" (Supplemental Disclosure, at 2-4) remains highly objectionable and improper testimony. The Court should preclude this testimony for substantially the reasons stated in the Government's moving papers. Permitting such testimony would both manage to usurp the jury's factfinding role and usurp this Court's role in instructing the jury as to the applicable law. (Govt. MIL Brf., at 46-48 (citing cases); Govt. MIL Reply Brf., at 16-20). It is the Court's role, not that of an expert, to tell the jury what the relevant considerations are when assessing materiality, and it is then the jury's role to apply that law to the specific facts of the case. *See, e.g., Feinberg v. Katz*, No. 01 CIV. 2739(CSH), 2007 WL 4562930, at *9 (S.D.N.Y. Dec. 21, 2007) (proposed expert's testimony that specific "omissions from the financial statements are material and it is my opinion that had this information been available, many if not all of the creditors using these financial statements would not have issued credit to the Company" was precluded because it "manages in a single sentence to both usurp the trial judge's function of instructing the jury on the law and tell the jury what result to reach on the facts: a breathtaking tour de force of inadmissibility.").

In addition, the proposed opinions suffer from basic relevancy defects. In opposing the motion to preclude Wertheim's materiality testimony, the defense argued that such testimony was admissible to rebut the expected testimony of institutional investors that the misstatements at issue would be important to a reasonable investor. (Def. Opp. Brf. 47-48). As the Government has stated, Wertheim is not qualified to testify about what would or would not have mattered to a reasonable investor --- which is the relevant inquiry with respect to the counts involving securities fraud and false statements in SEC filings.[3] Wertheim's background is in accounting and finance and there is nothing in his background that would qualify him to opine as to what would or would not matter to a reasonable investor. The defense essentially conceded the Government was correct in this regard during the final pretrial conference. (Tr. 47) (Dr. Wertheim is not going to opine on whether the allegedly omitted information would or would not have been material to a reasonable investor. We're not going to elicit that. That's not what he's going to be. We do intend to have him talk about what GAAP materiality means, how it's applied, and to apply it to the facts in evidence. That's all."). Wertheim's opinions are thus irrelevant as to Counts Two through Eight, which do not turn on whether the misstatements were material from an accounting standpoint but rather depend on whether they would matter to a reasonable investor.

With respect to Count Nine, which charges misleading the conduct of audits, the materiality inquiry is the same except that the jury will be asked to consider whether the false or misleading statement would have been material to a reasonable auditor, instead of a reasonable investor. To

---

[3] Count One charges a conspiracy with objects that include securities fraud. Count Two charges substantive securities fraud. Counts Three through Eight charge false statements in SEC filings.

the extent Wertheim's proposed materiality opinions are aimed at this Count alone, they still must be precluded because they improperly usurp the jury's factfinding role and the Court's role in instructing on the law. As to Count Nine, the testimony is essentially ultimate issue testimony because if the jury credits Wertheim's testimony – which will be cloaked with the added gravitas of an expert – it will have to conclude that the alleged misrepresentations and omissions are "not material from an accounting standpoint" and thus would not have been material to an auditor applying applicable accounting rules. It is not the job of an expert to so usurp the jury. Rather, the Court will instruct the jury as to what considerations it must take into consideration in assessing whether a particular misrepresentation or omission was material to a reasonable auditor and it will then be the job of the jury to apply that law to the facts.

In sum, the proposed materiality testimony is particularly egregious. This Court should preclude such testimony in its entirety and should permit the jury to do its job with the aid of the Court's well-reasoned legal instructions.

          C.        Wertheim's Remaining Opinions Should Be Precluded

The defendant's Supplemental Disclosure provides an array of additional proposed opinions from Wertheim that should be precluded.

