# EXHIBIT A

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER
(212) 373-3250

WRITER'S DIRECT FACSIMILE
(212) 492-0250

WRITER'S DIRECT E-MAIL ADDRESS
lreisner@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
JUSTIN ANDERSON
ALLAN J. ARFFA
JONATHAN H. ASHTOR
ROBERT A. ATKINS
SCOTT A. BARSHAY
PAUL M. BASTA
J. STEVEN BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
BRIAN BOLIN
ANGELO BONVINO
ROBERT A. BRITTON
DAVID W. BROWN
WALTER BROWN*+
SUSANNA M. BUERGEL
JESSICA S. CAREY
DAVID CARMONA
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
YAHONNES CLEARY
RACHAEL G. COFFEY
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
THOMAS V. DE LA BASTIDE III
MEREDITH DEARBORN*+
ARIEL J. DECKELBAUM
KAREN L. DUNN
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
HARRIS FISCHMAN
ANDREW J. FOLEY
VICTORIA S. FORRESTER
HARRIS B. FREIDUS
CHRISTOPHER D. FREY
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
MATTHEW B. GOLDSTEIN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
MELINDA HAAG*
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
JARRETT R. HOFFMAN
ROBERT E. HOLO
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
WILLIAM A. ISAACSON*
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
KYLE J. KIMPLER
ALEXIA D. KORBERG

ALAN W. KORNBERG
DANIEL J. KRAMER
BRIAN KRAUSE
CAITH KUSHNER
DAVID K. LAKHDHIR
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
RANDY LUSKEY*+
LORETTA E. LYNCH
JEFFREY D. MARELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH R. McCOLM
JEAN M. McLOUGHLIN
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
BRAD R. OKUN
LINDSAY B. PARKS
ANDREW M. PARLEN
DANIELLE C. PENHALL
CHARLES J. PESANT
JESSICA E. PHILLIPS*
AUSTIN POLLET*+
VALERIE E. RADWANER
JEFFREY J. RECHER
CARL L. REISNER
LORIN L. REISNER
JEANNIE S. RHEE*
WALTER G. RICCIARDI
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JUSTIN ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
KYLE T. SEIFRIED
KANNON K. SHANMUGAM*
CULLEN L. SINCLAIR
AUDRA J. SOLOWAY
SCOTT M. SONTAG
SARAH STASNY
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
BRETTE TANNENBAUM
RICHARD C. TARLOWE
DAVID TARR
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
KRISHNA VEERARAGHAVAN
JEREMY M. VEIT
LIZA M. VELAZQUEZ
MICHAEL VOGEL
RAMY J. WAHBEH
JOHN WEBER
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
LINDSEY L. WIERSMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
AUSTIN WITT
MARK B. WLAZLO
ADAM WOLLSTEIN
JULIA TARVER MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR
+ADMITTED ONLY TO THE CALIFORNIA BAR

October 12, 2021

**By Email**

Scott Hartman, Esq.
Noah Solowiejczyk, Esq.
Andrew Thomas, Esq.
Assistant United States Attorneys
U.S. Attorney's Office for the Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

    Re:    *United States* v. *Neil Cole,*
              19 Cr. 869 (ER)

Dear Scott, Noah and Andrew:

        Although we continue to believe that the expert disclosure provided by the defense to the government on June 2, 2021 fully satisfies the requirements of Rule 16 of the Federal Rules of Criminal Procedure, we are writing to provide additional details regarding the expected testimony of defense experts Paul Wertheim and Andrew Jassin. Because the testimony of both experts necessarily will depend on the evidence that will be introduced in the government's case-in-chief, Mr. Cole reserves the right to amend and supplement this information to the extent necessary.

A. **Dr. Paul Wertheim**

Expected testimony regarding the SEA 1 transaction.

- Under applicable accounting standards, the $2 million consultancy payment from Iconix to Li & Fung ("LF") could be treated as an expense in the fourth quarter of 2013, rather than as a reduction of revenue, if Iconix received an identifiable benefit in exchange for the consultancy payment and the fair value of the benefit could be estimated and was equal to or greater than the consultancy payment. This opinion is based on GAAP revenue recognition principles and accounting guidance, including ASC 605-50-45-2 and ASC 605-50-55-14 & 15.

