**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

NEIL COLE,

Defendant.

No. 19-cr-00869 (ER)

# MEMORANDUM OF LAW IN SUPPORT OF NEIL COLE'S MOTION *IN LIMINE* TO PERMIT EVIDENCE OF ICONIX'S DECEMBER 2015 PURCHASE OF SEA 3 ASSETS

Dated: October 3, 2022

**KAPLAN HECKER & FINK LLP**
Sean Hecker
Jenna M. Dabbs
Rebecca Sussman
Jeffrey Then
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883

**MARKUS/MOSS PLLC**
David Oscar Markus
A. Margot Moss
40 NW 3rd Street, PH 1
Miami, Florida 33128
Telephone: (305) 379-6667

*Attorneys for Neil Cole*

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

RELEVANT FACTUAL BACKGROUND ..... 2

ARGUMENT ..... 3

I. The Value of the Relevant Transactions is Central to the Government's Case, and Mr. Cole Should be Permitted to Rebut that Central Theme. ..... 3

II. Evidence of the December 2015 Purchase is Relevant to the Value of SEA 3. ..... 6

III. Evidence of the December 2015 Purchase Will Properly Contextualize the SEA 3 Purchase Price. ..... 7

IV. Any Potential Prejudice the Government Believes Would Follow From Introducing this Evidence Can be Eliminated With a Limiting Instruction. ..... 10

CONCLUSION ..... 11

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ansell v. Green Acres Contracting Co.*,
347 F.3d 515 (3d Cir. 2003) .................................................... 9

*Gogol v. City of New York*,
No. 15 CIV. 5703 (ER), 2018 WL 4616047 (S.D.N.Y. Sept. 26, 2018) .................... 2

*United States v. Akhavan*,
No. 20-CR-188, 2021 WL 2776648 (S.D.N.Y. July 2, 2021) ............................ 10

*United States v. Ghavami*,
No. 10 CR 1217, 2012 WL 2878126 (S.D.N.Y. July 13, 2012) .......................... 8, 10

*United States v. Leonard*,
529 F.3d 83 (2d Cir. 2008) ...................................................... 3, 7

*United States v. Riley*,
No. 13-CR-339, 2014 WL 3435721 (S.D.N.Y. July 14, 2014) ........................... 10

*United States v. Wheeler*,
No. 16-3780, 2021 WL 4129731 (3d Cir. Sept. 10, 2021) ............................. 9

*Zafiro v. United States*,
506 U.S. 534 (1993) ............................................................. 10

**Statutes**

18 U.S.C. § 1349 ................................................................ 8

**Rules**

Fed. R. Evid. 401 ................................................................ 6

## PRELIMINARY STATEMENT

The government's primary allegation against Neil Cole is that he engaged in a scheme to artificially inflate the purchase price of several transactions entered into between Iconix and its long-time business partner, GBG. *See, e.g.*, Indictment ¶¶ 14, 29, 35. During Mr. Cole's first trial, this allegation was central to the government's case, with the government forcefully making the accusation in its opening, in its examination of numerous witnesses, and in its closing. *See, e.g.*, Tr. 31; 1145; 2518.[1] The government sought to convince the jury that the proper valuation of each transaction was a single, static number, and that the actual purchase price of each transaction was inflated by millions of dollars over that alleged proper value.

But that is not how valuation of transactions such as these works—there can of course be a range of reasonable and justifiable valuations that different people attribute to a transaction and the assets underlying that transaction. Mr. Cole should be permitted to present evidence, therefore, that (1) the purchase price was not artificially inflated; and (2) it was reasonable for him to believe that the final purchase price was proper and reasonable, and not artificially inflated, as the government alleges.

