UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

    - v. -                              :            19 Cr. 869 (ER)

NEIL COLE,                                  :

        Defendant.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S MOTIONS *IN LIMINE* AND
## SUPPORTING MEMORANDUM OF LAW


DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrews Plaza
New York, New York 10007

Jared Lenow
Justin V. Rodriguez
Andrew Thomas
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ...................................................................................... 3

ARGUMENT ........................................................................................... 7

I. THE COURT SHOULD PRECLUDE REFERENCE TO A PRIOR "TRIAL,"
ESPECIALLY ANY REFERENCE TO COLE'S PRIOR ACQUITTAL ON
COUNTS ONE AND TEN ................................................................... 7

II. THE COURT SHOULD PRECLUDE EVIDENCE OF EXTRANEOUS SALES
INVOICES ........................................................................................ 10

    A. Relevant Facts ............................................................................. 10

    B. Applicable Law ............................................................................ 13

        *1. Relevancy and Prejudice* ........................................................ 13

        *2. Good Acts and Propensity* ...................................................... 13

        *3. Business Records* ................................................................... 14

        *4. Authentication* ...................................................................... 15

    C. Discussion .................................................................................... 15

III. THE COURT SHOULD ALLOW EVIDENCE OF CORRESPONDENCE WITH
THE SEC'S DIVISION OF CORPORATE FINANCE ............................... 18

    A. Relevant Facts ............................................................................. 19

    B. Applicable Law ............................................................................ 19

    C. Discussion .................................................................................... 21

IV. THE COURT SHOULD PRECLUDE IMPROPER CROSS EXAMINATION OF
SETH HOROWITZ ............................................................................. 22

    A. Applicable Law ............................................................................ 23

    B. Large Cash Withdrawals .............................................................. 24

    C. Personal Attacks on Horowitz With No Bearing on His Credibility ............ 28

    D. The Frequency of Horowitz's Privileged Communications With His Counsel ............ 30

V.   THE COURT SHOULD PROHIBIT THE DEFENSE FROM READING TO THE
     JURY DOCUMENTS THAT ARE NOT IN EVIDENCE..................................................31

CONCLUSION........................................................................................................................ 33

# TABLE OF AUTHORITIES

## RULES

Fed. R. Evid. 401 ................................................................................................... 7, 10, 13

Fed. R. Evid. 404 .................................................................................................. 10, 14, 17

Fed. R. Evid. 404(b) .............................................................................................. 19, 20, 21

Fed. R. Evid. 608 ............................................................................................................. 30

Fed. R. Evid. 608(b) ........................................................................................................ 23

Fed. R. Evid. 608(b)(1) .................................................................................................... 23

Fed. R. Evid. 802 ...................................................................................................... 10, 14

Fed. R. Evid. 803(22) ........................................................................................................ 8

Fed. R. Evid. 803(6) ....................................................................................................... 14

Fed. R. Evid. 901 ..................................................................................................... 10, 15

Fed. R. Evid. 901(a) ........................................................................................................ 15

## CASES

*Delaware* v. *Van Arsdall*, 475 U.S. 673 (1986) .................................................................... 24, 29

*Hynes v. Coughlin*, 79 F.3d 285 (2d Cir. 1996) .................................................................... 23

*Saks Int'l, Inc. v. M/V Export Champion*, 817 F.2d 1011 (2d Cir. 1987) ..................................... 15

*Tardif v. City of New York*, 13 Civ. 4056 (KMW), 2022 WL 1239233 (S.D.N.Y. Apr. 26, 2022) 7

*United States v. Amato*, 306 F. App'x. 630 (2d Cir. Jan. 12, 2009) ................................................. 9

*United States v. Arrington* 15 Cr. 33-A, 2022 WL 4077685 (W.D.N.Y. Sept. 6, 2022) ............ 7, 9

*United States v. Ashburn*, 11 Cr. 0303 (NGG), 2015 WL 729818 (E.D.N.Y. Feb. 19, 2015) ....... 8

*United States v. Augello*, 452 F.2d 1135 (2d Cir. 1971) ................................................................ 30

*United States v. Birney*, 686 F.2d 102 (2d Cir. 1982) .................................................................. 13

*United States v. Boykoff*, 67 F. App'x 15 (2d Cir. 2003) ............................................................. 14

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) ................................................................ 21

*United States v. Chambers*, 800 F. App'x 43 (2d Cir. 2020) ........................................................ 14

*United States v. Daly*, 842 F.2d 1380 (2d Cir. 1988) .................................................................. 20

*United States v. Giovanelli*, 945 F.2d 479 (2d Cir. 1991) ............................................................. 9

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ............................................................. 20

*United States v. Greer*, 631 F.3d 608 (2d Cir. 2011) ................................................................. 20

*United States v. Grimm*, 568 F.2d 1136 (5th Cir. 1978) ............................................................. 14

*United States* v. *Harvey*, 991 F.2d 981 (2d Cir. 1993) ............................................................. 23

*United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012) ................................................................... 20

*United States v. Jones*, 808 F.2d 561 (7th Cir. 1986) ................................................................. 8

*United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010) ................................................................. 20

*United States v. Katsougrakis*, 715 F.2d 769 (2d Cir. 1983) ........................................................ 23

*United States v. Krug*, 15 Cr. 157 (RJA), 2019 WL 3162091, at *7 (W.D.N.Y. July 16, 2019) . 29

*United States v. MacPherson*, 424 F.3d 183 (2d Cir. 2005) ................................................... 25, 26

*United States* v. *Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990).......................................... 15, 24

*United States v. Mustafa*, 753 F. App'x 22 (2d Cir. 2018) ......................................................... 17

*United States v. Nersesian*, 824 F.2d 1294 (2d Cir. 1987) .......................................................... 26

*United States v. O'Connor*, 580 F.2d 38 (2d Cir. 1978) ............................................................ 14

*United States v. Pluta*, 176 F. 3d 43 (2d Cir. 1999)................................................................. 15

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ................................................................ 21

*United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012) ............................................................. 20

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) .................................................... 21

*United States v. Rosario*, 09 Cr. 415 (VEC), 2014 WL 5870708 (S.D.N.Y. Nov. 13, 2014) ....... 7

*United States* v. *Sasso*, 59 F.3d 341 (2d Cir. 1995)................................................................. 23

*United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990)...................................................... 13, 16, 24

*United States* v. *Scarpa*, 913 F.2d 993 (2d Cir. 1990)......................................................... 24, 31

*United States* v. *Singh*, 628 F.2d 758 (2d Cir. 1980) ............................................................. 24

*United States v. Sliker*, 751 F.2d 477 (2d Cir. 1984) ............................................................. 15

*United States v. Strother*, 49 F.3d 869 (2d Cir. 1995) ............................................................ 15

*United States v. Taylor*, 816 F.3d 12 (2d Cir. 2016)...................................................... 25, 26

*United States v. Thomas*, 214 F.Supp.3d 187 (E.D.N.Y. 2016) .............................................. 7, 8

*United States v. Viserto*, 596 F.2d 531 (2d Cir.1979)................................................................. 8

*United States v. Walker*, 191 F.3d 326 (2d Cir. 1999)............................................................... 14

## PRELIMINARY STATEMENT

In a month-long trial beginning on September 30, 2021, the government presented evidence that Neil Cole used his position as Chief Executive Officer of Iconix Brand Group ("Iconix") to mislead the company's auditors and to deceive the investing public about the company's financial condition. The trial included testimony from, among others, Iconix's former Chief Operating Officer, Seth Horowitz; its former general counsel, Jason Schaefer; its outside auditor, Larry Shapiro; and representatives of a firm with which Iconix partnered in various joint ventures, Jason Rabin and Jared Margolis. Neil Cole also testified in his own defense. As the Court is aware, the jury failed to reach a unanimous verdict on the eight substantive counts in the Indictment (Counts Two through Nine), and acquitted Cole on the two charged conspiracy counts (Counts One and Ten). A retrial on Counts Two through Nine is scheduled to begin on October 31, 2022.

