# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL        212.763.0889
DIRECT EMAIL     shecker@kaplanhecker.com

September 27, 2023

**BY ECF**

Hon. Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:        *United States v. Neil Cole*, 19 Cr. 869 (ER)

Dear Judge Ramos:

We respectfully submit this memorandum on behalf of Neil Cole ahead of his sentencing on October 10, 2023.

As the Court is aware, Neil Cole is the former CEO of Iconix Brand Group, Inc. ("Iconix")—a Company Neil founded in 2005 and that by 2014, had become the second largest brand licensing company in the world behind Disney. Trial Tr. 634, ECF No. 261; 2354, ECF No. 285.[1]  Iconix's success amounted to a dream come true for Neil.  The last eight years, however, have been his nightmare.

In 2014, Iconix entered into two transactions that would forever change the course of Neil's life.  These two transactions—which occurred months apart and represent a tiny fraction of the many transactions Iconix has been a part of over Neil's long career—led to Neil's eventual departure from Iconix, and subjected Neil to internal investigations, a civil regulatory investigation, a criminal investigation and indictment, and two trials over the course of two years. In the first trial, Neil was acquitted of two of the indictment's ten counts, including the lead conspiracy charge.  In the second trial, Neil was convicted on the remaining eight charges.

Neil Cole now stands before the Court to be sentenced.  And although it is those two transactions that precipitated these events, Neil's life and his many good deeds transcend those two transactions.  He is a loving and caring grandfather, father, brother, and friend to many.  As Neil's brother, Kenneth Cole, explains in his letter, Neil is someone who "[d]espite facing various illnesses that have burdened him since childhood, [] has always prioritized the care of others."  Ex. A, K. Cole Letter.  He is a person whose "selflessness and generosity have touched the lives of many, and his contributions to society are truly commendable."  *Id.*  And as former Governor

---

[1]  References to "Trial Tr." refer to the November 2022 retrial.

KAPLAN HECKER & FINK LLP                                                    2

Andrew Cuomo writes, "[t]hrough all of Neil's business success and achievement, he has shown a car[e], empathy, and kindness that few CEOs do." Ex. B, Gov. Cuomo Letter.

Although Neil was convicted on November 28, 2022—over seven years after he stepped down from Iconix—he comes before this Court having "already paid a significant price for all that has happened: personally, financially, as well as professionally." Ex. A, K. Cole Letter. Neil has lost the business he created and loved. Since his conviction, he has also grappled with his wife filing for divorce ███████████████████████████████████████████ which was understandably stressed by this ordeal. █████████████ To make matters worse, █

██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

The punishment Neil has already suffered in connection with these events, which he has endured over an arduous eight-year period, has been substantial. ████████████████████

██████████████████████████████████████████████████████████████████
█████████████████████████████████████████

The punishment Neil has already suffered has also been disparate. Besides Neil, only one other individual has been charged in connection with these transactions. And not one individual on the other side of the deal has been charged, notwithstanding the government's arguments at both trials that they had also committed wrongdoing.

In consideration of Neil's state of health, and the fact that Neil has already paid—and continues to pay—a life-changing price, we respectfully request that the Court sentence Neil to a term of probation. As explained below, we believe that such a sentence would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing as applied uniquely to Neil, and would serve the "need to avoid unwarranted sentence disparities." *See* 18 U.S.C. § 3553(a).

## RELEVANT FACTUAL BACKGROUND

### I.    Neil's Background

#### A.    Neil's Upbringing and Education

Neil Cole was born in 1957, the third child of Charles and Gladys Cole (née Douglas). Neil's father was an entrepreneur whose self-made success in the shoe manufacturing business afforded the family a comfortable lifestyle in suburban Long Island. His mother was a homemaker

---

████████████████████████████████████████████████████
██████████████████████████████████████████

KAPLAN HECKER & FINK LLP                                             3

and later a philanthropist (and one of the first to push to establish Long Island Jewish Medical Center).  Before that, though, she spent several years in medical training.

Mrs. Cole's medical background became especially valuable when Neil was



Through this experience (perhaps, in part, because of it) Neil became exceptionally close to his family.  His parents had instilled shared values of hard work and dedication into Neil and each of his siblings—his older sister Abbie and brothers Kenneth and Evan.  Their father took work extremely seriously.  He regularly clocked thirteen-hour days at the factory to build the family company into a success.  Every summer from the age of thirteen on, Neil and his siblings joined him, learning about the family business (and the family work ethic) first-hand.

Neil's mother, in turn, stressed the importance of education.  She had personally ensured that Neil did not fall behind during his two years at home following ████████  Under her watchful eye, he not only kept up in middle school but also sped through high school, graduating a full six months early.  He moved with similar speed through college at the University of Florida, where he received a degree in political science and government.  Then, knowing how badly his mother wanted one of her children to become a lawyer—and that his older siblings, Abbie and Kenneth, had already chosen to follow in their father's footsteps in the family business—Neil dutifully headed to Boston to attend New England Law School.

Shortly after he headed off to school again, though, the family business began to make a new line of high-heeled slides from Italy called "Candie's."  The line was a success almost overnight.  Missing home and wanting to help any way he could, Neil transferred to Hofstra Law School, on Long Island, and spent his last two years of school studying and working for the family business simultaneously.  He received his J.D. in 1982 and joined the company as in-house counsel.

B.    Neil Works for the Family Business

For the first year, Neil practiced law for the family business, while his father and brother handled its business operations.  But as the company grew, trademark law and licensing were becoming more and more central to the business model.  Other businesses were calling to request permission to use the "Candie's" name to market other products, like jeans and apparel.  The idea that someone would pay not just for the company's products but also to borrow its branding for

KAPLAN HECKER & FINK LLP

their own was intriguing to Neil.  But he quickly came to realize that the legal structures surrounding these contracts were not the part of those licensing deals that he found most interesting.  He persuaded his father to hire one of his Hofstra Law School professors to handle the company's trademark work, allowing Neil to take on a business role and focus on the licensing deals he found most fascinating.

Working for his father was not always easy, though.  Neil's father was an exacting, often critical boss, especially toward his children.  Even as the company grew, he rarely delegated significant work to them and kept a punishing schedule, which he in turn expected his employees to match.  For his accomplished, capable children, this management style often grated horribly.  After one final, explosive fight, Neil's older brother Kenneth left and started his own (now very successful) shoe brand, Kenneth Cole Productions, in 1982.

Perhaps realizing his mistake with his older son, Neil's father began to entrust him with more autonomy over the subsequent years.  Neil was named president of Candie's.  His father began to spend more of his time in Florida, while Neil took over the day-to-day operations of the family business.

In this larger role, Neil took pride not just in running a flourishing brand but also in building a strong team around him.  As his employee of decades, Dari Marder, explained in her letter, he worked hard to ensure his team felt "appreciated and challenged and part of something meaningful."  *See* Ex. D, D. Marder Letter.  He viewed his employees as family and made sure they knew it.  *Id.*  And, one day, when Neil's father came up from Florida to insist that he fire fifteen of his employees after a tough year, Neil not only refused—he quit.

C.    Neil Sets Out to Start His Own Business

Relying on the lessons that he had learned at his family's company, Neil set out to begin his own apparel and licensing business called New Retail Concepts.  He and a friend from law school joined together and created "No Excuses," a jeans brand.  With spokeswomen like Joan Rivers, Marla Maples, and Monica Seles, the brand exploded.  They quickly licensed it to about twenty other companies.

Just after No Excuses reached the peak of its popularity in the early 1990s, Neil was given the opportunity to recover his family's company.  After Neil had quit, his father had sold Candie's to a company called the Pentland Group.  By 1991, the brand was floundering, and Pentland was looking to sell it back.  Unwilling to pass up the chance to reclaim a piece of his family's legacy, Neil sold No Excuses, using the proceeds of the sale to purchase his family's brand.

