

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 4, 2023

**VIA ECF**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

    Re:    *United States* v. *Neil Cole*, 19 Cr. 869 (ER)

Dear Judge Ramos:

    The Government respectfully writes in advance of the sentencing of defendant Neil Cole, scheduled for October 10, 2023, at 4 p.m., and in response to Cole's sentencing submission dated September 27, 2023 ("Def. Mem.").

    The Government respectfully submits that Cole's U.S. Sentencing Guidelines range is 78 to 97 months' imprisonment, and that a sentence within that Guidelines range would be sufficient but not greater than necessary in this matter in light of (a) the calculated, long-running, and sophisticated nature of Cole's fraudulent scheme; (b) Cole's abuse of his position of trust as the powerful CEO of a publicly traded, multi-billion dollar company; (c) Cole's leadership role in the scheme; (d) the importance of general deterrence in corporate fraud cases involving criminal conduct by high-ranking executives; and (e) Cole's perjurious testimony over the course of two trials, along with other behavior demonstrating a complete failure to accept any responsibility for his conduct.

    Cole's request for a probationary sentence—more than six years below the bottom end of the applicable Guidelines range—cannot be squared with the Court's obligation to impose a sentence sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct.

    **A.**    **Offense Conduct**

    From 2005 to 2015, Neil Cole served as the Chief Executive Officer of Iconix Brand Group ("Iconix"). Prior to that time period, Cole served as an executive at Iconix's predecessor companies. Iconix managed various clothing and fashion brands, typically by acquiring the rights to the brand name and then licensing those brands to retailers, wholesalers, and suppliers, who, in turn, produced and sold clothing and other products to retail customers. Iconix's shares traded publicly on the Nasdaq stock exchange.

As a publicly traded company, Iconix periodically filed disclosures with the U.S. Securities and Exchange Commission. Iconix's filings reported quarterly and annual revenue and earnings per share ("EPS"), among other information, which Cole certified as accurate. (*See, e.g.*, GX 103-A & B (2Q 2014 8K certifications); GX 105-A & B (3Q 2014 8K certifications); GX 107-A & B (2014 10K certifications)). Iconix executives, including Cole, publicly emphasized revenue and EPS as the principal metrics demonstrating Iconix's growth. Cole and his fellow executives also touted Iconix's consistent record of revenue and earnings growth and of meeting or exceeding Wall Street analyst consensus with respect to these metrics. (*See, e.g.*, GX-100, GX-104, GX-106 (press releases)).

Iconix used joint ventures ("JVs") to profit from its brands in foreign markets. In a typical JV arrangement, Iconix created a subsidiary, transferred ownership of a trademark or brand to that subsidiary, and then transformed the subsidiary into a JV by selling a 50 percent ownership interest in the JV to another business pursuant to a joint venture agreement. As part of the JV agreements, each JV partner was generally entitled to 50 percent of the JV's licensing revenue. From an accounting perspective, when Iconix entered into a JV, Iconix recognized as revenue the purchase price paid to Iconix by the JV partner, less Iconix's cost basis in the trademarks. Accordingly, the higher the price paid to Iconix by the JV partner, the more revenue Iconix could report on its financial statements.

From 2014 to 2015, Cole engaged in a scheme to falsely inflate Iconix's reported revenue and EPS by inducing a Hong Kong-based JV partner, Global Brands Group Asia Limited ("GBG"), to purchase JV interests at artificially inflated prices based on Cole's promise to reimburse GBG for the overpayments. Each of these JV agreements involved a fraudulent "round trip" transaction, lacking in economic substance, in which GBG paid an artificially inflated buy-in purchase price for its interest in the JV, in exchange for Cole's agreement that Iconix would give back the inflated portion of the purchase price to GBG. Cole—who had previously received a presentation from Iconix auditors about "round tripping"—knew that these arrangements were improper (*see, e.g.*, Second Trial Tr. 1000 (Cole)), and he hid the inflated purchase prices and offsetting round-trip payments from Iconix's lawyers and outside auditors.

