1:19-cr-00869-ER-1

23-7566
*United States v. Cole*

# In the
# United States Court of Appeals
# For the Second Circuit

USDC SDNY

DOCUMENT

ELECTRONICALLY FILED    10/27/2025

August Term, 2024

(Argued: January 30, 2025        Decided: October 27, 2025)

Docket No. 23-7566-cr

UNITED STATES OF AMERICA,

*Appellee,*

–v.–

NEIL COLE, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

B e f o r e :

JACOBS, CARNEY, and NARDINI, *Circuit Judges*.

Defendant-Appellant Neil Cole challenges his convictions after a 2022 jury trial in the United States District Court for the Southern District of New York (Ramos, *J.*) on charges of securities fraud, making false filings with the Securities and Exchange Commission (SEC), and improperly influencing the conduct of audits. He argues that the Double Jeopardy Clause should have precluded the government from trying him for those offenses, because he had been acquitted in a 2021 trial of conspiracy to achieve those same illicit objectives. The District Court erred, in Cole's view, by rejecting his double jeopardy argument and allowing the second trial to go forward.

CERTIFIED COPY ISSUED ON 10/27/2025

The primary question before us is whether the first jury's verdict acquitting Cole of conspiracy "necessarily decided" factual questions that were essential to the government's case against Cole at the second trial. If so, the Double Jeopardy Clause's "issue-preclusion" function should have prohibited Cole's retrial. *See Yeager v. United States*, 557 U.S. 110, 119 (2009). Cole urges that, by acquitting him, the first jury necessarily rejected the theory underlying the government's case on the substantive charges: that Cole inflated the revenue that Iconix reported to investors by making "secret deals" with executives at one of Iconix's business partners to shift money back-and-forth at strategic times. The government offers two narrower interpretations of the jury's verdict; neither, it says, would preclude the second trial.

After a close review of the trial record, we conclude that each of the government's theories would have required the first jury to reach an irrational conclusion unsupported by the evidence in the record. We agree with Cole that the acquitting jury must have doubted that Cole made the alleged "secret deals." Because that theory was essential to Cole's convictions at the second trial, we REVERSE the judgment of the District Court and REMAND with instructions to vacate Cole's convictions on the substantive counts and to dismiss the Indictment.

————————

> JUSTIN V. RODRIGUEZ, Assistant U.S. Attorney (Andrew Thomas, Danielle R. Sassoon, Assistant U.S. Attorneys, *on the brief*) *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for* Appellee United States.
>
> ALEXANDRA A.E. SHAPIRO (Daniel J. O'Neill, Bronwyn C. Roantree, *on the brief*), Shapiro Arato Bach LLP, New York, NY, *for* Defendant-Appellant Neil Cole.

————————

CARNEY, *Circuit Judge*:

Defendant-Appellant Neil Cole challenges his convictions after a jury trial in the United States District Court for the Southern District of New York (Ramos, *J.*) on charges of securities fraud, making false filings with the Securities and Exchange

Commission ("SEC"), and improperly influencing the conduct of audits. He argues that the Double Jeopardy Clause precluded the government from trying him for those offenses, because he had been acquitted in an earlier trial of conspiracy to achieve those same illicit objectives.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." This guarantee is enforced in part through the Clause's "issue preclusion" function, which prohibits the government from "relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." *Yeager v. United States*, 557 U.S. 110, 116, 119 (2009). The prohibition works to preserve the finality of the prior jury's not-guilty verdict and to protect individuals from facing repeated trials for the same conduct.

 Cole was tried twice, once in 2021 and again in 2022, for his alleged participation as Chief Executive Officer ("CEO") of Iconix Brand Group ("Iconix") in what the government calls an "overpayments-for-givebacks" scheme. In both trials, the government's theory was that Cole conspired with Iconix's Chief Operating Officer and executives at one of Iconix's business partners to inflate the revenues that Iconix reported to investors in 2014. To perpetrate this fraud, Cole allegedly agreed with a business partner that, if the business partner would pay Iconix inflated prices for certain assets (the "overpayments"), Iconix would return the excess amounts at a later date (the "givebacks"). Then, the government said, Cole touted the revenue from the inflated deal prices to investors while omitting mention of the promised givebacks.

A grand jury charged Cole by indictment (the "Indictment") with conspiracy to achieve three unlawful objectives: securities fraud; submitting false filings to the SEC; and interfering with the conduct of audits. It also charged the conduct underlying those objectives as substantive offenses. In the 2021 trial, the jury acquitted Cole of the conspiracy charge but was unable to reach a unanimous verdict as to any of the

substantive charges. In 2022, over Cole's objection, the District Court permitted the government to retry Cole on the substantive counts. The second jury, after hearing much of the same evidence as was presented to the first, convicted Cole on each of the substantive counts. Cole now appeals; the District Court has permitted his release on bail pending the outcome of this appeal.

While ordinarily the government may retry a defendant "on any count on which the [original] jury could not agree," Fed R. Crim. P. 31(b)(3), that rule does not automatically hold if the original jury also acquitted the defendant on related charges. *See Yeager*, 557 U.S. at 120–21. Rather, under the Double Jeopardy Clause, if the jury "necessarily decided" an issue in the defendant's favor when it acquitted him, the government is precluded from relitigating that issue. *Id.* at 120.

Our double jeopardy issue-preclusion analysis proceeds in two steps. To begin, we determine which issues, if any, the first jury's not-guilty verdict "necessarily decided" in the defendant's favor. *United States v. Mespoulede*, 597 F.2d 329, 333–34 (2d Cir. 1979). Next, we "examine how that determination bears on the second case." *Id.* at 333. Depending on the issues the first jury decided, we may conclude that its verdict entirely precluded the second trial; that it limited the evidence the government could present in the second trial; or that it had no effect on the second trial at all.

In this appeal, the key question is which, if any, factual questions the first jury's verdict "necessarily decided" in Cole's favor. Cole argues that the sole rational explanation for the first jury's acquittal on the conspiracy count is that it concluded he simply did not make illicit overpayments-for-givebacks deals. The government offers two alternative hypotheses. It proposes first that the jury might have doubted that Cole and his alleged coconspirators actually formed a conspiratorial agreement, without doubting that Cole was guilty of the underlying fraud. Second, it hypothesizes that the jury might have been unable to reach unanimity as to any single criminal object of the

alleged conspiracy, in which event the jury charge directed it to acquit. The District Court was persuaded by the latter theory and on that basis allowed a second trial.