*First*, Wertheim proposes to testify that "[f]rom an accounting perspective, there is nothing improper about a public company monitoring analyst consensus estimates and tracking expected financial results relative to those consensus estimates." (Supplemental Disclosure, at 4). As the Government previously stated, this testimony is irrelevant and improperly relates to the defendant's intent in taking certain actions. This opinion is irrelevant because there is no allegation in this case that the defendant and other senior executives at Iconix tracking analyst consensus estimates relative to the financial results was in and of itself improper. Tracking analyst consensus and Iconix's financial results relative to that consensus was a step that this defendant and his co-conspirators took in connection with committing the crime. That other executives may track the very same information and not use it to then engage in illegal transactions to inflate their companies' revenues tells the jury nothing of value and risks seriously misleading the jury. (*See* Govt. MIL Brf. at 49). This would be akin to offering testimony that plenty of other people buy power drills to do work on their home in the trial of a bank robber accused of using a power drill to break into a bank's safe. The fact the bank robber had bought the drill the day before the robbery would be relevant probative evidence. The fact that plenty of other people also buy power drills would not. And, of course, testimony that is aimed – either directly or indirectly – at telling the jury about the defendant's intent should be precluded. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony" and thus are not relevant testimony; "the question of intent is a classic jury question and not one for the experts."); *Highland Capital Mgmt., L.P.* v. *Schneider*, 551 F. Supp. 2d 173, 183 (S.D.N.Y. 2008) (speculative expert testimony about intent "cannot be saved by couching [the expert's] opinion as 'industry custom and practice.'").[4]

---

[4] In addition, it is unclear what Wertheim's opinion is based on in this regard and why he has the expertise to offer this opinion. Wertheim is going to state that "from an accounting perspective" there is nothing improper about monitoring analyst consensus and tracking results against that

*Second*, the defendant for the first time in his Supplemental Disclosure seeks for Wertheim to testify that "[r]evenue recognition criteria under GAAP are the same, and are not impacted by, whether the revenue being considered helped meet analyst estimates, or whether that revenue occurred at or near the close of a particular quarter." (Supplemental Disclosure, at 4). As an initial matter, the purpose of the Supplemental Disclosure was to *supplement* the details and bases and reasons for the proposed opinions in the original June 2021 expert disclosure, and decidedly not to offer new opinions for the first time. This particular opinion was not contained in the original June 2021 expert disclosure. It should be precluded on these grounds. More fundamentally, this opinion is not accounting expert testimony. It is essentially argument masquerading as expert opinion. There is no dispute that revenue recognition under GAAP would be the same regardless of whether the revenue at issue helps meet analyst estimates or is near the close of a particular quarter. No expert testimony is required in this regard as the point is basic commonsense and is an advocacy point and nothing more.

*Third*, the defendant seeks for Wertheim to testify that "the appropriate accounting determination under GAAP typically requires the exercise of judgment in the application of revenue recognition criteria" and that "it is possible for two accountants to reach different conclusions on revenue recognition, and yet for both conclusions to be reasonable based on the judgments made." (Supplemental Disclosure, at 4). This testimony would, at this point, be cumulative as Shapiro said as much on cross examination. (Tr. 1889).[5]

## II. Jassin's Testimony Should Be Precluded In Its Entirety

Jassin's testimony should be precluded for substantially the reasons stated in the Government's motions *in limine*. (Govt MIL Brf., at 53-61; Govt. MIL Reply Brf., at 22-25). The Supplemental Disclosure has not changed the fact that Jassin's proposed testimony lacks relevancy, usurps the jury's function, and relates to subjects that are not properly the subject of "expert" testimony. (*See* Govt. MIL Brf., at 57-65; Govt. Reply MIL Brf., at 22-25)). Furthermore, the testimony still remains, at bottom, the *ipse dixit* of the expert and does not appear to be grounded in sufficient reasons and bases as required by *Daubert*. (Govt. MIL at 60-61; Govt. MIL Reply Brf., at 23-25).

---

consensus, but this opinion does not even relate to an accounting question as far as the Government can tell.

[5] The defendant also states that, "[d]epending on the testimony offered by the government's 'summary' witness, Dr. Wertheim also may provide summary testimony regarding the impact of the alleged misstatements on meeting or not meeting consensus estimates and guidance." (Supplemental Disclosure, at 4). The Government remains unclear what specific opinion Wertheim has to offer at this point. The defense has had the summary witness's charts for weeks and from the face of those charts the defense could readily anticipate what the summary witness would say. Thus, the defense is in a position, and has been for weeks, to disclose with specificity what "expert" opinions Wertheim would offer in this regard. The fact the supplemental expert disclosure still does not do so warrants preclusion of whatever testimony the defense plans to offer as the Government will be provided with inadequate time to investigate and consider the merits of the opinions if the defense only discloses those opinions at the 23rd hour.