- Under applicable accounting standards, the $2 million consideration received by Iconix for entering into the JV agreements could be included in the calculation of revenue if the payment was non-refundable and represented the culmination of that earnings process, such that Iconix had substantially accomplished what it must do to be entitled to the revenue. This opinion is based on GAAP revenue recognition principles and accounting guidance, including ASC 605-10-S99-1 and ASC 605-10-25-1(b) (citing Concepts Statement 5, Recognition and Measurement in Financial Statements of Business Enterprises, Paragraph 83(b)).

- Under applicable accounting standards, assessing the materiality of a misstatement requires consideration of various qualitative and quantitative factors. Dr. Wertheim will identify relevant considerations and discuss the application of those considerations to the alleged misstatements in this case. For example, Dr. Wertheim will discuss the impact of the alleged misstatements on the company's financial statements taken as a whole. Based on these considerations, it is Dr. Wertheim's opinion that the alleged inflation of revenue was not material from an accounting standpoint. This opinion is based on GAAP principles and accounting guidance, including ASC 250-10-S99-1 and SFAC No. 8, Conceptual Framework for Financial Reporting, paragraph QC11B.

Expected testimony regarding the SEA 2 transaction.

- Under applicable accounting standards, revenue may appropriately be recognized in the period in which GAAP revenue recognition criteria are met. Accordingly, if at the time the SEA 2 transaction took place, Iconix had substantially accomplished what it must do to be entitled to the benefits represented by the revenue (i.e., delivery had occurred), and the agreement was final, in that there was persuasive evidence of an arrangement, then the full amount of the revenue received could be recorded as revenue in the second quarter of 2014. In particular, if there was no commitment or obligation by Iconix to make future payments to LF/GBG in connection with the SEA 2 transaction at the time it was entered (other than as set forth in the transaction documents), then under GAAP, the full amount of the revenue that LF/GBG agreed to pay relating to SEA 2 would be properly considered

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3

as part of the company's reported results for the second quarter of 2014 under the accounting principles applied by Iconix at that time. This opinion is based on GAAP revenue recognition principles and accounting guidance, including ASC 605-10-S99-1 and ASC 605-10-25-1(b).

- Under applicable accounting standards, assessing the materiality of a misstatement requires consideration of various qualitative and quantitative factors. Dr. Wertheim will identify relevant considerations and discuss the application of those considerations to the alleged misstatements in this case. For example, Dr. Wertheim will discuss the impact of the alleged misstatements on the company's financial statements taken as a whole. Based on these considerations, it is Dr. Wertheim's opinion that the alleged inflation of revenue was not material from an accounting standpoint. This opinion is based on GAAP principles and accounting guidance, including ASC 250-10-S99-1 and SFAC No. 8, Conceptual Framework for Financial Reporting, paragraph QC11B.

Expected testimony regarding the SEA 3 transaction.

- Under applicable accounting standards, revenue may appropriately be recognized in the period in which GAAP revenue recognition criteria are met. Accordingly, if at the time the SEA 3 transaction took place, Iconix had substantially accomplished what it must do to be entitled to the benefits represented by the revenue (i.e., delivery had occurred), and the agreement was final, in that there was persuasive evidence of an arrangement, then the full amount of the revenue received could be recorded as revenue in the third quarter of 2014. In particular, if at the time SEA 3 was entered, there was no commitment or obligation by Iconix to terminate the Rocawear Kids license agreement, then any prior or contemporaneous discussions about potentially terminating that agreement would have no impact on Iconix's reported results for the third quarter of 2014 under GAAP. This opinion is based on GAAP revenue recognition principles and accounting guidance, including ASC 605-10-S99-1 and ASC 605-10-25-1(b).

- Under applicable accounting standards, assessing the materiality of a misstatement requires consideration of various qualitative and quantitative factors. Dr. Wertheim will identify relevant considerations and discuss the application of those considerations to the alleged misstatements in this case. For example, Dr. Wertheim will discuss the impact of the alleged misstatements on the company's financial statements taken as a whole. Based on these considerations, it is Dr. Wertheim's opinion that the alleged inflation of revenue was not material from an accounting standpoint. This opinion is based on GAAP principles and accounting guidance, including ASC 250-10-S99-1 and SFAC No. 8, Conceptual Framework for Financial Reporting, paragraph QC11B.