With respect to SEA 3, in particular, there is highly relevant, admissible evidence that (1) directly rebuts the government's allegation as to the correct valuation for the transaction and (2) corroborates Mr. Cole's understanding that the SEA 3 purchase price was reasonable. Roughly one year after SEA 3 closed, Iconix purchased the very same interest it had sold as part of SEA 3, for a purchase price that was *$9.2 million more than what the government claimed was the fair value of that interest*. This evidence is highly relevant for the jury's understanding that (1) transactions of these types involve fluid and subjective valuations (which are often fluid based on

[1] All references to "Tr." refer to the transcript from Neil Cole's first trial.

numerous market factors and often not final until closing), instead of the rigid, static valuations the government wrongly suggests, (2) the purchase price of SEA 3 was not inflated at all, and (3) Neil had no reason to believe that the purchase price was inflated. As this Court has held, "[e]vidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *Gogol v. City of New York*, No. 15 CIV. 5703 (ER), 2018 WL 4616047, at *1 (S.D.N.Y. Sept. 26, 2018) (internal quotation marks and citation omitted). The Court should permit Mr. Cole to introduce evidence concerning this subsequent purchase of SEA 3 assets because it is admissible as evidence that is relevant to the value of SEA 3, Mr. Cole's understanding of the value of SEA 3, and because it directly contradicts the government's central allegation in this case. Absent this evidence, Mr. Cole will be unfairly hamstrung in his ability to present a relevant, persuasive, and valid line of defense; *i.e.*, that the purchase price was not inflated, contrary to the government's claims.

**RELEVANT FACTUAL BACKGROUND**

In September 2014, Iconix sold to GBG a 50% interest in the rights to Umbro (an English sports equipment brand known for its soccer and rugby apparel and equipment) and Lee Cooper in the China region for a purchase price of $21.5 million. The deal closed after Iconix oversaw a competitive process, where they considered entering into a joint venture arrangement with several potential business partners and ultimately chose to enter the deal with GBG because they offered the highest price, with a quick closing, and were in the process of negotiating a broad commercial relationship with David Beckham, one of the most famous soccer players in the world. Tr. 590-592. According to the government, however, the purchase price was "artificially inflated" by $6 million, and the actual value of the interest purchased by GBG was $15.5 million. *See, e.g.*, Indictment ¶¶ 14, 29, 35. In December 2015, after Mr. Cole was no longer employed by Iconix, Iconix purchased the exact same interest back from GBG for $24.7 million (the "December 2015

Purchase").[2] The purchase price paid by Iconix in December 2015 was $3.2 million more than the allegedly "inflated" purchase price paid by GBG for the same assets not long before in September 2014, and $9.2 million more than the fair value of that interest according to the government.

Prior to Mr. Cole's first trial, the government moved to preclude Mr. Cole from introducing evidence of (1) the December 2015 Purchase and (2) Iconix's much later sale, in 2020, of the Umbro brand in China, Hong Kong, Macau, and Taiwan for approximately $62.5 million.[3] ECF No. 115 at 12. The government argued that the evidence was irrelevant and inadmissible under Rule 403. *Id.* at 11. In particular, the government argued that the question of the evidence's admissibility was like a "no-ultimate-harm" charge which, holds that "'[n]o amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by [the defendant].'" ECF No. 115 at 13-14 (quoting *United States v. Leonard*, 529 F.3d 83, 91 (2d Cir. 2008)). The Court subsequently granted the government's motion, excluding the evidence after finding, as the government had urged, that the issue presented was like the "no-ultimate-harm charge." Final PTC Tr. at 22, ECF No. 133.

## ARGUMENT

### I. The Value of the Relevant Transactions is Central to the Government's Case, and Mr. Cole Should be Permitted to Rebut that Central Theme.

At Mr. Cole's first trial, the government argued repeatedly to the jury that the transactions at issue were artificially inflated.

---

[2] *See* Iconix Brand Group, Inc. Annual Report (Form 10-K) at 89 (Mar. 30, 2016) ("In December 2015, the Company purchased GBG's effective 50% interest in the Umbro and Lee Cooper trademarks in Greater China for $24.7 million.").

[3] Mr. Cole believes that evidence of Iconix's sale of the Umbro assets in 2020 remains relevant and admissible but does not intend to introduce evidence of Iconix's sale of the Umbro assets in 2020 at trial. Instead, he intends to introduce evidence of the December 2015 Purchase because even putting aside the question of admissibility, the December 2015 Purchase, which was very close in time to SEA 3, is clearly materially more probative than the 2020 sale.