In advance of the retrial, the Government respectfully moves *in limine* to (1) preclude any mention of a prior "trial" or its outcome, especially Cole's acquittal on Counts One and Ten, and instead to require that the parties refer only to a prior "proceeding" when otherwise appropriate; (2) preclude the admission of extraneous sales invoices unrelated to the charged conduct; (3) permit the introduction of correspondence with the SEC's Division of Corporate Finance ("Corp Fin"); (4) preclude improper cross examination of cooperating witness Seth Horowitz, including questions about alleged illegal financial "structuring," questions that amount to inappropriate personal attacks, and questions about the specific number of privileged communications between Horowitz and his personal lawyers; and (5) preclude the defense from reading to the jury documents that are not in evidence.

As further explained below, the record of the prior trial positions the Court to make informed rulings about how the parties should handle the fact of the prior trial and the admissibility of certain defense evidence and arguments that proved, by trial's end, to be improper and prejudicial.

*First*, any reference to a prior "trial" in this matter, including to Cole's prior acquittal on Counts One and Ten, would be highly improper under well-established precedent. The Government therefore seeks a pretrial ruling to set appropriate guidelines for referring to the prior trial in this matter, as well as to bar the defense from making arguments that seek to put the acquittals before the jury, either explicitly or implicitly.

*Second*, the Court should preclude the admission of extraneous sales invoices because they are irrelevant to the charged offenses, because they confuse and mislead to the jury, and because they invite the same improper propensity reasoning that leads courts to preclude "good acts" evidence. Those invoices should also be precluded because they lack an appropriate foundation and constitute inadmissible hearsay.

*Third*, the Court should permit the Government to again introduce correspondence with the SEC's Division of Corporate Finance, and other related evidence. While this correspondence served as one of the foundations for Count Ten, on which Cole was acquitted, the Corp Fin correspondence and surrounding facts also constitutes direct evidence of the remaining offenses.

*Fourth*, the defense pursued multiple improper lines of cross examination of Seth Horowitz that should be precluded at the retrial. At the first trial, the defense accused Seth Horowitz of the crime of financial structuring, but the defense's questioning of Horowitz actually established that Horowitz did not engage in illegal financial structuring and had not been untruthful with the Government about his financial dealings. Any renewed cross-examination on this point would be highly prejudicial and without a factual basis. The defense also pursued lines of questioning that amounted to inappropriate

2

personal attacks on Horowitz, including seeking to elicit a disparaging nickname and former employers' personal feelings of animosity or dislike that have no bearing on Horowitz's credibility. Such personal attacks are plainly improper. The defense also engaged in detailed questioning of Horowitz concerning the specific number of privileged communications between himself and his personal lawyers. That level of detail is irrelevant and prejudicial, and it should be precluded.

*Fifth*, at the first trial, defense counsel repeatedly read to the jury documents that were not in evidence, often as part of a purported effort to refresh a witness's recollection, leading the Court to admonish defense counsel that "you're getting a little close to reading from the documents, if you are not actually reading from the documents, which in fact you are." The Court should preclude such conduct at the retrial.

## BACKGROUND

Neil Cole served as the Chief Executive Officer of Iconix. Iconix managed various clothing and fashion brands, typically by acquiring the rights to the brand name and then licensing those brands to retailers, wholesalers, and suppliers, who, in turn, produced and sold clothing and other products to retail customers. Iconix operated as a public company with shares traded on the NASDAQ.

As a publicly traded company, Iconix periodically filed disclosures with the U.S. Securities and Exchange Commission. Iconix's filings reported quarterly and annual revenue and earnings per share ("EPS"), among other information, which Cole certified as accurate. (*See, e.g.*, GX 101-A & B (2013 10K certifications); GX 103-A & B (2Q 2014 8K certifications); GX 105-A & B (3Q 2014 8K certifications); GX 107-A & B (2014 10K certifications)). Iconix executives, including Cole, publicly emphasized revenue and EPS as the principal metrics demonstrating Iconix's growth. Cole and his fellow executives also touted Iconix's consistent record of revenue and earnings growth and of

3

meeting or exceeding Wall Street analyst consensus with respect to these metrics. (*See, e.g.*, GX-100, GX-104, GX-106 (press releases)).

Iconix used joint ventures ("JVs") to profit from its brands in foreign markets. In a typical JV arrangement, Iconix created a subsidiary, transferred ownership of a trademark or brand to that subsidiary, and then transformed the subsidiary into a JV by selling a 50 percent ownership interest in the JV to another business pursuant to a joint venture agreement. As part of the JV agreements, each JV partner was generally entitled to 50 percent of the JV's licensing revenue. From an accounting perspective, when Iconix entered into a JV, Iconix recognized as revenue the purchase price paid to Iconix by the JV partner, less Iconix's cost basis in the trademarks. Accordingly, the higher the price paid to Iconic by the JV partner the more revenue Iconix could report on its financial statements. (*See* Trial Tr. 1721-25 (Shapiro describing the accounting implications of a sale to a joint venture)).

From 2013 to 2015, Cole engaged in a scheme to falsely inflate Iconix's reported revenue and EPS by inducing a Hong Kong-based JV partner, Global Brands Group Asia Limited ("GBG")[1], to purchase JV interests at artificially inflated prices based on Cole's promise to reimburse GBG for the overpayments. (*See, e.g*., Trial Tr. 738 (Horowitz); Trial Tr. 815 (Rabin: "Mr. Cole said: If you raise the price by 5 million, you can bill it back for marketing."); Trial Tr. 1145 (Margolis)). Cole conducted that scheme with the knowledge and assistance of Seth Horowitz, who served under Cole as chief operating officer of Iconix, and with the aid of executives at GBG.[2] Cole and Horowitz executed the scheme so that Iconix "could hit quarterly numbers," (*see* Trial Tr. 355), such as revenue and EPS.

---

[1] During the early portions of the scheme, the entity that was later known as GBG operated under the name LF Asia. For simplicity's sake, both entities are referred to herein as GBG.

[2] The government acknowledges the jury's verdict with respect to the conspiracy counts. The evidence, however, demonstrates well beyond a preponderance that Cole, Horowitz, and GBG

At the first trial, the Government introduced evidence that Cole arranged for Iconix to enter into JVs with GBG that included inflated buy-in purchase prices on three occasions: (1) the Southeast Asia JV, which closed on or about October 1, 2013 ("SEA-1"); (2) the Southeast Asia first amendment, which closed on or about June 30, 2014 ("SEA-2"); and (3) the Southeast Asia second amendment, which closed on or about September 17, 2014 ("SEA-3") (collectively, the "SEA JVs"). Each of the SEA JVs involved a fraudulent "round trip" transaction, lacking in economic substance, in which GBG paid an artificially inflated buy-in purchase price for its interest in the JV, in exchange for Cole's agreement that Iconix would give back the inflated portion of the purchase price to GBG. Cole—who had previously received a presentation from Iconix auditors about "round tripping"—knew that these arrangements were improper. (*See, e.g.*, Tr. 2334 (Cole) (Q: "But you understood . . . that when you do a transaction that has no real basis just to give money to one person and you money back to another, you understand that that was wrong, isn't that right? A: "Yes.")). So Cole and Horowitz hid the inflated purchase prices and offsetting round-trip payments from Iconix's lawyers and outside auditors.