From there, Neil set out to revitalize Candie's, embarking on a new, exciting marketing campaign that generated astonishing sales of jeans, shoes, and other products.  Most important to Neil, though, was the fact that he was able to share the renewed success of Candie's with his father, ███████████████████████████████████  Though Neil's father passed away before the Candie's renaissance reached its peak, Neil made sure that his father knew his life's work would live on.  Over the next twelve years, under Neil's careful management, the company grew to over 100 stores and over 300 employees.

KAPLAN HECKER & FINK LLP                                                    5

D.      Neil Starts a Family and Confronts ████████████████

As he was rebuilding the family brand, Neil was also embarking on an entirely different journey: creating a new family of his own.  He met his first wife, Kimberly Seelbrede, they had two sons, Brandon and Alexander, and they settled into a comfortable life in Westchester.

It was at around this time that Neil realized he needed to make another significant change:



he and his wife drifted apart, and in 2000, when their sons were ten and thirteen, they decided to divorce.  Nevertheless, Neil remained close with his children, continuing to play an active presence in their lives.  And a year later, Neil's mother, playing matchmaker, introduced him to Elizabeth Miller.  Neil and Ms. Miller dated for two years before marrying in 2003—and two years after that, Neil's youngest child, his daughter Charley, was born.

E.      Neil Builds His Most Successful Licensing Company Yet with Iconix

By 2005, Neil, who had run several successful businesses, was looking for a different challenge professionally.  He founded a company with the aim of creating and revitalizing legacy brands through licensing—just as he had in earlier years with his family's brand.

At Iconix, Neil and his new team also brought a truly innovative idea to the table.  They recognized that a brand's underlying IP held significant monetary value, often in the form of royalties guaranteed by its licensing agreements.  The team harnessed this value by pioneering an innovative financing mechanism where banks extended financing against the IP the company sought to acquire.  This unique financing then allowed Iconix to acquire several brands quickly: they started with the women's dress brand Badgley Mischka and the underwear brand Joe Boxer and grew from there.  Soon, they were working with Madonna to develop and license her new Material Girl brand to Macy's; with Jay-Z to acquire and license his Rocawear apparel line; and eventually, with the Schultz family, as they negotiated to buy the rights to the Peanuts characters, adding Charlie Brown and Snoopy to their growing list of marketable IP.  By 2008, Iconix had climbed into the top fifty of CNN Money's list of the fastest growing public companies in the

KAPLAN HECKER & FINK LLP

world.[3]  Today, more than a dozen companies are built on the Iconix model, buying and licensing brands—but when Neil and his team started Iconix, they were the first, and the only, ones.

Neil's team expanded, and in quick succession, both of his sons joined, bringing the legacy of family businesses to a third generation.  By 2014, the business was worth $3 billion on NASDAQ and employed 150 people across multiple continents.  The only company in the world doing more licensing was Disney.

F.    Neil Mentors Aspiring Business Leaders and Invests in His Team

During this time, Neil's sons weren't the only businesspeople whom he took the time to mentor and guide.  As several of his letters of support note, throughout his time leading Candie's and Iconix, Neil went out of his way to support potential future leaders as they tried to find their paths in life and business.  Neil's rabbi, Yitz Greenman, notes in his letter how "[w]hen some of [his] students were in need of job opportunities, Neil graciously stepped forward and provided internships for them . . . . offer[ing] valuable work experience but also instill[ing] a sense of confidence and purpose in these young individuals."  Ex. F, Y. Greenman Letter.

Neil not only made sure Iconix offered these internships—he also devoted significant time as CEO to interacting directly with the company's interns.  As his former employee Dari Marder recalls, "students were able to have access to and engage with Neil throughout their time at the Company, a rarity for an intern to have such face time with a CEO."  Ex. D, D. Marder Letter.  She also recalled Neil's deft ability to connect with the interns, noting how "[he] always tried to put the students at ease with humor and it was a joy to watch these students go from being terrified of being in a meeting with the CEO to ultimately finding their confidence and contributing to our team."  Id.

Multiple letters of support specifically highlight Neil's impact on the letter-writers' own children.  See Ex. G, L. Howard Letter; Ex. H, G. Eisenstein Letter; Ex. I, S. Edelman Letter.  Glenn Eisenstein explains that Neil not only helped his daughter launch her charity supporting survivors of childhood cancer but also notes how "[m]any times through th[e] years [his] daughter sought advice and support from Neil, and never once did he fail to find the time to provide whatever was needed."  Ex. H, G. Eisenstein Letter.  And Dr. Lawrence Howard writes how Neil was always "generous with his time and . . . a great influence" on his son Ben.  Ex. G, L. Howard Letter.

Perhaps most movingly, Neil's friend Sam Edelman notes how Neil not only guided his son through a career turning point but also through a turning point in his relationship with his parents and their family business.  Mr. Edelman explains:

██████████████        I asked Neil if he would meet with him. He did, and then called me up and said, "Sam, you're the luckiest man in the world.  Your son is content.  He is a real person. He loves what he does every day, and he loves working with you and your wife."  Neil said that he was "in awe

KAPLAN HECKER & FINK LLP                                                              7

> of what we had accomplished". Hearing that from Neil not only made my day then, but it helped me to cement my relationship with my son. It helped me to encourage my son to grow and today my son is the Chief Operating Officer of our business. Neil recognized his talent and potential and supported me in my efforts to develop and mentor him. To this day, I have Neil to thank for that.

Ex. I, S. Edelman Letter. Throughout his career, Neil went out of his way to mentor and support those around him, with profound impacts on their lives.

And, as Dari Marder emphasizes, this investment in mentorship extended to Neil's employees as well. She stresses "how many loyal, longtime employees worked at Iconix and like [her], stayed for decades, as they felt appreciated and challenged and part of something meaningful." Ex. D, D. Marder Letter. As she put it, they were not doing easy work, but "Neil made us all feel like family and proud to be a part of Iconix." *Id.*

G.    Neil's Departure from Iconix

Neil's departure from Iconix was precipitated by an Iconix employee in a relatively new position, however—Seth Horowitz. In 2015, while Iconix was under investigation by the SEC Division of Corporate Finance, Mr. Horowitz resigned. Neil still remembers the nerve pain that shot through his leg when he read Mr. Horowitz's resignation letter, and the feeling that his life would never be the same. Trial Tr. 2464, ECF No. 277. What followed next were numerous internal investigations and Neil's departure from the company in August of 2015. *Id.* Neil would go on to lose approximately $150 million worth of Iconix stock that he owned and to return approximately $8 million to Iconix following the company's decision to restate certain financial statements. As Neil's brother Kenneth writes, in departing from Iconix, Neil "lost the business he built and loved, and along with his kids (who also lost their jobs), have been forced to live under a shadow making it almost impossible to find alternative employment." Ex. A, K. Cole Letter.

But things would get worse. Three years after Neil's departure from Iconix, in December of 2018, Mr. Horowitz claimed that there was something fraudulent about two of the joint venture transactions that he executed in 2014. Trial Tr. 1037:23-38:1, ECF No. 265 ("Q. Well, you never told anyone that there was something fraudulent about these transactions that you did, until December of 2018 and thereafter; correct? A. Generally correct.").

II.   **Criminal Proceedings**

A.    Neil is Arrested and Waits in Limbo as the Pandemic Delays His Trial

In November 2019, Neil knew his arrest was imminent. To spare his daughter the trauma of seeing him arrested in their home, he spent almost a month staying at a hotel, awaiting the police. His indictment was filed on December 4, 2019; he was arrested and arraigned the following day. Apart from Mr. Horowitz, Neil was the only individual charged by the government in connection with these transactions. No one who worked for Global Brands Group ("GBG"), the counterparty to the transactions, was charged either.