Specifically, Cole arranged for Iconix to enter into JVs with GBG that included inflated buy-in purchase prices on multiple occasions relating to a joint venture in Southeast Asia, including the Southeast Asia first amendment, which closed on or about June 30, 2014 ("SEA-2"), and the Southeast Asia second amendment, which closed on or about September 17, 2014 ("SEA-3") (collectively, the "SEA JVs"). (*See, e.g.*, Second Trial Tr. 652 (Horowitz: the deal price "went up in that fashion because we had agreed to give the $5 million back to GBG in the future"); Second Trial Tr. 816 (Horowitz: "GBG had a financial commitment of $6 million in guaranteed minimum royalties that we would let them out of in exchange for the inflated price"); Second Trial Tr. 406 (Rabin: "Neil said if I raised the price by $5 million, we could bill it back for marketing."); Second Trial Tr. 1710 (Margolis: Rabin said the SEA-2 deal price jump up by $5 million because "we would get the money back" from Iconix)). Cole conducted that scheme with the knowledge and assistance of Seth Horowitz, who served under Cole as chief operating officer of Iconix, and with the aid of executives at GBG. Cole and Horowitz executed the scheme so that Iconix could hit its financial targets, such as Wall Street's expectations about the company's quarterly EPS and

revenue results. (*See* Second Trial Tr. 651 (Horowitz: "We inflated the prices of the joint ventures with promises of givebacks in order to hit our financial goals.")).

The government also introduced evidence that Cole and his collaborators in fact sent the money back—as promised—for SEA-2. In that transaction, Cole approved $5 million in roundtrip payments disguised as payments for marketing expenses. (*See* Second Trial Tr. 800 (Horowitz: "These invoices were just a cover, something to pass a sniff test, in order to get the money back to GBG for the June joint venture."); 416 (Rabin)). But marketing expenses were supposed to be borne by the JV itself and not by Iconix. In order to hide the fraudulent nature of the $5 million roundtrip payment, Cole used sham marketing invoices in amounts that, in the words of the Iconix employee who actually performed the marketing work reflected in the sham invoices, were "utterly, utterly out of keeping" and "ludicrously out of whack" with the value of the work. (*See* Second Trial Tr. 1623 (Laramy-Binks)). And the government introduced evidence that Cole, Horowitz, and their GBG conspirators explored still further ways to return the SEA-3 overpayment, including by excusing millions of dollars in royalty payments (*see* Second Trial Tr. 415 (Rabin)), or by hiding the payment in a joint venture relating to the Middle East and North Africa, (*see* Second Trial Tr. 985 (Horowitz), 2556 (Cole)). Cole's actions with respect to SEA-2 and SEA-3 had a material impact on the accounting and Iconix's auditor would have wanted to know about them before reviewing Iconix's financial statements. (*See* Second Trial Tr. 2017-20, 2027, 2041-42, 2049 (Shapiro)).

In late 2014 and early 2015, the SEC Division of Corporation Finance ("Corp Fin") inquired of Iconix about its accounting treatment for the formation of certain Iconix international JVs, including the SEA JVs. Cole panicked when Iconix received the Corp Fin inquiry because he believed it could reveal his accounting fraud scheme, and he planned to engage in a further cover up of his crimes. Horowitz testified about how Cole said he planned to lie to government regulators even if Horowitz came clean:

> Neil would threaten me that my career was over and that I would no longer be able to work at a public company. He said something to the effect that he knew about the transactions but that he could pass a lie detector test saying he didn't but he knew I could too, essentially building a he-said-versus-he-said scenario.

(Second Trial Tr. 994). Around this time, Cole also began speaking about using other Iconix employees as "fall guys" for his misconduct. (Second Trial Tr. 1006).

Although the SEC directed Iconix to disclose to the SEC the "business purpose" and material terms of the SEA JVs, Cole intentionally and falsely omitted from an Iconix response letter to the SEC that GBG had agreed to inflate the purchase prices for SEA-2 and SEA-3 by $5 million and $6 million, respectively, in exchange for Cole's secret agreement that Iconix would reimburse GBG for these overpayments. (Second Trial Tr. 1000, 1009-12 (Horowitz)).