After a close review of the evidence presented to the first jury, we conclude that each of the government's hypotheses is, in the end, implausible. As a practical matter, Cole could not have made and concealed an overpayments-for-givebacks arrangement without persuading a co-conspirator to participate. Nor could the only explanation for the jury verdict be that it split as to the object of the conspiracy, because the three charged objects—securities fraud, deceiving the SEC, and interfering with the conduct of audits—were too closely intertwined.

We therefore decide that the acquitting jury must have determined that Cole did not make agreements to inflate Iconix's revenue fraudulently. And that theory was without a doubt essential to Cole's convictions at the second trial. Accordingly, we REVERSE the judgment of the District Court and REMAND with instructions to vacate Cole's convictions on the substantive counts and to dismiss the Indictment.

## FACTUAL AND PROCEDURAL BACKGROUND

The double jeopardy issue before us "cannot be decided in the abstract." *Mespoulede*, 597 F.2d at 330. Instead, to determine which factual questions the first jury "necessarily decided" in Cole's favor—and the effects that its "necessary" decisions had on the second trial—we must conduct a "a detailed examination of the transcripts of [the] two trials." *Id.* We therefore begin by summarizing the charges against Cole, the evidence presented to each jury, and the relevant procedural history.

## I.    Cole's alleged criminal conduct as CEO of Iconix

Cole founded Iconix, a brand-management company, in 2005, and he spent the next decade as its CEO. Iconix acquires trademarks for well-known brands, often in

fashion. It then licenses those trademarks to retailers that wish to sell products bearing those marks and collects royalties.

When Cole founded Iconix, this business model was innovative. By 2014, Iconix was generating $460 million in royalty income annually and had become the second largest brand licensing company in the world, behind only Disney.

During Cole's tenure as its CEO, Iconix sometimes formed partnerships with international companies experienced in working with retailers in a particular foreign market. It did so by forming joint ventures in which it sold its business partner a geographically limited ownership interest in one of the brands that it controlled. The partner would then make licensing arrangements with retailers in the specified region, and Iconix and the partner shared the resulting royalty payments.

The criminal charges against Cole relate to Iconix's joint ventures with one of its major business partners, Global Brands Group ("GBG"), a Hong-Kong based subsidiary of a major multinational apparel company.[1] The government alleges that Cole arranged fraudulent overpayments-for-givebacks deals when negotiating two joint ventures with GBG involving the Southeast Asia region: a June 2014 joint venture ("SEA-2") and a September 2014 joint venture ("SEA-3").

Both transactions were spinoffs of an initial joint venture between Iconix and GBG, "SEA-1," formed in October 2013. At the first trial, the government argued that

---

[1] Two of the transactions were negotiated with GBG's predecessor corporation, LF Asia. For convenience, we refer to LF Asia and GBG collectively as "GBG." The successor status of GBG does not affect our analysis.

SEA-1 also involved fraudulent overpayments-for-givebacks. The evidence of fraud that it presented concerning SEA-1 was not robust.[2]

In negotiations for both the SEA-2 and SEA-3 deals, the price that GBG was offering and eventually agreed to pay rose substantially shortly before the close of negotiations—by $5 million for SEA-2 (a 54 percent increase) and by $6 million for SEA-3 (a 39 percent increase). The government's theory was that the deal price increased not because GBG had reassessed the value of the licenses it was acquiring, but because Cole had promised to return portions of the payments to GBG at a later date.

Cole structured the deals in this way, the government alleged, to inflate the public revenue figures that Iconix reported to its investors. As a publicly traded company, Iconix was obligated to file quarterly and annual financial statements accurately reporting revenue and other financial data. *See* 15 U.S.C. §§ 78m(a), 78ff. The government portrayed Cole as hyper-focused on the revenue that Iconix reported. Cole believed it was "critical," one government witness testified, that Iconix show its revenue was growing year-over-year. App'x 98. The witness said that Cole had a "how-do-we-get-to-these-numbers mentality." *Id.* at 97 (hyphens added).

Both of the SEA transactions closed shortly before the end of a quarter in 2014: SEA-2 closed on June 30 (the last day of Q2) and SEA-3 closed on September 17 (two weeks before the end of Q3). As the close of each of those quarters approached, the government asserted, Cole feared that Iconix was about to fall short of its revenue goals.

---

[2] Among other problems, the purported "giveback" in SEA-1—a $2 million consultancy payment—was not secret: that part of the deal was documented in a written agreement that Iconix's lawyers sent together with the SEA-2 deal document. In addition, the SEA-1 deal closed at the beginning of the third quarter of 2013, before Iconix was likely to have known whether it needed additional revenue to meet its goals for the quarter. At the second trial, the government chose not to present evidence regarding SEA-1, focusing instead on the SEA-2 and SEA-3 transactions.

Running out of time, he approached his associates at GBG with a proposal, the prosecution charged: GBG would agree to a higher deal price in the joint ventures under negotiation (allowing Iconix to meet its revenue goals), and Cole would secretly arrange to return the excess at a later date (avoiding an adverse effect on GBG's costs).

After striking these deals, Cole allegedly reported the enhanced deal price to investors, using the higher price to demonstrate—falsely—that Iconix's revenue had continued to grow. In Q2 and Q3 2014, for instance, Iconix claimed that it had brought in "record" revenues of $118.9 million (a 3 percent increase over the same quarter in the prior year) and $113.8 million (a 6 percent increase over the same quarter in the prior year), respectively. *Id.* at 47. Without inflating Iconix's revenue through the SEA deals, the prosecution asserted, those numbers would have been $113.9 million and $107.8 million—meaning Iconix would have underperformed relative to the prior year.

To accomplish the whole scheme, of course, it was essential that Cole hide the promised giveback. Therefore, the government claimed, Cole lied about the deals, not only to Iconix's investors, but also to the SEC and the company's auditors. And when it came time to return the overage to GBG, Cole allegedly disguised the payments as legitimate business expenses by persuading his coconspirators at GBG to generate sham invoices for "marketing" costs. *Id.* at 208, 297.

## II.    Indictment

In December 2019, Cole was arrested and charged in the Southern District of New York pursuant to a ten-count Indictment. The grand jury alleged that Cole, as CEO, along with Seth Horowitz, Iconix's Chief Operating Officer ("COO"), conspired to inflate and falsely report Iconix's revenue through the SEA joint venture transactions.

Count 1 of the Indictment (the "Conspiracy Count") charged Cole with engaging in a conspiracy with three unlawful objectives: (1) securities fraud, 15 U.S.C. §§ 78j(b),

78ff; (2) submitting false or misleading SEC filings, *id.* §§ 78m(a), 78ff; and (3) improperly influencing the conduct of audits, *id.* §§ 7202, 7242, 78f. Counts 2–9 (the "Substantive Counts") charged the conduct related to those same objects as substantive offenses: Count 2 charged Cole with securities fraud; Counts 3–8 charged him with making false or misleading SEC filings; and Count 9 charged him with improperly influencing the conduct of audits. Finally, Count 10 (the "Interference Count") charged Cole with "Conspiracy to Destroy, Alter, and Falsify Records in Federal Investigations." App'x 72.