Jassin's proposed industry custom and practice testimony should be precluded in its entirety because, even in the Supplemental Disclosure, the defense continues to propose that Jassin testify about general industry custom and practice and does not tether his specific opinions to the relevant context of a joint venture relationship. That flaw is fatal. This Court already expressed skepticism about the relevance and admissibility of Jassin's proposed testimony at the final pretrial conference.[6] That skepticism was well placed, especially now that the Court has the benefit of the trial record, which shows that testimony about general industry custom and practice is not of particular utility and risks confusing and misleading the jury because what generally happens in the industry is not particularly relevant. Because Jassin cannot say with specificity that his proffered opinions are typical practice in a joint venture situation similar to the business relationship that existed between Iconix and GBG, his opinions about generic licensor-licensee relationships and other generic brand owner relationships with business partners is not relevant to this case. Here, the brand owner (Iconix) transferred ownership of a trademark or brand to the JV while maintaining a 50 percent ownership interest in the JV itself and agreed with the counterparty (GBG) to share in the licensing revenue equally, as well as to share in the expenses equally. (Indictment ¶ 4). The testimony in the record is that Iconix and GBG were supposed to bear expenses equally as joint venture partners. Those expenses would be paid by the joint venture, and Iconix and GBG would then split whatever remained as profit. *See, e.g.,* Tr. 70-72 (Horowitz explaining that joint venture should pay expenses, including marketing expenses, and the Joint Venture partners would then share in what profits remained); Tr. 752 (Horowitz explaining marketing expense for Iconix Europe joint venture would be shared between Iconix and GBG/TLC); Tr. 789-90 (Rabin explaining LF Asia was paying for "half of the income that that territory generated" and that the profit or royalty stream would be "minus expenses" which included "marketing expense"); 817-18 (Rabin stating that LF Asia would market the brands as a joint venture partner regardless of whether Iconix provided marketing support and that as a joint venture partner LF Asia would not be entitled to bill Iconix for marketing rather than the joint venture itself); Tr. 970-71 (Rabin stating that marketing is typically handled by the joint venture and that the expenses are to be charged to the joint venture and that the parties profit from the royalties after deducting expenses, which includes marketing); Tr. 1148-49 (Margolis stating that marketing expenses should have been paid for by the joint venture itself); *see also* DX 302-A5 (Local Services Agreement for SEA JV) That is a fundamentally different business relationship that a licensor and a licensee, where the business partners are not joint owners of the IP and are not obligated to share in the profits and expenses equally.

The Court, in its gatekeeping role under *Daubert*, should only permit testimony that it determines would be helpful to the factfinder to resolve facts at issue. Jassin's proposed testimony simply is not. *See Nimely*, 414 F.3d at 397 ("Even after determining that a witness is 'qualified as an expert' to testify as to a particular matter, and that the opinion is based upon reliable data and methodology, Rule 702[ (a) ] requires the district court to make a third inquiry: whether the expert's

---

[6] At the final pretrial conference the Court stated that if, in fact, the joint venture context was not equivalent to a run-of-the-mill licensor-licensee relationship – as the Government claimed – that the Court would not find Jassin's testimony "terribly helpful" and "would not be inclined to allow Mr. Jassin's testimony." (9/30/21 Tr. at 58). The Court added that it was "not inclined to allow Mr. Jassin's testimony" but was "happy to hear some additional information." (*Id.*).

testimony ... will 'assist the trier of fact'" in understanding the evidence or determining a fact in issue.") (quoting Fed. R. Evid 702); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful") (citations omitted).[7]

In addition, the testimony would be unduly cumulative. The defense has been given wide latitude on cross examination to make many of the points it seeks that Jassin make, including by asking questions of the fact witnesses about general industry practices that mirror much of the proposed expert testimony of Jassin, as well as by offering evidence relating to both Iconix's practices outside of the Iconix-GBG joint venture, as well as by offering evidence about GBG's practices outside of that joint venture.[8] Such evidence and testimony has included, among other things, practices relating to billing for marketing generally (which has included introducing round dollar invoices in unrelated business transactions and other invoices in other unrelated business transactions), relieving licensees of obligations, and how at times longtime business partners accede to each other's requests in order to preserve the longstanding business relationship, among many other aspects of the industry practices writ large that the defense has been permitted to explore extensively on cross examination.