Other subject matters to be addressed by Dr. Wertheim.

- From an accounting perspective, there is nothing improper about a public company monitoring analyst consensus estimates and tracking expected financial results relative to those consensus estimates.

- Revenue recognition criteria under GAAP are the same, and are not impacted by, whether the revenue being considered helped meet analyst estimates, or whether that revenue occurred at or near the close of a particular quarter.

- Where there are multiple agreements between counterparties with respect to a revenue transaction, the appropriate accounting determination under GAAP typically requires the exercise of judgment in the application of revenue recognition criteria. Because of the judgment involved, it is possible for two accountants to reach different conclusions on revenue recognition, and yet for both conclusions to be reasonable based on the judgments made.

- Depending on the testimony offered by the government's "summary" witness, Dr. Wertheim also may provide summary testimony regarding the impact of the alleged misstatements on meeting or not meeting consensus estimates and guidance.

B. **Andrew Jassin**

Industry customs and practices with respect to marketing.

- In the fashion, apparel and brand licensing industry, it is customary for brand owners to undertake and fund marketing efforts to try to enhance the value of their brands and increase product sales, even if they have no specific contractual obligation to do so. Examples of discretionary marketing support provided by brand owners include advertising and promotional campaigns, social media campaigns, product endorsements, trend and positioning analyses, launch plans, design work, and in-store fixturing.

- In the fashion, apparel and brand licensing industry, business partners (e.g., licensor-licensee or joint venture partners) often work together to promote shared interests in brands, including by sharing the costs of marketing and advertising for those brands.

- These opinions are based on Mr. Jassin's extensive experience in the industry.

Industry customs and practices with respect to negotiations.

- In the fashion, apparel and brand licensing industry, during negotiations between long-term business partners, it is customary for one party to compromise in response to a request by a counterparty, whether or not it receives any commitment

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

5

    or obligation from that counterparty, for the purpose of increasing the likelihood of obtaining benefits in future transactions.

- It is common in the industry for a party to express a willingness—for the benefit of an ongoing relationship—"not to forget," "to do its best," or "to see what it can do," without undertaking an obligation or commitment. These are classic forms of negotiation in the industry.

- In the fashion, apparel and brand licensing industry, it is common for brand owners to receive requests from licensees, retailers and other partners to compensate them for expenses incurred or concessions made in bringing products successfully to market. Examples include advertising and marketing support, markdown allowances and chargebacks. It is common for brand owners to accommodate such requests to preserve and protect business relationships and for competitive reasons.

- These opinions are based on Mr. Jassin's extensive experience in the industry.

Marketing invoices from GBG.

- The supporting documentation provided to Iconix by GBG in connection with marketing invoices sent to Iconix in 2014 reflects substantial marketing work on behalf of Iconix brands that would be of significant value to Iconix. It is consistent with the type of back-up that commonly is received to support requests for payments of shared expenses or other types of marketing support from an industry business partner.

- Marketing and consulting work is commonly billed in round numbers in the fashion and licensing industries since it involves the provision of specialty services rather than the buying and selling of tangible goods. It is not uncommon for the party paying such invoices to request a more detailed breakdown of work performed or to demand assurances that the work was actually performed.

- These opinions are based on Mr. Jassin's extensive experience in the industry.

Replacing underperforming licensees.

- In the fashion, apparel and brand licensing industry, it is common for licensees of underperforming brands to seek to be released from their obligations to brand owners if they believe the arrangement is no longer financially advantageous for them.

- Likewise, when an existing licensee is not performing well, it is customary for a brand owner to seek to transfer the license to a replacement licensee. This would not necessarily be considered a concession by the brand owner because it is in the

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

6

brand owner's interest to replace the poorly performing licensee with a better performing licensee if it can find one.

\* \* \*

Please let us know if you have any further questions.

Very truly yours,

/s/ Lorin L. Reisner
Lorin L. Reisner
Richard C. Tarlowe