- In its opening, the government described an alleged scheme involving "overpayments," "excess payment[s]," and "excess phony revenue." *See, e.g.*, Tr. at 32, 38.
- In its examination of Mr. Horowitz, the government elicited extensive testimony as to the "fair market value" of the transactions and their underlying assets:
    - *See, e.g.*, Tr. 124 ("Q: And there is a reference to the marks having a *fair market value* of $21.8 million. . . . Do you have an understanding of how that was arrived at? A. That number was arrived at through a calculation that took projected royalty or prior royalty for that group of brands in that geography and multiplied it by five and a half times.");
    - Tr. 149 ("Q: And so what does a $15 million purchase price imply in terms of the value of the IP in the region? A. It would value the IP at $30 million. Q. So an increase from 20 million to 30 million; is that right? A. That is correct. Q. To your knowledge, Mr. Horowitz, was there any analysis done to conclude that the value of the IP should increase by 50 percent in the region? A. No.");
    - Tr. 246: ("Q. What was the reason for the change? A. The reason for the change in the fair market value was simply because the price had increased, and it was now being doubled.");
    - Tr. 251: ("Q: Why was it important to the business parties that the buyback amount be 15.5 million, as opposed to 21.5 million? A. It was important because 15.5 million was the actual value or price of the joint venture

without the increase in the price in exchange for the Rocawear Kids termination.");

  - Tr. 382: ("Q. And what is the purchase price that's indicated here in the response? A. $15.9 million. Q. How was that purchase price obtained? A. The purchase price was obtained by agreeing to approximately $10.9 million value for the joint venture and GBG agreeing to pay $5 million more for that joint venture in exchange for being paid back.").

- The government also elicited valuation evidence from Mr. Rabin. *See, e.g.*, Tr. 818 (Q. Did you participate in an effort to compute the value that Li & Fung was willing to pay to participate in SEA-3? A. Yes. Q. What sort of work was done on that? A. We did the same diligence that we did with the other two deals and came up with a number times a multiple. Q. What was that number? A. 15.5 million.").
- Similarly, the government elicited testimony from Mr. Rabin's colleague, Mr. Margolis, on the valuation of the relevant transactions. *See, e.g.*, Tr. 1114 ("Q. Mr. Margolis, at the time did you actually believe the fair market value was worth 31.8 million instead of 21.8 million? A. No, sir."); Tr. 1144 (Q. And what did you think at the time was the actual value of this -- of these marks in this territory? A. 15.5 million.)."
- And in its closing, the government argued that SEA 3 involved a "$6 million increase in the purchase price," which according to the government, "had nothing to do with the *value of the assets*. It had to do with the overpayment. . . ." Tr. at 2422.

The government made the valuation of each transaction a central piece of the case and a crucial question for the jury to consider in determining whether the government had carried its burden of proof. And it did so in such a way that suggested to the jury that there was one uniformly accepted valuation and price of the assets, which is clearly incorrect. In doing so, the government prevented Mr. Cole's lawyers from suggesting that whatever Mr. Horowitz or the GBG witnesses thought the value of SEA 3 was, the transaction could have been priced differently by other individuals, and Mr. Cole had no reason to think that the purchase price was out of step with market value. The government, therefore, has opened the door to other highly probative and relevant evidence regarding the valuation of the relevant transactions. And it should not be the case that the government is the only party permitted to present such evidence to the jury.

## II. Evidence of the December 2015 Purchase is Relevant to the Value of SEA 3.

Under Federal Rule of Evidence 401, "[e]vidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence." Evidence of the December 2015 Purchase is highly relevant because it directly bears on the value of SEA 3 and its underlying assets, and it also bears directly on whether the SEA 3 purchase price was in fact artificially inflated, as the government suggests, and makes that allegation "less probable." *Id.* The December 2015 Purchase essentially serves as a real-world independent evaluation of SEA 3's proper value. While Iconix sold the assets to GBG in September 2014 for $21.5 million, GBG sold the assets back to Iconix a little over a year after SEA 3 closed, for a price of $24.7 million—a price that is much closer to SEA 3's purchase price than what the government suggests the assets were worth—and a price that was arrived at after arms-length negotiations by individuals at Iconix and GBG not alleged to have taken part in the alleged conspiracy. The December 2015 Purchase

therefore speaks directly to the fair value of SEA 3, directly rebuts the government's assertion that SEA 3 was artificially inflated, and should be admitted.[4]