The government also introduced evidence that Cole and his collaborators sent the money back—as promised—for at least two of the deals. With respect to SEA-1, Cole approved a $2 million payment disguised as a consulting fee. (*See* Trial Tr. 972). That consulting fee went to a company that provided no consulting services to Iconix. (*See* Trial Tr. 979 (Rabin); Trial Tr. 1195 (Schaefer)). With respect to SEA-2, Cole approved $5 million in roundtrip payments disguised as payments for marketing expenses. (*See* Trial Tr. 309 (Horowitz)). But marketing expenses were supposed to be

executives conspired to accomplish the charged fraud. Accordingly, and as this Court found at the first trial, many communications between them are co-conspirator statements admissible pursuant to Rule 801(d)(2)(E) even in the absence of a remaining conspiracy count. (*See* Trial Tr. 1337 ("I find that they have proven by at least a preponderance of the evidence that [Exhibits 1068 and 1139] should come in as con-conspirator statements.").

borne by the JV itself and not by Iconix. And the government introduced evidence that Cole, Horowitz, and their GBG conspirators explored still further ways to return the SEA-3 overpayment, including by excusing millions of dollars in royalty payments, (*see* Trial Tr. 216, 225-227 (Horowitz)), or by hiding the payment in a joint venture relating to the Middle East and North Africa, (*see* Trial Tr. 298). Cole's actions with respect to SEA-1, SEA-2, and SEA-3 had a material impact on the accounting and Iconix's auditor would have wanted to know about them before reviewing Iconix's financial statements. (*See* Trial Tr. 1928-1929 (Shapiro)).

In late 2014 and early 2015, the SEC Division of Corporate Finance ("Corp Fin") inquired about Iconix's accounting treatment for the formation of certain Iconix international JVs, including the SEA JVs. Although the SEC directed Iconix to disclose to the SEC the "business purpose" and material terms of the SEA JVs, Cole intentionally and falsely omitted from an Iconix response letter to the SEC that GBG had agreed to inflate the purchase prices for SEA-2 and SEA-3 by $5 million and $6 million, respectively, in exchange for Cole's secret agreement that Iconix would reimburse GBG for these overpayments. (Trial Tr. 355 (Horowitz)). Cole also took steps during the Corp Fin inquiry to destroy and conceal relevant evidence, including by directing Horowitz to delete relevant emails, in order to prevent the scheme from being detected. (Trial Tr. 353 (Horowitz)).

## ARGUMENT

### I.   THE COURT SHOULD PRECLUDE REFERENCE TO A PRIOR "TRIAL," ESPECIALLY ANY REFERENCE TO COLE'S PRIOR ACQUITTAL ON COUNTS ONE AND TEN

The Court should preclude any reference to a prior "trial" in this matter, including any reference to the prior jury's acquittal on Counts One and Ten, and its inability to reach a unanimous verdict on the other counts. If it is otherwise appropriate for a party to refer to a witness's testimony at the defendant's prior trial, any such reference should be to testimony at a "prior proceeding." Reference to a prior "trial," including the jury's verdict, would be irrelevant under Rule 401 and would be unfairly prejudicial to the Government and confusing to the jury under Rule 403.

#### A.  Applicable Law

It is well-established in this Circuit that, during a retrial, a defendant's prior trial may only be referred to as a prior "proceeding," including when impeaching a witness who testified at a prior trial. *See, e.g., Tardif v. City of New York*, 13 Civ. 4056 (KMW), 2022 WL 1239233, at *2 (S.D.N.Y. Apr. 26, 2022) ("In general, if a party seeks to impeach a witness with that witness's testimony from the first trial, the party shall refer to the witness's testimony in a prior 'proceeding,' without mentioning that the 'proceeding' was an earlier trial of this case."); *United States v. Thomas*, 214 F.Supp.3d 187, 194 (E.D.N.Y. 2016) (ordering the parties not to mention the "prior trial" and instead requiring the use of the term a "prior proceeding"); *United States v. Rosario*, 09 Cr. 415 (VEC), 2014 WL 5870708, at *1 (S.D.N.Y. Nov. 13, 2014) (ordering that "the parties should refer to the first trial, when necessary, as a 'prior proceeding'"). Recent instructions from the district court in *United States v. Arrington* are illustrative:

> During the retrial, the parties are prohibited from referring to a "prior trial," "first trial," "initial trial," "prior" acquittal or conviction on certain counts, or otherwise suggest in any fashion that this case has

7

> been previously tried or what its outcome was. If either party seeks to impeach a witness with that witness's testimony from the first trial, the party shall refer to the witness's testimony in a prior "proceeding" without commenting that said "proceeding" was an earlier trial of this case.

15 Cr. 33-A, 2022 WL 4077685, at *3 to *4 (W.D.N.Y. Sept. 6, 2022).

Courts routinely preclude mention of a defendant's prior "trial," and the attendant outcome, because the fact of such a prior trial and its outcome is irrelevant, unfairly prejudicial to the Government, and confusing to the jury. *See Arrington*, 2022 WL 4077685, at *3 ("[A]side from relevancy, remarking on the prior trial or its outcome would certainly confuse and mislead the new jury, and unfairly prejudice the Government."); *Thomas*, 214 F.Supp.3d at 194 (finding "any reference to a 'prior trial' inappropriate because," among other things, it is "irrelevant to this trial, and will potentially confuse the jury").

With respect to a prior acquittal, "[t]he Second Circuit has long held that absent claims of preclusion—whether based on collateral estoppel or double jeopardy—evidence of prior acquittals is not relevant at trial." *United States v. Ashburn*, 11 Cr. 0303 (NGG), 2015 WL 729818, at *2 (E.D.N.Y. Feb. 19, 2015) (citing *United States v. Viserto*, 596 F.2d 531 (2d Cir.1979)); *see also United States v. Jones*, 808 F.2d 561, 566 (7th Cir. 1986) ("Evidence of an acquittal is not otherwise relevant because it does not prove innocence but rather merely indicates that the prior prosecution failed to meet its burden of proving beyond a reasonable doubt at least one element of the crime."). In addition, a "judgment of acquittal is hearsay" as the "Federal Rules of Evidence except from the operation of the hearsay rule only judgments of conviction, Rule 803(22), not judgments of acquittal." *Viserto*, 596 F.2d at 536-537.

**B. Discussion**

In accordance with the well-established law cited above, the Court should preclude any reference to the prior "trial," including any reference to the prior acquittals on Counts One and Ten and the jury's inability to reach a unanimous verdict on the other counts, both of which are hearsay. The fact of the prior trial or its outcome has no tendency to make the existence of any fact of consequence in the retrial more or less probable. And even the mention of a prior trial would be highly prejudicial to the Government and would risk confusion by the jury. It would invite the jury to speculate about what happened at the first trial, and what the first's jury verdict was (and why). In short, it would risk this jury's deciding this case—contrary to their oath—based not on their own assessment of the evidence presented at trial, but rather based on another jury's assessment of other evidence presented at a different trial.