KAPLAN HECKER & FINK LLP

8

Three months into trial preparations, however, the COVID-19 pandemic arrived. Neil's trial was postponed indefinitely as the city and world entered lockdown. ECF No. 40. And, just as Neil was reconciling himself to this indefinite delay, his mother—who had been so worried about the prospect of Neil being incarcerated after his arrest— ████████████████████ ███████████

During this time, Neil also attempted to reenter the business world but faced several challenges tied to the criminal proceedings—challenges that Neil had to deal with long before he was convicted of a crime. For example, his company quickly failed after the government subpoenaed his customers and employees. And banks refused to do business with him or his company, further dooming his attempts to reenter the business world.

B.    Neil Faces Trial and is Acquitted of the Leading Charges

The case finally went to trial, with COVID precautions, on October 5, 2021. Again, Neil was the only person other than Mr. Horowitz to be charged in connection with the SEA JV transactions. After almost a month of trial—during which Neil testified in his own defense—the jury returned a verdict of not guilty on two of the ten counts. ECF No. 141. He was acquitted of the main charge, conspiracy to commit securities fraud, and of conspiracy to alter, destroy, and falsify documents in a federal investigation. *Id.* It is also our understanding that when prior counsel and the government debriefed the first jury, they were told the majority of jurors had voted to acquit on the remaining charges.

C.    Neil Stands Trial Again

Several months later, the government announced its intention to retry Neil on the remaining eight counts. ECF No. 187. The second trial commenced on October 31, 2022, and was, in many ways, similar to the first trial, although the government dropped its argument that fraud occurred in one of the three joint venture transactions that had been the subject of the first trial, SEA 1.[4] For the other two transactions, it relied largely on the same witnesses and arguments as it had in trial one. As he had in the first trial, Neil testified in his own defense. Trial Tr. 2340-464, ECF No. 285.

The parties delivered their summations on Monday, November 21, 2022. ECF No. 279. The jury was charged the following morning and began their deliberations that same day. ECF No. 281. The jury retired to deliberate at 10:42 a.m. Trial Tr. 2817, ECF No. 281. Around 1:45 p.m., the Court shared with the parties that the jury had passed a note to the Court asking whether the jurors could bring their notes home, over the Thanksgiving break, with the understanding that they would not show them to anyone. *Id.* at 2818. The Court also shared that the jury had indicated that it would break for the week at 2:30 p.m., and return the following Monday, after the Thanksgiving break, to continue deliberating. *Id.*

When the jury returned that following Monday, a juror was removed after testing positive for COVID-19, and replaced by an alternate juror. Trial Tr. 2826-27, ECF No.283. The Court

---

[4] *See* Trial Tr. at 2676, ECF No. 279 ("So what if Neil Cole didn't commit fraud with SEA-1 . . . As my colleague, Jared Lenow, told you at the start of this case, the core of this trial is about two deals, SEA-2 and SEA-3."); *see also id.* (government referring in summation to SEA-1 as a "sideshow").

KAPLAN HECKER & FINK LLP                                                    9

instructed the jury that due to the reconfiguration of the jury they would need to begin their deliberations anew. *Id.* at 2827.  Notwithstanding that instruction, this new jury, which began deliberations at 9:30 a.m., reached a unanimous verdict by 10:30 a.m.  *Id.* at 2827-28.  In other words, the reconfigured jury reached a unanimous verdict in an hour, whereas the original jury had not reached a verdict in the almost three hours that they deliberated for.

Unlike, the first trial, this jury voted to convict Neil of the remaining eight charges.  ECF No. 252.[5]

**III.**   ████████████ **and Divorce**



To make matters worse, on the night he was convicted, Neil's wife informed him that she would be divorcing him.  She formally filed for divorce in April 2023.  She and Neil now live apart.

As he awaits ███████████████████████████ the outcome of this sentencing, and the conclusion of his appeal, Neil has filled his days by helping his sons plan a new business venture, to replace the careers they lost as a result of his trial and conviction, and spending as much time with his family as he can, with the possibility looming that his time with them may soon be cut short.

---

[5] Standing trial the first time was incredibly difficult for Neil and his family.  Standing trial, a second time, after having been acquitted of two charges in the first trial, was even more difficult for them. ███████████

KAPLAN HECKER & FINK LLP

## IV.    The Offense Conduct

As the Court is aware, this case ultimately concerned two financial transactions from 2014 known as SEA-2 and SEA-3.[6]  Neil was convicted of falsely inflating the value of the two transactions, one in June 2014 and the other in September 2014.  ECF No. 252.  Both transactions were amendments to an earlier joint venture known as SEA-1.  Trial Tr. 2374, 2383, ECF No. 285.  In SEA-2, the June 2014 amendment, Iconix sold a partial interest in certain trademarks in Korea and various European countries to GBG[7] for $15.9 million dollars.  The jury found that that price included an undisclosed $5 million overpay.  The second amendment, also known as SEA-3, took place in September.  The jury found that the total price for that transaction included an undisclosed $6 million overpay.

Notably, however, neither the $5 million in inflated revenue for SEA-2 nor the $6 million for SEA-3 was necessary for Iconix to meet its consensus revenue targets for that year—and they amounted to only a small fraction of Iconix's total revenue for 2014.  Trial Tr. 2318-19, 2335-37, ECF No. 285 (Carina Chambarry, a financial economist for the SEC—acknowledging that overpayments were not necessary to meet consensus), 148-49, ECF No. 257 (noting total reported revenue of $461,243,000 in 2014).[8]

## V.    Neil's Philanthropic Efforts and Significant Positive Impact

As Neil's brother writes, "Neil has consistently shown compassion for others and a deep commitment to making a positive impact in his community, exhibiting outstanding leadership in

---

[6] Though in the first trial, the government argued that a third transaction, referred to as SEA-1, was also fraudulent, it dropped that theory during the second trial.  Trial Tr. at 2676, ECF No. 279 ("When you get the verdict form, you'll see that Counts Three and Four relate to false filings that Neil Cole made after SEA-2.  And you'll see that Counts Five and Six relate to false filings Neil Cole made after SEA-3.  You won't see any count about false filings that relate to SEA-1.").

[7] At this time, GBG was still a division of the larger company, Li & Fung; however, it had fully spun off from Li & Fung by the time SEA-3 was negotiated.  Trial Tr. 2433, ECF No. 277.

[8] In his first trial, Neil was acquitted of conspiracy to commit securities fraud, and of conspiracy to alter, destroy, and falsify documents in a federal investigation.  ECF No. 141.  This Court should decline to consider that acquitted conduct at sentencing.  First, the practice of considering acquitted conduct at sentencing has been widely criticized, and this Court is not required to perpetuate it.  *See McClinton v. United States*, 143 S. Ct. 2400, 2402-03 (2023) (Sotomayor, J., dissenting from denial of certiorari) ("With an acquittal, the jury as representative of the community has been asked by the State to authorize punishment for an alleged crime and has refused to do so . . . . acquitted-conduct sentencing also raises questions about the public's perception that justice is being done, a concern that is vital to the legitimacy of the criminal justice system."); *United States v. Bell*, 808 F.3d 926, 927 (D.C. Cir. 2015) (Kavanaugh, J.) ("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement on the rights to due process and to a jury trial."); *United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008) ("To say that district court judges may enhance a defendant's sentence based on acquitted conduct, however, is not to say that they *must* do so.").  Second, the government has chosen not to argue that the conduct of which a jury has acquitted Neil here was proved by a preponderance of the evidence, the standard applicable at sentencing.  *See* PSR at 41 (noting "the Government has agreed that all information concerning allegations regarding the defendant's destruction and concealment of relevant evidence should be removed from the presentence report"); *United States v. Willis*, 14 F.4th 170, 189-90 (2d Cir. 2021) (reversing sentence where district court failed to discuss how evidence met the preponderance standard).