### B.  Arrest, Charge, and Conviction

On December 4, 2019, a grand jury returned an indictment charging Cole in ten counts (the "Indictment"). The Indictment charged Cole with one count of conspiracy to commit securities

fraud, make false filings with the SEC, and improperly influence the conduct of audits; one count of securities fraud; six counts of making false filings with the SEC; one count of improperly influencing the conduct of audits; and one count of conspiracy to destroy, alter, and falsify records in federal investigations.

Cole initially proceeded to trial on September 30, 2021. After approximately one month of evidence, argument, and deliberations, the jury failed to reach a unanimous verdict on the eight substantive counts in the Indictment (Counts Two through Nine), and acquitted Cole on the two charged conspiracy counts (Counts One and Ten).

Cole's retrial on Counts Two through Nine began on October 31, 2022. On November 23, 2022, the jury returned a verdict of guilty on each remaining count of the Indictment.

### C. The Presentence Investigation Report and the Applicable Guidelines Range

The U.S. Probation Office ("Probation") prepared a presentence investigation report and filed the final version on September 12, 2023. Cole refused to discuss the offense conduct with Probation. (PSR ¶ 52). In the PSR, Probation calculates the applicable Guidelines to be 78 to 97 months' imprisonment, based upon an offense level of 28 and a criminal history category of I. (PSR ¶ 111). Probation arrives at the offense level of 28 by (a) assigning a base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1)(A); by increasing the offense level by 14, pursuant to U.S.S.G. § 2B1.1(b)(1)(H), to reflect the gain to the defendant from the offense, which the parties agree to be approximately $790,200; by further increasing the offense level by 4, pursuant to U.S.S.G. § 2B1.1(b)(20)(A)(i), to reflect that the defendant committed the offense while an officer of a public company; and by adjusting the offense level upward by 3, pursuant to U.S.S.G. § 3B1.1(b), to reflect the defendant's role as a manager or supervisor (but not an organizer or leader) of the offense, which involved five or more participants or was otherwise extensive. As discussed below, the Government agrees that the Guidelines range applicable to the defendant's offenses is 78 to 97 months' imprisonment, but reaches that range through a slightly different calculation.

Probation recommends the defendant receive a 42-month term of imprisonment. Probation explains its recommendation as a balance of considerations, such as Cole's role "as a leader in an extensive and sophisticated fraud scheme," the fact he "admittedly personally profited" from the scheme, presumably committed the offense "out of pure greed," is a "first-time offender who appears to have otherwise been a law-abiding and contributing member of society," and suffers from "serious health conditions." (*See* PSR at 46).

### D. Discussion

Under the factors set forth in Title 18, United States Code, Section 3553(a), the Government respectfully submits that a sentence of imprisonment within the Guidelines range of 78 to 97 months would be sufficient but not greater than necessary to comply with the purposes of sentencing, particularly in light of the seriousness of the offense and the need to promote general deterrence. Such a sentence would fairly balance the needs to punish Cole for his misconduct and to deter others from following his example, while recognizing Cole's personal health circumstances and civic works.

#### 1. Guidelines

The Government submits that the applicable Guidelines range is 78 to 97 months' imprisonment. Much of the underlying calculation for that range is undisputed. The parties and probation agree that the base offense level is 7, the level is increased by 14 points to reflect gain, and the level is further increased by 4 points to reflect Cole committed the offense as an officer and director of a public company. (*See* Cole Mem. 14; PSR ¶¶ 55-57). The parties and Probation also agree that Cole will satisfy the requirements for a two-level decrease set forth in proposed amendment U.S.S.G. § 4C1.1, which operates to reduce a defendant's offense level by 2 points when the defendant is a person: (1) with no criminal history points; (2) who did not receive a terrorism enhancement, (3) who did not use violence or threats of violence, (4) who did not cause death or serious injury, (5) who did not commit a sex offense, (6) who did not cause any victim substantial financial hardship, (7) who did not possess or use a firearm or deadly weapon, (8) who did not violate a victim's civil rights, (9) who did not commit a hate crime, and (10) who did not receive a role adjustment. The Government does not contest that Cole meets all the required criteria. Cole asks for the Court to apply the two-level reduction now, even though the amendment will not take effect until after Cole's sentencing. The Government does not oppose the request, provided that Cole's counsel confirm, on the record, that the defense will not later seek a sentencing reduction pursuant to 18 U.S.C. § 3582 on the basis of the amendment.