## III.   The 2021 trial

Cole's first trial began on October 5, 2021. Over fourteen trial days, the jury heard from twelve government witnesses and from Cole himself, in presentations we review below.

### A.   The government's case

The government aimed to persuade the jury that, in 2014, Cole had orchestrated two fraudulent overpayments-for-givebacks deals with GBG.[3] Prosecutors described the "central question" in the case as whether Cole made "secret agreements" that obligated Iconix to return part of the stated deal prices to GBG. *Id.* at 453.

The government's case relied primarily on the testimony of three witnesses who allegedly assisted Cole with the fraud: Iconix's former COO (Seth Horowitz) and two GBG executives (Jason Rabin and Jared Margolis). All three of these "insiders," the government urged, "worked hand in hand with [Cole]" to "pull this scheme off" and "cook the books at Iconix." *Id.* at 80. Horowitz, indicted as Cole's co-conspirator, was

---

[3] As explained above, *see supra* note 2, the government also argued that a 2013 joint venture between Iconix and GBG (SEA-1) had involved a similar overpayments-for-givebacks arrangement.

indisputably the government's key witness: he spent all or part of the first five trial days on the witness stand. Before trial began, he pleaded guilty to fraud charges.[4] At trial, he testified pursuant to a cooperation agreement with the government.

Horowitz told the jury that he and Cole worked together to arrange two overpayments-for-givebacks deals with their counterparts at GBG—Rabin and Margolis. By Horowitz's account, Cole led the conspiracy and Horowitz was Cole's "right hand." *Id.* at 165. Horowitz described at great length his conversations with Cole about the deals, *see, e.g., id.* at 105, and their efforts to conceal the givebacks, including by persuading Rabin and Margolis to send fraudulent invoices for "marketing" payments, *see, e.g., id.* at 254–55. Horowitz also testified to Cole's plot to cover up the fraud by destroying incriminating evidence and setting up others to take the blame for the scheme should it come to light. *See, e.g., id.* at 158.

Rabin and Margolis were the New York City-based GBG executives who were alleged to have helped Cole and Horowitz make the necessary arrangements. Upon the government's request, the court issued orders giving them immunity from prosecution for their truthful statements at trial, and compelling them to testify. Rabin and Margolis told the jury that in the SEA-2 and SEA-3 deals, GBG agreed to pay an inflated price because Cole made a firm verbal commitment to return the excess payments at a later

---

[4] Horowitz left Iconix in April 2015, announcing his resignation in a letter to the company's Board of Directors that described the alleged overpayments-for-givebacks scheme. Horowitz wrote that he wanted to bring to the Board's attention "certain accounting issues," including that (1) the deal price for SEA-2 had increased from $10.9 million to $15.9 million because Cole made a "verbal commitment to compensate GBG for $5 million in marketing expenses" in the fourth quarter of 2014; and (2) the deal price for SEA-3 had increased from $15.5 million to $21.5 million after Cole had agreed to release GBG from an unrelated licensing agreement. App'x 1558–59. Horowitz represented in the letter that he did "not know" whether these side agreements were "communicated to [Iconix's auditor] for its consideration." *Id.* at 1559. After receiving Horowitz's letter, the Board informed the SEC of Horowitz's claims, triggering an investigation. Cole left Iconix a few months later.

time. But both also denied that Cole asked them to keep the giveback portion of the deals secret or to omit it from the written contracts. Rabin insisted that he committed no crimes with Cole. At the same time, both executives acknowledged that the refund promises were not reflected in the final versions of the deal contracts.

B.    Cole's defense

Cole's defense was that he never made secret verbal commitments to return part of the SEA-2 and SEA-3 payments to GBG.[5] At trial, defense counsel insisted that "all of the terms of the transaction[s] were in the written contracts." *Id.* at 83. Cole's philosophy, as he explained it in his testimony, was that the terms of any deal must be "in writing and signed by everyone, or else it's just chatter and negotiation." *Id.* at 408; *see also id.* at 437 (Cole testifying that he believed oral agreements were not legally binding, and that at the time Iconix's "practice was not to do oral agreements"). He categorically denied making any undisclosed side agreements with GBG and insisted that he believed Iconix had accurately represented the SEA transactions in its statements to investors, to the SEC, and to Iconix's auditors. Cole declared that the payments the government called "givebacks" had "absolutely no connection" to the SEA-2 and SEA-3 transactions. *Id.* at 409. Instead, Cole explained, the payments were intended to strengthen Iconix's relationship with GBG—one of Iconix's biggest partners, with financial commitments to Iconix exceeding $140 million.

Defense counsel also sought to poke holes in the government's story. For instance, counsel emphasized that the purported giveback for SEA-2 ($5.4 million in payments for "marketing") exceeded the amount of the purported overpayment. And

---

[5] Cole and the government also presented competing evidence regarding SEA-1, which we do not describe here. *See supra* note 2.

counsel pointed out that the purported giveback for SEA-3 (in the form of cancellation of GBG's obligation to pay millions in royalties) was ultimately scrapped by Iconix.

Cole's defense team worked further to discredit Horowitz's testimony, arguing that he had fabricated the entire overpayments-for-givebacks story because he was facing intense scrutiny over his own mistakes as COO of Iconix, and because he felt "slighted and disrespected by [Cole]." *Id.* at 84. Having invented the scheme, defense counsel suggested, Horowitz then decided to cooperate with government investigators to "avoid going to jail." *Id.* at 476. The defense likewise asserted that the government put "immense pressure" on Rabin and Margolis to corroborate Horowitz's account so that they could avoid prosecution. *Id.* at 477.

C.    The jury verdict

The jury began deliberating on October 27, and on November 1, the fourth day of deliberations, it advised the court that it had reached a unanimous verdict on two counts, but was split and at an impasse on the rest. With the court's permission, the jury then entered its verdict on those two counts: not guilty as to the Conspiracy Count (Count 1), and not guilty as to the Interference Count (Count 10), as well. The court gave the jury an *Allen* charge[6] but to no avail: after further deliberations, the jury reported that it was still unable to reach consensus on the eight remaining Substantive Counts. The court accordingly declared a mistrial as to those counts.

---

[6] An *Allen* charge encourages jurors to reach a verdict without forcing them to "abandon[] without reason conscientiously held doubts." *United States v. Ruggiero*, 928 F.2d 1289, 1299 (2d Cir. 1991). Such charges are derived from the jury instructions approved in *Allen v. United States*, 164 U.S. 492 (1896).