Finally, the Government has learned through online research that Mr. Jassin on his LinkedIn page references having done work with both Iconix and Li & Fung. Because the Government has received no disclosures under Rule 26.2, the Government has no understanding as to the nature of Jassin's dealings with Iconix and Li & Fung and whether Jassin has prior experiences with Iconix and Li & Fung that would disqualify him as an expert.[9] The Government has additional concerns that Jassin may have had prior dealings directly with Neil Cole given that he features his work with Iconix on his LinkedIn page. The Government also has concerns that Jassin will draw on his specific business experiences with Iconix and Li & Fung and extrapolate from those experiences to provide purported "expert" testimony, which would mix the functions of a fact witness and an expert witness in an impermissible fashion.

With respect to the specific opinions, the Government discusses briefly below a non-exhaustive list of additional deficiencies in the proffered opinions:

---

[7] All of Jassin's opinions are based on his "extensive experience in the industry." (Supplemental Disclosure, at 4-6). The Government does not dispute that Jassin has extensive experience in the industry generally. But Jassin's resume does not demonstrate that he has the requisite industry experience to opine on what is customary in the joint venture context. The Government has only ever been provided with a four page summary of Jassin's credentials. He operated a joint venture from 1974 to 1979. It is dubious that experience forty years ago would qualify him to opine on what is customary in joint venture relationships today.

[8] Such evidence and testimony has included offering invoices from other business relationships over the Government's objection.

[9] The fact that Jassin previously worked with both Iconix and Li & Fung was not in the defendant's initial expert disclosure or the Supplemental Disclosure, nor was it referenced in the CV that the defense included with its original expert disclosure in June 2021.

Jassin's proposed testimony about "industry customs and practices with respect to marketing" (Supplemental Disclosure, at 4) lack relevance because they are not specific to the joint venture setting (Govt. MIL Reply Brf., at 23-24). In addition, through cross examination of fact witnesses the defense has already established that at times brand owners pay for marketing expenses even when they have no contractual obligation to do so, including with respect to Iconix and GBG's relationship in connection with the Peanuts master license (Tr. 835-36; 838), and thus the testimony would be cumulative at this point.

Jassin's proposed opinion that in the industry "it is customary for one party to compromise in response to a request by a counterparty, whether or not it receives any commitment or obligation from that counterparty, for the purpose of increasing the likelihood of obtaining benefits in future transactions" is unduly speculative. The reasons a party decides to compromise or not compromise in a specific business negotiation is highly fact-specific and is not conducive to the sort of broad and conclusory assertions that Jassin seeks to pass off as "expert" testimony. In addition, the testimony is cumulative. The record is riddled at this point with the fact that longtime business partners sometimes accede to each other's requests even when not contractually obligated to do so. *See, e.g.,* Tr. 835-38; 875; 1470-72.

Jassin's proposed testimony that it is common in the industry for "a party to express a willingness – for the benefit of an ongoing relationship – 'not to forget,' 'to do its best,' or 'to see what it can do,' without undertaking an obligation or commitment" and that such conduct are "classic forms of negotiation in the industry" (Supplemental Disclosure, at 5) is particularly objectionable because it seeks to insinuate what Cole's intent was in making certain statements and taking certain actions. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony" and thus are not relevant testimony; "the question of intent is a classic jury question and not one for the experts."); *Highland Capital Mgmt., L.P.* v. *Schneider*, 551 F. Supp. 2d 173, 183 (S.D.N.Y. 2008) (speculative expert testimony about intent "cannot be saved by couching [the expert's] opinion as 'industry custom and practice.'"). The meaning of Cole's statements and actions when interfacing with GBG executives is plainly a central factual issue the jury will need to resolve. The defense claims that Cole never made any firm commitments and at best made the types of aspirational and non-binding statements reflected in Jassin's opinion, while the Government claims a firm commitment to return the overpayments existed. It is the jury's role, with the benefit of the full record, to decide Cole's intent during these interactions. Couched as industry custom testimony or not, this aspect of Jassin's proposed testimony is clearly aimed at telling the jury how it should interpret Cole's intent, and that is impermissible.