The December 2015 Purchase also speaks directly to an argument that the defense intends to make at trial: that notwithstanding the fact that Horowitz, Margolis, and Rabin testified to the value of SEA 3, their valuation was wrong, and Mr. Cole had every reason to think that the transaction value was not artificially inflated. Mr. Cole was not the primary point of contact with respect to SEA 3—Mr. Horowitz was. Tr. 593. Mr. Cole was not negotiating SEA 3 and so when reviewing the deal, he had to rely on the factors that he was aware of: the numbers explicitly stated in the contracts, the fact that the deal was approved by both the Iconix and GBG board, and his own belief as to what the transaction was worth. As the Court is aware, Mr. Cole was acquitted of having conspired to commit securities fraud and make false filings with the Securities and Exchange Commission, *see* Tr. 2618, making the question of what *Mr. Cole* believed about the purchase price, and evidence corroborating *his belief*, of the utmost relevance at Mr. Cole's retrial.

## III. Evidence of the December 2015 Purchase Will Properly Contextualize the SEA 3 Purchase Price.

In advance of Mr. Cole's first trial, the Court excluded evidence of the December 2015 Purchase, finding that the issue was like the "no-ultimate-harm issue." Final PTC Tr. at 22, ECF No. 133; *see also infra*. A "no-ultimate-harm" charge instructs a jury that "'[n]o amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by [the defendant].'" *Leonard*, 529 F.3d at 91. Here, the evidence of the December 2015 Purchase will not require a "no-ultimate-harm" charge,

[4] The Court recently allowed the government to present evidence of later events that proved probative of earlier events in *USA v. Milton*, 21-cr-00478 (ER) (Oct. 3, 2022). In *Milton*, the government sought to introduce evidence of a 10-K filing containing corrective disclosures, which was made by the company months after Mr. Milton had left the company. The government argued that the stock price drop following the corrective disclosures was proof that previous statements were in fact material. *See Milton* Tr. 2603-09. Just as the later corrective disclosure is probative of the prior statement's materiality, the December 2015 Purchase is highly probative of the value of SEA 3.

or any action premised on the principles underlying a "no-ultimate-harm" charge, because the defense does not intend to argue that there was a scheme that ultimately resulted in no harm. To the contrary, the defense plans to argue—with this evidence, among other things—that there was no scheme, that the value was not artificially inflated, and that Mr. Cole certainly did not believe that the value was artificially inflated. This evidence is critical to show that the government's theory on valuation is wrong and that Mr. Cole operated in good faith, which is a defense to the charges for which he will be tried again, as the Court has previously instructed.

The evidence of the December 2015 Purchase will demonstrate that the SEA 3 purchase price was reasonable, and within the range for several reasonable price points. Courts routinely allow parties to present evidence of prior or later acts or events, where such acts or events help put the charged conduct in context. In *United States v. Ghavami*, for example, defendants were charged with engaging in various conspiracies and schemes to defraud. No. 10 CR 1217, 2012 WL 2878126, at *1 (S.D.N.Y. July 13, 2012), *aff'd sub nom. United States v. Heinz*, 790 F.3d 365 (2d Cir. 2015). Two of the charges were brought pursuant to 18 U.S.C. § 1349 (attempt and conspiracy), which was enacted in 2002. *Id.* at *11. The government intended to offer evidence of both pre-enactment and post-enactment transactions. *Id.* at *13. And the defense moved to exclude evidence related to the pre-enactment transactions, under Rule 403, fearing that "a jury would be unable to differentiate between pre- and post-enactment transactions, and would instead simply rely on the pre-enactment transactions as to which there is more evidence than there is as to post-enactment transactions." *Id.* at *12. The Court, however, allowed the evidence to be presented, pursuant to a limiting instruction, to show "the alleged conspiracies' geneses, purposes, or operations over time," or the "intent and purpose of" later acts, among other contextual information. *Id.* at *13. Here as well, the evidence of the December 2015 Purchase is highly

relevant to understanding the fair value of SEA 3, refutes the government's claim that the transaction was inflated, and is the same type of evidence that can help the jury contextualize Mr. Cole's reaction to the SEA 3 purchase price.