The defendant will be able to effectively seek to impeach and cross-examine witnesses who testified at his first trial while still referring to the first trial as a "prior proceeding." *See United States v. Amato*, 306 F. App'x. 630, 632 (2d Cir. Jan. 12, 2009) (summary order) ("[T]he district court's instruction that LoCurto refer to testimony in a prior proceeding rather than in a prior trial did not prejudice LoCurto in any way."). If, during the course of the retrial, the defendant establishes "a particular need to mention the first trial in front of the jury, he can raise this argument outside the presence of the jury or file a motion seeking permission to do so." *Arrington*, 2022 WL 4077685, at *3.[3] Until then, however, the Court should preclude any reference to the prior "trial," and instead only permit references to a prior "proceeding."

---

[3] In *Giovanelli*, the Second Circuit noted that "the dynamics of a particular trial may require the trial judge to reverse or curtail a ruling that initially precluded all references to a prior trial." *United States v. Giovanelli*, 945 F.2d 479, 487 (2d Cir. 1991). In that case, the Circuit held that the trial court abused

## II.     THE COURT SHOULD PRECLUDE EVIDENCE OF EXTRANEOUS SALES INVOICES

The Court should preclude Cole from presenting the jury with sales invoices and accompanying correspondence that have no factual nexus to the charged offenses. As reflected by Cole's use of random sales invoices at the first trial, the evidence is irrelevant and calculated to confuse the jury and to engage in impermissible propensity reasoning, and thus should be precluded under Rules 401, 403, and 404. Also, based on the present record, the evidence is inadmissible because it has not been authenticated and because it is hearsay, and thus also should be precluded under Rule 901 and Rule 802.

### A.     Relevant Facts

At the first trial, the government presented substantial evidence that GBG agreed to overpay Iconix by $5 million in connection with SEA-2 based on Cole's commitment to return the amount of the overpayment to GBG disguised as $5 million in marketing payments. (*See, e.g.*, Trial Tr. 152 (Horowitz: "I was called into Neil's office, at which point he told me that he had gotten GBG to agree to a $5 million increase in the price in exchange for paying them back in some type of marketing fees in the future."); Trial Tr. 815 (Rabin: "Mr. Cole said: If you raise the price by 5 million, you can bill it back for marketing."); Tr. 1128-29) (Margolis: Q. "What did you tell Ethan

---

its discretion in instructing at the outset of the trial that the parties were to not refer to the fact that there were prior trials but instead were to refer to those trials as "prior proceedings"—and then "subsequently and repeatedly expanded" this ruling in instructing defense counsel to refer to grand jury proceedings, prior interviews, and the like, as only "prior proceedings" as well, which the Government is not requesting here. *Id.* at 487-88. The Circuit reasoned, "from the very first day of trial, it was patently clear that the crux of the defense to the alleged predicate acts of murder and attempted murder would be that key government witnesses ... had subtly refined their testimony at the various trials and proceedings," as the conduct underlying the federal racketeering charges had been previously tried twice in state court. *Id.* at 488. No such claim can be made "from the very first day of" the retrial in this matter. If such a claim is made, it should be made outside the presence of the jury and ruled upon by the Court before any mention of the prior trial is made in the jury's presence.

Cole?" A. "That we were going to invoice the – were were going to invoice them for – to get the money, the overpay back.")). The Government also presented evidence that when GBG attempted to facilitate the giveback by sending invoices for fictitious marketing work (collectively, the "Giveback Invoices"), the Iconix team balked at them because they were in round dollar amounts, presented without back-up documentation, and requested immediate payment that would harm Iconix's financials for the quarter. (*See, e.g.*, Trial Tr. 278 (Horowitz: "So the actual invoice was real. It was a document, and we request more backup to these invoices, but the work itself that was put into those invoices was not real."); Trial Tr. 279 (Horowitz: "I conveyed to GBG that it couldn't be round numbers, which was the direction I was given by Neil.")). In response, GBG employees (namely, Margolis and Ethan Cole), manufactured new invoices with specific dollar amounts and purported backup materials, that still added up to the promised approximately $5 million. (*See* GX 1111 (email from Ethan Cole to Horowitz enclosing revised invoices and purported backup)).

In summation, the government argued, among other things, that Cole and Horowitz reacted negatively to the round dollar invoices and lack of accompanying back-up because Iconix was a public company that needed to survive auditor scrutiny. (*See, e.g.*, Trial Tr. 2426). The government also argued that the fact that GBG restyled the invoices and caused them to still add up to approximately $5 million reflected that no real work had been done and that the true objective of the invoices was to facilitate a $5 million giveback to GBG. (Trial Tr. 2426-2427). The Government also noted that some of the backup documents later supplied to justify the invoices showed work that Iconix had already paid for directly, revealing Iconix's double payment for those expenses to be a sham. (*See* Trial Tr. 2427).

Cole responded to the government's proof about the invoices by introducing a number of sales invoice documents that purported to reflect transactions between Li & Fung or GBG and

Authentic Brands Group and other business (collectively, the "Extraneous Invoices"). As

exemplified by DX-2102-A3, shown below, most of these invoices did not involve Iconix or

transactions during the period of the charged conduct, or Cole:



Cole's counsel argued for the admission of the Extraneous Invoices on the grounds that "These

are the exact format of the invoices in our case that the government says were sham invoices" and

because "the government is arguing that big round-number invoices [are] somehow inherently suspect

or suspicious. We need to be able to show that this is GBG's business practice." (Trial. Tr. 960-961).

Based on that proffer, the Court admitted DX 2102-A1, DX 2102-A2, and 2102-A3, and later

DX-1174-A21, DX-1174-A22, DX-1174-A23, and DX-2086-A1. (*See, e.g.*, Trial Tr. 960-61, 1479-

80). At various points, Cole attempted to offer still others, including DX-2088-A1, but the Court

sustained the Government's objection when it became obvious that the witness had no knowledge of the referenced transaction. (*See* Trial Tr. 963-964 (Rabin)).

In summation, Cole's counsel argued, among other things, "You saw that GBG sent invoices that looked nearly identical to the Iconix invoices to other business partners. These have nothing to do with Iconix. These are brands owned by other companies. $3 million, $8 million, $2 million. Big round numbers, general descriptions." (Trial Tr. 2482). Cole never called a witness who testified that these were actual invoices prepared or received by GBG, that the invoices were sent, that the invoices were paid, that the invoices did or did not have legitimate back-up materials, or that Cole had any awareness of them. Further, in advance of offering the invoice exhibits, Cole did not produce them as Rule 16 material and has provided no custodial certificate or cover letter that identifies their provenance.

### B.    Applicable Law

#### 1.   *Relevancy and Prejudice*

Under Rule 401, relevant evidence is any evidence that has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable . . . than it would be without the evidence." Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." A district court has "broad discretion" to admit or exclude evidence under Rule 403. *United States v. Birney*, 686 F.2d 102, 106 (2d Cir. 1982).