KAPLAN HECKER & FINK LLP

charitable efforts." Ex. A, K. Cole Letter.  Barry Kringstein, a friend of Neil who has known him for over 40 years, agrees.  He writes in his letter that:

> Neil is, and always has been, a respected and well-liked individual within our community.  Whether it be through his philanthropic work for the Candie's Foundation or his leadership in the political arena, he consistently displays kindness, empathy, and dependability to those around him, and to those who seek his support and guidance.

Ex. J, B. Kringstein Letter.

Neil's commitment to helping others is perhaps best embodied by The Candie's Foundation, an organization he launched in 2001 to address the epidemic of teen pregnancy in the United States.  At that time, the United States had the second highest teen pregnancy rate in the industrialized world, with over 750,000 teens becoming pregnant each year.  Neil harnessed the celebrity relationships he'd built through licensing to create public service campaigns that young people noticed; the campaigns garnered billions of media impressions and, in addition to the in-school messaging presented by the Foundation's celebrity spokespeople, helped contribute to the historic decline of the United States's teen pregnancy rate by over 75%.  The former Director of The National Campaign for the Prevention of Teen Pregnancy called the Foundation's efforts "instrumental in reaching teens and young women with prevention messaging."  As Ms. Marder's letter explains, "[t]he Candie's Foundation was credited for being a large part of the reduction of the teen pregnancy rate in the United States" and is "one of the accomplishments Neil is most proud of in his long, storied career."  Ex. D, D. Marder Letter.  The importance of this work is further reflected in Governor Cuomo's letter of support: as he notes, Neil's "work in combating Teen Pregnancy with the Candie's Foundation was very important in reaching and communicating with teenagers of the devastating consequences of teen pregnancy."  Ex. B, Gov. Cuomo Letter.

The Candie's Foundation is only one of many examples of Neil's drive to help others.  As Neil's life-long friend Gregory Fisher makes clear, Neil's compassion and commitment to helping others began at a young age.  When Neil was seventeen, he and Mr. Fisher were driving home one night when they saw a young man lying unconscious beside his motorbike.  *See* Ex. K, G. Fisher Letter.  Without hesitation, Neil set out to find help and returned with a police car and ambulance. The young man who was injured spent four months in a coma and months later, would introduce Neil to his friends as the person who saved his life.  *Id.*

Mr. Fisher adds that Neil is someone who "acts unhesitatingly for those in need."  *Id.*  Neil has consistently harnessed his success in business to make significant philanthropic contributions to a variety of pressing issues—including HIV/AIDS research, youth incarceration, housing for homeless families and veterans, international disaster relief, children's healthcare, and support for cancer patients and survivors.  *See, e.g.*, Ex. A, K. Cole Letter; Ex. D, D. Marder letter; Ex. H, G. Eisenstein Letter; Ex. F, Y. Greenman Letter.  As Ms. Marder—again, one of Neil's longtime employees and friends—explained in her letter: "[w]hether it was donating thousands of pairs of jeans and footwear to Haiti after the devastating earthquake or organizing aid from the fashion industry after the heartbreaking tsunami in Thailand, Neil was always quick to respond to those in need around the world."  Ex. D, D. Marder Letter.

KAPLAN HECKER & FINK LLP

Ms. Marder also speaks to Neil's commitment in mentoring and nurturing students and employees, and there are many examples where Neil's passion for mentoring and passion for charity, have come together to create significant contributions to society. For example, Neil has donated both his time and financial resources to The SamFund, a not-for-profit that provides grants to young adult cancer survivors to support their personal, professional, and academic goals. As explained by Glen Eisenstein, the father of the SamFund's founder, Neil's substantial guidance on the charity's inaugural fundraiser was essential to the organization's success. *See* Ex. H, G. Eisenstein Letter. Mr. Eisenstein adds that The SamFund has "given away over $3,000,000 to thousands of young men and women . . . but without Neil's help, friendship and guidance we would never have made it to our first grant or scholarship." *Id.* Neil also served on the Advisory Board of Mount Sinai Adolescent Health Center for twelve years, working to raise funds and build awareness for the Center, including helping to expand care at Mt. Sinai Hospital's neonatal intensive care unit.

Finally, Neil's contributions are not limited to the private sphere. Governor Cuomo's letter speaks to some of the many positive contributions Neil has made in the public sphere. Governor Cuomo, who began working with Neil during his first administration, appointed Neil to the SAGE Commission, which was responsible for proposing structural and operational changes to state agencies in an effort to streamline, modernize, and reduce costs of government operations. *Id.* According to Governor Cuomo, Neil was also instrumental in helping New York State form the Women's Equality Party, "which was the first of its kind in our nation." *Id.*

Helping others has been a cornerstone of Neil's life. As those who know Neil best noted in their letters of support, there is no doubt that, notwithstanding Neil's conviction, he "will continue to positively contribute to society, furthering his mission of empowering and inspiring others." Ex. F, Y. Greenman Letter; *see also* Ex. H, G. Eisenstein Letter ("I believe from the bottom of my heart that given the opportunity [Neil] will continue to have a positive effect on so many others, and will remain a force able to do much good in the world."); Ex. A, K. Cole Letter ("I believe that he has the potential to continue making significant contributions to society, and the compassion[ate] approach would provide him with the [ability] to re build his life.").

## VI.    Looking Ahead to the Future

Neil is an unquestionably hard worker. The many letters in support submitted by family and friends, reflecting close personal and professional relationships that span decades, reveal a man who is dedicated to others. Whether that is his employees, *see, e.g.*, Ex. D, D. Marder Letter (explaining "how many loyal, longtime employees worked at Iconix and like me, stayed for decades, as they felt appreciated and challenged and part of something meaningful"), young aspiring business leaders, *see, e.g.*, Ex. L, G. Bader Letter ("The success of her line is based on her tremendous knowledge of marketing which much of was learned 'hands on' during her internship" at Iconix), or those most needy in our community, *see, e.g.*, Ex. I, S. Edelman Letter ("He showed me through his actions that I could use my power in the community to be a catalyst for positive change and to be philanthropic for a cause."), Neil always has time to help others, no matter the personal battles he's faced.

As he works to get back on his feet, and to recover physically, mentally, and financially from the tremendous toll of these criminal proceedings, Neil—never one for sitting idly by—looks

KAPLAN HECKER & FINK LLP

forward to the opportunity to once again build a business, support his colleagues, and work alongside his sons.

## ARGUMENT

**VII.   Neil Should Be Sentenced to Probation**

A.      Sentencing Analysis

While the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *Peugh v. United States*, 569 U.S. 530, 536 (2013), the resulting range is "not to be presumed reasonable," *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis omitted).  Rather, the Court must make an "individualized assessment," *Gall v. United States*, 552 U.S. 38, 50 (2007), to determine a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of the sentencing law as applied uniquely to Neil, *see* 18 U.S.C. § 3553(a) (providing relevant factors).  These considerations evaluate the circumstances of the offense in view of the characteristics of the defendant, and weigh the relative seriousness of the violation alongside the needed degree of deterrence and public protection in order to "provide just punishment." *See id.*

Moreover, as this Court is aware, the Guidelines are widely critiqued for using loss amount as a measure of culpability and the appropriate time to be served in cases of financial crime. *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) ("What drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss.  As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.").

For that reason, courts in this Circuit (including this Court) are often confronted with advisory Guidelines ranges far in excess of the sentences they ultimately issue in such cases.[9] *See, e.g.*, Sentencing Tr., *United States v. Thompson*, No. 19 Cr. 698 (ER), at 28-29 (S.D.N.Y. Feb. 4, 2021), ECF No. 49 (departing from Guidelines imprisonment range of 36 to 47 months to impose a sentence of time-served and three years' supervised release when "the fraud guidelines put entirely too much emphasis on the amount of the fraud"); *United States v. Gupta*, 904 F. Supp. 2d 349, 353, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (departing from Guidelines range of 78-97 months' imprisonment to impose a sentence of 24 months' imprisonment because the guidelines range—two-thirds of which is the product of the gain calculation—"does not rationally square with the facts of this case").