However, the parties disagree about the applicability of enhancements for a leadership role and obstruction of justice. For the reasons discussed below, the Government submits that both enhancements are warranted.

##### a. Leader/Organizer Enhancement

The Government submits that Probation properly included a three-level role enhancement under U.S.S.G. § 3B1.1 based on the fact that Cole was a "manager or supervisor" of criminal activity "involved five or more participants or was otherwise extensive." The Application Notes to that section make clear that a "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 Application Note 1. The Application Notes also state that "[i]in assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered," and thus "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1 Application Note 3.

The trial evidence amply supports the application of the enhancement. Seth Horowitz testified about how Neil Cole negotiated inflated deal prices in exchange for secret givebacks with Jason Rabin, and how Horowitz, Margolis, and Ethan Cole carried out lower-level tasks in furtherance the scheme such as assembling supporting documents the sham invoices used to cover up a roundtrip payment to GBG. (Second Trial Tr. 992 (Horowitz: "I was not the driver of these joint ventures. I had never done a joint venture. Neil was giving me guidance on every negotiating point of these joint ventures."), 781 (Horowitz: describing meeting with Cole, Rabin, Margolis), 961 (Horowitz: "Ethan Cole showed up at the Iconix office. He handed me two relatively large folders full of invoices and backup. He said something to the effect of, we don't care which ones you pay. Just pay us."). Rabin and Margolis corroborated that testimony. (Second Trial Tr. 406 (Rabin: "Neil said if I raised the price by $5 million, we could bill it back for marketing."), 1710 (Margolis: Rabin relayed that Cole had promised GBG would "get the money back" for the SEA-2 overpayment)).

Cole opposes the enhancement. As a factual argument, Cole contends that most of the other participants in the scheme—Rabin, Margolis, Ethan Cole—"did not believe that they had committed any crimes in connection with the charged conduct." (Def. Mem. 14). However, the trial evidence amply demonstrates that those other participants knowingly assisted Cole in inflating the SEA JV payments to Iconix in furtherance of the scheme. (Second Trial Tr. 799-800, 887-89 (Horowitz)). In any event, the enhancement does not even require the involvement of five or more knowing participants if the fraud is also "otherwise extensive," as it was here. *United States v. Chacko*, 169 F.3d 140, 151 (2d Cir. 1999) (in applying leadership enhancement based on involvement of unknowing participants in the offense, "the district court need only state the general identity of the unknowing participants (or category thereof, in instances where numerous institutional employees were indiscriminately drawn into the scheme) and the basic tasks which these participants unwittingly conducted for the organization"). Here, Cole's scheme used the "unknowing services of many outsiders" such as Iconix employees Justin Abrahamson, Marcia McMclaughlin, Jason Schaefer, Lauren Gee, Daisy Laramy-Binks, and others. (Second Trial Tr. 280-87 (Schaefer: discussing revision of deal documents), 1520, 1525-26 (McLaughlin: discussing how Abrahamson would have given McLaughlin directions about accounting classifications of marketing giveback payments); GX 1145 (email from Ethan Cole to Laramy-Binks, copying Margolis, asking Laramy-Binks for supporting documentation for sham invoices); GX 1210 (email from Lauren Gee about updating SEA-3 documents)).

As a legal argument, Cole contends that the first jury's acquittal on the conspiracy counts precludes the application of the enhancement: "to argue that Neil was involved in criminal activity involving five or more participants[] is akin to saying that Neil conspired with five or more participants to commit the charged crimes—a theory that was flatly rejected by the jury . . . ." (Cole Mem. 14). Cole cites no authority for the view that the enhancement only applies to co-conspirators. In fact, as the Application Note 3 makes clear, the Guidelines also direct the Court to consider the "unknowing services of many outsiders" in assessing whether a leadership enhancement applies. Of course, even if the enhancement only applied to co-conspirators, Cole's acquittal on the conspiracy counts would be no bar to application of the enhancement inasmuch as, consistent with the Court's evidentiary rulings, the evidence demonstrated by more than a preponderance of the evidence that Cole did conspire with others. *See, e.g.*, *United States v. Delva*, ("Because the quantum of proof required for a verdict of guilt is higher than the quantum required