IV.    **The 2022 Trial**

Following the verdict, the government informed the court that it intended to seek retrial on the Substantive Counts. The court scheduled the second trial for October 31, 2022.

A.    Cole's *motion in limine*

Before the second trial began, Cole moved *in limine* to exclude "any evidence, statement, or suggestion that Mr. Cole participated in any conspiracy with other individuals." Dist. Ct. Dkt. No. 212 at 4. He argued based on the 2021 acquittal on the Conspiracy Count that the first jury had necessarily decided that "the conspiracy never existed or that [Cole] never joined it." *Id.* at 6. Therefore, he urged, the Double Jeopardy Clause barred the government from introducing evidence at the second trial that would "necessarily indicate [his] participation in the conspiracy." *Id.* (internal quotation marks omitted).

The government disputed the proposition that the not-guilty verdict precluded it from reintroducing any particular evidence. The first jury might have acquitted Cole on the Conspiracy Count, the government hypothesized, because, while jurors believed Cole worked with others to arrange fraudulent deals, they were not persuaded that he formed a conspiratorial agreement with anyone. If so, the government submitted, nothing precluded the second jury from hearing evidence of Cole's collaboration with others on the overpayments-for-givebacks scheme.

In the alternative, the government contested that the first jury necessarily decided that Cole did not participate in the charged conspiracy. It pointed to the jury charge at the first trial, which read: "if you cannot unanimously agree as to *which* of the unlawful objects alleged in the indictment have been proven beyond a reasonable doubt, then you must find Mr. Cole not guilty as to the conspiracy charge." App'x 500

(quoting jury charge at App'x 485–86) (emphasis added). Therefore, the government theorized, the jurors might have unanimously agreed that Cole participated in *some* conspiracy, but acquitted him of the charge for want of consensus as to any particular unlawful object of the conspiracy.

The government emphasized that the "very essence" of the government's theory on the Substantive Counts was that Cole "work[ed] with others as part of a scheme to fraudulently inflate Iconix's revenue . . . and, in the process, lie to the SEC and interfere with audits." *Id.* at 503; *see also id.* at 632 ("[T]he core of the government's theory here is that Mr. Cole agreed with and worked with others to commit the crimes charged in the indictment."). To stop the government from introducing evidence that Cole schemed with Horowitz and others would therefore improperly halt its prosecution of the substantive crimes, it contended.

Cole responded by highlighting what he viewed as the government's concession that it "intend[ed] to essentially present precisely the same theory of the case" in the second trial. Dist. Ct. Dkt. No. 237 at 1. In light of that purported admission, Cole argued, the Court should "construe [his] motion to exclude conspiracy evidence and argument as a motion to bar retrial on the remaining [Substantive Counts]." *Id.* at 2.

The District Court was not persuaded that the first jury's acquittal either precluded retrial or required it to exclude evidence. Based on the unanimity charge, the court was concluded that the "jury could have found beyond a reasonable doubt that . . . Cole participated in a conspiracy, but disagreed over the object of the conspiracy." *Id.* at 634. The modest limitation placed on the government's case at the second trial was that it could use phrases like "community of unlawful intent" and "anything [else it] want[ed]" but not the particular word "conspiracy" itself. *Id.*

B.    <u>Evidence presented at the 2022 trial</u>

On October 22, 2022, approximately one year after the first jury was dismissed, the second trial began.

Both Cole and the government fine-tuned their presentations based on lessons learned at the first trial, certainly, but the record shows the second trial to have been largely a repeat of the first. The government brought back eleven of its twelve original witnesses and added seven new witnesses to bolster its case, as discussed in the margin.[7] Horowitz remained at center stage, joined by Rabin and Margolis.

As in the first trial, the government sought to prove that Cole orchestrated an illicit overpayments-for-givebacks scheme through the SEA-2 and SEA-3 deals. It again portrayed Cole as the leader of the scheme, with Horowitz as his "right hand." *Id.* at 836. On this go-round, however, the government refrained from using the word "conspiracy" and instead used other terms that similarly evoked a joint criminal endeavor. For instance, prosecutors referred to Horowitz and Rabin as Cole's "partners" in the scheme, *id.* at 1098; stated that "Cole and his crew cranked the dirty deal machine into action," *id.* at 1089; and argued that Cole recruited Rabin and

---

[7] The sole witness not recalled was a paralegal in the U.S. Attorney's Office. The seven new witnesses were: a paralegal in the U.S. Attorney's Office who read several exhibits into the record; an FBI agent who testified to the accuracy of several charts that the government introduced as exhibits; an employee of Iconix's European joint venture who testified to how Iconix ordinarily reimbursed marketing expenses (in contrast to how Cole handled the GBG marketing invoices in Fall 2014); Iconix's Head of International who also told the jury about (among other things) how Iconix handled marketing invoices for joint ventures; a System Controller at GBG, who testified about the marketing invoices that GBG sent to Iconix in Fall 2014; Iconix's Director of Investor Relations, who explained how Cole handled quarterly SEC filings, investor earnings calls, and press releases; and Iconix's Deputy General Counsel, who testified that Cole would "move [transactions] more quickly than [the legal team was] comfortable with" so that Iconix could close deals by the end of the quarter. 2022 Trial Tr. 1415.

Margolis because he knew they would be "enthusiastic participants in the crime," *id.* at 1116. But these phrases are mere thesaurus entries for "conspiracy."

C.    Verdict and sentencing

After hearing twelve days of evidence and argument, the jury unanimously convicted Cole on all eight Substantive Counts. The District Court sentenced Cole to 18 months' imprisonment, to be followed by three years' supervised release, and ordered forfeiture of $790,200.

Cole timely appealed. With the government's consent, the District Court granted bail pending appeal.

**DISCUSSION**

Our focus here is on the issue-preclusion rule that courts have derived from the Double Jeopardy Clause. As described above, the rule prohibits the government from "relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial."[8] *Yeager*, 557 U.S. at 119 (2009). Cole's primary argument in this appeal is that, in light of his acquittal on the Conspiracy Count in the first trial, the District Court erred by allowing the government to retry him on the Substantive Counts.

**I.    Legal Standard**

We review the District Court's double jeopardy ruling de novo. *United States v. Zemlyansky*, 908 F.3d 1, 9 n.3 (2d Cir. 2018). As previewed, to evaluate whether issue preclusion bars a subsequent prosecution, we conduct a two-step analysis. First, we determine which issues, if any, the first jury's verdict "necessarily decided" in the

---

[8] The Double Jeopardy Clause also has a "claim preclusion" rule, designed to prevent the government from prosecuting and punishing a defendant doubly for a single offense. *See Blockburger v. United States*, 284 U.S. 299 (1932). It is not at issue here.

defendant's favor. *Mespoulede*, 597 F.2d at 334. Second, we "examine how that determination bears on the second case." *Id.* at 333.