Jassin's proposed testimony regarding the marketing invoices submitted by GBG to Iconix (Supplemental Disclosure at 4) is perhaps the most objectionable of all of his proposed testimony and the Government would suffer significant prejudice were this testimony permitted. This proposed testimony is squarely aimed at using expert testimony to usurp the jury's factfinding role. Jassin proposes to testify, among other things, that the supporting documentation for the marketing invoices submitted by GBG to Iconix reflects "substantial marketing work on behalf of Iconix brands . . . [that] would be of significant value to Iconix" and that such backup documentation is "consistent with the type of back-up that commonly is received to support requests for payments of shared expenses or other types of marketing support from an industry business partner,"

(Supplemental Disclosure, at 5). This testimony goes directly to a crucial fact issue in the case and permitting Jassin to testify in this conclusory manner – with the added gravitas of his being an "expert" – would usurp the jury's factfinding role. As the Government stated in its motions *in limine*, it is for the jury, not a purported expert like Jassin, to decide whether the marketing invoices were actually entirely appropriate and consistent with the value of the work performed or if, to the contrary, the invoices were merely a means to return the $5 million overpayment to GBG. (Govt. MIL Brf. at 59-60) (citing cases). These are clearly highly fact-specific inquiries that turn on the full record to resolve. That is the jury's job at this trial. And it is not Mr. Jassin's.[10]

Similarly, Jassin's proposed "expert" testimony that "marketing and consulting work is commonly billed in round numbers in the fashion and licensing industries since it involves the provision of specialty services rather than the buying and selling of tangible goods" and that it is "not uncommon for the party paying such invoices to request a more detailed breakdown of work performed" again usurps the jury's factfinding role. In addition, this testimony is unduly cumulative at this juncture given that the defense has – over the Government's objections – introduced various invoices in round dollar numbers, irrespective of the timeframe of the invoices and the underlying business relationship between GBG and the party it was invoicing.

Jassin's proposed testimony regarding the fact it is common for "licensees of underperforming brands" to seek to be released from their obligations to brand owners "if they believe the arrangement is no longer financially advantageous" (Supplemental Disclosure, at 5) is irrelevant. Whether or not such requests are common has no bearing on the case. Similarly, Jassin's proposed testimony that "it is customary for a brand owner to seek to transfer the license to a replacement licensee" and that "it is in the brand owner's interest to replace the poorly performing licensee with a better performing licensee if it can find one" appears to be of little relevance given there is nothing in the evidentiary record to suggest that anyone at Iconix viewed transferring Rocawear Kids from GBG to a replacement licensee as in its interests. Expert testimony about hypothetical facts that did not exist and are not borne out by the record will just confuse the jury and the Court should preclude it in its gatekeeping role as unhelpful. *Raskin*, 125 F.3d at 66 ("[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful") (citations omitted).

---

[10] In addition, if the defense wanted to prove that this type of backup documentation was, in fact, "consistent with the type of back-up that commonly is received to support requests for payments", it could have sought to do so through Iconix records and GBG records of the variety similar to those that it has offered at trial and have been largely admitted over the Government's objections. Because the defense has been given significant latitude in offering evidence of other business dealings of both Iconix and GBG that purportedly goes to the bonafides of the marketing invoices, the defense could seek to make these arguments by offering backup documentation from other marketing expenses that is similar in nature to that submitted by GBG to Iconix, to the extent such evidence exists. The Government reserves its right to object to that evidence, as it has objected to various other invoices and other backup documents the defense has offered to date.

## Conclusion

For the foregoing reasons, Jassin's testimony should be precluded in its entirety and Wertheim's testimony should be substantially curtailed.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: \_\_\_/s/_____
    Scott Hartman
    Noah Solowiejczyk
    Andrew Thomas
    Assistant United States Attorneys
    (212) 637-2357 / 2473 /2106

cc:   Defense counsel (by ECF)