The same reasoning also was applied by the Third Circuit in a recent and similar case affirming a district court's decision to admit evidence seized from an alleged co-conspirator nearly a year after the termination of the conspiracy. *United States v. Wheeler*, No. 16-3780, 2021 WL 4129731, at *1 (3d Cir. Sept. 10, 2021), *cert. denied*, 142 S. Ct. 842 (2022). The *Wheeler* court observed that "[e]vidence is not irrelevant merely because it arises post-conspiracy, particularly when the evidence sheds light on a defendant's intent." *Id.* at *14; *see also id.* (observing that "[w]here evidence may 'giv[e] rise to reasonable inferences of fact' which are *central to the determination of the case,* there is 'no bright line rule for determining when evidence is too remote to be relevant'") (quoting *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 525 (3d Cir. 2003) (emphasis added)). Here, the fact that the December 2015 Purchase occurred (relatively shortly) after SEA-3 does not render evidence of that purchase irrelevant. At a minimum, that evidence sheds light on (1) the fair value of the SEA 3 assets, (2) whether the purchase price included an alleged overpayment, and (3) Mr. Cole's understanding that the SEA 3 purchase price was reasonable. These issues are all "central to the determination of the case." *See id.*

These cases, and the principles underlying them, support admission of this evidence and are more analogous to the question before the Court than the "no-ultimate-harm" principle. Because the December 2015 Purchase is critical to the defense, refutes core government arguments, and helps contextualize a central issue of the case, it is proper evidence and should be admitted. At trial, the government can argue to the jury what weight it should assign to the December 2015 Purchase. It is "up to the jury," however, "to decide what weight to give to the

after-discovered evidence." *Id.* at *15; *United States v. Akhavan*, No. 20-CR-188, 2021 WL 2776648, at *8 (S.D.N.Y. July 2, 2021) ("[I]t was for the jury to decide how much weight to afford each exhibit.").

## IV. Any Potential Prejudice the Government Believes Would Follow From Introducing this Evidence Can be Eliminated With a Limiting Instruction.

Mr. Cole intends to introduce evidence of a simple fact—that Iconix sold certain assets in September 2014 as part of SEA 3 for $21.5 million, and then bought that same interest in December 2015 for $24.7 million. The sole purpose for introducing this evidence is so that the jury may be fully informed when evaluating the fair value of the SEA 3 assets, and whether the SEA 3 purchase price was artificially inflated, as the government contends. Mr. Cole does not intend to make any arguments or suggestions beyond that purpose. Given the limited scope of the evidence sought to be introduced and its relevancy, the evidence should be admitted.

To the extent the government claims that the evidence would be prejudicial and should be excluded pursuant to Rule 403, the appropriate remedy would be a limiting instruction, not exclusion. After all, "[c]arefully crafted limiting instructions are a court's first line of defense against the risk of unfair prejudice." *Ghavami*, 2012 WL 2878126, at *13. Courts routinely use limiting instructions to admit evidence that is highly relevant, while directing the jury as to the appropriate purpose for which they can consider that evidence. *See, e.g.*, *United States v. Riley*, No. 13-CR-339, 2014 WL 3435721, at *6 (S.D.N.Y. July 14, 2014) (where party was concerned jury would conflate definitions in company policy with statutory definitions, "[t]he proper remedy for this concern," was "the use of a limiting instruction" informing jury of distinction between a violation of company policy and a crime); *Ghavami*, 2012 WL 2878126, at *13 (admitting evidence concerning transactions that took place prior to enactment of relevant statute pursuant to a liming instruction); *see also Zafiro v. United States*, 506 U.S. 534, 540-41 (1993) (emphasizing

that prejudice "can be cured with proper instructions, and juries are presumed to follow their instructions") (internal quotations omitted).

Here too, the appropriate remedy to any alleged prejudice to result from evidence of the December 2015 purchase is a limiting instruction, not exclusion.

**CONCLUSION**

For the reasons set forth above, Neil Cole respectfully requests that the Court grant his motion *in limine*, allowing for the introduction of evidence related to the December 2015 Purchase.

Dated: October 3, 2022

Respectfully submitted,

Sean Hecker
Jenna M. Dabbs
Rebecca Sussman
Jeffrey Then
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
rsussman@kaplanhecker.com
jthen@kaplanhecker.com

David Oscar Markus*
A. Margot Moss*
MARKUS/MOSS PLLC
40 NW 3rd Street, PH 1
Miami, Florida 33128
Telephone: (305) 379-6667
dmarkus@markuslaw.com
mmoss@markuslaw.com

*Attorneys for Neil Cole*

**Admitted pro hac vice*