#### 2.   *Good Acts and Propensity*

It is black letter law that "[a] defendant may not seek to establish his innocence through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Whether analyzed under the rubric of relevance, pursuant to Rule 401, or character propensity evidence, under Rule 404(b), courts uniformly hold that evidence that a defendant engaged

in legal, honest business conduct on some occasions may not be introduce to rebut an allegation that the defendant engaged in charged offenses involving bribery or fraud on other occasions. *See, e.g., United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) (summary order) ("Chambers's argument that his running of a legitimate law practice makes it less likely that he had corrupt intent to bribe Villanueva is precisely the type of propensity inference that Rule 404(b)(1) is intended to prohibit."); *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978) (affirming district court's exclusion of testimony that witnesses did not pay defendant any bribes "because such testimony would in effect be an attempt to demonstrate appellant's good character by proof of specific good acts"); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming the district court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); *see also United States v. Boykoff*, 67 F. App'x 15, 20-21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.") (quoting *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978)).

### 3. *Business Records*

Rule 802 generally forbids the introduction of hearsay evidence except in certain circumstances. In order for business records to be admissible as exceptions to the hearsay rule pursuant to Rule 803(6), the documents at issue must be prepared at or near the time, by or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, . . . all as shown by the testimony of the custodian or otherwise qualified witness, unless the source of

14

information of the method or circumstances of preparation indicate a lack of trustworthiness. Fed. R. Evid. 803(6).

Although the Second Circuit has adopted a "generous view" of the business records exception, and the "principal precondition" of admissibility is the "trustworthiness" of the record, the proffered evidence "must meet all of the requirements of the exception" to be accepted into evidence. *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995); *Saks Int'l, Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987).

### 4.   Authentication

"The requirement of authentication is. . . a condition precedent to admitting evidence." *United States v. Sliker*, 751 F.2d 477, 497 (2d Cir. 1984); *see also Maldonado-Rivera*, 922 F.2d at 957 ("In general, a document may not be admitted into evidence unless it is shown to be genuine."). Rule 901 of the Federal Rules of Evidence provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "This requirement is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *United States v. Pluta*, 176 F. 3d 43, 49 (2d Cir. 1999).

### C.   Discussion

The Court should preclude Cole from introducing evidence of the Extraneous Invoices because they are (i) irrelevant and unfairly prejudicial and because, on the present record, they are (ii) unauthenticated documents and (iii) inadmissible hearsay.

The Extraneous Invoices evidence provides the jury with no relevant information about any material fact in the case. Cole's relevancy argument proceeds from the false premise that the government has alleged that the mere format of the Giveback Invoices is proof of Cole's participation

15

in fraud. But the Indictment does not allege that it is improper to prepare or to receive round-dollar marketing invoices with spare descriptions, and the government has not made such an argument. Rather, the Indictment alleges, among other things, that Cole reimbursed GBG for paying an inflated purchase price on SEA-2 by hiding the giveback payments behind pretextual invoices. (Indictment ¶ 14). And the government has argued—and has presented evidence sufficient to conclude—that Cole and Horowitz insisted that GBG send a revised set of invoices after an initial set arrived with no backup, displaying big round dollar amounts, and calling for immediate (rather than distributed) payment. Accordingly, Cole's and Horowitz's frustrated reaction to the format of the Giveback Invoices under the circumstances is probative of their knowledge and awareness of the specific terms of fraud and their desire to create plausible records to explain the payments.

Whether GBG sent other parties round dollar invoices on other occasions is beside the point. Cole's efforts to put random invoices before the jury does not rebut the evidence that Cole and Horowitz reacted negatively to the Giveback Invoices based on the surrounding circumstances; does not impeach the evidence that the original invoices submitted by GBG to paper the giveback were subsequently redone by Cole's GBG co-conspirators; and does not undermine the testimony that the invoicing process was conceived of to facilitate the giveback. Instead, the Extraneous Invoice evidence improperly invites the jury to confuse the issues and waste time trying to understand why they are being shown invoices from other occasions, often years after the charged conduct in the case. Under these circumstances, the Court should preclude the evidence pursuant to Rule 401 and Rule 403.

Moreover, the Extraneous Invoices evidence resembles improper good acts evidence and should be excluded for that reason as well. It is black letter law that "[a] defendant may not seek to establish his innocence through proof of the absence of criminal acts on specific occasions." *Scarpa*, 897 F.2d at 70. Cole should likewise be precluded from pursuing similar propensity arguments about

Iconix's or GBG's invoicing practices at other times or under other circumstances. *United States v. Mustafa*, 753 F. App'x 22, 38 (2d Cir. 2018) (summary order) ("[T]he Rules of Evidence and our precedent clearly prohibit 'good acts' evidence to demonstrate a defendant's propensity not to engage in charged crimes."). Such arguments appeal to propensity reasoning and should be precluded pursuant to Rule 404, as improper character evidence, as well as Rule 403.

The prejudicial aspects to the Extraneous Invoice evidence are compounded by Cole's accompanying arguments about what the Extraneous Invoices evidence represents. In closing arguments, for example, Cole asserted that the jury "saw that GBG sent invoices that looked nearly identical to the Iconix invoices to other business partners." (Trial Tr. 2482). But, in fact, no witness testified that the Extraneous Invoices were finalized GBG invoices that had been sent to other business partners; rather, the witnesses were merely led to acknowledge the words on the page before them. *See, e.g.*, Trial Tr. 958-59 (Rabin); Trial Tr. 1483 (Margolis). Indeed, when asked if he recognized the formatting of the invoices, Rabin testified that he did not. (Trial Tr. 963-964). Nor did Cole present any evidence of how GBG's business partners reacted to any such invoices or whether they included back-up materials or whether the amounts had been pre-negotiated.[4] Cole likewise did not present any evidence that the Extraneous Invoices were subject to the terms of a joint venture agreement, as the GBG SEA payments ought to have been, and the Government expects it could show that ABG and GBG were not partners in any joint venture. In the absence of such context, Cole cannot make good on his proffer to the Court about the import of the Extraneous Invoices, and simply invites the jury to

---

[4] The Government expects it could show that at least one set of the invoices likely represented negotiated payments made pursuant to a licensing agreement and did not represent billing for sham marketing.

credit his speculation about what the Extraneous Invoices might mean. Based on the full record of the first trial, the Court should preclude this prejudicial evidence at the retrial.

Finally, Cole's failure to lay a proper foundation for the Extraneous Invoice evidence renders the evidence inadmissible on the present record for two other reasons: First, Cole has not shown the Extraneous Invoices are what they purport to be and thus has not authenticated them. *See* Rule 901. Indeed, Cole did not produce the Extraneous Invoices in discovery and did not provide any certification, production cover letter, or Bates number that would reveal their provenance. Second, Cole has not established that the Extraneous Invoices fit within an exception to the rule against hearsay. He did not adduce any testimony that these particular invoices were made or produced in the ordinary course of GBG's business, for example. Accordingly, unless and until Cole supplies a basic evidentiary foundation at the retrial for the Extraneous Exhibits, the Court should preclude their admission.