For the following reasons, we respectfully submit that this Court should sentence Neil to a sentence of probation.  Such a sentence, apart from avoiding unwarranted sentence disparities, *see*

---

[9] *See also* Daniel S. Guarnera, A Fatally Flawed Proxy:  The Role of "Intended Loss" in the U.S. Sentencing Guidelines for Fraud, 81 Mo. L. Rev. 715, 716 (2016) (citing Sentencing Commission finding that "judges depart from the economic crime Guidelines at higher rates than almost any other major Guidelines provision").

KAPLAN HECKER & FINK LLP

18 U.S.C. § 3553(a)(6), is "sufficient, but not greater than necessary" to meet the purposes of sentencing under 18 U.S.C. § 3553, in light of the grueling and devastating nature of the nearly eight years Neil has endured since his departure from Iconix.

B.      Calculation of the Sentencing Guidelines

In the Presentence Investigation Report ("PSR"), Probation calculated a guidelines imprisonment range of 78 to 97 months, based on a total offense level of 28 and Criminal History Category of I. PSR ¶ 111. Probation's calculation includes the parties' agreed-upon gain amount of $790,200. *Id.* ¶ 56. As the Court is aware, where loss cannot be easily determined, U.S.S.G. § 2B1.1 specifically approves "the use of a defendant's gains as an alternate measure of loss." *United States v. Zafar*, 291 F. App'x 425, 429 (2d Cir. 2008). Here, Neil and the government have agreed that loss cannot be easily determined and have instead, agreed to a gain calculation that focuses on Neil's October 31, 2014 sale of stock. PSR ¶ 44 & n.2. This agreed-upon calculation, which Probation has incorporated into the PSR, assumes that if the market knew, at the time of Neil's stock sale, that Iconix's revenue was inflated, the stock price would have been 2% lower. Accordingly, the calculation proceeds as follows:

- On October 31, 2014, Neil sold one million shares of Iconix stock at a price of $39.51 resulting in a total gain of $39,510,000 (before taxes).

- If the stock price had been 2% lower, the stock price at the point of sale would have been $38.72 instead, and the total gain from the sale would have been $38,719,800.

- The difference between those two scenarios is $790,200.00, representing the gain to Neil.

Pursuant to this calculation, the agreed-upon gain calculation in the PSR which, based on a gain of $790,200.00, results in a 14-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(H). *Id.* ¶ 56.

We otherwise agree with Probation's Guidelines calculation, except for the inclusion of a three-level enhancement pursuant to U.S.S.G. § 3B1.1(b) based on Neil's role as the CEO of Iconix and "the criminal activity involv[ing] five or more participants." *See* PSR ¶¶ 44, 59. Although the PSR does not identify the five individuals involved in criminal activity, we presume Probation refers to Neil, Seth Horowitz, Jason Rabin, Jared Margolis, and Ethan Cole. As the Court is aware, of these four individuals, only Mr. Horowitz was charged in connection with this case or worked for Iconix. Mr. Rabin and Mr. Margolis, who worked with GBG, testified at trial that they did not believe that they had committed any crimes in connection with the charged conduct, and both the testimony of Mr. Margolis and discovery material provided by the government made clear that Mr. Ethan Cole (another GBG employee) similarly maintained that he had not committed a crime. *See* Trial Tr. at 420, ECF No. 259; *id.* at 1814-15, ECF No. 273.

Moreover, to argue that Neil was involved in criminal activity involving five or more participants, is akin to saying that Neil conspired with five or more participants to commit the charged crimes—a theory that was flatly rejected by the jury that acquitted Neil of conspiracy to commit securities fraud in his first trial. ECF No. 141. Thus, since (1) Neil has been acquitted of conspiring to commit any crimes, (2) only one of the four individuals worked with Neil or under

KAPLAN HECKER & FINK LLP

Neil's supervision, and (3) only one individual possessed any criminal intent or was charged with engaging in criminal conduct, we respectfully object to the inclusion of the enhancement.

The PSR also indicates that the government may seek an adjustment to the sentencing guidelines for obstruction of justice based on Neil's testimony at trial. PSR ¶ 51; *id.* at 41. Probation has deferred to the Court on the question of whether to apply such an adjustment here. PSR ¶ 51. We respectfully submit that an enhancement for obstruction of justice is unwarranted in this case. The Application Notes to U.S.S.G. § 3C1.1 caution courts to view allegations that a criminal defendant made false statements in his own defense critically as inaccurate testimony may sometimes result from confusion, mistake, or faulty memory. *See* U.S.S.G. § 3C1.1, cmt. n. 2. We would ask that the Court proceed with such caution here, where Neil provided substantially the same evidence at two trials and the jury listening to Neil's testimony in his first trial voted to acquit him of the two-lead conspiracy charges, and did not convict on the remaining charges. Moreover, Rule 16 discovery material provided by counsel for the Special Committee of the Iconix Board of Directors to the government at the eleventh hour of Neil's second trial further demonstrated that Neil has been consistent with his understanding of the events since the beginning of these events. Accordingly, we respectfully request that the Court not impose a two-level enhancement pursuant to § 3C1.1.

Finally, though not incorporated into Probation's Guidelines calculation, the PSR acknowledges that a two-level decrease is warranted based on proposed U.S.S.G § 4C1.1. *See* PSR ¶ 128. The newly adopted Guidelines amendment—which will go into effect on November 1, 2023, unless it is rejected by Congress, and was recently voted by the Commission to be retroactive—provides a 2-level decrease for first time, nonviolent offenders, like Neil. The government does not contest that Neil satisfies the amendment's ten criteria and agrees that a downward variance is appropriate, despite that Neil will presumably be sentenced before the new amendment goes into effect. Courts have already begun crediting defendants with the two-level reduction, often with the government's agreement as here. *See, e.g., United States v. Soong*, No. 3:22-cr-00372-SI (N.D. Cal.), ECF Nos. 41-42; Sentencing Tr., *United States v. Buyer*, No. 22-cr-397-RMB, at 34-35 (S.D.N.Y. Sept. 19, 2023). We therefore request that the Court apply this 2-level decrease to Neil's offense level.

Considering this 2-level decrease and the lack of a role enhancement, we respectfully submit that the correct calculation is a total offense level of 23, which provides for a Guidelines range of 46 to 57 months.[10]

C.    Probation's Sentencing Recommendation

In this case, Probation recommends a downward variance from a Guidelines sentence, recommending a custodial sentence of 42 months on each count to run concurrently. PSR at 43.

Probation's recommendation of a downward variance is driven by the fact that Neil, "who is now in his mid-60s and suffers from serious health conditions, is a first-time offender who appears to have otherwise been a law-abiding and contributing member of society." *Id.* at 46.

---

[10] Although Probation noted that its sentence recommendation took the upcoming amendments to § 4C1.1 "into consideration," *See* PSR at 46, we respectfully urge the Court to calculate the Guidelines range to include the 2-level reduction.

KAPLAN HECKER & FINK LLP

Probation also notes that Neil "has the benefit of above-average educational and vocational skills, as well as strong family ties, all of which should assist with his successful reintegration into society following his release from custody." *Id.*

Although we agree with Probation that a downward variance is warranted here, we respectfully urge that a greater variance is warranted—one that results in a non-custodial sentence for Neil—in order to impose a sentence that would be "sufficient, but not greater than necessary" to achieve the purposes of the sentencing law. *See* 18 U.S.C. § 3553(a). First and foremost, Probation did not have the benefit of ████████████████████████████████████████ ████████████████████████ It is not uncommon for Probation to recommend, and a court to impose, a non-custodial or even time-served sentence when a defendant requires ███████████ ████████████████ *See, e.g.*, Sentencing Tr. at 22, 34-35, *United States v. Voudouris*, No. 18 Cr. 217 (KMW) (S.D.N.Y. Mar. 2, 2020), ECF. No. 292 (departing from Guidelines level of 23 and criminal history of I to adopt Probation's recommendation of a non-custodial sentence when defendant required treatment outside of BOP facility and BOP "may not be able to give [the defendant] the level of care" that she was currently receiving). Presumably, had Probation ██████████████████████████████████████████ ████████████████████████ its recommendation would have been lower.