for sentencing, it is established that 'a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.'" (quoting *United States v. Watts*, 519 U.S. 148, 157 (1997)); *United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012) ("A district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct."); *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) ("[D]istrict courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct, as long as the judge does not impose (1) a sentence in the belief that the Guidelines are mandatory, (2) a sentence that exceeds the statutory maximum authorized by the jury verdict, or (3) a mandatory minimum sentence under § 841(b) not authorized by the verdict.").

### b. Obstruction of Justice Enhancement

"[A] defendant's right to testify does not include a right to commit perjury." *United States v. Dunnigan*, 507 U.S. 87, 96 (1993). "Under a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines." *Id.* at 98. "To base a § 3C1.1 enhancement for 'Obstructing or Impeding the Administration of Justice' upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Salim*, 549 F.3d 67, 73 (2d Cir. 2008) (internal quotation marks and brackets omitted). "The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence." *United States v. Cassiliano*, 137 F.3d 742, 747 (2d Cir. 1998).

The Court should apply a two-level obstruction of justice enhancement based on Cole's testimony at each of his trials. Cole emphatically denied at both trials that he agreed with GBG in a secret side deal to inflate the purchase price of the SEA JVs in exchange for roundtrip payments that would be disguised as legitimate payments for something else, and that he therefore did not mislead the company's auditors, lie on SEC filings, or defraud the company's investors. (Second Trial Tr. 2342-43). The trial evidence demonstrated beyond a reasonable doubt that Cole's denial was false, and that he committed perjury on the stand (a necessary inference from the jury's verdict).

Cole's testimony was also riddled with more discrete lies. For example, Cole denied working with Jared Margolis, despite the documentary and testimonial evidence of their working relationship. (Second Trial Tr. 2542-43 ("I didn't work with him. I believe Mr. Margolis, after looking through all the documents at this trial, worked very closely with Mr. Horowitz.")). Cole denied being familiar with core terms in the SEA JV deals that he himself negotiated. (Second Trial Tr. 2513-16 (with regarding to puts and calls provisions, "I have no idea where they came from"). Cole not only denied that negotiated roundtrips as part of the SEA JVs, but he denied spending *any* time negotiating SEA-2 (Second Trial Tr. 2375 ("But I spent zero time in negotiating SEA-2. But I was running the company, and we had lots going on, besides what I mentioned before about CAA and the Peanuts movie.")), and he denied recalling anything about the negotiations for SEA-3 (Second Trial Tr. 2384 ("I don't remember a single direct discussion. . . . I don't remember any negotiation in any part of that deal or contract.")). Cole even denied that the "highlights"

section of Iconix's public filings, which referenced the SEA JVs, actually constituted highlights of his company. (Second Trial Tr. 2535-36 ("Q: And they're highlights because they're highlights of your company. Right? A. No. . . .")).

The defendant argues that the enhancement should not apply because he "provided substantially the same evidence at two trials and the jury listening to Neil's testimony in his first trial voted to acquit him of the two-lead conspiracy charges, and did not convict on the remaining charges." (Def. Mem. 15). Of course, the fact that the jury in the first trial did not unanimously find the Government met its burden of proof beyond a reasonable doubt does not answer the question of whether this Court should find, by a preponderance of the evidence, that Cole committed perjury at the first or second trial. Indeed, the jury in the second trial necessarily unanimously determined that Cole perjured himself in finding him guilty beyond a reasonable doubt on eight counts (and thus rejected the core substance of his testimony).

### 2. 3553(a) Factors

The Government submits that a sentence within the applicable Guidelines range is necessary in this case in light of the sentencing factors set forth in 18 U.S.C. § 3553(a), particularly the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct.