At the first step, the defendant bears the burden of persuading the court that the initial jury verdict necessarily decided an issue in his favor. *United States v. Hicks*, 5 F.4th 270, 276 (2d Cir. 2021). This burden is, in practice, a "heavy" one: it is often difficult to pinpoint a single factual finding behind a jury's acquittal. *United States v. Clark*, 613 F.2d 391, 400 (2d Cir. 1979). This is particularly true where the acquitted charge is conspiracy. Many conspiracy charges are complex—they may involve many participants, several different theories about the objectives of the conspiracy, and multiple overt acts.

Although attempting to derive a single definitive meaning from a conspiracy acquittal can be an "onerous" task, *Clark*, 613 F.2d at 400, it need not always be, *see, e.g.*, *Sealfon v. United States*, 332 U.S. 575 (1948) (holding that conspiracy acquittal precluded subsequent retrial on substantive count). As in any issue-preclusion analysis, we should not "strain[] to postulate hypertechnical and unrealistic grounds on which the jury could conceivably have rested its conclusions." *Mespoulede*, 597 F.2d at 333 (internal quotation marks omitted). Instead, to determine the preclusive effect of the first jury's verdict, we set our inquiry "in a practical frame and [conduct our review] with an eye to all the circumstances." *Ashe v. Swenson*, 397 U.S. 436, 444 (1970). This requires us to closely consider "the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter." *Id.*; *see also United States v. Kramer*, 289 F.2d 909, 913 (2d Cir. 1961).[9]

---

[9] The transcript of the first trial spans some 2,600 pages. The government made our review of this record more challenging by citing to the presentence investigation report ("PSR"), rather than the trial transcript, in its description of Cole's alleged criminal conduct. *See* Gov't Br. 3–14.

If our review establishes that the first jury necessarily decided an issue in the defendant's favor, we proceed to the next step: "examin[ing] how that determination bears on the second case." *Mespoulede*, 597 F.2d at 333. If the first jury necessarily decided an issue that would be an "essential element" of the government's case at the second trial, the government may be precluded entirely from retrying the defendant. *Hicks*, 5 F.4th at 275 (quoting *Yeager*, 557 U.S. at 123). Or, if the issue necessarily decided was relevant but not essential to the government's case, the Double Jeopardy Clause may instead operate as an exclusionary rule: the government will be precluded from reintroducing evidence "for the specific purpose of proving conduct of which [the defendant] was previously acquitted." *Zemlyansky*, 908 F.3d at 13; *see also Mespoulede*, 587 F.2d at 333. Finally, where the government does not "seek to reuse . . . evidence for [that] specific purpose," the first verdict may have no effect on the second trial at all. *Hicks*, 5 F.4th at 277 (internal quotation marks omitted).

At both *Mespoulede* steps, the fact that the jury was unable to reach a decision on a count does not enter into our analysis, because the jury "speaks only through its verdict." *Yeager*, 557 U.S. at 121. Any failure to reach a verdict "cannot—by negative implication—yield a piece of information that helps put together the trial puzzle." *Id.*

## II.    What did the first jury necessarily decide?

Cole and the government present diametrically opposed theories as to the issues the first jury "necessarily decided" in acquitting Cole on the conspiracy charge. As we have explained, Cole contends that the first jury could have acquitted him on the Conspiracy Count only if it doubted the story at the heart of the government's case: that Cole made fraudulent overpayments-for-givebacks deals with GBG. The government

---

The PSR was prepared only after Cole's second trial, of course, and was never before either jury. It therefore has little if any bearing on the question before us.

counters with two alternative interpretations of the first jury's verdict: (1) the jury might have concluded that Cole's coordination with Horowitz, Rabin, and Margolis "did not amount to an *unlawful agreement*"—a requirement for a conspiracy conviction, Gov't Br. 30 (emphasis added); or (2) the jury might have been unable to reach consensus as to a single objective of the conspiracy, even though all twelve jurors believed Cole had entered into some type of illicit agreement. If the jurors were unable to settle on any single objective, the jury charge directed jurors to acquit Cole.

For the reasons explained below, we agree with Cole's interpretation of the jury verdict and reject each of the government's alternative explanations as implausible.

### A. The obvious explanation for the jury's verdict is that it was not persuaded that Cole made fraudulent overpayments-for-givebacks deals

To convict Cole of conspiracy, the first jury was required to find beyond a reasonable doubt that (1) Cole and one or more people agreed to achieve one of the three unlawful objects charged in the Indictment;[10] (2) Cole knowingly participated in the conspiracy; and (3) one or more members of the conspiracy committed an overt act in furtherance of the conspiracy. *See United States v. Allen*, 788 F.3d 61, 70 (2d Cir. 2015); App'x 485–86 (jury charge instructing the first jury as to these elements).

Despite the many facets of the Conspiracy Count, the dispute before the jury was relatively simple: whether the government had proved that Cole made undisclosed verbal deals with GBG to inflate Iconix's revenue. The government argued that Cole worked closely with Horowitz and others to arrange overpayments-for-givebacks deals;

---

[10] As a reminder: the charged objects of the conspiracy were securities fraud, submitting false and misleading filings to the SEC, and interfering with the conduct of audits. As pertinent here, the jury could convict Cole of conspiring to achieve these objects only if it concluded he intended to make materially false or misleading representations to the relevant parties, *i.e.*, investors, the SEC, or Iconix's auditors.

Cole denied doing so. Indeed, the government stressed to the jury that the "central question in [the] case" was: "Were there secret agreements? Did Mr. Cole strike dirty deals? And was there a scheme for overpayments and givebacks?" App'x 453.

Many of the other relevant facts were not in dispute. For instance, the government conclusively established that the deal prices for SEA-2 and SEA-3 increased shortly before the deals closed, and that the increased prices helped Iconix meet its quarterly revenue goals for Q2 and Q3 2014. Cole admitted that meeting the quarterly goals could affect Iconix's stock price. He further admitted that, as CEO, he could not engage in a transaction purely to inflate reported revenue and that any commitments Iconix made should be reflected in the company's books and records and disclosed to its auditors.

It was likewise clear that no reference to any agreement to return part of the purchase price appeared in Iconix's books, in its public statements to investors, in its filings with the SEC, or in its submissions to its auditors. The government also proved that, in December 2014, Cole approved payments by Iconix to GBG that were denoted on invoices as "marketing" reimbursements. It further established that, in Fall 2014, Iconix considered cancelling a licensing agreement that obligated GBG to make millions in royalty payments to Iconix.