## III.   THE COURT SHOULD ALLOW EVIDENCE OF CORRESPONDENCE WITH THE SEC'S DIVISION OF CORPORATE FINANCE

Cole was acquitted on Count Ten of the Indictment, which charged him with conspiracy to destroy, alter, and falsify records in a federal investigation. One of the underlying acts that formed the basis of that Count was Cole's approval of a February 24, 2015 letter response from Iconix to Corp Fin that purported to describe the material terms of SEA-2 and SEA-3 but omitted any mention of inflated purchase prices or secret givebacks. (GX-113). Although Cole was acquitted on Count Ten, the February 24, 2014 Iconix letter response, as well as other facts relating to the Corp Fin inquiry, are direct evidence of the remaining counts, and should therefore still be admitted at the trial.

## A.    Relevant Facts

As the Court is aware from the first trial, after the Southeast Asia joint venture transactions had been signed, Corp Fin made a number of inquiries to Iconix concerning the accounting for those joint ventures. While the Corp Fin inquiries were not specifically directed to the overpayments and side deals at the center of this criminal matter, Corp Fin did ask Iconix to describe all material terms of the Southeast Asia joint ventures, and this alarmed Cole and resulted in him making a number of highly incriminating statements demonstrating his fraudulent intent and participation in the fraudulent overpayments.

For example, Horowitz testified at trial that in response to the Corp Fin inquiry, Cole began falsely denying having read certain emails relating to the Southeast Asia joint venture that Horowitz had specifically discussed with Cole, and denying participating in certain conversations that Horowitz had with Cole. Horowitz further testified that Cole sought to alter Iconix's responses to Corp Fin, including the February 24, 2015 letter, to minimize or remove mention of his own role in the Southeast Asia joint venture negotiations, and that Cole made comments about pinning the blame for the transactions on a "fall guy." Cole's concern that the Corp Fin inquiry would result in the discovery of the fraudulent overpayments also caused him to direct Horowitz to delete relevant emails. Ultimately, Cole's reaction to the Corp Fin inquiry at least in part led to Horowitz resigning from Iconix and sending a letter to the Board of Directors raising concerns about the Southeast Asia joint venture. (Trial Tr. 341-65, 375-96).

## B.    Applicable Law

Evidence of an uncharged act is admissible as direct evidence, without regard to Rule 404(b), if the uncharged act "arose out of the same transaction or series of transactions as the charged offense"; (2) "is inextricably intertwined with the evidence regarding the charged offense"; or (3) "is necessary

19

to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *see also United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (explaining that some kinds of evidence offered "to show the background of a conspiracy" is not "other crimes" evidence subject to Rule 404(b), but rather "'direct proof of the charged conspiracy'"); *accord United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

The Second Circuit has repeatedly affirmed the admissibility of evidence fitting one or more of these descriptions, whether it relates to conduct during the period of the charged crime or before it. *See, e.g.*, *United States v. Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012) (following conviction after trial on campaign finance related charges, affirming district court's admission, as direct evidence, of testimony that defendant had engaged in a Ponzi scheme contemporaneously with, and arguably related to, the campaign finance violations); *United States v. Robinson*, 702 F.3d 22, 37-38 (2d Cir. 2012) (in child sex trafficking case, affirming admission as direct evidence and necessary to complete the story of the crimes on trial proof of defendant's calls, contemporaneous with the charged conduct, in which he discussed uncharged crimes related to prostitution and trafficking); *United States v. Greer*, 631 F.3d 608, 614 (2d Cir. 2011) (where defendant was charged with being a felon in possession of a firearm, affirming admissibility as direct evidence necessary to complete the story of the crime charged testimony regarding defendant's uncharged plan to commit a robbery, which preceded the charged conduct); *United States v. Kaiser*, 609 F.3d at 571 (in securities fraud case, holding that bad acts predating the conspiracy were admissible as direct evidence, without regard to Rule 404(b), because

20

they had carry-over effects during the conspiracy); *United States v. Rigas*, 490 F.3d 208, 238-39 (2d Cir. 2007) (affirming district court's decision to permit Government to adduce evidence of uncharged fraudulent acts predating the charged conspiracy as direct proof of charged accounting fraud conspiracy because the evidence was "'inextricably intertwined with'" the proof of the charged conspiracy and "'necessary to complete the story of the crime on trial'"); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (in case charging false statements to maintain a line of credit, affirming admissibility of uncharged acts of falsification of business inventory, which occurred at or around the same time as the charged crimes, as direct proof inextricably intertwined with charged conduct); *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence of pre-existing drug trafficking relationship between defendant and co-conspirator admissible to aid jury's understanding of how transaction for which defendant was charged came about and his role in it).

### C.    Discussion

Here, the February 24, 2015 Iconix letter response to Corp Fin directly addresses the fraudulent transactions at the core of this case, it was sent and approved by Cole during the time period of the alleged scheme to defraud, and the statements in the letter (and the omission of material facts) were part of an effort by Cole to cover up that very scheme. The letter thus plainly "arose out of the same transaction or series of transactions as the charged offense" and "is inextricably intertwined with the evidence regarding the charged offense."

The letter and surrounding circumstances are also "necessary to complete the story of the crime on trial." As discussed above, Horowitz testified about how the Corp Fin inquiry led to Cole making a number of inculpatory statements, seeking to scapegoat Horowitz and others in the February 24, 2015 letter, and directing Horowitz to delete emails. Horowitz also testified that he refused to sign-off on fraudulent GBG invoices at least in part because of Cole's lashing out as a result of the Corp Fin

inquiry, and that this resulted in Cole himself signing off on the invoices, which resulted in the roundtripping of funds back to GBG. That in turn led to the further deterioration of the relationship between Cole and Horowitz, and Horowitz's resignation from Iconix. (Trial Tr. 341-65, 375-96).

In short, the February 24, 2015 letter was a critical event in the timeline of the fraudulent scheme and is admissible as direct evidence of the counts on trial.

## IV.   THE COURT SHOULD PRECLUDE IMPROPER CROSS EXAMINATION OF SETH HOROWITZ

At the first trial, the defense pursued multiple improper lines of cross examination as to Seth Horowitz that should be precluded at the retrial, including questions about alleged illegal financial "structuring," questions that amount to inappropriate personal attacks, and questions about the specific number of privileged communications between Horowitz and his personal lawyers. The structuring cross examination should be precluded because the defense's questioning of Horowitz actually established that Horowitz did not engage in illegal financial structuring, and had not been untruthful with the Government about his financial dealings. While the Government does not object to appropriate cross examination on topics that arguably bear on witness credibility, the defense should be precluded from again veering off into inappropriate personal attacks and questioning about others' unfavorable opinions of Horowitz that have no bearing on his truthfulness, such as a disparaging nickname and former employers' personal feelings of animosity or dislike. Finally, while the Government does not object to the defense eliciting testimony from Horowitz that he retained and

conferred with personal counsel, detailed questioning about the specific number of privileged communications between Horowitz and his personal lawyers is irrelevant and unfairly prejudicial.

### A.      Applicable Law

Rule 608(b) provides that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." The Court "may, on cross-examination, allow [those prior acts] to be inquired into," but only if such acts "are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b)(1). Any such cross-examination also must satisfy Rule 403—that is, specific instances of a witness's prior conduct may be inquired into on cross-examination only if the probative value of such evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Fed. R. Evid. 403; *United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995). In this context, evidence is unfairly prejudicial if it would invite the jury to decide an issue material to the outcome of the case for reasons that have nothing to do with the factual issues properly before the jury. *See United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993).