Second, as noted above, the Guidelines ranges for financial crimes, such as this one, grossly overstate culpability by relying on loss amount, and as such, Probation's recommendation here varied from a presumably unreasonable starting point.

Third and finally, Probation's recommendation, of course, was based on a Guidelines calculation which included a three-level enhancement pursuant to U.S.S.G. § 3B1.1(b), which we believe to be unwarranted here. Thus, even putting Neil's serious and life-threatening health issues to the side, had Probation calculated Neil's total offense level to be 23, which would have also formally included and incorporated a two-point reduction pursuant to the first-time offender amendment, Probation's recommendation presumably would have been even lower.

D.     Section 3553(a) Factors

i.     *Neil's History and Characteristics*

(a)     A Non-Custodial Sentence ██████████████████████████ ████████████████████████████

███████████ That, in addition to his age and other serious health conditions, warrant significant weight in his request for a non-custodial sentence. Whether a formal departure under the Guidelines, *see* U.S.S.G. §§ 5H1.1, 5H1.4 (providing that a court may consider non-prison sentence given defendant's age or when defendant is "seriously infirm"), or a variance under the sentencing factors, *see* 18 U.S.C. § 3553(a)(2)(D) (court shall consider need to provide medical care "in the most effective manner"), courts often place great weight on a defendant's serious health issues when imposing a sentence of probation despite a significant Guidelines range. *See, e.g.*, *United States v. McFarlin*, 535 F.3d 808 (8th Cit. 2008) (upholding sentence of three years' probation for conspiracy to distribute cocaine, despite Guidelines range of 60 months, in light of

KAPLAN HECKER & FINK LLP

54-year-old defendant's serious health problems, including anxiety, depression, nervous disorders and heart disease); *see also United States v. Chase*, 560 F.3d 828, 831 (8th Cir. 2009) (remanding for resentencing when district court assumed no discretion to consider "advanced age" of sixty-three years and "health issues" as supporting potential downward variance, even if factors did not support formal departure).  This Court has also concluded that extenuating circumstances, such as the defendant's health, the risk of exposure to Covid-19, and the combination of these two risk factors, weigh in favor of a non-custodial sentence.  *United States v. Thompson*, No. 19-cr-698 (ER) (S.D.N.Y. Sept. 27, 2019).  In *Thompson*, the defendant, who held a position of trust, engaged in a scheme to defraud a company of more than $3 million in connection with a Bitcoin investment.  *Id.*, ECF No. 49 at 6.  Although the defendant's Guidelines range was 37 to 46 months' imprisonment, this Court imposed a sentence of time served and three years of supervised release in order to, *inter alia*, provide the defendant "needed medical care in the most effective manner."  *Id.* at 27.

These factors carry equal force here.



KAPLAN HECKER & FINK LLP

███████████████████████████████████████████████████████████████

Accordingly, we respectfully submit that a custodial sentence would unquestionably threaten Neil's health. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████

(b)      Neil's History and Characteristics Favor a Non-Custodial Sentence

Neil's history and characteristics are exclusively mitigating factors.

This is Neil's first encounter with the criminal justice system, making him a perfect candidate for a downward variance under § 4C1.1, as argued above. We urge the Court to consider that Neil's hard work in building Iconix was commendable and productive. As described by his long-term business partner, Ms. Marder, employees of Iconix often stayed with the company "for decades, as they felt appreciated and challenged and part of something meaningful," due to Neil's leadership. Ex. D, D. Marder Letter. Neil's dedication to his employees' success was not limited to long-term employees, however. Neil often lent significant time to mentoring young business leaders, both within Iconix, *see id.*, and beyond, *see* Ex. H, G. Eisenstein Letter. And as described in detail above, Neil has, throughout his life, been committed to helping others, including through his support of philanthropic causes, tackling issues ranging from children's healthcare to teen pregnancy prevention though the Candie's Foundation—an organization that Neil founded and dedicated so much of himself to. Neil's commitment to philanthropic work fully supports that Neil would continue to make these significant contributions to society in the years ahead.

In similar cases, courts have found such charitable contributions to warrant downward variances in sentencing. *See, e.g.*, *United States v. Tomko*, 562 F.3d 558, 571 (3d Cir. 2009) (varying downward from guidelines range to impose a non-custodial sentence after taking into account the defendant's "negligible criminal history, his employment record, his community ties, and *his extensive charitable works*," including charitable acts "that involved not only money, but also his personal time"); *U.S. v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming 6-level downward departure based on extraordinary public service and good works where defendant, more than twenty years before sentencing, served in Marine Corps' active reserves and as a volunteer firefighter, and more recently had acted as Good Samaritan demonstrating his commitment to helping persons in distress was an instinctive part of his character.)

As in *Tomko*, Neil has made extensive positive contributions "that involved not only money, but also his personal time," *Tomko*, 562 F.3d 558 at 571, as evident from Neil's countless hours of work founding and running the Candie's Foundation; his work supporting The SamFund, including meeting with Mr. Eisentein's daughter to give her advice and support in planning the organization's first fundraiser, Ex. H, G. Eisenstein Letter, and his work supporting and mentoring young business leaders. *See, e.g.*, Ex. I, S. Edelman Letter (describing how Neil helped Mr. Edelman's son at a time that he was at a "loss as to the direction of his career"). And as in *Canova*,

Neil has often acted as a "Good Samaritan." As evident by Mr. Fisher's letter who recounts the day that Neil and Mr. Fisher drove by a man lying unconscious on his bike, and Neil acted quickly to get the young man what turned out to be life-saving help. *See* Ex. K, G. Fisher Letter.  Dr. Howard shared a similar story in his letter of support, describing how Neil supported Dr. Howard ███████████████████████ which left Dr. Howard feeling appreciative for how Neil handled "every step of that situation," and "overwhelmed by the loyalty and care [Neil] demonstrated." Ex. G, L. Howard Letter.

These commendable characteristics are reflected in every stage of Neil's life. ███ ██████████████████████████████████ to striking out on his own from the family business ███████████████████████ Neil's history reveals a hard worker who is dedicated to bettering his community, supporting his family, and achieving the best for his employees.  Indeed, the person who emerges from the accounts of his family, friends, and professional acquaintances is the polar opposite of the potential recidivist for whom sentences of incarceration are appropriate.  *See United States v. Knights*, 534 U.S. 112, 119 (2001) (defining the "two primary goals" of probation as "rehabilitation and protecting society from future criminal violations").

ii.   *The Nature and Circumstances of the Offense*

Neil fully understands the importance of accurately reporting financial terms to the SEC and public, and the seriousness of failing to fully and accurately report such terms.  To wit, Neil had served as the CEO of public companies for many years before the two transactions at issue here.  We respectfully submit that the nature and circumstances of this particular offense militate in favor of a non-custodial sentence.

This was not a wide-ranging, years-long scheme that resulted in millions of dollars in gain to Neil, or significant losses to any victims.  Rather, the two transactions—SEA-2 and SEA-3— which occurred months apart, formed a small part of Iconix's total revenue for 2014 of $461,243,000.  *See* Trial Tr. at 148-49.  Neither the $5 million in inflated revenue for SEA-2 nor the $6 million for SEA-3 was necessary for Iconix to meet its consensus projections for 2014.  Trial Tr. at 2318-19, 2335-37.  As the government agrees, these transactions likely resulted in only a 2% increase to Iconix's stock price, ultimately leading to a less than $800,000 gain for Neil. While such numbers are not negligible, they pale in comparison to more extensive criminal conduct prosecuted in recent years.  *See, e.g.*, Sentencing Tr., *United States v. Moseley*, No. 1:16-cr-00079-ER (S.D.N.Y. June 12, 2018), ECF No. 187 (120 months' imprisonment for decade-long pay-day lending fraud scheme with hundreds of thousands of victims).