#### a. Cole's Fraud Was Calculated, Long-Running, and Sophisticated

Cole engaged in a calculated, long-running, and sophisticated accounting fraud scheme. Cole engineered business deals with inflated prices and secret side deals to meet or exceed important financial metrics on multiple occasions, manipulating information that was highly material to investors. (Second Trial Tr. 590 (Snyder: "Well, we had a saying that a revenue problem is an everything problem.")). For the scheme to succeed, it required extensive planning, knowledge of complex accounting rules and metrics, and precise execution.

Cole's misconduct was not limited to the day the SEA-2 deal was signed in June 2014 or the day the SEA-3 deal was signed in September 2014; rather, his scheme involved months of advance planning for each deal, as well as months spent after those deals working to secretly complete the roundtrip payments to GBG. As demonstrated at trial, Cole carefully tracked Iconix's projected quarterly and annual EPS and earnings on a regular basis leading up to the end of each quarter, and he concocted the SEA JV roundtrips towards the ends of financial quarters when he realized Iconix was going to miss its targets. (*See, e.g.*, Second Trial Tr. 689 (Horowitz); GX 234, 250 (Iconix forecast documents)). Cole also engineered the creation of sham invoices and underlying supporting documents to cover up his conduct. (Second Trial Tr. 878 (Horowitz: Cole directed that sham invoices "needed to look more real in case anybody from accounting would take a look at them")).

Cole's misconduct was not some passing lapse in judgment, but rather an intricately planned fraud. Such conduct merits a serious sentence, to reflect the seriousness of the offense and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A).

### b. Cole Played a Leadership Role in the Criminal Scheme

Cole was also a leader of the accounting scheme. Cole was the moving force behind the accounting fraud, including engineering fraudulent deals, covering them up, making repeated false certifications about Iconix's financial statements, and directing others to help him in these tasks.

### c. Cole Abused His Position of Trust as the CEO of a Public Company

The seriousness of Cole's misconduct is amplified by his position of trust as the powerful CEO of a publicly traded, multi-billion dollar company. Iconix's investors and auditors relied on Cole to ensure that the company's financial statements were honest and accurate. Rather than fulfill that responsibility, Cole used his position to engage in transactions designed to deceive the very same people who placed their trust in Cole. When problems arose at Iconix, rather than take responsibility and handle those problems honestly, Cole lied and looked for "fall guys." (Second Trial Tr. 1006 (Horowitz: "Neil used various people as fall guys or potential fall guys and that included Justin Abrahamson in the meeting that we just talked about, it included Brian Snyderman, it included Jeff Lupinacci. At various points he would define these people as fall guys.")).

### d. Cole Appears to Have Been Motivated by Greed

Cole held large amounts of Iconix stock, and his accounting fraud was aimed at keeping Iconix's stock (and thus Cole's personal assets) at an artificially inflated price. It is difficult to precisely quantify the effect of the fraud on Iconix's stock, but the parties have estimated that it artificially inflated the share price by 2%, netting Cole almost $1 million in extra profits when he sold approximately $40 million worth of Iconix shares during the scheme. As Probation observed, "[w]e can only surmise that this offense was committed out of pure greed, in light of Cole's means and the significant wealth which he amassed during the course of his career." (PSR at 46).

The defendant's sentencing submission notes that the amount of inflated revenue from the scheme was much smaller than Iconix's overall revenues at the relevant times. But that observation cuts both ways. The fact that Iconix had significant legitimate revenue and earnings during the time period of the scheme—even if these legitimate metrics were slightly lower than Wall Street expectations—only highlights the avarice and dishonesty intrinsic to Cole's fraud. Cole could have easily taken the honest path, owning up to his Company's modest financial shortcomings and making more sustainable financial projections. The stock would have declined in value, and missing financial expectations may have bruised Cole's ego and decreased the value of his own stock holdings to some degree, but it would not have been a disastrous event for Iconix or Cole. But Cole did not think the rules applied to him, and he was willing to cheat and lie even about a relatively modest financial shortfall when his own wealth and ego were on the line. Cole appeared obsessed with closing deals that would enable Iconix to meet financial expectations, and he was willing to commit fraud to accomplish this goal. (*See* Second Trial Tr. 1397 (Alford: "There was a focus or an obsession on closing deals by the end of the quarter, by the end of the fiscal year . . ."); Second Trial Tr. 1397 (Alford: "There was a real push to move more quickly than we were comfortable with and to get this deal closed by the quarter end. And that did make me uncomfortable, yes.")). This sort of behavior by the CEO of a public company merits substantial punishment.