Because many of the relevant facts were undisputed, Cole and the government focused at trial on the factual question of whether Cole had made undisclosed verbal commitments to return money to GBG. *See, e.g. id.* at 79 (government arguing in opening that Cole made "a series of dirty deals with one of Iconix's biggest business partners"); *id.* at 81 (defense arguing in opening that "[t]here were no commitments or obligations other than what was in the contracts" and "[t]here were no secret agreements or secret side deals"); *id.* at 456 (government arguing in closing that there was "overwhelming proof that [Cole] was doing secret side deals"); *id.* at 468 (defense

arguing in closing that "[t]here was no commitment or obligation undertaken by
Iconix" outside the terms agreed to in the SEA deal documents).

The intuitive explanation for the acquittal, then, is simply that the jury had
reasonable doubt that Cole formed the alleged verbal commitments. Therefore, when
the jury acquitted Cole on the Conspiracy Count, the parties would expect that the jury
resolved this "central question" in Cole's favor. The government nevertheless offers two
alternative hypotheses, which we now address.

B.    Cole's acquittal cannot be explained by the hypothesis that the jury found
      no conspiratorial agreement but did find collusive behavior

To start, the government submits that the jury might have acquitted Cole on the
Conspiracy Count because "the jury simply regarded the evidence as insufficient to
prove [a conspiratorial] agreement." Gov't Br. 26 (quoting *United States v. Jackson*, 778
F.2d 933, 940 (2d Cir. 1985)). But, the government says, the jury could still have believed
Cole was guilty of the Substantive Counts: it might have "agreed that Cole did not enter
an unlawful agreement with Horowitz, Rabin, or Margolis, [but] . . . found that their
coordination amounted to one or all three witnesses aiding and abetting Cole's
commission of the scheme, or vice versa, or that Cole perpetrated the crimes alone." *Id.*
at 25–26.[11]

---

[11] Conspiracy liability and aiding and abetting liability are "separate and distinct." *United States
v. Tyler*, 758 F.2d 66, 70 (2d Cir. 1985). A conspiracy—as the trial judge here defined that term
for the jury—is "an agreement or understanding to violate other laws." App'x 483. To establish
the existence of a conspiracy, the government must show that "two or more people explicitly or
implicitly came to an understanding to achieve [a] specified criminal objective." *Id.* at 485. As
the use of the word "implicitly" tells us, the agreement need not be an "express or formal one"
to suffice. *Id.*; *see United States v. Amiel*, 95 F.3d 135, 144 (2d Cir. 1996) (explaining that "a tacit
understanding will suffice to show agreement for the purposes of a conspiracy conviction").

Unlike conspiracy, aiding and abetting is not a distinct criminal offense. *See United States v.
Delgado*, 972 F.3d 63, 74–75 (2d Cir. 2020). Instead, it is a theory of liability that allows a
defendant to be found guilty of a substantive offense if he "helps someone else [successfully]

Thus, the government contends, the jury might have acquitted Cole on the Conspiracy Count because it was not persuaded beyond a reasonable doubt that Cole and at least one other person "explicitly or implicitly came to an understanding to achieve [a] specified objective," as required for a conspiracy conviction. App'x 485. But this, in the government's view, would not necessarily preclude the jury from concluding that Cole was guilty of the Substantive Offenses. The government offers three hypothetical jury findings that would result in this outcome: (1) that Cole acted alone in committing the Substantive Offenses; (2) that Cole was aided and abetted by Horowitz but did not conspire with him; and (3) that Horowitz committed the substantive offenses, and Cole aided and abetted him. We address each hypothetical in turn.

*Hypothetical 1: The jury found that Cole acted alone.* First, the government posits, the jury could have concluded that Cole "perpetrated [the substantive offenses] alone." Gov't Br. 26. This would be true if, for example, Horowitz, Margolis, and Rabin assisted Cole in negotiating the deals but lacked any criminal intent.

Based on the evidence presented at the first trial, it is plausible enough that the jury believed Cole committed the substantive offenses without the knowing assistance of either Rabin or Margolis. Neither admitted to acting with the intent to defraud Iconix's investors, to deceive the SEC, or to mislead auditors. There was no evidence that either kept tabs on how Iconix described the SEA deals in press releases, earnings calls, SEC filings, or submissions to auditors. Indeed, Rabin denied during cross-examination that he had committed any crimes with Cole. Further, both Rabin and

_____

commit" that offense. 2021 Trial Tr. at 2547. A defendant is guilty of aiding and abetting if he "associate[s] himself" with another person's criminal venture, "participate[s]" in it, and seeks "by his actions to make [the] criminal venture succeed." *Id.* at 2548. The government need offer no proof that the defendant formed an agreement of any kind. *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975).

Margolis told the jury that Cole never asked them to keep the overpayments-for-givebacks deals secret. That testimony, if credited, suggests that neither may have believed Cole was perpetrating a fraud. Based on this evidence, the jury might have doubted the government's position that "Rabin and Margolis were knowing members of the specific criminal conspiracy with the specific criminal goals charged in [the Conspiracy Count]." Gov't Br. 29.

We struggle to see how Cole might have managed the scheme without conspiring with Horowitz, however. According to the government's theory, the jury would need to conclude both that: (1) Cole *did not* conspire with Horowitz; and (2) Cole *did* arrange fraudulent overpayments-for-givebacks deals. No reasonable jury could simultaneously reach both conclusions based on the evidence at the first trial.

As an initial matter, if the jury determined that Cole and Horowitz did not form an agreement, it must have disregarded all (or nearly all) of Horowitz's testimony. Horowitz insisted that he was a knowing and active participant in a scheme organized by Cole to defraud investors and deceive the SEC. *See* App'x 165 ("I was a part of this fraud. I helped negotiate these deals. I hid the information from the finance team and from the legal team. I was Neil's right hand in this."); *id.* at 167 ("I pled guilty to committing fraud, being a part of a conspiracy to commit fraud, to inflating revenue, and making false statements to the SEC . . . . I am guilty of those crimes."). Over five days of testimony—spanning nearly 700 pages of the trial transcript—Horowitz detailed how he and Cole worked together to arrange the alleged overpayments-for-givebacks deals. If the jury believed even a fraction of Horowitz's account, it would have concluded that he and Cole formed a conspiracy.[12]

---

[12] The government points out that the jury was instructed that it could "find that a witness testified falsely in one part" and "still accept his or her testimony in other parts." 2021 Trial Tr.