Before cross-examining a witness on specific instances of prior conduct pursuant to Rule 608, the questioner must have good-faith basis to believe that the conduct occurred and that it implicated the witness's credibility. *Hynes v. Coughlin*, 79 F.3d 285, 294 (2d Cir. 1996). "Although counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts." *United States v. Katsougrakis*, 715 F.2d 769, 779 (2d Cir. 1983).

Furthermore, Rule 611 provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility," and that the Court should "avoid wasting time" and "protect witnesses from harassment or undue embarrassment." It is well settled that "[t]he scope and extent of cross-examination lies within the discretion of the trial judge." *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990) (internal quotation marks omitted). As the Supreme Court has explained:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination [of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted). "As long as a defendant's right to confront the witnesses against him is not violated, limitations on cross-examination are not grounds for reversal," *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990), and "[t]he decision of the trial court to restrict cross-examination will not be reversed on appeal unless its broad discretion has been abused," *United States v. Maldonado-Rivera*, 922 F.2d 934, 956 (2d Cir. 1990). "A trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has 'sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.'" *Scarpa*, 913 F.2d at 1018 (quoting *United States* v. *Singh*, 628 F.2d 758, 763 (2d Cir. 1980)).

### B.   Large Cash Withdrawals

In the prior trial, defense counsel cross examined Horowitz about a handful of large cash withdrawals made from a bank account Horowitz held jointly with his wife, and accused Horowitz of

engaging in the crime of financial structuring. (*See, e.g.*, Tr. 698 ("Do you know that it's a crime to structure cash transactions in order to avoid triggering the $10,000 reporting requirement?"). Defense counsel claimed that this was proper cross examination under Rule 608(b) on the grounds that structuring is a crime bearing on truthfulness, Horowitz had not disclosed the alleged structuring to the Government, and that the cash withdrawals may be evidence of Horowitz purchasing larger amounts of illegal drugs than he had disclosed to the Government. The Court should preclude this line of questioning at the retrial because the record developed by the defense questioning established that Horowitz did not engage in illegal financial structuring, and that Horowitz had not been untruthful with the Government about his financial dealings.

"Under 31 U.S.C. § 5313(a) and implementing regulations, domestic financial institutions must file Currency Transaction Reports ('CTRs') with the Financial Crimes Enforcement Network (FinCEN) of the Treasury Department whenever they are involved in transactions for the exchange of currency exceeding $10,000 during one business day." *United States v. Taylor*, 816 F.3d 12, 20 (2d Cir. 2016) (citing 31 U.S.C. § 5313(a) and 31 C.F.R. §§ 1010.311, 1010.313(b)). "Section 5324 of the same subchapter makes it a crime to cause, or attempt to cause, a financial institution to not file a required CTR." *Id.* (citing 31 U.S.C. § 5324(a)). There are three elements of that offense: "(1) the defendant must, in fact, have engaged in acts of structuring; (2) he must have done so with knowledge that the financial institutions involved were legally obligated to report currency transactions in excess of $10,000; and (3) he must have acted with the intent to evade this reporting requirement." *Id.* (quoting *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005)).

Here, the record developed by the defense does not support the illegal structuring allegation. First, the defense failed to point to acts of structuring. Merely withdrawing large cash sums under $10,000 does not constitute an act of structuring; rather, structuring occurs when a single transaction

is broken up into multiple transactions to avoid the $10,000 reporting requirement. *See United States v. Taylor*, 816 F.3d 12, 25 (2d Cir. 2016) (evidence insufficient to support financial structuring counts where "[t]here was no evidence that [the defendant's] deposits on the dates of the alleged structured transactions were part of a single lump sum that was split into multiple deposits"). While Horowitz and/or his wife made large cash withdrawals under $10,000, the defense has failed to show the breaking up of a single transaction into multiple components to avoid a $10,000 withdrawal. Rather, the defense pointed to eight cash withdrawals spread over a two-year period, including withdrawals on January 17, 2014 ($9,000); July 14, 2014 ($8,010); August 7, 2014 ($6,000); August 12, 2014 ($8,010); August 18, 2014 ($5,000); October 3, 2014 ($9,000); May 11, 2015 ($8,000); and January 26, 2016 ($8,500). (Trial Tr. 687-89, 94-95). The number and timing of these withdrawals—some separated by 6 months or more—stands in stark contrast to the transaction patterns that courts have held to constitute structuring, such as multiple deposits with different banks on the same day, or very large numbers of transactions in a short period of time. *See, e.g., United States v. MacPherson*, 424 F.3d 183, 191 (2d Cir. 2005) (making identical $9,000 deposits at three different banks on the same day, and repeating this pattern in six out of seven consecutive weeks, constituted structuring); *United States v. Nersesian*, 824 F.2d 1294, 1309, 1314 (2d Cir. 1987) (conspiracy's use of $117,000 in cash to purchase more than one hundred $1,000 money orders at numerous banks throughout New York City over a one-month period constituted structuring). Based on the record, the transactions highlighted by the defense merely reflect decisions to withdraw large cash sums under $10,000, which standing alone is not unlawful.

Second, Horowitz lacked the knowledge and intent required under the criminal structuring statute. Section 5324 requires evidence of knowledge of a financial institution's reporting requirements, and an intent to evade that requirement. Indeed, when defense counsel began

questioning Horowitz concerning his cash withdrawals, the Court cautioned "we don't know yet whether in fact Mr. Horowitz knows about the reporting requirements" and "you'd have to establish that." (Trial Tr. 693). Defense counsel then failed to establish that necessary foundation, instead eliciting testimony from Horowitz that he was not aware that a bank was required to file a report with the U.S. Treasury Department concerning cash withdrawals over $10,000, or even that the $10,000 figure had anything to do with federal regulations or legal requirements of any sort. (Trial Tr. 697). Horowitz further testified that he "knew there was some importance to the $10,000 number, but I was not aware of what it was," that he had been instructed by a financial adviser to keep cash withdrawals under $10,000, and that "I did not know what it had to do with. I just knew that it was a number that we were supposed to withdraw less than." (Trial Tr. 697-98).

Now, with the defense having tried and failed to establish the necessary foundation to make this line of questioning arguably relevant, the Court should preclude it entirely at the retrial. Based on the fully developed record before the Court, any insinuation from the defense that Horowitz engaged in unlawful structuring would be without foundation, legally incorrect, and misleading. Based on the record, Horowitz and/or his wife simply made large cash withdrawals from their joint bank account, and as this Court previously observed, "[t]he mere fact of having a sufficient amount in your bank account to withdraw large sums is obviously not relevant." (Trial Tr. 693).

Third, the bank account at issue was a joint account held by both Horowitz and his wife, and it is not clear from the account records who made the cash withdrawals at issue. In particular, the defense elicited testimony from Horowitz that he did not recall the specific cash withdrawals that the defense alleged were illegally structured. (Trial Tr. 687-89, 94-95).

The record also does not provide any foundation for the defense allegation that Horowitz was untruthful with the Government about his cash withdrawals. Horowitz testified that he did not recall

27

ever being questioned by the Government about cash withdrawals. (Trial Tr. 695 ("I don't recall us having any discussions or being asked any questions about withdrawals.")). Further, in light of the fact that the cash withdrawals do not constitute illegal structuring, there was no obligation for Horowitz to affirmatively raise the issue with the Government as part of his cooperation agreement.