That these two transactions are not representative of Neil's tenure as CEO of Iconix is clear from reading the letter of Cliff Greenberg, a Portfolio Manager at Baron Capital, who invested in Iconix early in its development and held a significant investment in the stock for over a decade. Ex. N, C. Greenberg Letter.  As Mr. Greenberg notes:

> As a large shareholder of Iconix, I believe I got to know Neil very well.  I hold him in high regard, as an innovative and thoughtful entrepreneur, as an accomplished businessperson who was always open and direct with his investors, and someone who Wall Street, and I, rightfully considered a trailblazer.

KAPLAN HECKER & FINK LLP

*Id.* Mr. Greenberg, who over the years has become close friends with Neil, describes Neil as a "good man" who has "made real contributions in business, family, and society" and has "more to give." *Id.* The person Mr. Greenberg describes is much more than these two transactions.

Finally, while hindsight can be 20/20, it is important to recall the testimony of those who participated in those transactions at the time. Mr. Rabin and Mr. Margolis, the two GBG executives involved in these transactions, both testified at Neil's trials, under oath and pursuant to an immunity order, that they did not believe that they had committed any crimes in connection with these ventures.[11] The government said to the jury that they testified truthfully. And of course, they were never even charged with any offense. This context is important to understand what Neil was thinking at the time.

Thus, we respectfully submit that the nature and circumstances of the offense do not outweigh the seriousness of the ████████ that Neil is facing, or the many consequences that Neil has endured since 2015. *See, e.g.*, *Thompson*, ECF No. 49 at 28-31.

### iii.    *The Need to Avoid Unwarranted Sentencing Disparities*

Sentencing Neil to probation would also serve the need to avoid unwarranted sentence disparities. *See* 18 U.S.C. § 3553(a)(6). Although the government contends that at least five people engaged in this criminal "scheme," only Neil faces the threat of incarceration or financial penalties. No GBG participants—without whom the transactions could not have occurred—were charged by the government. Rather, Mr. Rabin and Mr. Margolis were swiftly granted immunity, even though they continued to maintain on the stand under oath that they did not believe they had done anything wrong. Mr. Ethan Cole was not even called as a witness and will similarly never face punishment. Mr. Rabin, Mr. Margolis, and Mr. Ethan Cole have not faced any of the consequences that Neil has already had to face to date. None have lost their careers, jobs, or reputations as Neil has. None have had to stand trial, once, let alone twice. None have had to watch their family endure the challenges of supporting a loved one through two trials.

And Mr. Horowitz, the principal negotiator of the two deals at issue, and the only individual to be charged alongside Neil, will likely receive no period of incarceration.

Accordingly, we respectfully submit that the need to avoid unwarranted sentencing disparities weighs heavily in favor of a non-custodial sentence.

### iv.    *Providing Just Punishment*

The remaining sentencing factors—including the need to "provide just punishment for the offense" in view of its relative seriousness and the necessary degrees of deterrence and public protection—similarly point in favor of a sentence of probation.

---

[11] *See* Trial Tr. at 420, ECF No. 259 (Rabin Cross examination: Mr. Markus: "And so that we are crystal clear with the jury, you don't believe you have committed a crime with SEA-1, SEA-2, or SEA-3; correct?" Mr. Rabin: "Correct." Mr. Markus: "And you don't believe you have committed any crimes with Neil Cole, correct?" Mr. Rabin: "Correct."); Trial Tr. at 1815, ECF No. 273 (Mr. Margolis: "I never thought that [Ethan Cole] was doing anything wrong, and I never thought I was doing anything wrong.").

KAPLAN HECKER & FINK LLP

The imposition of probation alone is a serious punishment. *See Blanton v. City of N. Las Vegas, Nev.*, 489 U.S. 538, 542 (1989) ("Penalties such as probation or a fine may engender a significant infringement of personal freedom . . . ." (internal quotation marks and citation omitted)). Neil's punishment does not begin when the Court imposes its sentence. As detailed above, Neil has endured eight years of losing the business he built (including losing approximately $150 million worth of Iconix stock that he owned and having already returned approximately $8 million to Iconix following the company's decision to restate its financial statements), becoming estranged from his soon-to-be ex-wife, ███████████████████████████████████ ████████████████████ Paired with these other crushing consequences Neil has suffered, a sentence of probation, along with any forfeiture amount that Neil may have to pay, reflect the seriousness of the offense and serve the need for just punishment.[12] Someone in Neil's shoes—for whom their company, their family, and their reputation are everything—would be substantially deterred by these penalties. *See, e.g.*, *Thompson*, ECF No. 49 at 31 (considering "the residual and other challenges that [the defendant] has to deal with in terms of the arbitrations, and the civil matters, et cetera, that, in total, constitutes a series of ramifications that do serve as a general deterrence for anyone who might consider that it would be worth to engage in [commodities fraud]").

There can also be no serious concern that Neil is at risk for reoffending. Not only was Neil a law-abiding citizen before this conviction, but he was an upstanding citizen, admired by friends, business associates, and family alike. He inspired others with his extensive philanthropy, *see* Ex. I, S. Edelman Letter, and always "prioritized the care of others," Ex. A, K. Cole Letter. Given his age, the fact that he will likely not lead a public company again, and his extensive support network as reflected in the numerous letters of support, there is no doubt that Neil's first offense is his last offense, and thus a more punitive punishment is not needed to "protect the public from further crimes." 18 U.S.C. § 3553(a)(2)(C).

## VIII.  Restitution

The PSR reports that Iconix, in advance of Neil's sentencing, has submitted a victim impact statement which includes a request for restitution in the amount of at least $135 million. PSR at 44. Put bluntly, that request from Iconix's billionaire owners, who purchased Iconix for pennies on the dollar, is preposterous.

Notably, Iconix filed its victim impact statement during what had been financial negotiations aimed at potentially settling a dispute relating to Neil's legal fees from his first and second trial. During these negotiations, Iconix tied its decision to file the victim impact statement to its dissatisfaction with Neil's settlement offer. Neil offered Iconix $4 million to settle the ongoing dispute. In making that offer, Neil was effectively agreeing to release Iconix of its obligation to reimburse him for the costs of his second trial and his appeal (which he has paid out of pocket, even though Iconix remains obligated to advance those costs). Iconix rejected that substantial offer, however, and tried to leverage the threat of filing a victim impact statement into a higher one: it told Neil's counsel that the Company was looking for "an offer above $4 million," and made clear that, if its demands were not met, the Company would file its letter with Probation.

---

[12] We agree with Probation's recommendation that "in light of the outstanding restitution and forfeiture orders which will serve to disgorge [Neil] of the ill-gotten gains derived from the offense, we recommend that the fine in this case be waived." PSR at 51.

KAPLAN HECKER & FINK LLP

Neil declined to increase his substantial offer, at which point, Iconix, as threatened, filed its Impact Statement advocating that Neil receive a "significant period of incarceration."

Iconix's unseemly attempt to seek a windfall for harms they did not suffer at the expense of Neil's liberty is disturbing, to say the least.  It is also not surprising: Iconix has long done everything in its power to disadvantage Neil's defense over the past several years.  For example, Iconix has repeatedly and unlawfully failed to meet its obligation to advance Neil's legal fees.  During Neil's first trial, in which he was acquitted of two counts of conspiracy (the main counts and the only two on which the jury reached a verdict), Iconix stopped paying Neil's legal fees and had to be ordered by a New York state court to comply with its obligations.  *See* Prelim. Injunction Hr'g Tr. at 30–39, *Cole v. Iconix Brand Group, Inc.*, No. 655837/2021 (N.Y. Sup. Ct. Oct. 25, 2021).[13]  And as the Court is aware, Neil tried for years to obtain records from his interviews (and those of Seth Horowitz) with the Iconix Special Committee, in order to corroborate his version of events, only for Iconix to deny those requests repeatedly before providing that same requested information to the government during Neil's second trial—specifically, the night before Neil was to be cross-examined by the government.