### e. Cole Committed Perjury at Two Separate Trials

Separate and apart from the underlying offense conduct, Cole engaged in a brazen act of dishonesty when he perjured himself extensively during his testimony at both of his trials. As discussed above, Cole lied in his testimony about matters both large and small. He lied not only about his participation in the accounting fraud scheme more broadly, but also about working with Jared Margolis or playing any role in the negotiation of the SEA-2 and SEA-3 deals.

A defendant is entitled to put the Government to its proof at trial. But a defendant is not entitled to lie to the jury and the Court during his testimony. Cole's perjury demonstrates his total lack of contrition and his willingness to engage in additional dishonest and illegal acts when he believes it may benefit him.

### f. The Importance of General Deterrence in Corporate Fraud Cases

A substantial sentence is also necessary to afford adequate general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). Cole's crime is all the more troubling because he has led an extraordinarily privileged life. Cole was a fabulously successful businessman and quite wealthy. As demonstrated by the letters submitted along with his sentencing submission, Cole also has a stable and supportive network of friends and colleagues surrounding him. In short, Cole could have lived a comfortable life without resorting to fraud. That fact is relevant to sentencing for at least two reasons. First, it demonstrates the degree to which greed and pride motivated Cole's actions, as opposed to financial desperation or some other motive. Second, it is important for the public to see that defendants of privilege are held to account for serious criminal offenses, in order to promote respect for the criminal justice system. Although the offense conduct here would be egregious regardless of the defendant's background, Cole's conduct is all the more shocking because of his position of privilege. For a defendant with so much support and success—unlike many disadvantaged defendants that come before the Court—to nevertheless choose to commit the charged offenses reflects an uncommon brazenness and greed.

Cole seeks a sentence of probation, but such a sentence would send the wrong message to both Cole and the public about the consequences for high-ranking executives who commit accounting fraud. Such frauds are difficult to uncover and require substantial resources to prosecute. Moreover, individuals who commit fraud often do so on the basis of a cost-benefit analysis—a belief that the likelihood of financial gain outweighs risk of being caught and punished. This combination makes general deterrence an especially important factor in fraud prosecutions. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (citation and internal quotation marks omitted); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). In this context, a significant deterrent message to the defendant and public is necessary.

### g. The Mitigating Factors Do Not Outweigh the Need for a Substantial Sentence

The Government acknowledges the mitigating factors raised by Cole concerning his health issues and agrees that the Court should consider these facts in fashioning an appropriate sentencing. However, the BOP has informed the Government that based on the materials submitted by Cole concerning his medical issues, the BOP would be able to provide appropriate treatment for him. Cole would most likely be designated to one of BOP's federal medical centers, and would likely be classified as a Care 4 inmate, a classification that applies to inmates who have cancer that is being actively treated. Cole has failed to explain why the U.S. Bureau of Prisons would be unable to provide him with appropriate treatment, as it does with respect to other inmates who have similar medical conditions.

### 3. Restitution and Forfeiture

The Government is seeking forfeiture of Cole's estimated gain from the offense conduct, which the parties agree to be approximately $790,200.

The Government agrees with Cole that the Mandatory Victims Restitution Act does not apply in this case because Cole was convicted only of Title 15 offenses. *United States v. Petit*, 541 F. Supp. 3d 304, 306-08 (S.D.N.Y. 2021). However, to the extent the Court believes restitution for any expenses incurred by Iconix is warranted, such restitution may be made a condition of supervised release. *United States v. Adams*, 955 F.3d 238, 250 (2d Cir. 2020) (holding that district courts have the authority to order restitution as a condition of supervised release).

\* \* \*

For the foregoing reasons, the defense's requested probationary sentence would not be sufficient to serve the purposes of sentencing. The Government respectfully submits that the defendant should be sentenced within his Guidelines range of 78 to 97 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Jared Lenow
Justin V. Rodriguez
Andrew Thomas
Assistant United States Attorneys
(212) 637-2591

cc:   Counsel of record (by ECF)