The government speculates that the jury might have disregarded Horowitz's testimony and still convicted Cole based on the other evidence before it, such as the emails Cole received from Horowitz and others and the testimony of Rabin and Margolis. Given the central role that Horowitz played at trial, this theory too strikes us as implausible. But even if we accept the premise, the argument has a deeper flaw: the government's remaining evidence also incriminated Horowitz in the scheme. For instance, the government presented a large volume of supposedly incriminating emails regarding the SEA transactions, and Horowitz was either the author of or a recipient of nearly all of them. On some of the emails, Cole was not copied at all (although Horowitz claimed to have kept Cole apprised). The emails also establish that Horowitz played an indispensable role in both SEA negotiations, a fact that the testimony of Rabin and Margolis further supported.

Simply put, Horowitz's fingerprints were all over the SEA transactions. Whether or not the jury believed Horowitz's testimony, it is simply inconceivable, based on the evidence presented at the trial, that the jury would find an unlawful overpayments-for-givebacks scheme run by Cole and not believe that Horowitz was part of it.

*Hypothetical 2: The jury found that Horowitz aided and abetted Cole.* The government's related hypothesis is that the jury concluded that Horowitz aided and abetted Cole's criminal conduct but did not conspire with Cole. Once again, this theory is divorced from the trial record. The scheme alleged is not of the sort that Horowitz could have "aided" absent an at-least-implicit agreement with Cole. It required Horowitz to represent Cole's position in deal negotiations and carefully hide the terms of the final deals from Iconix's investors, its auditors, and the SEC. The government's

---

at 2571. But the thrust of Horowitz's testimony was that he conspired with Cole. If the jury disbelieved that part of Horowitz's account, the government has not explained what remnants of his testimony, if any, would be useful to its case.

own hypothetical—*i.e.*, a scenario in which the jury believed that Horowitz "aided and abetted Cole by negotiating the overpayments-for-giveback[s] agreements on his behalf"—reveals the argument's deficiency. If Horowitz negotiated the "dirty deals" on Cole's knowing behalf, the only reasonable inference is that they conspired together.

*Hypothetical 3: The jury found that Cole aided and abetted Horowitz.* The government's final hypothetical is the inverse: that the jury believed it was *Horowitz* who led the overpayments-for-givebacks scheme, and Cole merely aided and abetted (but never made any agreement with) him. For example, the government says, the jury might have concluded that Cole aided and abetted Horowitz's fraud by signing Iconix's letters to the SEC. Gov't Br. 30.

In its brief on appeal, the government spends little time developing this theory or supporting it with citations to relevant record evidence. This is unsurprising, because the hypothesis directly contradicts a central premise of the government's case: that Cole was the "man in charge" of the scheme. *See, e.g.*, App'x 78 (government's opening in the first trial: "[Cole] was the CEO of Iconix, the man in charge . . . . [H]e orchestrated a scheme from the top to cook the books of the company"); *id.* at 1117 (government's closing in the second trial: "Cole was the CEO. He was the man in charge."). Indeed, all the government's key witnesses named Cole as a leader of the scheme.

We have sometimes determined that a conspiracy acquittal did not bar retrial on a substantive count where a defendant was alleged to have played a "relatively peripheral role in the conspiracy." *Jackson*, 778 F.2d at 941; *see also United States v. Clark*, 613 F.2d 391, 394 (2d Cir. 1979) (same where defendant was accused of joining a scheme that another individual "organized and principally directed"). In such cases, we have said, a jury could have reasonably inferred that the defendant committed the substantive offenses without joining the conspiracy. But here, the government has not

portrayed Cole as a peripheral participant in the scheme, and no jury could have believed he was unless it rejected the government's proof.

In sum, each of the government's hypotheticals is unrealistic. The jury could not rationally find that Cole participated in an overpayments-for-givebacks scheme—either as the leader of the scheme or as Horowitz's aider-and-abetter—without joining a conspiracy. At minimum, to find that Cole participated in the scheme, the jury must have believed that Cole conspired with Horowitz.

C.    Cole's acquittal on the conspiracy count cannot be explained by a jury split as to the conspiracy's object.

The government proposes a very different hypothesis, which the District Court accepted in a brief oral ruling: that the jury acquitted Cole on the Conspiracy Count because it "found beyond a reasonable doubt that [Cole] participated in a conspiracy but disagreed over the object of the conspiracy." Gov't Br. 23 (quoting District Court oral ruling at App'x 634). This theory relies entirely on a single sentence of the charge given to the jury during the first trial. But when we set the jury charge "in a practical frame and view[] [it] with an eye to all the circumstances of the proceedings," *Sealfon*, 332 U.S. at 579, the government's argument falls apart.

As the reader will recall, the government charged Cole with participating in a conspiracy that had three objects: securities fraud; submitting false or misleading filings to the SEC; and interfering with the conduct of audits. When the government charges a conspiracy with multiple objects, the jury is permitted to convict the defendant on the conspiracy charge only if it "unanimously agree[s] on the object the defendant conspired to bring about." *United States v. Sharpsteen*, 913 F.2d 59, 62 (2d Cir. 1990); *see also United States v. Patino-Prado*, 533 F.3d 304, 311 (5th Cir. 2008) (collecting cases from several Circuits "holding that when the government charges a defendant with a multi-

object conspiracy, the jury must unanimously agree as to at least one object of the conspiracy in order to return a conviction" (internal quotation marks omitted)).

In the charge it gave at the first trial, the District Court instructed accordingly that the jury "must find [Cole] not guilty as to the conspiracy charge" if it was unable to "unanimously agree as to which of the unlawful objects alleged in the indictment have been proven beyond a reasonable doubt." App'x 485–86. The court's entire unanimity charge as to the Conspiracy Count was as follows:

> Although the finding of one unlawful object is sufficient to satisfy the illegal purpose element, I instruct you that you must unanimously agree on which object, if any, was the specific object or objects alleged in the conspiracy. If the government fails to prove beyond a reasonable doubt that at least one of the unlawful objectives alleged in Count One was in fact an objective of the conspiracy, or *if you cannot unanimously agree as to which of the unlawful objects alleged in the indictment have been proven beyond a reasonable doubt, then you must find Mr. Cole not guilty as to the conspiracy charge.*

*Id.* (emphasis added).[13]

---

[13] Other courts have formulated the conspiracy charges differently in a material respect. For example: "If you cannot unanimously agree as to which of the unlawful objects alleged in the indictment have been proven beyond a reasonable doubt, then you *may not find the defendant guilty*." *United States v. Block*, No. 16-cr-00595 (S.D.N.Y. June 29, 2017) (Dkt. No. 146 at 239) (emphasis added). Under that articulation, if all jurors agree that the defendant is guilty of conspiracy but cannot agree as to any single object of the conspiracy, the jury has hung, and the court would declare a mistrial; it would not direct the jury to enter a not-guilty verdict.