Finally, the argument raised by prior defense counsel that the cash withdrawals in some manner bear on Horowitz's candor concerning his drug use is wholly unsupported by the facts. Defense counsel appeared to concede the speculative nature of this theory at the prior trial. (Trial Tr. 693 ("We want to know the amount that was for drugs because it *may* be inconsistent about the type and frequency of drug purchases and drug use that the witness has disclosed to the government." (emphasis added)).

### C.     Personal Attacks on Horowitz With No Bearing on His Credibility

The Government does not object to the defense asking appropriate questions of Horowitz concerning aspects of his employment history that arguably bear on his credibility. However, at the initial trial, the defense's questioning of Horowitz concerning his prior employment at times veered off into inappropriate personal attacks and questioning about others' unfavorable opinions of Horowitz that have no bearing on his truthfulness. Such unfairly prejudicial questioning should be precluded.

For example, at the initial trial, Cole's counsel asked if one of Horowitz's former employers, the CEO of Modell's Sporting Goods, called Horowitz "little Mussolini." (Trial Tr. 678). Whether or not an employer had a derogatory nickname for Horowitz has no bearing on his credibility, and amounts to little more than mud-slinging. That is especially true where the alleged nickname refers to a fascist dictator who allied himself with Nazi Germany.

Cole's counsel also questioned Horowitz about his prior employment at Baked By Melissa, including his failure to disclose to the company's founder and President that he was under criminal

investigation in this case. The Government does not object to Cole's counsel questioning Horowitz about whether he was forthcoming with the founder of Baked By Melissa about his involvement in wrongdoing at Iconix. However, the defense's questioning also explored the subjective reaction of the founder to learning of Horowitz's criminal case, including her refusal to write Horowitz a letter of reference. (*See, e.g.*, Trial Tr. 679 ("And you understand that she refused because she thought you were dishonest, correct?")). The founder's personal reaction and opinion about this specific fact—as distinct from any alleged act of dishonesty that led to that reaction—says nothing about Horowitz's truthfulness, and was improperly elicited solely to paint Horowitz as a bad person worthy of opprobrium. *See United States v. Krug*, No. 15 Cr. 157 (RJA), 2019 WL 3162091, at *7 (W.D.N.Y. July 16, 2019) (precluding cross examination seeking to establish that witness was a "bad person," and holding that witness credibility was not implicated by "anti-social, unlawful and sometimes violent behavior, including criminal mischief, damaging property, harassment, domestic violence, criminal trespass, possession of marijuana, assault, aggravated unlicensed of a motor vehicle, and burglary"). Eliciting the fact of any alleged deception by Horowitz is sufficient to serve any legitimate defense interest in this topic, and the Court should limit cross examination to bar testimony of the founder's subjective reaction. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (permitting district court to "impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant").[5]

---

[5] The founder's reaction to Horowitz's disclosure of the criminal matter is also not admissible as reputation evidence under Rule 608(a), as it concerns a specific incident, not "a bad reputation in the community for truth and veracity." *United States v. Augello*, 452 F.2d 1135, 1139 (2d Cir. 1971).

Cole's counsel compounded this prejudicial questioning in summation by making factually unsupported arguments to the jury about the potential harm that Horowitz had caused the founder of Baked By Melissa, including that Horowitz "had no hesitation about putting her entire career and reputation at risk, her company at risk, just because he wanted to keep his job at Baked by Melissa." (Trial Tr. 2498). But Cole did not adduce any evidence at trial that Horowitz put at risk the "career and reputation" of the founder of Baked by Melissa, and even if had done so, it would not bear on his truthfulness.

These particular questions and arguments appear calculated to embarrass Horowitz and to encourage the jury to make assessments—not of his truthfulness and his credibility—but of his character more broadly, and thus should be precluded under Rule 403 and Rule 608.

### D.     The Frequency of Horowitz's Privileged Communications With His Counsel

During the initial trial, the defense extensively cross-examined Horowitz about the frequency and timing of communications with his personal lawyers, primarily by reading the substance of a privilege log into the record in the guise of seeking to refresh the witness's recollection. (*See, e.g.*, Trial Tr. 650-51 ("Does that refresh your recollection that on April 12th, you communicated with your personal lawyers 25 separate times concerning legal advice in anticipation of legal or regulatory proceedings?"; "So you recall that on April 13th, you communicated with your personal lawyers 19 separate times concerning legal advice in anticipation of legal or regulatory proceedings, correct?"). The Government does not object to the defense asking Horowitz whether he retained and communicated with personal counsel at certain time periods, but detailed questioning about the specific number of privileged communications is aimed at eliciting irrelevant and unfairly prejudicial testimony.

The substance of Horowitz's communications with his personal counsel is obviously privileged and inadmissible. Detailed questioning about the timing and frequency of these privileged communications is plainly aimed at inviting the jury to speculate about their contents, but such speculation has little probative value by virtue of the fact that it is mere speculation. In addition to having little if any probative value, such questioning is unfairly prejudicial because it is confusing and misleading to the jury. It is confusing because the jury will see both that the Court has (properly) precluded the admission of privileged information, but at the same time hear arguments from the defense about the substance of those communications. It is misleading because the line of questioning implies that there is something inherently suspicious or nefarious about the frequency of Horowitz's communicating with a lawyer, regardless of the substance of those privileged communications. That is incorrect, but the existence of the privilege limits the Government's ability to respond to the argument.

In sum, the Court should exercise its discretion to preclude detailed cross examination of Horowitz about the frequency and timing of his communications with his personal lawyers. *See Scarpa*, 913 F.2d at 1018 ("The scope and extent of cross-examination lies within the discretion of the trial judge." (internal alterations and quotation marks omitted)).

## V.   THE COURT SHOULD PROHIBIT THE DEFENSE FROM READING TO THE JURY DOCUMENTS THAT ARE NOT IN EVIDENCE

During witness cross examination in the initial trial, defense counsel repeatedly read to the jury documents that were not in evidence, often as part of a purported effort to refresh a witness's recollection. That is improper, and it should be precluded. One example of this occurred during the testimony of Seth Horowitz, when the Government raised "some concern about the fact that there

31

appears to be a pattern of reading, or making clear to the jury what is in these documents that are being

used to refresh." The Court agreed, and then admonished defense counsel:

> I think that's right. I think, [counsel], you're getting a little close to reading from the
> documents, if you are not actually reading from the documents, which in fact you are.
> So be a little bit more careful. My working assumption is that you know what you're
> doing and that you are doing it on purpose. So be a little bit more discrete in front of
> the jury with respect to the documents that you're using to refresh his recollection.

(Trial Tr. 661). A similar approach is warranted in the retrial. *See also* 28 Fed. Prac. & Proc. Evid. §

6184 (2d ed.) ("In the usual case counsel will hand the witness the writing, show counsel for the

adverse parties a copy, and ask the witness to silently read the writing. Counsel then will ask the

witness if the writing has refreshed the witness' memory. If the witness responds in the affirmative,

counsel will retrieve the writing and ask the witness to testify as to the matters on which the witness'

memory was refreshed. . . . If the witness states that his recollection has not been refreshed, he cannot

then testify as to the contents of the writing unless it is shown that the writing itself is admissible.").

**CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court grant its

motions *in limine*.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

By:   /s/
_____
Dated: New York, New York          Jared Lenow
       October 3, 2022             Justin V. Rodriguez
                                   Andrew Thomas
                                   Assistant United States Attorneys

33