Nevertheless, Iconix's attempt to turn what is, at bottom, a contractual dispute between Neil and Iconix into a windfall through a dubious claim for restitution, fails as a matter of law.  Restitution is neither mandatory under the Mandatory Victims Restitution Act (MRVA) nor discretionary under the Victim and Witness Restitution Act (VWRA) in this case.  *United States v. Petit*, 541 F. Supp. 3d 304, 306-08 (S.D.N.Y. 2021) (Rakoff, J.) (holding neither the MRVA nor the VWRA authorizes restitution for Title 15 offenses).  And it should not be ordered as a condition of supervised release under 18 U.S.C. § 3563(b)(2), because Iconix is not a "victim" for purposes of restitution.

The restitution statutes define a "victim" as

a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2); 18 U.S.C. § 3663(a)(2).

In *United States v. Petit*, Judge Rakoff concluded that this definition did not apply to a company seeking restitution from employees convicted of Title 15 securities fraud offenses.  541 F. Supp. 3d at 306-07.  Echoing reasoning provided by Judge Oetken in a similar case, Judge Rakoff held that the company was not entitled to restitution because:

The defendants' criminal actions were within the scope of their employment and designed to benefit [the company]. Although they were undoubtedly also motivated by personal financial gain, "such gain was a function of anticipated gain by the company. Indeed, the direct and proximate effect of their conduct was to inflate [the company's] share price.

---

[13] Iconix also failed to timely pay Neil's prior counsel and refused to pay prior counsel for his retrial forcing Neil to obtain new counsel for his second trial.

KAPLAN HECKER & FINK LLP

23

That benefit was short-lived, of course, but only because [their] fraud and the problematic accounting [was eventually discovered].

*Id.* at 310 (quoting *United States v. Block*, No. 16-cr-595 (JPO), 2018 WL 722854, *3 (S.D.N.Y. Feb. 6, 2018)).  Under normal *respondeat superior* principles, Judge Rakoff reasoned, this made the company equally responsible for the defendants' conduct—not a victim of it.  *Id.*

Here, Neil's alleged actions were also within the scope of his employment and designed to benefit Iconix.  Any personal gain he anticipated "was a function of anticipated gain by the company."  *Id.*  And "the direct and proximate effect of [his] conduct was to inflate [Iconix's] share price."  *Id.*  Thus, Iconix is not a victim eligible for restitution.

Additionally, even if Iconix *were* a victim, it improperly seeks restitution for non-compensable expenses.  Iconix seeks a staggering $135 million, including "loss to the value of the business" and "legal fees and expenses incurred related to participation in the government investigations and prosecution of Mr. Cole's misconduct."  PSR at 44.  However, this amount appears to include legal costs associated with solely internal or SEC investigations—which are not eligible for restitution under the major restitution statute.  *United States v. Afriyie*, 27 F.4th 161, 171 (2d Cir.), *cert. denied*, 143 S. Ct. 326 (2022) (no restitution under the MRVA for costs "arising from private investigations and civil proceedings"); *Lagos v. United States*, 138 S. Ct. 1684, 1690 (2018) (restitution under the MRVA "does not cover the costs of a private investigation that the victim chooses on its own to conduct").  And, as noted in Neil's objections to the draft PSR, Neil cannot fairly be held to have "proximately caused," Charles Alan Wright et al., 3 Fed. Prac. & Proc. Crim. § 546 (5th ed. 2023), the current value of the business a decade after he left—especially a decade in which:

1) the marketing and licensing field experienced a sea change, with the rise of social media platforms like Instagram and TikTok, in addition to a global pandemic;[14]

2) Iconix shareholders were made whole through a $6 million settlement agreement in 2019;[15]

3) Iconix itself was sold in a go-private transaction for pennies on the dollar, a price which clearly incorporated the company's ongoing legal and financial obligations;[16] and

4) Neil already attempted to settle with Iconix in civil court, to the tune of millions of dollars.

At this point, the restitution Iconix seeks would merely provide a windfall to the company's new owners.  But restitution "cannot award the victim 'a windfall,' *i.e.*, more in restitution than he

---

[14] Kalley Huang, Isabella Simonetti & Tiffany Hsu, *TikTok Builds Itself Into an Ads Juggernaut*, N.Y. Times (Nov. 14, 2022), https://www.nytimes.com/2022/11/14/technology/tiktok-ads-social-media.html; Jenna Wortham, *On Instagram, a Thriving Bazaar Taps a Big Market*, N.Y. Times (Dec. 14, 2012), https://www.nytimes.com/2012/12/15/technology/on-instagram-a-thriving-bazaar-taps-a-big-market.html.

[15] Stipulation of Settlement and Release, *In re Iconix Brand Group, Inc.*, No.1:15-cv-04860-PGG (S.D.N.Y.), ECF No. 147; *id.*, Final Judgment, ECF No. 171.

[16] Jean E. Palmieri, *Iconix Completes Deal to Go Private*, Women's Wear Daily (Aug. 2, 2021), https://wwd.com/feature/iconix-completes-deal-to-go-private-lancer-1234891840/.

KAPLAN HECKER & FINK LLP

actually lost." *United States v. Boccagna*, 450 F.3d 107, 117 (2d Cir. 2006). Thus, the restitution Iconix seeks is inappropriate here.

## IX.    Forfeiture

The indictment in this case contains a forfeiture allegation which provides that:

> As a result of committing one or more of the offenses charged in Counts One through Nine of this Indictment, Neil Cole, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 98l(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendant personally obtained.

Indictment ¶ 64, ECF No. 1.

In connection with calculating the appropriate sentencing guidelines calculation, Neil and the government agreed that loss from the offense could not be easily determined and used the gain to Neil as an alternate measure. *See supra* at Section VII.B. Focusing on Neil's stock sale from October 2014, the parties agreed that the gain to Neil was $790,200.00. To the extent that the Court orders forfeiture, we respectfully request that this calculated gain should serve as a cap to such an order.

Neil will also pay a fine to the SEC in connection with the parallel civil case, *see SEC v. Cole*, No. 19-cv-11148-JPC (S.D.N.Y.). We respectfully request that any forfeiture amount ordered to be paid in this case be offset against any monetary penalty Neil is ordered to pay in that case.

## X.    Conclusion

Neil stands before this Court to be sentenced based on events stemming from two transactions that occurred almost a decade ago. Neil has led a life full of positive contributions that more fully define him as a person than these two transactions. Neil has already lost so much since 2014—his marriage, the business he created and loved, his reputation. These consequences, along with any forfeiture amount the Court may impose, are sufficient to meet the purposes of sentencing, and more restrictive sanctions would be greater than necessary under the law.

Moreover, in the years since 2014, Neil has seen his ████████████████████

KAPLAN HECKER & FINK LLP

████ and the price Neil has already paid, and continues to pay in connection with the offense conduct, we respectfully request that the Court sentence Neil to a term of probation.[17]

Respectfully submitted,

Sean Hecker
Jenna M. Dabbs
Jeffrey Then
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
jthen@kaplanhecker.com

David Oscar Markus*
A. Margot Moss*
MARKUS/MOSS PLLC
40 NW 3rd Street, PH 1
Miami, Florida 33128
Telephone: (305) 379-6667
dmarkus@markuslaw.com
mmoss@markuslaw.com

*Attorneys for Neil Cole*

*\*Admitted pro hac vice*

---

[17] As the parties indicated in their joint letter, dated February 28, 2023, should the Court sentence Neil to a period of confinement, the parties will request following sentencing that the Court continue Neil's release on bail pending appeal.  ECF No. 290.