The trial judge here used the phrase "you must find [the defendant] not guilty," App'x 486, instead of "you may not find the defendant guilty." Other district courts have done the same over time. *See, e.g.*, *United States v. Sabatu*, 891 F.2d 1308, 1326 n.5 (7th Cir. 1989) (discussing the former type of charge); *United States v. Grigsby*, 111 F.3d 806, 834 n.49 (11th Cir. 1997) (same). Both Cole and the government proposed instructions with language similar to the formulation used by the District Court, and neither Cole nor the government has taken issue with it on appeal.

The question before us is therefore whether, based on the instruction, the jury might have split about the object of the conspiracy and for that reason alone acquitted Cole of the conspiracy charge.

The government contends that a reasonable jury could have "divided about the principal objective on which the coconspirators had agreed." Gov't Br. 24. Perhaps, the government suggests, "some jurors . . . concluded that Cole conspired with Rabin and Margolis to defraud Iconix investors, but that Rabin and Margolis (who worked at GBG) were unaware of Cole's dealings with Iconix's auditors and the SEC." *Id.* at 25. Still other jurors, the government urges, might have believed that "Cole acted alone in defrauding his investors, but conspired with Horowitz to deceive Iconix's auditors or the SEC." *Id.* In this hypothetical, the alleged conspiracy would have no single object as to which all twelve jurors agreed. Therefore, following the court's directive, the jury would have had to vote to acquit.

This theory has an evident defect, however: it requires at least one juror to have concluded that a conspiracy existed but that it did not have securities fraud as an object. Recall, again, that the government's charged conspiracy had three objects: securities fraud, submitting false or misleading filings to the SEC, and interfering with the conduct of audits. If the jury unanimously agreed that Cole conspired with others to achieve at least one object (*i.e.*, securities fraud), it would have convicted him of conspiracy. On this theory, then, some jurors must have concluded that Cole and his coconspirators agreed to deceive the SEC or Iconix's auditors but did *not* agree to commit securities fraud. That would be a strange conclusion indeed, since the

---

So, although we note the meaningful variation, our decision to reverse the conviction means that we need not examine further whether the jury instruction was erroneous and, if so, to what effect.

government's case tightly linked Cole's alleged lies to the SEC and auditors to the charged securities fraud.[14]

The government has had several opportunities to explain why the coconspirators would go through the trouble of lying to the SEC and to Iconix's auditors if not to deceive investors. It has yet to do so, and no answer is evident from the record. During the first trial, the government argued that Cole submitted false filings to the SEC and to Iconix's auditors *in order to facilitate* the securities fraud. Deceiving the SEC and impeding Iconix's auditors were, as Cole puts it, "subsidiary means to effect securities fraud, not . . . ends in themselves." Cole Br. 35.

At oral argument in our Court, the government attempted to substantiate its split-jury theory by explaining how a juror might have believed that the sole object of the conspiracy was to deceive Iconix's auditors. *See* Oral Argument at 18:48–19:03. The government pointed to trial testimony given by Iconix's head auditor, Larry Shapiro, that he "previously instructed Mr. Cole about roundtripping and how it violated the applicable accounting rules." *Id.* at 19:37–:52.[15] So, the government supposed, some jurors might have concluded that Cole and his coconspirators viewed the inflated

---

[14] Another possibility, not raised by the government, is that some jurors thought Cole was innocent on the Conspiracy Count because they did not think the conspirators agreed on *any* of the illegal objects charged in the Indictment. When a jury is split as to the defendant's guilt on a count, it is ordinarily considered a hung jury. But taking a strained reading of the jury charge, one could perhaps say that the jury acquitted because it was unable to "unanimously agree as to which of the unlawful objects alleged in the indictment [had] been proven beyond a reasonable doubt." App'x 485–86. We need not decide whether this theory is plausible, however, because the government has not contended that it is.

[15] Shapiro testified that in 2011, auditors were concerned that one of Iconix's transactions included a "roundtripping event," that is, an event where money moved back and forth between two companies in a circle. 2021 Trial Tr. 1698–99. At that time, Shapiro said, members of Iconix's management (including Cole) met with the auditors and were informed about the sensitivity of roundtrip transactions and how to properly account for them.

revenue as material to auditors (who were focused on technical accounting rules), but immaterial to investors (who looked at multiple metrics to evaluate the company's performance, the evidence showed). *Id.* at 20:08–22:15. Therefore, it contends, the conspirators might have aimed to materially mislead only Iconix's auditors.

But when the government was pressed to explain *why* Cole and his coconspirators would bother trying to deceive the auditors if the goal was not to defraud investors, it had no answer. *Id.* at 22:16–27:08. It reiterated that Cole wanted to "get past the auditors" so that Iconix could report inflated revenue. *Id.* at 26:15–:33. Counsel identified no record evidence, however, that Cole and his coconspirators viewed getting past Iconix's auditors as anything but an instrumental part of their fraud. No reasonable jury could find that Cole—let alone his coconspirators—would concoct and carry out an elaborate criminal scheme simply for the thrill of evading Iconix's auditors.

Thus, we do not think the erroneous jury instruction offers a plausible explanation for the jury's decision to acquit Cole of the conspiracy charge. The government's hypothesis is a "hypertechnical and unrealistic" one; no reasonable jury could have decided the case on any of the grounds that the government proposes. *Mespoulede*, 597 F.2d at 333.

## III.    What effect did the first jury's verdict have on the second trial?

Having rejected as unrealistic each of the government's hypotheses for the jury's verdict, we are left with one plausible option: the jury "necessarily decided" that Cole never made verbal commitments to return to GBG part of the purchase price that it paid for SEA-2 and SEA-3. We therefore turn to the second stage of the analysis: examining "how [the jury's] determination bears on the second [trial]." *Mespoulede*, 597 U.S. at 333.

Here, this portion of the analysis is simple. The government admits that its case at the second trial relied on the theory that Cole formed fraudulent overpayments-for-givebacks agreements. Evidence of his participation in those agreements was indisputably essential to Cole's convictions on each of the Substantive Counts. The conspiracy charge acquittal rejected the government's interpretation of the evidence. Accordingly, the Double Jeopardy Clause barred Cole's retrial, and his convictions must be reversed.

## CONCLUSION

For the reasons described above, we **REVERSE** the judgment of the District Court and **REMAND** with instructions to vacate Cole's convictions on the Substantive Counts and dismiss the Indictment.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit